UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CIV-UNGARO-BENAGES

CASE NO: _____ **00-6151**

JOYCE WILLIAMS, MICHAEL
FERGUSON, JOSEPH PATRICK
MCMULLEN, DELORES OKONMAH,
BERNICE SHORTER-MEARES,
CONSTANCE ECHEBIRI, MIA DAWN
TAYLOR, CARMITA McMULLEN, KIM
COLSTON, LESTER HENDERSON, and
JOSEPH SMITH, Individually, and on behalf
of all other persons similarly situated,

Plaintiffs,

v.

WALGREEN COMPANY,

Defendant.

_____/

**COMPLAINT - CLASS ACTION**

MAGISTRATE JUDGE
BROWN



## COMPLAINT - INJUNCTIVE RELIEF SOUGHT AND DEMAND FOR JURY TRIAL

Plaintiffs, JOYCE WILLIAMS, MICHAEL FERGUSON, JOSEPH PATRICK

MCMULLEN, DELORES OKONMAH, BERNICE SHORTER-MEARES, CONSTANCE

ECHEBIRI, MIA DAWN TAYLOR, CARMITA MCMULLEN, KIM COLSTON, LESTER

HENDERSON, and JOSEPH SMITH, individually, and on behalf of all other persons similarly

situated (hereinafter referred to as "PLAINTIFFS" or "the CLASS"), bring this class action against

WALGREEN COMPANY (hereafter referred to as "WALGREENS") under federal and state laws

prohibiting discrimination in employment on the basis of race. PLAINTIFFS allege:

## JURISDICTION AND VENUE

1.      This Court has original jurisdiction of PLAINTIFFS' claims pursuant to 28 U.S.C. § 1331, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981. This Court has supplemental jurisdiction over PLAINTIFFS' claims pursuant to 28 U.S.C. § 1367 as PLAINTIFFS' state law claims under the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.* are so related to PLAINTIFFS' claims under federal law in that they form part of the same case or controversy.

2.      This Court also has supplemental jurisdiction over a companion discrimination charge on the basis of age included within Plaintiff, JOYCE WILLIAMS' EEOC charge pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*

3.      Venue is appropriate in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. §§ 1391(b)-(c) and 42 U.S.C. §2000e. Many of the unlawful employment practices hereinafter alleged have been committed in the Southern District of Florida, and a majority of the named PLAINTIFFS reside within the Southern District of Florida.

## I. INTRODUCTION

4.      This is a class action for damages and injunctive relief brought by current and former Black pharmacists of WALGREENS, individually, and on behalf of all other Black pharmacists who on the basis of their race are, have been, continue to be, or may in the future be adversely affected by WALGREENS' continuing policy and pattern or practice of race-based discriminatory treatment of its Black pharmacists. This systemic discriminatory treatment is manifested by such policies and patterns or practices as denying Black pharmacists promotional opportunities such as the opportunity to advance into the Pharmacy Supervisor or Store Manager positions; disciplining Black pharmacists

-2-

more severely than non-Black pharmacists are disciplined for committing the same infractions; continually and repeatedly promoting less qualified, non-Black pharmacists to Pharmacy Supervisor or Store Manager positions over Black pharmacists who were and are more qualified to serve as Pharmacy Supervisors or Store Managers despite the Black pharmacists' expressed desires and expectations for promotion; continually and repeatedly informing only non-Black pharmacists about Pharmacy Supervisor or Store Manager positions within WALGREENS as well as other benefits and conditions of employment on the same terms applied to non-Black pharmacists.

5.     In addition, WALGREENS channels its Black pharmacists into undesirable, poor-performing and/or high-crime stores that limit or hinder opportunities for promotion; deters Black pharmacists from seeking promotions, management positions and desirable job assignments; fails to hire Black pharmacists into any positions beyond Pharmacy Manager; fails to hire Black pharmacists into the Pharmacy Supervisor positions; fails to hire Black pharmacists into the Store Manager positions; fails to hire Black pharmacists as Pharmacy Managers or Store Managers in its more desirable, low-crime or affluent-area stores; and fails to effectively enforce policies prohibiting race discrimination.

6.     The illegal policy and pattern or practice of race discrimination described above has been furthered by subjective decision-making by a predominately non-Black supervisory and managerial workforce. This pervasive, subjective and race-biased decision-making constitutes discriminatory terms and conditions of the employment contract and has had an adverse impact on Black pharmacists and Black employees as a whole, and is a continuing violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981, and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*

-3-

## II. PARTIES

### Plaintiffs

7.    JOYCE WILLIAMS is a Black pharmacist who has been employed with WALGREENS as a Pharmacist from 1994 until present. JOYCE WILLIAMS graduated with a Bachelor of Science degree in pharmacy from Florida A&M University in 1977. JOYCE WILLIAMS is *sui juris,* over the age of 40, and otherwise competent. JOYCE WILLIAMS is a resident of Hillsborough County, Florida.

8.    MICHAEL FERGUSON is a Black pharmacist who has been employed with WALGREENS as a Pharmacy Intern, Pharmacist and Pharmacy Manager from 1982 until present. MICHAEL FERGUSON graduated with a Bachelor of Science degree in pharmacy from Xavier University in 1984. MICHAEL FERGUSON is *sui juris,* over the age of 18, and otherwise competent. MICHAEL FERGUSON is a resident of Broward County, Florida.

9.    JOSEPH PATRICK MCMULLEN is a Black pharmacist who was employed with WALGREENS as a Pharmacy Intern, Pharmacist and Pharmacy Manager from 1993 until August 1998. JOSEPH PATRICK MCMULLEN graduated with a Bachelor of Science degree in pharmacy from Florida A&M University in 1993. JOSEPH PATRICK MCMULLEN is *sui juris,* over the age of 18, and otherwise competent. JOSEPH PATRICK MCMULLEN is a resident of Broward County, Florida.

10.    DELORES OKONMAH is a Black pharmacist who has been employed with WALGREENS as a Pharmacist from 1996 until present. DELORES OKONMAH graduated with a Bachelor of Science degree in pharmacy from Florida A&M University in 1979. DELORES OKONMAH is *sui juris,* over the age of 18, and otherwise competent. DELORES OKONMAH is

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8ᵀᴴ STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 446-2646

a resident of Miami-Dade County, Florida.

11.    BERNICE SHORTER-MEARES is a Black pharmacist who has been employed with WALGREENS as a Pharmacist from 1996 until present. BERNICE SHORTER-MEARES graduated with a Bachelor of Science degree in pharmacy from Howard University in 1977. BERNICE SHORTER-MEARES is *sui juris*, over the age of 18, and otherwise competent. BERNICE SHORTER-MEARES is a resident of Miami-Dade County, Florida.

12.    CONSTANCE ECHEBIRI is a Black pharmacist who has been employed with WALGREENS as a Pharmacist from 1994 until present. CONSTANCE ECHEBIRI graduated with a Bachelor of Science degree in pharmacy from Massachusetts College of Pharmacy and Allied Health Sciences in 1992. CONSTANCE ECHEBIRI is *sui juris,* over the age of 18, and otherwise competent. CONSTANCE ECHEBIRI is a resident of Polk County, Florida.

13.    MIA DAWN TAYLOR is a Black pharmacist who has been employed with WALGREENS as a Pharmacy Intern and Pharmacist from 1990 until present. MIA DAWN TAYLOR graduated with a Bachelor of Science degree in pharmacy from Florida A&M University in 1990. MIA DAWN TAYLOR is *sui juris,* over the age of 18, and otherwise competent. MIA DAWN TAYLOR is a resident of Miami-Dade County, Florida.

14.    CARMITA MCMULLEN is a Black pharmacist who was employed with WALGREENS as a Pharmacy Cashier, Pharmacy Technician, Pharmacy Intern, Pharmacist and Pharmacy Manager from 1986 until 1999. CARMITA MCMULLEN graduated with a Bachelor of Science degree in pharmacy from Florida A&M University in 1994. CARMITA MCMULLEN is *sui juris,* over the age of 18, and otherwise competent. CARMITA MCMULLEN is a resident of Broward County, Florida.

-5-

15.    KIM COLSTON is a Black pharmacist who was employed with WALGREENS as a Pharmacist from 1991 to about 1994. KIM COLSTON graduated with a Bachelor of Science degree in pharmacy from Florida A&M University in 1990. KIM COLSTON is *sui juris*, over the age of 18, and otherwise competent. KIM COLSTON is a resident of Polk County, Florida.

16.    LESTER HENDERSON is a Black pharmacist who was employed with WALGREENS as a Pharmacist from 1995 until December 1999. LESTER HENDERSON graduated with a Bachelor of Science degree in pharmacy from Florida A&M University in 1976. LESTER HENDERSON is *sui juris*, over the age of 18, and otherwise competent. LESTER HENDERSON is a resident of Polk County, Florida.

17.    JOSEPH SMITH is a Black pharmacist who was employed with WALGREENS as a Pharmacy Intern, Pharmacist and Pharmacy Manager from 1983 through 1996. JOSEPH SMITH graduated with a Bachelor of Science degree in pharmacy from Florida A&M University in 1983. JOSEPH SMITH is *sui juris*, over the age of 18, and otherwise competent. JOSEPH SMITH is a resident of Polk County, Florida.

18.    "The CLASS" or "PLAINTIFFS" shall mean and refer to the named PLAINTIFFS and all other persons who are similarly situated and who are or were licensed Black pharmacists formerly or presently employed by WALGREENS in the state of Florida at some time during the period of years of 1990 to the present.

### Defendant

19.    WALGREENS is an Illinois corporation with its principal place of business in Illinois, and is licensed to do business in Florida. WALGREENS employs more than 107,000 people and owns more than 2,800 stores in 39 states and the Commonwealth of Puerto Rico, each store

-6-

averaging $5.8 million in annual sales. Approximately twenty percent (20%) of WALGREENS' profits and revenues are made in the State of Florida. WALGREENS, one of the fastest growing retailers in the United States, leads the chain drugstore industry in sales and profits.

20.    In 1998, WALGREENS' net sales exceeded $15 billion, having increased fourteen percent (14%) from 1997. WALGREENS filed nearly 226 million prescriptions in 1998, which was approximately nine percent (9%) of the United States retail market. WALGREENS also operates two mail service facilities that dispensed nearly 6 million prescriptions (more than 19,000 per day) that produced sales of approximately $600 million in 1998. Pharmacy sales are nearly half of WALGREENS' business.

21.    WALGREENS has been and is an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b), 42 U.S.C. § 1981, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, and the Florida Civil Rights Act, Fla. Stat. § 760.02(7).

### III. CLASS ACTION ALLEGATIONS

22.    PLAINTIFFS bring this class action pursuant to Fed. R. Civ. P. 23(a), Fed. R. Civ. P. 23(b)(1) and (b)(3), and S.D. Fla. L.R. 23.1 on behalf of the CLASS of all past, present and future Black pharmacist employees of WALGREENS who, on the basis of race, have been, continue to be, or may in the future be adversely affected by the continuing policy and pattern or practice complained of herein by WALGREENS, including but not limited to:

    a.    Failing and refusing to implement and follow a uniform posting procedure to ensure that all employees have equal notice of promotional opportunities, which adversely affects the ability of Black pharmacists to advance;

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8TH STREET, MIAMI, FLORIDA 33130 • TELEPHONE (305) 446-2646

b.    Failing and refusing to establish a uniform and unbiased process by which Black pharmacists and non-Black pharmacists can apply and compete equally for promotions and management positions;

c.    Relying on subjective, race-based and/or arbitrary criteria utilized by a nearly all non-Black managerial workforce in making assignment, training and promotional decisions;

d.    Failing and refusing to consider Black pharmacists for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists are considered;

e.    Disciplining Black pharmacists unjustifiably and/or more severely than non-Black pharmacists are and were disciplined;

f.    Creating a "paper trail" of unjustified trumped-up disciplinary records on Black pharmacists to hinder, interfere and/or prevent them from being considered for management positions;

g.    Discouraging and deterring Black pharmacists from applying for desirable assignments, promotions and management positions;

h.    Failing and refusing to provide Black pharmacists with the necessary work experience and training to qualify them for more desirable positions on the same basis as non-Black pharmacists are provided with the same experience and training;

i.    Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past discriminatory policy and pattern or practice;

j.    Retaliating against Black pharmacists who protest against WALGREENS' discriminatory policy and pattern or practice; and

-8-

k.    Denying Black pharmacists other terms and conditions of employment on the same basis applied to non-Black pharmacists.

23.    <u>Numerosity.</u>  This suit is properly maintainable as a class action because the named members of the CLASS are so numerous that joinder of all members is impracticable. The number of class members possibly affected by WALGREENS' illegal policy and pattern or practice of race discrimination is indeterminate at the present time, but it is clearly larger than can be addressed by joinder. There are approximately 2,800 stores in 39 states and the Commonwealth of Puerto Rico with no less than two to three pharmacists in each store. There are also more than 420 WALGREENS' stores in Florida, each store employing at least three pharmacists. Further, on information and belief, PLAINTIFFS allege that Black pharmacists constitute over forty percent (40%) of all pharmacists employed by WALGREENS in the state of Florida, the pool from which Pharmacy Supervisors and Store Managers are recruited and promoted.

24.    <u>Commonality and Typicality.</u>  This suit poses questions of law and fact which are common to and affect the rights of all members of the CLASS including, without limitation, whether WALGREENS has violated Title VII, 42 U.S.C. § 1981 and the Florida Civil Rights Act, as alleged herein, under either disparate treatment or disparate impact theories. The claims of the named PLAINTIFFS are typical of the claims of the class members as a whole in the state of Florida.

25.    WALGREENS maintains a systemwide policy and pattern or practice of treating Black pharmacists and Black employees as a whole less favorable than their non-Black counterparts. This constitutes illegal classwide disparate treatment in violation of Title VII, 42 U.S.C. § 1981, and Fla. Stat. § 760. This policy and pattern or practice has been implemented and maintained by WALGREENS' nearly all non-Black supervisory and management personnel through a subjective

-9-

and race-based system for making employment decisions in all aspects of WALGREENS' operations, including, but not limited to: promotions, training, store assignments, discipline and other terms and conditions of employment. This policy and pattern or practice is common to and typical of the claims of all the PLAINTIFFS and class members in the state of Florida.

26.    WALGREENS' policy and pattern or practice of race discrimination is further manifested by its continuing practice of limiting the opportunities for Black pharmacists and Black employees as a whole to be selected for desirable store assignments, promotions and management positions. WALGREENS maintains two "career tracks:" one of non-Blacks, which leads to promotions into higher-paying management positions; and another for Black pharmacists and Black employees, which leads to dead-end lower-paying positions. From the beginning of their employment with WALGREENS, Black pharmacists and Black employees as a whole are typically channeled into undesirable, high-crime and/or problem store locations and are never considered for promotion into Pharmacy Supervisor or Store Manager positions. Instead, Black pharmacists are commonly limited to Floater Pharmacist or Staff Pharmacist positions. Further, the Black pharmacists that reach the Pharmacy Manager level do so in the undesirable, high-crime and/or problem stores. In any event, Black pharmacists do not advance into Pharmacy Supervisor or Store Manager positions. This is evidenced by the fact that the Pharmacy Supervisor, Store Manager and District Manager positions at WALGREENS are predominately, if not exclusively, held by non-Black pharmacists and non-Black employees in the state of Florida.

27.    WALGREENS' policy and pattern or practice of race discrimination is also manifested by its failure and refusal to establish a uniform and unbiased procedure for posting available promotional opportunities. WALGREENS does not post the availability of promotional

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8TH STREET, MIAMI  FLORIDA 33130 · TELEPHONE (305) 446-2646

opportunities; therefore, Black pharmacists and Black employees as a whole have no way of knowing when a promotion or more desirable position becomes available, despite the fact that WALGREENS typically fills open Pharmacy Supervisor and Store Manager positions from its pool of current pharmacists and employees. Instead, available positions are filled through a "tap on the shoulder" system whereby the predominantly non-Black Pharmacy Supervisors, Store Managers and District Managers make subjective and race-based decisions regarding promotions. As a result, many promotions, vacancies or advancement opportunities are unknown to Black pharmacists as well as other Black employees as a whole and are filled by non-Black pharmacists and employees.

28.    WALGREENS' policy and pattern or practice of race discrimination is also manifested by its denial of training and mentoring to Black pharmacists and employees. Non-Black pharmacists are mentored by non-Black Pharmacy Supervisors, non-Black Store Managers and non-Black District Managers, which further assists non-Black pharmacists and non-Black employees in obtaining promotions. However, since Black Pharmacy Supervisors, Store Managers and District Managers are virtually nonexistent in WALGREENS in the state of Florida, Black pharmacists and Black employees are denied mentoring on the same terms and conditions that such mentoring is provided to non-Black pharmacists and non-Black employees.

29.    WALGREENS' policy and pattern or practice of race discrimination is also manifested by its disciplining of Black pharmacists unjustifiably and/or more severely than non-Black pharmacists are disciplined. This disparity in the discipline of Black pharmacists further deters and discourages Black pharmacists from pursuing management opportunities.

30.    WALGREENS also engages in retaliation against Black pharmacists as well as Black employees as a whole who protest WALGREENS' discriminatory policy and pattern or practice.

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8TH STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 446-2646

Such retaliation further deters and discourages Black pharmacists and Black employees from lodging justifiable protests.

31.     WALGREENS' well-known reputation for discriminating against Black pharmacists and Black employees as a whole also deters Black pharmacists and Black employees from seeking promotions to the positions of Pharmacy Manager, Pharmacy Supervisor, and Store Manager.

32.     <u>Adequacy of Representation.</u> PLAINTIFFS will adequately represent the CLASS. PLAINTIFFS desire to represent the CLASS and have retained counsel experienced in litigating class action claims.

33.     The prosecution of separate actions by or against individual members of the CLASS would create a risk of inconsistent or varying adjudications with respect to individual members of the CLASS which would establish incompatible standards of conduct for the party opposing the CLASS pursuant to Fed. R. Civ. P. 23(b)(1)(A). Accordingly, class certification is appropriate.

34.     The prosecution of separate actions by or against individual members of the CLASS would also create a risk of adjudications with respect to individual members of the CLASS which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests pursuant to Fed. R. Civ. P. 23(b)(1)(B). Accordingly, class certification is appropriate.

35.     Class certification is also appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because WALGREENS has acted and/or refused to act on grounds generally applicable to the CLASS, making appropriate declaratory and injunctive relief with respect to PLAINTIFFS and the CLASS as a whole.

36.     The questions of law or facts common to the members of the CLASS predominate

-12-

over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy pursuant to Fed. R. Civ. P. 23(b)(3). Each member of the CLASS has been damaged and is entitled to recovery by reasons of the systemic, common, uniform, illegal employment policy, pattern or practice and procedures of WALGREENS. Accordingly, class certification is appropriate.

37.    The alleged questions of law and fact common to the CLASS are:

a.    Whether WALGREENS' continuous and on-going pattern and practice of failing and refusing to implement and follow a uniform posting procedure to ensure that all employees have equal notice of promotional opportunities has a disparate impact on Black pharmacists, thereby violating Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*;

b.    Whether WALGREENS' continuous and on-going pattern and practice of failing and refusing to establish a uniform and unbiased process by which Black pharmacists and Black employees and non-Black pharmacists and non-Black employees can apply and compete equally for promotions and management positions has a disparate impact on Black pharmacists, thereby violating Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*;

c.    Whether WALGREENS' continuous and on-going pattern and practice of relying on subjective, race-based and/or arbitrary criteria utilized by a nearly all non-Black managerial workforce in making assignment, training and promotional decisions has a disparate impact on Black pharmacists, thereby violating Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*;

-13-

d.      Whether WALGREENS' continuous and on-going pattern and practice of failing and refusing to consider Black pharmacists and employees for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists and employees are considered has a disparate impact on Black pharmacists, thereby violating Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*;

e.      Whether WALGREENS' continuous and on-going pattern and practice of disciplining Black pharmacists and employees unjustifiably and/or more severely than non-Black pharmacists and employees are disciplined has a disparate impact on Black pharmacists, thereby violating Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*;

f.      Whether WALGREENS' continuous and on-going pattern and practice of discouraging and deterring Black pharmacists and employees from applying for desirable assignments, promotions and management positions has a disparate impact on Black pharmacists, thereby violating Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*;

g.      Whether WALGREENS' continuous and on-going pattern and practice of failing and refusing to provide Black pharmacists and employees with the necessary work experience and training to qualify them for more desirable positions on the same basis as non-Black pharmacists and employees are provided with such experience and training has a disparate impact on Black pharmacists, thereby violating Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*;

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8TH STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 446-2646

h.    Whether WALGREENS' continuous and on-going pattern and practice of failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past discriminatory policy and pattern or practice has a disparate impact on Black pharmacists, thereby violating Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*;

i.    Whether WALGREENS' continuous and on-going pattern and practice of retaliating against Black pharmacists and Black employees who protest against WALGREENS' discriminatory policy and pattern or practice has a disparate impact on Black pharmacists, thereby violating Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*;

j.    Whether WALGREENS' continuous and on-going pattern and practice of denying Black pharmacists and employees other terms and conditions of employment afforded to non-Black pharmacists and employees has a disparate impact on Black pharmacists, thereby violating Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*;

k.    Whether WALGREENS' continuous and on-going pattern and practice of failing and refusing to implement and follow a uniform posting procedure to ensure that all employees have equal notice of promotional opportunities constitutes disparate treatment of Black pharmacists, thereby violating Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981, and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*;

l.    Whether WALGREENS' continuous and on-going pattern and practice of failing and refusing to establish a uniform and unbiased process by which Black pharmacists and

-15-

Black employees and non-Black pharmacists and non-Black employees can apply and compete equally for promotions and management positions constitutes disparate treatment of Black pharmacists, thereby violating Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981, and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*;

   m.  Whether WALGREENS' continuous and on-going pattern and practice of relying on subjective, race-based and/or arbitrary criteria utilized by a nearly all non-Black managerial workforce in making assignment, training and promotional decisions constitutes disparate treatment of Black pharmacists, thereby violating Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981, and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*;

   n.  Whether WALGREENS' continuous and on-going pattern and practice of failing and refusing to consider Black pharmacists and employees for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists and employees are considered constitutes disparate treatment of Black pharmacists, thereby violating Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981, and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*;

   o.  Whether WALGREENS' continuous and on-going pattern and practice of disciplining Black pharmacists and employees unjustifiably and/or more severely than non-Black pharmacists and employees are disciplined constitutes disparate treatment of Black pharmacists, thereby violating Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981, and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*;

   p.  Whether WALGREENS' continuous and on-going pattern and practice of

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8ᵀᴴ STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 446-2646

discouraging and deterring Black pharmacists and employees from applying for desirable assignments, promotions and management positions constitutes disparate treatment of Black pharmacists, thereby violating Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981, and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*;

   q. Whether WALGREENS' continuous and on-going pattern and practice of failing and refusing to provide Black pharmacists and employees with the necessary work experience and training to qualify them for more desirable positions on the same basis as non-Black pharmacists and employees are provided with such experience and training constitutes disparate treatment of Black pharmacists, thereby violating Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981, and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*;

   r. Whether WALGREENS' continuous and on-going pattern and practice of failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past discriminatory policy and pattern or practice constitutes disparate treatment of Black pharmacists, thereby violating Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981, and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*;

   s. Whether WALGREENS' continuous and on-going pattern and practice of retaliating against Black pharmacists and Black employees who protest against WALGREENS' discriminatory policies and patterns or practices constitutes disparate treatment of Black pharmacists, thereby violating Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981, and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*; and

   t. Whether WALGREENS' continuous and on-going pattern and practice of

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8TH STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 446-2646

denying Black pharmacists and employees other terms and conditions of employment afforded to non-Black pharmacists and employees constitutes disparate treatment of Black pharmacists, thereby violating Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981, and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*

## IV.  GENERAL PATTERNS OF DISCRIMINATION

38.    The denials and abridgments of employment rights and opportunities suffered by PLAINTIFFS as detailed below are not isolated examples of WALGREENS' employment practices. Rather, they are illustrative of the pervasive policy and pattern or practice of race discrimination in employment that has continually existed at WALGREENS. WALGREENS has created and maintained a systemwide policy and pattern or practice of race-based disparate treatment that limits the employment opportunities of Black pharmacists in all aspects of WALGREENS' operations.

39.    WALGREENS maintains a highly race-segregated workforce, with non-Black pharmacists and employees filling the vast majority of Pharmacy Supervisor, Store Manager and District Manager positions. The under-representation of Black pharmacists and Black employees in the Pharmacy Supervisor, Store Manager or District Manager positions is not random or accidental. Rather, it is the result of WALGREENS' longstanding systemic policy and pattern or practice of discriminating against Black pharmacists and Black employees in the state of Florida.

40.    As a result of the illegal policies and patterns or practices described above, there are in fact two separate workforces at WALGREENS. One workforce, which is primarily non-Black pharmacists and non-Black employees, enjoys preferential treatment, better job opportunities, better store placement, a swift path to advancement, and dominates all management positions. The other workforce, which is primarily Black pharmacists and Black employees, holds a disproportionate

-18-

share of the lowest level positions, is denied equal terms and conditions of employment, and with few exceptions, has not been allowed to advance to the Pharmacy Supervisor, Store Manager or District Manager positions in the state of Florida.

## V.  CLAIMS OF NAMED PLAINTIFFS

### JOYCE WILLIAMS

41.     Plaintiff, JOYCE WILLIAMS, over forty (40) years of age and an employee within the meaning of Title VII, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, 42 U.S.C. § 1981 and the Florida Civil Rights Act, has been employed with WALGREENS as a Pharmacist from 1994 until present. As a result of WILLIAMS' previous pharmacy management experience prior to joining WALGREENS, she expressed her desire and interest in WALGREENS management positions immediately after starting with the company. To date, WILLIAMS has never been afforded an opportunity to work as a Pharmacy Manager, Store Manager or Pharmacy Supervisor. Further, WILLIAMS is never informed about management opportunities as they become available even though non-Black pharmacists are informed. WILLIAMS currently works as a pharmacist in multiple locations with no specific stores assigned (a "Floater Pharmacist") in various stores throughout the Hillsborough County area.

42.     WILLIAMS' initial position in 1994 with WALGREENS was as a Floater Pharmacist. Even though WILLIAMS was an experienced pharmacist prior to being employed with WALGREENS and expressed the desire to be assigned to a permanent store location in the Tampa area, the Pharmacy Supervisor forced WILLIAMS to work as a Floater Pharmacist. Conversely, non-Black pharmacists with less years of experience and with equal or less time with WALGREENS were assigned permanent stores. In fact, many non-Black pharmacy graduates newly hired by

-19-

WALGREENS were often assigned permanent stores almost immediately upon becoming licensed as pharmacists in the state of Florida.

43.     After WILLIAMS observed several instances where non-Black pharmacists with less years of experience and equal or less time with WALGREENS were assigned permanent store locations while her requests went ignored, WILLIAMS went to the District Manager, Kirk Wolfram ("Mr. Wolfram"), and expressed the desire to be assigned to a permanent store location in the Tampa area. After speaking to Mr. Wolfram, the Pharmacy Supervisor, Bob Kipp ("Mr. Kipp"), reluctantly assigned WILLIAMS to work in a permanent store location in the St. Petersburg area on the condition that WILLIAMS work the midnight shift (10 p.m. - 7 a.m.). WILLIAMS was assigned to this St. Petersburg store even though non-Black pharmacists with equal or less time with WALGREENS were permanently assigned to stores in the Tampa area that did not require working the midnight shift. WILLIAMS expressed her desire to Mr. Wolfram to be assigned to a permanent store location in the Tampa area only after her plea to Mr. Kipp went ignored. Mr. Kipp was thereafter hostile towards WILLIAMS because of her race and the fact that she talked to Mr. Wolfram. WILLIAMS worked in the permanent store location in St. Petersburg for approximately nine month before being transferred to a store in the Tampa area.

44.     Mr. Kipp conveyed his hostility and hatred towards WILLIAMS to Mr. Kipp's personal friend and Store Manager, Glenn Taylor ("Mr. Taylor") and the Pharmacy Manager of the Tampa store. Unbelievably, Mr. Kipp and Mr. Taylor went to the Pharmacy Manager and asked the Pharmacy Manager to begin creating disciplinary records on WILLIAMS regarding minute, inconsequential, and insignificant events. In desperation, WALGREENS even went to the extreme of accusing WILLIAMS of stealing artificial sweeteners (it was alleged that she added one hundred

-20-

(100) packets of Equal™ to her cup of coffee), but WALGREENS' claim dissolved after WILLIAMS challenged the company's bogus accusation. WILLIAMS has also been subjected to the following _after_ filing a discrimination charge with the EEOC: hostility; false accusations of misconduct; false accusations of dispensing her own prescriptions without authorization[1]; search of personal belongings; and unjustified reprimands for failing to follow "store-implemented" policies and practices. Attached as Exhibit "A" are some of the letters written by WILLIAMS to management evidencing her complaints about hostile, pestering and racial harassment at WALGREENS.

45.    Even though WILLIAMS continually expressed her desire to obtain a management position, WALGREENS hired a non-Black pharmacist with less years of experience (approximately two years of experience) and less time with WALGREENS to become the Pharmacy Manager. Further, Mr. Kipp coerced the Store Manager and the new Pharmacy Manager into treating WILLIAMS in a hostile manner.

46.    In July 1999, the Tampa store eliminated the need for a midnight pharmacist. WILLIAMS was forced to begin working as a Floater Pharmacist again even though there were positions available where non-Black pharmacists with less experience and equal or less time with WALGREENS were assigned. Having experienced all of the racism, scrutiny and discrimination for several years, WILLIAMS, like many of the Black pharmacists in the Tampa/Orlando area,

---

[1]WILLIAMS was suspended without pay for two weeks because she initially refused to authorize the release of her medical records to WALGREENS. Her hesitancy, however, was justified in that the Pharmacy Manager and Store Manager were openly discussing WILLIAMS' medication profile with other WALGREENS employees. WILLIAMS eventually authorized the release of her medical records, and WALGREENS' investigation revealed that all of the prescriptions filled for WILLIAMS were authorized. It should be noted that because of WALGREENS' bogus investigation, one of WILLIAMS' treating physicians, Dr. Frank, refused any further treatments of WILLIAMS because WALGREENS implicated that WILLIAMS was a "prescription abuser." _See_ as Exhibit "B" the letter to Cliff Newman of WALGREENS Lost Prevention.

-21-

reluctantly elected to work as a midnight shift Floater Pharmacist to avoid the continuous harassment in the workplace during the day from WALGREENS' management.

47.    Since filing WILLIAMS' first EEOC charge, WALGREENS has also retaliated against WILLIAMS by forcing her to use her accrued paid sick days when leaving a store early while non-Black pharmacists, such as Warren Striek, were not forced to use their sick days when they left the store early.

48.    Several non-Black individuals, including, but not limited to Philip Howthore, were promoted to Store Manager over WILLIAMS even though she had more years as a pharmacist and more management experience. Further, several non-Black pharmacists, such as Debbie Bonanno, Kim Russell, Doug Healy, Holly Provance, Donna O'Neal, Paul Whitt and Michelle Brantly, were promoted to the position of Pharmacy Manager even though WILLIAMS had more experience as a pharmacist and more pharmacy management experience.

49.    Although totally qualified to work as a Pharmacy Manager and Store Manager, WILLIAMS, over the age of 40, was ignored and passed over for promotions because of her age in addition to her race. Other less qualified non-Black WALGREENS pharmacists and employees, not members of the protected age group, were promoted.

50.    Most recently, in June 1999, WALGREENS accused WILLIAMS of paying a Pharmacy Technician cash, out of her own pocket, to put up a medication order that had arrived in the pharmacy. Martin Northrup, the Pharmacy Supervisor ("Mr. Northrup"), along with a loss prevention representative, questioned WILLIAMS and the Pharmacy Technician about the incident and launched another fraudulent, contrived investigation of WILLIAMS. After the Pharmacy Technician confirmed that she was "on the clock" for WALGREENS when asked to put up the

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8TH STREET, MIAMI, FLORIDA 33130 • TELEPHONE (305) 446-2646

order, Mr. Northrup apologized to WILLIAMS for the bogus allegation.

51.     WALGREENS has discriminated against WILLIAMS on account of her race and age by:

a.     Failing to inform her of advancement opportunities available while informing non-Black pharmacists of the same advancement opportunities;

b.     Failing to provide her with training to qualify her for promotional opportunities on the same basis as is provided to non-Black pharmacists because of her race;

c.     Failing to provide her with training to qualify her for promotional opportunities on the same basis as is provided to non-Black pharmacists because of her age;

d.     Relying on subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny her promotional opportunities for which she was qualified;

e.     Disciplining her unjustifiably and/or more severely than non-Black pharmacists;

f.     Besmirching the character and professionalism of WILLIAMS by having Pharmacy Managers and Store Managers create disciplinary records and make false accusations against WILLIAMS;

g.     Discouraging and deterring her from seeking promotional opportunities;

h.     Failing to provide her with job assignments on the same basis as non-Black pharmacists;

i.     Failing and refusing to implement and follow a uniform posting procedure to ensure that she had and has equal notice of promotional opportunities, which adversely affected and continues to affect her career advancement;

-23-

j.      Failing and refusing to establish a uniform and unbiased process by which she and non-Black pharmacists can apply and compete equally for promotions and management positions;

k.      Failing and refusing to consider her for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists were and are considered;

l.      failing to promote her to positions she was qualified for due to her age while promoting lesser qualified employees under the age of 40;

m.      Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

n.      Denying her other terms and conditions of employment on the same basis applied to non-Black pharmacists.

52.      WILLIAMS filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in January of 1997 alleging, among other things, continuous race discrimination and age discrimination as it pertains to promotions in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* and the Age Discrimination Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"). See Exhibit "C." Subsequently, on February 5, 1997, WILLIAMS amended her EEOC charge to further allege that "Black employees as a class have been discriminated against in regards to promotions" and that WALGREENS does not inform Black employees about advancement opportunities. See Exhibit "D." Later, WILLIAMS was forced to file a second EEOC charge against WALGREENS for retaliatory actions alleging that she has been forced to use her accrued paid sick days when she left work early whereas her co-

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE. SUITE 2900. 80 SOUTHWEST 8TH STREET, MIAMI, FLORIDA 33130 • TELEPHONE (305) 446-2646

workers are not, and that she has been denied additional promotions to management position in retaliation for filing her EEOC charge of discrimination against WALGREENS. See Exhibit "E." The EEOC issued WILLIAMS a Notice of Suit Rights on October 2, 1999. See Exhibit "F." Finally, on December 28, 1999, Jack Kenesay, Employee Relations Department of WALGREENS, in essence, extended WILLIAMS time to file suit until January 31, 2000 by stating that WALGREENS "will not assert a limitations defense if the suit is filed on or before January 31, 2000.". See Exhibit "G." Thus, WILLIAMS has satisfied all conditions precedent to filing this suit under Title VII.

MICHAEL FERGUSON

53.    Plaintiff, MICHAEL FERGUSON has been employed with WALGREENS as a Pharmacy Intern from 1982 to 1984, a Pharmacist from 1984 to 1988, and a Pharmacy Manager 1988 until present. As a Pharmacist, FERGUSON initially worked as a Floater Pharmacist for approximately three months prior to being placed in a permanent store. FERGUSON was asked to be a Pharmacy Manager in 1985 in an undesirable store with significant financial problems, but FERGUSON deferred accepting the Pharmacy Manager position at that time because he felt he had not yet received adequate training from WALGREENS to effectively perform the job. As a result of FERGUSON not wanting to accept this problem store at that time, Gary Vanderbilt, the Pharmacy Supervisor ("Mr. Vanderbilt") began to treat FERGUSON differently. Upon information and belief, FERGUSON believes that Bruce Adams, his Pharmacy Manager ("Mr. Adams") was told by Mr. Vanderbilt to begin creating false disciplinary records on FERGUSON. For example, Mr. Adams attempted to write a disciplinary report on FERGUSON for allegedly showing up to work late. Because FERGUSON was very familiar with company policy, however, he told

-25-

Mr. Adams that WALGREENS' company policy required that an employee be afforded a verbal warning first. The hostility of Mr. Adams continued after this incident. FERGUSON confronted Mr. Adams about his conduct, but to no avail. After this meeting, Mr. Vanderbilt transferred FERGUSON to the store where the district office was located.

54.    FERGUSON worked as a staff pharmacist at the store connected to the district office for over two years. In 1988, FERGUSON was asked to assume the Pharmacy Manager position at a problem-ridden store in the Sunny Isles area. In less than a year, FERGUSON not only improved the performance of the store, but also had the store so profitable that it was generating $1.00 for every 60 cents of inventory, which surpassed the goals set by WALGREENS. FERGUSON also recovered outstanding money from rejected third-party insurance company claims that were left by the previous Pharmacy Manager.

55.    In December 1990, FERGUSON was approached by Mr. Vanderbilt to transfer to an undesirable, problem-ridden store in the Northside area as the Pharmacy Manager. Mr. Vanderbilt indicated that FERGUSON's talents as a Pharmacy Manager were being "wasted and underutilized" at the Sunny Isles store. It was at this point that FERGUSON explicitly expressed to Mr. Vanderbilt and Anthony Frizzell, his District Manager ("Mr. Frizzell") that he was interested in being considered for a Pharmacy Supervisor position within WALGREENS. FERGUSON believed that because he had managed to completely turn around the problem-ridden store in the Sunny Isles area and was asked to clean up another problem-ridden store in an undesirable area, he was "paying his dues" and preparing himself for a Pharmacy Supervisor position. Mr. Vanderbilt told FERGUSON that in order to gain the position of Pharmacy Supervisor with WALGREENS, "You have to be able to smile in someone's face to make them think everything is fine, and put an ax in their back when

they look away from you." Statements like this caused FERGUSON to doubt the sincerity of previous promotional career promises he had heard over the years from WALGREENS' management.

56.     FERGUSON began working at the Northside store in Miami in January 1992. The store was in shambles and was accumulating $3,000 to $4,000 per month of third party rejected claims from the insurance companies. As expected, FERGUSON not only turned the store around, but also recovered outstanding money from the third-party rejected claims. In addition, FERGUSON had improved the efficiency and effectiveness of the Northside store so much that it was filling 500+ prescriptions per day even though its hours of operation were from 8:00 a.m. through 9:00 p.m. - well exceeding other stores with similar hours of operation. Throughout his time at the Northside store, FERGUSON continually expressed his interest in a Pharmacy Supervisor position to Mr. Vanderbilt. In fact, on or about 1994, many of the Black pharmacists in the district voiced their concerns to higher management that Black pharmacists were never considered or interviewed for Pharmacy Supervisor positions even though Black Pharmacy Managers like FERGUSON had proven themselves several times over by rehabilitating and reviving problem-ridden stores. Mr. Vanderbilt and Mr. Frizzell swept the Black pharmacists' inquiry under the rug and never publicly addressed this issue.

57.     In March 1995, FERGUSON asked to be transferred to one of the stores in the Broward County area. FERGUSON made such a request because (1) WALGREENS was opening new stores in several high-crime, undesirable areas in Miami-Dade County; and (2) he knew that traditionally WALGREENS only placed Black pharmacists in these areas. Subsequently, he was transferred to a Broward County store as the Pharmacy Manager. In April 1999, FERGUSON was

transferred to another store in the north Miami-Dade County area and immediately thereafter became the Pharmacy Manager. Throughout this time, FERGUSON continually expressed his desire and interest in becoming a Pharmacy Supervisor. FERGUSON's pleas were ignored, and he was transferred to another store in Miami-Dade County as Pharmacy Manager.

58.    In the 1990s, Jorge Acosta, Albert Garcia, and Vivian Ceballos, three non-Black pharmacists with less experience as pharmacists, less experience in management, and less time with WALGREENS were promoted to the position of Pharmacy Supervisor over FERGUSON who had more experience, more experience in management, and more time with WALGREENS. FERGUSON was not informed, interviewed or considered for the Pharmacy Supervisor positions because of his race even though he was more experienced and was more qualified than Mr. Acosta, Mr. Garcia, and Ms. Ceballos.

59.    WALGREENS has discriminated against FERGUSON on account of his race by:

a.    Failing to inform him of advancement opportunities available while informing non-Black pharmacists of the same advancement opportunities;

b.    Failing to provide him with training to qualify him for promotional opportunities on the same basis as is provided to non-Black pharmacists;

c.    Relying on arbitrary, race-based and subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny him promotional opportunities for which he was qualified;

d.    Discouraging and deterring him from seeking promotional opportunities;

e.    Failing to provide him with job assignments on the same basis as non-Black pharmacists;

-28-

f.       Failing and refusing to implement and follow a uniform posting procedure to ensure that he had and has equal notice of promotional opportunities, which adversely affected and continues to affect his career advancement;

g.       Failing and refusing to establish a uniform and unbiased process by which he and non-Black pharmacists can apply and compete equally for promotions and management positions;

h.       Failing and refusing to consider him for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists were and are considered;

i.       Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

j.       Denying him other terms and conditions of employment on the same basis applied to non-Black pharmacists.

60.    FERGUSON may rely on the EEOC charge filed by Plaintiff, JOYCE WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of Plaintiff, JOYCE WILLIAMS and FERGUSON have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

JOSEPH PATRICK MCMULLEN

61.    Plaintiff, JOSEPH PATRICK MCMULLEN ("J. MCMULLEN") was employed with WALGREENS, first as a Pharmacy Intern and subsequently as a Pharmacist from 1993 until 1998.

-29-

After becoming licensed as a Pharmacist, J. MCMULLEN worked as a Floater Pharmacist for a few month before being assigned to work in the Northside store, a problem-ridden store in an undesirable area in Miami. J. MCMULLEN immediately expressed his interest in the management opportunities available within WALGREENS including Store Manager and Pharmacy Supervisor positions to Orvil Maloney, his Store Manager, Gary Vanderbilt, his Pharmacy Supervisor, and Roy Ripak, his District Manager ("Mr. Ripak"). J. MCMULLEN was told by Mr. Ripak that WALGREENS would "prefer" J. MCMULLEN become a Pharmacy Manager for at least six (6) months before WALGREENS would really consider him for Store Manager. A non-Black pharmacist, however, was allowed to enter the store management training program even though he had never worked as a pharmacist.[2] This disparity in treatment as it pertained to the store management training program was because of J. MCMULLEN's race; working as a Pharmacy Manager is not a prerequisite to becoming a Store Manager.

62.    Subsequently, J. MCMULLEN became the Pharmacy Manager of the Northside store. After six (6) months, J. MCMULLEN went to Mr. Ripak about the possibility of a Store Manager position. Instead of permitting J. MCMULLEN to enter into the store management training program as the non-Black pharmacist had been allowed, however, WALGREENS permitted J. MCMULLEN to allegedly "train" in the Northside store for two days a week while still remaining responsible for the pharmacy department as the Pharmacy Manager. J. MCMULLEN was treated differently from others allowed into the store management training program because of his race. Reluctantly,

---

[2]John Cohn, a non-Black employee, worked as a Pharmacy Intern before becoming a licensed pharmacist. Immediately upon becoming licensed as a pharmacist, Mr. Cohn was permitted to begin the store management training program without having worked as a Pharmacist or Pharmacy Manager.

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8ᵀᴴ STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 446-2646

J. MCMULLEN began this artificially-created management training regimen. Obviously, WALGREENS never sincerely intended to properly train J. MCMULLEN.

63.     J. MCMULLEN complained about the disparate treatment to Mr. Ripak, and because of his complaints, Mr. Ripak developed a hostile attitude towards J. MCMULLEN. Afterwards, Mr. Ripak began to harass J. MCMULLEN about minute, inconsequential, and insignificant events. For example, J. MCMULLEN had scheduled and paid for a vacation prior to beginning the bogus management training program to placate him. Without any reasonable notice, Mr. Ripak told J. MCMULLEN to cancel his vacation plans immediately before the scheduled vacation. When J. MCMULLEN told Mr. Ripak that the vacation could not be canceled because the vacation plans had been made months in advance and certain expenses had already been incurred, Mr. Ripak told J. MCMULLEN that "in order for you to grow in this company, part of your life has to be owned by WALGREENS." Upon returning from his vacation, J. MCMULLEN was denied the opportunity to continue in the "pseudo" management training program and forced to return to working in the pharmacy full-time. The subject of a store management training program was never again broached with J. MCMULLEN. Further, J. MCMULLEN was denied the opportunity to continue "training" in the obscure management arrangement that was done to pacify him. J. MCMULLEN was denied these opportunities because of his race.

64.     Several months later, J. MCMULLEN was transferred to a store in the Hallendale area. J. MCMULLEN continued to express his interest in store management, but his pleas went ignored because of his race. Other non-Black pharmacists and employees who were less qualified than J. MCMULLEN were permitted to enter into WALGREENS' store management training program in the state of Florida.

-31-

65.     As a result of the discriminatory conduct and treatment, J. MCMULLEN was constructively discharged in August 1998.

66.     WALGREENS has discriminated against J. MCMULLEN on account of his race by:

a.      Failing to inform him of advancement opportunities available while informing non-Black pharmacists of the same advancement opportunities;

b.      Failing to provide him with adequate training to qualify him for promotional opportunities on the same basis as is provided to non-Black pharmacists;

c.      Relying on arbitrary, race-based, subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny him promotional opportunities for which he was qualified;

d.      Disciplining him unjustifiably and/or more severely than non-Black pharmacists;

e.      Discouraging and deterring him from seeking promotional opportunities;

f.      Failing to provide him with job assignments on the same basis as non-Black pharmacists;

g.      Failing and refusing to implement and follow a uniform posting procedure to ensure that he had equal notice of promotional opportunities, which adversely affected his career advancement;

h.      Failing and refusing to establish a uniform and unbiased process by which he and non-Black pharmacists could apply and compete equally for promotions and management positions;

i.      Failing and refusing to consider him for desirable work assignments,

-32-

promotions and management positions on the same basis as non-Black pharmacists were and are considered;

      j.     Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

      k.     Denying him other terms and conditions of employment on the same basis applied to non-Black pharmacists.

67.    J. MCMULLEN may rely on the EEOC charge filed by Plaintiff, JOYCE WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of Plaintiff, JOYCE WILLIAMS and J. MCMULLEN have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

## DELORES OKONMAH

68.    Plaintiff, DELORES OKONMAH has been employed with WALGREENS as a Pharmacist since 1996. Because OKONMAH had extensive pharmacy and pharmacy management experience prior to joining WALGREENS, OKONMAH had the desire and expectation of being afforded a management position shortly after being hired.

69.    Initially, OKONMAH was forced to work as a Floater Pharmacist for approximately six (6) months even though many non-Black pharmacists with less experience as a pharmacist and who had joined WALGREENS around the same time OKONMAH was hired were assigned permanent store locations. After being forced to deal with the uncertainty of the scheduling as a Floater Pharmacist, OKONMAH was finally assigned a permanent store.

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8TH STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 446-2646

70. While at her permanent store location, OKONMAH was often chastised by the customers, particularly when it came to controlled-medications. OKONMAH was called *"nigger"* by a customer in front of the Store Manager and Pharmacy Manager, and the only response from the Store and Pharmacy Managers was to assist the bigoted customer. The Pharmacy Manager was transferred to another store, and WALGREENS appointed a non-Black pharmacist working at another store as Pharmacy Manager even though OKONMAH had more experience as a pharmacist and had more pharmacy management experience. The non-Black pharmacist that had less experience as a pharmacist as well as less pharmacy management experience was appointed Pharmacy Manager while OKONMAH was neither considered nor interviewed for Pharmacy Manager because of OKONMAH's race.

71. The new non-Black Pharmacy Manager forced OKONMAH and another Black pharmacist to work all of the night and weekend hours while he worked Monday through Friday from 8:00 a.m. to 5:00 p.m. OKONMAH pleaded with the Pharmacy Manager about how unfair it was for she and the other pharmacist to work all of the evening and weekend hours, while the Pharmacy Manager ignored her plea. After approximately six (6) months of this one-sided scheduling, OKONMAH spoke with the Pharmacy Supervisor about the unfair scheduling. After that conversation, the Pharmacy Manager worked one night per week and one Saturday per month while OKONMAH was forced to continue working the remaining evening and weekend hours. After three (3) years of working this unfair schedule under the less qualified non-Black Pharmacy Manager, OKONMAH was transferred to work a split schedule between two stores.

72. On December 17, 1999, one week before Christmas, OKONMAH realized that WALGREENS had not deposited her paycheck into her checking account. OKONMAH was

-34-

concerned about not having received her direct deposit because when it had occurred before, she had not received her check a few days later. This would have posed a problem for OKONMAH. After placing several telephone calls and not making any progress with regards to being paid, OKONMAH contacted Vivian Ceballos, her Pharmacy Supervisor ("Ms. Ceballos")[3] about the problem. OKONMAH was asked to leave a message for Ms. Ceballos. The message left was to have Ms. Ceballos return her call within the next fifteen (15) minutes or she may have to close the store to try to resolve her payroll problem created by WALGREENS' payroll department. Within a few minutes, Ms. Ceballos returned the call and OKONMAH informed the Pharmacy Supervisor about the problem. Ms. Ceballos turned the conversation in a negative direction when she accused OKONMAH of making threats. Ms. Ceballos further stated that she does not want a pharmacist like OKONMAH working for her. After an exchange of words, OKONMAH informed Ms. Ceballos that customers were waiting to speak with her and waiting for their prescriptions.

73.    After a few hours had passed, Ms. Ceballos came to the store, handed OKONMAH her pay *in cash*, and told OKONMAH that she was fired on the grounds of insubordination. Ms. Ceballos fired OKONMAH with Plaintiff, MICHAEL FERGUSON, as a witness. After inquiry, Ms. Ceballos told OKONMAH that she was insubordinate because she threatened to close the store and for allegedly hanging up the phone on her. OKONMAH told Ms. Ceballos that her actions were a bit extreme, especially knowing that many non-Black pharmacists had actually closed the store for

---

[3]Ms. Ceballos, OKONMAH's Pharmacy Supervisor is a non-Black pharmacist with less experience as a pharmacist, less pharmacy management experience, and less time with WALGREENS than OKONMAH. Ms. Ceballos was promoted to Pharmacy Supervisor on or about September 1999 even though OKONMAH and others Black pharmacists were more qualified and deserving of the promotion. It should be noted that Ms. Ceballos is very good friends with Albert Garcia and Jorge Acosta, both of which are Pharmacy Supervisors with WALGREENS in neighboring districts.

-35-

personal reasons and were not disciplined. Evidently, Ms. Ceballos was predisposed to fire OKONMAH because of this incident since Ms. Ceballos had already informed a neighboring Store Manager of her impending termination of OKONMAH. OKONMAH was forced to undergo the humiliation of being terminated while other non-Black pharmacist were not terminated or even disciplined because of OKONMAH's race.

74.    Thereafter, OKONMAH met with Mr. Ripak, her District Manager and explained her side of the occurrence. Although she did not feel as though she acted inappropriately, OKONMAH drafted a letter of apology to Ms. Ceballos in an effort to facilitate the discussion. Attached as Exhibit "H" is a copy of the letter to Ms. Ceballos. Within 48 hours, Mr. Ripak rescinded the termination of OKONMAH because he quickly recognized the unprofessional and discriminatory manner in which Ms. Ceballos originally handled the termination.

75.    WALGREENS has discriminated against OKONMAH on account of her race by:

a.    Failing to inform her of advancement opportunities available while informing non-Black pharmacists of the same advancement opportunities;

b.    Failing to provide her with training to qualify her for promotional opportunities on the same basis as is provided to non-Black pharmacists;

c.    Relying on arbitrary, race-based, subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny her promotional opportunities for which she was qualified;

d.    Disciplining her unjustifiably and/or more severely than non-Black pharmacists;

e.    Humiliating her in front of her staff and customers because of a

-36-

WALGREENS error with her pay;

     f.    Discouraging and deterring her from seeking promotional opportunities;

     g.    Failing to provide her with job assignments on the same basis as non-Black pharmacists;

     h.    Failing and refusing to implement and follow a uniform posting procedure to ensure that she had and has equal notice of promotional opportunities, which adversely affected and continues to affect her career advancement;

     i.    Failing and refusing to establish a uniform and unbiased process by which she and non-Black pharmacists can apply and compete equally for promotions and management positions;

     j.    Failing and refusing to consider her for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists were and are considered;

     k.    Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

     l.    Denying her other terms and conditions of employment on the same basis applied to non-Black pharmacists.

76.    OKONMAH may rely on the EEOC charge filed by Plaintiff, JOYCE WILLIAMS, *supra*, because (1) the charge being relied upon was time and not otherwise defective; (2) the individual claims of Plaintiff, JOYCE WILLIAMS and OKONMAH have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8TH STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 446-2646

(11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

### BERNICE SHORTER-MEARES

77.    Plaintiff, BERNICE SHORTER-MEARES has been employed with WALGREENS as a Pharmacist since 1996. Initially, SHORTER-MEARES worked as a Floater Pharmacist for approximately one and a half years even though she requested to be assigned a permanent store. In addition to her request to be assigned a permanent store, SHORTER-MEARES expressed her interest in management opportunities with WALGREENS because she had over fourteen (14) years of management experience prior to joining WALGREENS. SHORTER-MEARES' interests in management were and are still ignored even though non-Black pharmacists with less experience and less time with the company have been allowed to advance into management.

78.    After giving SHORTER-MEARES the impression that she had been assigned to a permanent store, SHORTER-MEARES was forced to continue transferring from store to store every couple of months even though non-Black pharmacists with less time with the company had been assigned to permanent store locations. In fact, SHORTER-MEARES was told by Ms. Ceballos that she was being transferred to a particular store location because WALGREENS needed her "to get this store organized" and that she was the best candidate to do so because of her "years of experience." The Pharmacy Manager position, however, was given to Xavier Ziegler, a non-Black pharmacist with less years of experience and less time with WALGREENS than SHORTER-MEARES. Mr. Ziegler benefitted from SHORTER-MEARES' knowledge and management experience while SHORTER-MEARES' management desires continued to be ignored by WALGREENS.

79.    Throughout her tenure with WALGREENS, SHORTER-MEARES has never been

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8TH STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 446-2646

informed nor interviewed for management opportunities because of her race. Incredibly, during her tenure with WALGREENS, SHORTER-MEARES never received an evaluation from the District Manager or Pharmacy Supervisor. Further, many non-Black pharmacists with less experience, less pharmacy management experience, and less time with the company were informed, interviewed, considered, and/or received promotions for the same management opportunities that SHORTER-MEARES was more qualified for, including Mr. Ziegler. Additionally, SHORTER-MEARES was not afforded the opportunities afforded to non-Black pharmacists that involved working with the Pharmacy Supervisors and District Managers.

80.    WALGREENS has discriminated against SHORTER-MEARES on account of her race by:

a.    Failing to inform her of advancement opportunities available while informing non-Black pharmacists of the same advancement opportunities;

b.    Failing to provide her with training to qualify her for promotional opportunities on the same basis as is provided to non-Black pharmacists because of her race;

c.    Relying on arbitrary, race-based, subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny her promotional opportunities for which she was qualified;

d.    Discouraging and deterring her from seeking promotional opportunities;

e.    Failing to provide her with job assignments on the same basis as non-Black pharmacists;

f.    Failing and refusing to implement and follow a uniform posting procedure to ensure that she had and has equal notice of promotional opportunities, which adversely affected and

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8TH STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 446-2646

continues to affect her from advancement;

g.      Failing and refusing to establish a uniform and unbiased process by which she and non-Black pharmacists can apply and compete equally for promotions and management positions;

h.      Failing and refusing to consider her for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists were and are considered;

i.      Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

j.      Denying her other terms and conditions of employment on the same basis applied to non-Black pharmacists.

81.     SHORTER-MEARES may rely on the EEOC charge filed by Plaintiff, JOYCE WILLIAMS, *supra*, because (1) the charge being relied upon was time and not otherwise defective; (2) the individual claims of Plaintiff, JOYCE WILLIAMS and SHORTER-MEARES have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

<u>CONSTANCE ECHEBIRI</u>

82.     Plaintiff, CONSTANCE ECHEBIRI has worked for WALGREENS from 1992 until present. ECHEBIRI began working with WALGREENS as a Floater Pharmacist even though she asked to be assigned a permanent store location. Although ECHEBIRI requested a permanent store, ECHEBIRI was forced to work as a Floater Pharmacist for almost four (4) years while many non-

-40-

Black pharmacists with less years of experience and less years with WALGREENS were assigned permanent stores. Some of the stores where ECHEBIRI was scheduled to work were as far as seventy (70) miles from her home.

83.     WALGREENS also misled ECHEBIRI to believe that she was assigned a permanent store location in 1995. Instead, after ECHEBIRI trained Michelle Brantly ("Ms. Brantly")[4], a non-Black Pharmacy Intern who subsequently became licensed as a pharmacist, Ms. Brantly was assigned the actual store where ECHEBIRI trained her, while ECHEBIRI was then forced to continue working as a Floater Pharmacist.

84.     After ECHEBIRI continued to complain to the Pharmacy Supervisor about not being placed in a permanent store location, ECHEBIRI was finally assigned to a permanent store location, but ECHEBIRI was required to work the midnight shift (10:00 p.m. - 8:00 a.m. for Monday through Friday, 10:00 p.m. - 7:00 a.m. on Saturday and 7:00 p.m. - 7:00 a.m. on Sunday). ECHEBIRI was forced to work this undesirable shift while many non-Black pharmacists with less years of experience and less years with WALGREENS were assigned permanent stores with more desirable hours. ECHEBIRI experienced this disparate treatment concerning permanent store assignment and having to work the midnight shift because of her race.

85.     ECHEBIRI also experienced racial insults from management while working with WALGREENS. For example, an Assistant Store Manager, David Weiss[5], in the presence of the Store Manager, Mr. Carpenter, gave ECHEBIRI the password to access the computer system of

---

[4]Ms. Brantly is now a Pharmacy Manager within WALGREENS, while ECHEBIRI, who has more experience as a pharmacist, more time with WALGREENS, and who actually trained Ms. Brantly, has not been offered nor considered for a Pharmacy Manager position.

[5]Mr. Weiss has since been <u>promoted</u> to Store Manager within WALGREENS.

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8ᵀᴴ STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 446-2646

"Anthrax", a phrase that not only means "charcoal", but also is the name of a bacterial infectious disease that infects animals and humans. After ECHEBIRI became distraught at having received "Anthrax" as her password, she was then given the password of "Ebola", which is most commonly known as a deadly *viral* disease that affects *monkeys* and *apes* in *Africa*. What possible inference should ECHEBIRI have drawn from WALGREENS management's blatant, racial mockery?

86.    WALGREENS also forced ECHEBIRI to use her vacation time to attend her mother's funeral in 1995, and denied ECHEBIRI the opportunity to attend her sister's funeral in 1996. Martin Northrup, the District Manager ("Mr. Northrup") suggested that ECHEBIRI would "lose her job" if she attended her sister's funeral. This thoughtless manager forced ECHEBIRI to have to weigh the possible loss of her economic livelihood against the emotional upheaval of gathering with family members at her sister's funeral. ECHEBIRI experienced this harassment and disparate treatment because of her race.

87.    WALGREENS also began creating disciplinary records on ECHEBIRI in an effort to besmirch her character professionally, a routine pattern and practice of WALGREENS. WALGREENS has falsely accused ECHEBIRI of dispensing errors that did not occur and of sleeping in the pharmacy on her shift, which also was untrue.

88.    In 1997, ECHEBIRI had gotten approval for vacation from WALGREENS. Two days prior to her vacation, however, ECHEBIRI was injured on the job. ECHEBIRI went to the hospital and later received treatment from a physician and chiropractor. WALGREENS initially refused to cover ECHEBIRI's medical expenses incurred as a result of her on-the-job injury. Instead, ECHEBIRI was forced to use her personal health insurance until her treating health practitioners intervened with WALGREENS' workers compensation carrier.

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8TH STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 446-2646

89.    In 1998, ECHEBIRI was also denied a vacation by Michael Calnan, ECHEBIRI's newly-assigned District Manager ("Mr. Calnan") and Cheryl Nicolay, ECHEBIRI's Pharmacy Manager ("Ms. Nicolay"), even though the vacation had previously been approved by her former District Manager, Mr. Northrup. Because of Mr. Northrup's prior approval, ECHEBIRI incurred travel expenses including airline tickets for an international flight. Since Mr. Calnan and Ms. Nicolay halted ECHEBIRI's vacation plans, ECHEBIRI had to bare the full cost of travel expenses that she had to pay in advance.

90.    As a result of ECHEBIRI's frustration associated with WALGREENS' hostile working environment, ECHEBIRI's stress-induced gastrointestinal problems surfaced again and prompted a physician visit. Her physician, Dr. P. Ijewere, authorized ECHEBIRI to take four days off. ECHEBIRI formally submitted the official documentation from Dr. Ijewere. WALGREENS, in its typical disparate treatment of ECHEBIRI, charged ECHEBIRI with the use of vacation time instead of company-provided sick time. Attached as Exhibit "I" is a correspondence to Michael Whatley of WALGREENS' Department of Employee Relations regarding the 1988 vacation incident.

91.    ECHEBIRI has also complained about unwarranted disciplinary reports prepared by Ms. Nicolay, ECHEBIRI's Pharmacy Manager. For example, Ms. Nicolay prepared a disciplinary report on ECHEBIRI because of ECHEBIRI's failure to arrive at work, in spite of the fact that her flight, U.S. Airways Flight # 1181, had been canceled because of whether conditions. Immediately after finding out about the cancellation of her flight, ECHEBIRI called the pharmacy and informed WALGREENS to make alternate arrangements for a pharmacist in case she was unable to make it to work. She also requested that Ms. Nicolay be notified immediately about ECHEBIRI's

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8TH STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 446-2646

predicament. After the bogus disciplinary report, on January 15, 1999, ECHEBIRI sought a forum

for which she and Ms. Nicolay could discuss Ms. Nicolay's personal grievances - one year later,

Ms. Nicolay has yet to respond. Attached as Exhibit "J" is the correspondence to Ms. Nicolay

evidencing ECHEBIRI's intent to address Ms. Nicolay's grievances.

92.    ECHEBIRI complained to the Pharmacy Supervisor as well as WALGREENS'

corporate headquarters about all of the racial experiences she encountered at WALGREENS, but the

Pharmacy Supervisor and corporate headquarters ignored, continues to ignore, and will likely

continue to ignore ECHEBIRI's pleas for help in the racist environment placed around her.

93.    ECHEBIRI desired a management opportunity with WALGREENS, but convinced

herself that she would not be considered for such an opportunity because of her race. The following

disheartening employment experiences in ECHEBIRI's tenure with WALGREENS are some of the

experiences that deterred and discouraged her from pursuing management opportunities: (1) assigned

to work as a Floater Pharmacist for nearly four (4) years while non-Black pharmacists with less years

of experience and less time with WALGREENS, such as Michelle Brantly, were assigned permanent

stores; (2) experienced racial slurs and constant, baseless scrutiny from management that was not

directed to non-Black pharmacists; (3) treated harshly by management during her time of family

mourning and personal illness; (4) denied vacations; and (5) scheduled to work the midnight shift

in a discriminatory manner.

94.    WALGREENS has discriminated against ECHEBIRI on account of her race by:

   a.    Failing to inform her of advancement opportunities available while informing

non-Black pharmacists of the same advancement opportunities;

   b.    Failing to provide her with training to qualify her for promotional

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8TH STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 446-2646

opportunities on the same basis as is provided to non-Black pharmacists;

c.      Relying on arbitrary, race-based, subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny her promotional opportunities for which she was qualified;

d.      Disciplining her unjustifiably and/or more severely than non-Black pharmacists;

e.      Humiliating her with the use of racial slurs from management and staff;

f.      Discouraging and deterring her from seeking promotional opportunities;

g.      Failing to provide her with job assignments on the same basis as non-Black pharmacists;

h.      Failing and refusing to implement and follow a uniform posting procedure to ensure that she had and has equal notice of promotional opportunities, which adversely affected and continues to affect her from advancement;

i.      Failing and refusing to establish a uniform and unbiased process by which she and non-Black pharmacists can apply and compete equally for promotions and management positions;

j.      Failing and refusing to consider her for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists were and are considered;

k.      Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

l.      Denying her other terms and conditions of employment on the same basis

-45-

applied to non-Black pharmacists.

95.    ECHEBIRI may rely on the EEOC charge filed by Plaintiff, JOYCE WILLIAMS, *supra*, because (1) the charge being relied upon was time and not otherwise defective; (2) the individual claims of Plaintiff, JOYCE WILLIAMS and ECHEBIRI have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuing violation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

<u>MIA DAWN TAYLOR</u>

96.    Plaintiff, MIA DAWN TAYLOR has been employed with WALGREENS, first as a Pharmacy Intern and, subsequently, as a Pharmacist from 1990 until present. After becoming licensed as a Pharmacist, TAYLOR was forced to work as a Floater Pharmacist even though she asked to be placed in a permanent store location. While TAYLOR was forced to work as a Floater Pharmacist, several non-Black Pharmacists who were hired around the same time she was hired were assigned to permanent store locations. After approximately a year, TAYLOR was assigned to the Northside store temporarily before being transferred to another store in the Miami area. After being ill for approximately one week, TAYLOR was again transferred back to the Northside store. Throughout the various transfers, TAYLOR requested that she be placed in a permanent store location and be afforded a management opportunity to the position of Pharmacy Manager, but her request went ignored by WALGREENS. Subsequently, TAYLOR was transferred again to another store in the Miami area and not afforded a management opportunity. Again, she expressed her interest in management opportunities but her expressed interest went ignored.

97.    While her interest in management went ignored by WALGREENS, TAYLOR

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8™ STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 446-2646

received company-wide accolades for customer service based on a letter written by a customer discussing the way she handled his particular problem. TAYLOR received so much company-wide praise for this incident that a story appeared in *Walgreens World*, one of the company's newsletters, about TAYLOR and her encounter with the customer.

98.    TAYLOR was never informed about Pharmacy Manager or Store Manager opportunities with WALGREENS. Further, because of WALGREENS' continuing and on-going pattern and practice for subjectively informing only non-Black pharmacists about management opportunities available, several less-qualified employees, like John Cohn, were informed, considered, and subsequently promoted. Instead, many of the Pharmacy Manager and Store Manager opportunities, particularly in WALGREENS' more desirable stores, were filled by non-Black pharmacists. Finally, TAYLOR was not afforded the opportunities afforded to non-Black pharmacists of working as a scheduler or trainer, which would have involved working with the Pharmacy Supervisors and District Managers directly.

99.    WALGREENS has discriminated against TAYLOR on account of her race by:

a.    Failing to inform her of advancement opportunities available while informing non-Black pharmacists of the same advancement opportunities;

b.    Failing to provide her with training to qualify her for promotional opportunities on the same basis as is provided to non-Black pharmacists;

c.    Relying on arbitrary, race-based, subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny her promotional opportunities for which she was qualified;

d.    Disciplining her unjustifiably and/or more severely than non-Black

-47-

pharmacists;

e.     Discouraging and deterring her from seeking promotional opportunities;

f.     Failing to provide her with job assignments on the same basis as non-Black pharmacists;

g.     Failing and refusing to implement and follow a uniform posting procedure to ensure that she had and has equal notice of promotional opportunities, which adversely affected and continues to affect her from advancement;

h.     Failing and refusing to establish a uniform and unbiased process by which she and non-Black pharmacists can apply and compete equally for promotions and management positions;

i.     Failing and refusing to consider her for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists were and are considered;

j.     Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

k.     Denying her other terms and conditions of employment on the same basis applied to non-Black pharmacists.

100.    TAYLOR may rely on the EEOC charge filed by Plaintiff, JOYCE WILLIAMS, *supra*, because (1) the charge being relied upon was time and not otherwise defective; (2) the individual claims of Plaintiff, JOYCE WILLIAMS and TAYLOR have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8ᵀᴴ STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 446-2646

(11th Cir. 1993); <u>Clark v. Olinkraft, Inc.</u>, 556 F.2d 1219 (5th Cir. 1977).

CARMITA MCMULLEN

101.    Plaintiff, CARMITA MCMULLEN ("C. MCMULLEN") began working with WALGREENS in 1986 while she was a high school student. C. MCMULLEN worked as a Pharmacy Cashier and subsequently became a Pharmacy Technician. C. MCMULLEN then attended pharmacy school at Florida A&M University while continuing to work with WALGREENS on Christmas and summer vacations. It was C. McMullen's desire to one day reach the level of Pharmacy Supervisor and/or District Manager with WALGREENS. Upon completing the didactic work in pharmacy school, C. McMullen worked as a Pharmacy Intern for WALGREENS. In 1994, C. MCMULLEN graduated with a Bachelor of Science degree in pharmacy from Florida A&M University and began working as a Pharmacist for WALGREENS.

102.    Because C. MCMULLEN was very familiar with WALGREENS' pharmacy operations, her transition into assuming the responsibility of running a WALGREENS pharmacy was smooth. C. McMullen expressed an interest in management opportunities such as Pharmacy Manager, Pharmacy Supervisor and Store Manager positions immediately. She became a Pharmacy Manager in November 1995 even though she was constantly transferred to various low-performing stores in the Miami area. In fact, C. MCMULLEN was transferred to an undesirable, low-performing WALGREENS that closed two months after the transfer. C. MCMULLEN was transferred to this store even though there were Pharmacy Manager opportunities in more desirable stores. During her tenure at this low-performing, undesirable store, C. MCMULLEN <u>trained</u> Ms. Ceballos, a Pharmacy Supervisor that was promoted on or about September 1999.

103.    C. MCMULLEN was never informed about Pharmacy Manager or Store Manager

-49-

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8TH STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 446-2646

opportunities in the more desirable stores because of WALGREENS' continuing and on-going pattern and practice for subjectively informing non-Black pharmacists about management opportunities available. As expected, the Pharmacy Manager opportunities in the desirable stores of WALGREENS were filled by non-Black pharmacists.

104.    As a result of the discriminatory conduct, C. McMullen was constructively discharged on approximately January 9, 1999.

105.    WALGREENS has discriminated against C. MCMULLEN on account of her race by:

a.    Failing to inform her of advancement opportunities available while informing non-Black pharmacists of the same advancement opportunities;

b.    Failing to provide her with training to qualify her for promotional opportunities on the same basis as is provided to non-Black pharmacists because of her race;

c.    Relying on arbitrary, race-based, subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny her promotional opportunities for which she was qualified;

d.    Discouraging and deterring her from seeking promotional opportunities;

e.    Failing to provide her with job assignments on the same basis as non-Black pharmacists;

f.    Failing and refusing to implement and follow a uniform posting procedure to ensure that she had equal notice of promotional opportunities, which adversely affected her from advancement;

g.    Failing and refusing to establish a uniform and unbiased process by which she and non-Black pharmacists could apply and compete equally for promotions and management

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8TH STREET, MIAMI, FLORIDA 33130 • TELEPHONE (305) 446-2646

positions;

        h.     Failing and refusing to consider her for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists were and are considered;

        i.     Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

        j.     Denying her other terms and conditions of employment on the same basis applied to non-Black pharmacists.

    106.   C. MCMULLEN may rely on the EEOC charge filed by Plaintiff, JOYCE WILLIAMS, *supra*, because (1) the charge being relied upon was time and not otherwise defective; (2) the individual claims of Plaintiff, Joyce Willams and C. MCMULLEN have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. <u>Calloway v. Partners National Health Plans</u>, 986 F.2d 446 (11th Cir. 1993); <u>Clark v. Olinkraft, Inc.</u>, 556 F.2d 1219 (5th Cir. 1977).

<u>KIM COLSTON</u>

    107.   Plaintiff, KIM COLSTON was employed with WALGREENS from 1991 through about 1994 as a Floater Pharmacist. COLSTON was promised a permanent store by her Pharmacy Supervisor, but was forced to work at various stores. COLSTON also voiced an interest in management to her Pharmacy Supervisor, but her expressed interest went ignored. COLSTON was subsequently assigned to work in a store that was approximately seventy (70) miles from her home for over a year even though non-Black pharmacists with less years of experience and less years with WALGREENS were assigned to permanent stores nearer to their homes. After repeated complaints

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8TH STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 446-2646

to the Pharmacy Supervisor about the distance, she was transferred to a store closer to her home. Since the Pharmacy Manager and Pharmacy Supervisor were friends and because the Pharmacy Supervisor had developed an acrimonious feeling towards COLSTON, COLSTON was subjected to a hostile work environment.

108.    Even though COLSTON continued to express her desire and interest in becoming a Pharmacy Manager, COLSTON was never informed, considered, interviewed nor approved for advancement to any managerial position at WALGREENS even though non-Black pharmacists with less years of experience and less time with WALGREENS received such opportunity and advancement. The disparity in treatment between COLSTON and her non-Black pharmacist counterparts was because of COLSTON's race.

109.    As a result of the discriminatory conduct, COLSTON was constructively discharged on or about 1994.

110.    WALGREENS has discriminated against COLSTON on account of her race by:

a.    Failing to inform her of advancement opportunities available while informing non-Black pharmacists of the same advancement opportunities;

b.    Failing to provide her with training to qualify her for promotional opportunities on the same basis as is provided to non-Black pharmacists because of her race;

c.    Relying on arbitrary, race-based, subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny her promotional opportunities for which she was qualified;

d.    Discouraging and deterring her from seeking promotional opportunities;

e.    Failing to provide her with job assignments on the same basis as non-Black

-52-

pharmacists;

       f.      Failing and refusing to implement and follow a uniform posting procedure to ensure that she had equal notice of promotional opportunities, which adversely affected her from advancement;

       g.      Failing and refusing to establish a uniform and unbiased process by which she and non-Black pharmacists can apply and compete equally for promotions and management positions;

       h.      Failing and refusing to consider her for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists were and are considered;

       i.      Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

       j.      Denying her other terms and conditions of employment on the same basis applied to non-Black pharmacists.

111.    COLSTON may rely on the EEOC charge filed by Plaintiff, JOYCE WILLIAMS, *supra*, because (1) the charge being relied upon was time and not otherwise defective; (2) the individual claims of Plaintiff, JOYCE WILLIAMS and COLSTON have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

## LESTER HENDERSON

112.    Plaintiff, LESTER HENDERSON worked as a Pharmacist for WALGREENS from

-53-

1995 until December 1999. Initially, HENDERSON worked as a part-time Pharmacist before joining WALGREENS as a full-time Floater Pharmacist. HENDERSON worked as a Floater Pharmacist for approximately four (4) years even though he requested a permanent store location. HENDERSON was also forced to work as a Floater Pharmacist even though non-Black pharmacists with less experience and less years with WALGREENS were assigned permanent stores. HENDERSON experienced disparate treatment from the non-Black pharmacists with less experience and less years with WALGREENS because of his race.

113.     HENDERSON was led to believe that he had been placed in a permanent store location, but in actuality, HENDERSON was ask to work in a store where his assigned shift was eliminated in less than two months. After the shift was eliminated, HENDERSON was forced to become a Floater Pharmacist again. Because of the disparate treatment HENDERSON experienced at WALGREENS with regards to store placement as well as the disparate treatment of other Black pharmacists HENDERSON witnessed at WALGREENS, HENDERSON was deterred and discouraged from seeking a management position with WALGREENS even though HENDERSON had an interest in management.

114.     HENDERSON continued to work as a Floater Pharmacist for WALGREENS until December 27, 1999. On this day, HENDERSON and a telephone customer got into a verbal dispute over the medication the customer received. HENDERSON's staff apparently told the Store Manager what had occurred, and the Store Manager confronted HENDERSON. HENDERSON explained what had occurred, and the Store Manager called the District Manager and got the authority to fire HENDERSON. HENDERSON was constructively discharged on or about December 27, 1999 even though non-Black pharmacists who had done the same or similar thing were not disciplined or fired.

-54-

This disparity in treatment of HENDERSON and his non-Black counterparts was because of HENDERSON's race.

115.    WALGREENS has discriminated against HENDERSON on account of his race by:

a.    Failing to inform him of advancement opportunities available while informing non-Black pharmacists of the same advancement opportunities;

b.    Failing to provide him with training to qualify him for promotional opportunities on the same basis as is provided to non-Black pharmacists;

c.    Relying on arbitrary, race-based, subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny him promotional opportunities for which he was qualified;

d.    Disciplining him unjustifiably and/or more severely than non-Black pharmacists;

e.    Discouraging and deterring him from seeking promotional opportunities;

f.    Failing to provide him with job assignments on the same basis as non-Black pharmacists;

g.    Failing and refusing to implement and follow a uniform posting procedure to ensure that he had equal notice of promotional opportunities, which adversely affected him from advancement;

h.    Failing and refusing to establish a uniform and unbiased process by which he and non-Black pharmacists could apply and compete equally for promotions and management positions;

i.    Failing and refusing to consider him for desirable work assignments,

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8TH STREET, MIAMI, FLORIDA 33130 • TELEPHONE (305) 446-2646

promotions and management positions on the same basis as non-Black pharmacists were and are considered;

      j.     Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

      k.     Denying him other terms and conditions of employment on the same basis applied to non-Black pharmacists.

116.    HENDERSON may rely on the EEOC charge filed by Plaintiff, JOYCE WILLIAMS, *supra*, because (1) the charge being relied upon was time and not otherwise defective; (2) the individual claims of Plaintiff, JOYCE WILLIAMS and HENDERSON have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11ᵗʰ Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5ᵗʰ Cir. 1977).

<u>JOSEPH SMITH</u>

117.    Plaintiff, JOSEPH SMITH worked with WALGREENS from 1983 to 1996 as a Pharmacy Intern, Pharmacist and Pharmacy Manager. As a Pharmacist, SMITH was assigned to work in four stores over a period of three years. Having proven himself as a competent, skilled Pharmacist, SMITH was subsequently transferred to a store in the Winter Haven area where he later became the Pharmacy Manager. It was in 1986-87 that SMITH explicitly expressed his desire and interest in becoming a Pharmacy Supervisor for WALGREENS. Even though SMITH had more years as a pharmacist, more years of pharmacy management experience, and had been with WALGREENS for a longer period of time, Martin Northrup was promoted to Pharmacy Supervisor over SMITH. SMITH was bypassed for the Pharmacy Supervisor position because of SMITH's race.

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8ᵀᴴ STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 446-2646

118.    After working in the Winter Haven store for approximately three years, SMITH was transferred to an Auburndale store as the Pharmacy Manager. SMITH worked as the Pharmacy Manager in Auburndale before being transferred to a Bartow store. SMITH served as the Pharmacy Manager at the Bartow store for nearly five years.

119.    In 1996, SMITH received an unexpected visit from the WALGREENS Regional Vice President (the "Regional VP"). Although SMITH greeted the Regional VP, SMITH could not speak with him extensively because the store was extremely busy and customers were waiting for their prescriptions. After SMITH finished serving the long line of customers, SMITH searched for the Regional VP, but he was already gone. The Store Manager made it known that the Regional VP took offense to SMITH's failure to entertain him during his visit. In fact, the Store Manager told SMITH that the Regional VP was "pissed off" and that the Regional VP stated that SMITH "must be on something." It was after this incident that SMITH's relationship with WALGREENS rapidly deteriorated.

120.    Over the next two weeks, the Pharmacy Supervisor and District Manager began reviewing every prescription ever filled for SMITH, SMITH's wife and SMITH's children. Specifically, WALGREENS called the prescribing physicians on every prescription to verify that the prescriptions were actually authorized by the physician, a typical practice of WALGREENS to defame the character of its unwanted Black pharmacists. See WILLIAMS, *supra*. The Pharmacy Supervisor and a representative of Risk Management confronted SMITH regarding a prescription cough syrup that had been authorized by the physician's office. WALGREENS made the accusation that SMITH's prescription was not authorized by the physician's office, and that WALGREENS would let it be known to the Florida Board of Pharmacy that they questioned the validity of the

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8TH STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 446-2646

prescription <u>unless</u> he resigned.[6] Since SMITH was in the process of closing on his home and feared

jeopardizing that purchase, SMITH was constructively discharged in 1996.

121.    WALGREENS has discriminated against SMITH on account of his race by:

a.    Failing to inform him of advancement opportunities available while informing

non-Black pharmacists of the same advancement opportunities;

b.    Failing to provide him with training to qualify him for promotional

opportunities on the same basis as is provided to non-Black pharmacists;

c.    Relying on arbitrary, race-based, subjective selection criteria and decision-

making by non-Black pharmacists and supervisors to deny him promotional opportunities for which

he was qualified;

d.    Disciplining him unjustifiably and/or more severely than non-Black

pharmacists;

e.    Discouraging and deterring him from seeking promotional opportunities;

f.    Failing to provide him with job assignments on the same basis as non-Black

pharmacists;

g.    Failing and refusing to implement and follow a uniform posting procedure to

ensure that he had equal notice of promotional opportunities, which adversely affected him from

advancement;

h.    Failing and refusing to establish a uniform and unbiased process by which he

and non-Black pharmacists could apply and compete equally for promotions and management

---

[6]Under Florida law, WALGREENS would have been required to report such an incident to
the Florida Board of Pharmacy if WALGREENS believed that such an incident occurred. <u>See</u> Fla.
Stat. § 465.015.

THORNTON, DAVIS & MURRAY. P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8TH STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 446-2646

positions;

i.      Failing and refusing to consider him for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists were and are considered;

j.      Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

k.      Denying him other terms and conditions of employment on the same basis applied to non-Black pharmacists.

122.    SMITH may rely on the EEOC charge filed by Plaintiff, JOYCE WILLIAMS, *infra*, because (1) the charge being relied upon was time and not otherwise defective; (2) the individual claims of Plaintiff, Joyce Willams and SMITH have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

## VI. FIRST CLAIM FOR RELIEF - DISPARATE IMPACT

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

123.    PLAINTIFFS incorporate Paragraph 1 through 118 as if fully set forth herein.

124.    This claim is brought on behalf of all PLAINTIFFS and the CLASS they seek to represent.

125.    At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

126.    At all times material hereto, PLAINTIFFS were employees within the meaning of 42

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8TH STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 446-2646

U.S.C. § 2000e(f).

127.   PLAINTIFFS are Black and are therefore members of a protected class.

128.   Plaintiff, JOYCE WILLIAMS timely filed an EEOC charge. PLAINTIFFS may rely

on the EEOC charge because (1) the charge being relied upon was timely filed and not otherwise

defective; (2) the individual claims of Plaintiff, JOYCE WILLIAMS and the PLAINTIFFS have

arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation

of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986

F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

129.   The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended,

42 U.S.C. § 2000e, et seq. because the conduct had, continues to have, and will have in the future

a disparate impact on WALGREENS' Black pharmacists in the state of Florida.

130.   Plaintiff, JOYCE WILLIAMS has received a Notice of Right to Sue notice from the

EEOC. Further,  Plaintiff, JOYCE WILLIAMS exhausted all administrative remedies prior to the

institution of this action. By agreement with WALGREENS, Plaintiff, JOYCE WILLIAMS is not

filing the Complaint outside of the expiration of her Notice of Right to Sue. See Exhibit "G."

VII.  SECOND CLAIM FOR RELIEF - DISPARATE TREATMENT

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.)

131.   PLAINTIFFS incorporate Paragraph 1 through 118 as if fully set forth herein.

132.   This claim is brought on behalf of all PLAINTIFFS and the CLASS they seek to

represent.

133.   At all times material hereto, WALGREENS was an employer within the meaning of

42 U.S.C. § 2000e(b).

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8TH STREET, MIAMI, FLORIDA 33130 • TELEPHONE (305) 446-2646

134.    At all times material hereto, PLAINTIFFS were employees within the meaning of 42 U.S.C. § 2000e(f).

135.    PLAINTIFFS are Black and are therefore members of a protected class.

136.    Plaintiff, JOYCE WILLIAMS timely filed an EEOC charge. The PLAINTIFFS may rely on the EEOC charge because (1) the charge being relied upon was time and not otherwise defective; (2) the individual claims of Plaintiff, JOYCE WILLIAMS and the PLAINTIFFS have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

137.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. because the conduct constitutes disparate treatment of WALGREENS' Black pharmacists in the state of Florida.

138.    Plaintiff, JOYCE WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further,  Plaintiff, JOYCE WILLIAMS exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, Plaintiff, JOYCE WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. See Exhibit "G."

VIII.    THIRD CLAIM FOR RELIEF - DISPARATE TREATMENT

(42 U.S.C. § 1981)

139.    PLAINTIFFS incorporate Paragraph 1 through 118 as if fully set forth herein.

140.    This claim is brought on behalf of all PLAINTIFFS and the CLASS they seek to represent.

141.    PLAINTIFFS are members of a racial minority, Black.

142.    The foregoing conduct violates 42 U.S.C. § 1981 because the conduct constitutes disparate treatment of WALGREENS' Black pharmacists in the state of Florida.

## IX.  FOURTH CLAIM FOR RELIEF

### (Florida Civil Rights Act)

143.    PLAINTIFFS incorporate Paragraph 1 through 118 as if fully set forth herein.

144.    This claim is brought on behalf of all PLAINTIFFS and the CLASS they seek to represent.

145.    PLAINTIFFS are members of a protected class.

146.    At all times material hereto, WALGREENS was an employer within the meaning of Fla. Stat. § 760.02(7).

147.    At all times material hereto, PLAINTIFFS were employees and aggrieved persons within the meaning of Fla. Stat. §§ 760.02(6) and 760.02(10).

148.    The foregoing conduct as described above constitutes a prohibited discriminatory practice in violation of the Florida Civil Rights Act of 1992, Fla. Stat. §760.11.

149.    All conditions precedent have been met for filing this action and proceeding under the Florida Civil Rights Act of 1992.

## X.  JURY DEMAND

150.    PLAINTIFFS demand trial by jury in this action.

## XI.  PUNITIVE DAMAGES

151.    WALGREENS has engaged in the discriminatory conduct as alleged herein maliciously or in reckless disregard and/or indifference of the federally protected rights of PLAINTIFFS and the CLASS. PLAINTIFFS and the CLASS are therefore entitled to recover

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8ᵀᴴ STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 446-2646

punitive damages in the amount according to proof.

## XII. PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS, individually, and on behalf of the CLASS whom they seek to represent request the following relief:

1.     Certification of the case as a class action on behalf of the proposed CLASS and designation of the PLAINTIFFS as representatives of the CLASS and their counsel of record as Class Counsel;

2.     A declaratory judgment that WALGREENS' practices complained of herein are unlawful and violative of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981 and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*

3.     An award of back pay; front pay; damages for lost compensation, promotions, and job benefits that the individual PLAINTIFFS and the CLASS they seek to represent would have received but for WALGREENS' discriminatory practices; and compensatory damages for emotional distress, humiliation, embarrassment and anguish;

4.     An award of exemplary and punitive damages commensurate with WALGREENS' ability to pay and to deter future discriminatory conduct;

5.     An injunction against WALGREENS and its partners, officers, owners, agents, successors, employees, representatives and any and all persons acting in concert with it, from engaging in each of the unlawful practices, policies, customs and usages set forth herein;

6.     An order requiring WALGREENS to institute and carry out policies, practices and affirmative action programs that provide equal employment opportunities for Black pharmacists and Black employees as a whole and that remedy the effect of WALGREENS' past and present unlawful

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8ᵗʰ STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 446-2646

employment practices;

7.     An order restoring PLAINTIFFS and the CLASS they seek to represent to those jobs they would not be occupying but for WALGREENS' discriminatory practices;

8.     A declaratory judgment in favor of Plaintiff, JOYC WILLIAMS, that WALGREENS' practices complained of herein are unlawful and violative of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*

9.     Reasonable attorney's fees, costs and expenses of suit;

10.     Prejudgment interest; and

11.     Such other and further relief as the Court may deem just and proper.

Dated: January 31, 2000.

THORNTON, DAVIS & MURRAY, P.A.
Attorneys for Plaintiffs
Brickell BayView Centre, Suite 2900
80 SW 8th Street
Miami, Florida 33130
Tel:     305/446-2646
Fax:     305/441-2374

By:_____
**BARRY L. DAVIS**
Fla. Bar No. 294977
**PATRICIA A. LEID**
Fla. Bar No. 027006
**WENDELL T. LOCKE**
Fla. Bar No. 119260

THORNTON, DAVIS & MURRAY, P.A., ATTORNEYS AT LAW
BRICKELL BAY VIEW CENTRE, SUITE 2900, 80 SOUTHWEST 8TH STREET, MIAMI, FLORIDA 33130 · TELEPHONE (305) 446-2646

# ADDITIONAL

# ATTACHMENTS

# <u>NOT</u>

# SCANNED

PLEASE REFER TO COURT FILE

# CIVIL COVER SHEET

**00-6151**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I.(a) PLAINTIFFS

Joyce Williams, et al.

## DEFENDANTS

Walgreen Company

**CIV-UNGARO-BENAGES**

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   Hillsborough
(EXCEPT IN U.S. PLAINTIFF CASES)

A—NORTH— 6151 UUB/ BROWN

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   Cook
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME ADDRESS, AND TELEPHONE NUMBER)
Thornton, Davis & Murray, P.A., 80 Southwest 8 St., Suite 2900, Miami, FL 33130 (305) 446-2646

ATTORNEYS (IF KNOWN)

**MAGISTRATE JUDGE BROWN**

**MAGISTRATE JUDGE BROWN**

**(d)** CIRCLE COUNTY WHERE ACTION AROSE: DADE, MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury – Product Liability | ☐ 630 Liquor Laws | | B☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R R & Truck | **A PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 650 Airline Regs | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **A LABOR** | **B SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **B PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☒ 220 Foreclosure | ☒ 442 Employment | **HABEAS CORPUS:** | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | B☐ 530 General | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | A☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | A☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | | ☐ 871 IRS – Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions A OR B |
| ☐ 290 All Other Real Property | | B☐ 550 Civil Rights | | | |
| | | B☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Employment discrimination on basis of race; Title VII of Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e, et. seq., 42 U.S.C. Section 1981; Florida Civil Rights Act, Fla. Statute Section 760.01 et seq.

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

DEMAND $ undetermined in excess of $50,000,000 & injunctive relief

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____ DOCKET NUMBER _____

DATE   1-31-2000

SIGNATURE OF ATTORNEY OF RECORD _____

*(signature)*   31-00

**FOR OFFICE USE ONLY**

RECEIPT # 518 451   AMOUNT #150   APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____