UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO: 00-6151-CIV-UNGARO/Brown

JOYCE WILLIAMS, individually;
MICHAEL FERGUSON, individually;
JOSEPH PATRICK McMULLEN,
individually; DELORES OKONMAH,
individually; BERNICE SHORTER-
MEARES, individually;
CONSTANCE ECHEBIRI, individually;
MIA DAWN TAYLOR, individually;
and CARMITA McMULLEN, individually,

NIGHT BOX
FILED

APR 1 0 2000

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

        Plaintiffs,

v.

WALGREEN COMPANY,

        Defendant.
_____/

## MOTION FOR LEAVE TO AMEND COMPLAINT

    Plaintiffs by and through undersigned counsel, file their Motion for Leave to

Amend the Complaint for the following reasons:

    1.  After reviewing the Defendant's Motion to Dismiss, which is premised

primarily upon the class formation, the Plaintiffs have agreed to voluntarily dismiss that

portion of the Complaint.

    2.  Attached as **Exhibit 1**, is the First Amended Complaint. The First Amended

Complaint cures any defective pleadings and paragraphs found in the Complaint. This

Honorable Court's acceptance of it obviates the need to respond to Defendant's pending motion.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served via U.S. Mail this 7 day of April , 2000, to: MARK R. CHESKINS, ESQ., Attorneys for Defendant, Steel Hector & Davis LLP, 200 South Biscayne Blvd., 40th Floor, Miami, Florida 33131-2398.

**LAW OFFICES OF MICHAEL M. TOBIN, P.A.**
Attorneys for Plaintiffs
1099 Ponce De Leon Blvd.
Coral Gables, Florida 33134-3319
Tel:   305-445-5475
Fax:   305-445-5479


KELSAY D. PATTERSON
Fla. Bar No. 119784

CASE NO. 00-6151-CIV-UNGARO/Brown

UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO: 00-6151-CIV-UNGARO/Brown

JOYCE WILLIAMS, individually;
MICHAEL FERGUSON, individually;
JOSEPH PATRICK McMULLEN,
individually; DELORES OKONMAH,
individually; BERNICE SHORTER-
MEARES, individually;
CONSTANCE ECHEBIRI, individually;
MIA DAWN TAYLOR, individually;
and CARMITA McMULLEN, individually,

                    Plaintiffs,

v.

WALGREEN COMPANY,

                    Defendant.
_____/

## PLAINTIFF'S FIRST AMENDED COMPLAINT - INJUNCTIVE RELIEF SOUGHT AND DEMAND FOR JURY TRIAL

Plaintiffs, JOYCE WILLIAMS ("WILLIAMS"), MICHAEL FERGUSON ("FERGUSON"), JOSEPH PATRICK McMULLEN ("J. McMULLEN"), DELORES OKONMAH ("OKONMAH"), BERNICE SHORTER-MEARES ("SHORTER-MEARES"), CONSTANCE ECHEBIRI ("ECHEBIRI"), MIA DAWN TAYLOR ("TAYLOR"), and CARMITA McMULLEN ("C. McMULLEN"), individually (hereinafter referred to collectively as the "PLAINTIFFS"), bring this action against WALGREEN COMPANY (hereafter referred to as "WALGREENS") under federal and state laws prohibiting discrimination in employment on the basis of race. PLAINTIFFS allege:

1

## JURISDICTION AND VENUE

1.      This Court has original jurisdiction of PLAINTIFFS' claims pursuant to 28 U.S.C. § 1331, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981. This Court has supplemental jurisdiction over PLAINTIFFS' claims pursuant to 28 U.S.C. § 1367 as PLAINTIFFS' state law claims under the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.* are so related to PLAINTIFFS' claims under federal law in that they form part of the same case or controversy.

2.      This Court also has supplemental jurisdiction over a companion discrimination charge on the basis of age included within WILLIAMS' EEOC charge pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*

3.      Venue is appropriate in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. §§ 1391(b)-(c) and 42 U.S.C. §2000e. Many of the unlawful employment practices hereinafter alleged have been committed in the Southern District of Florida, and a majority of the PLAINTIFFS reside within the Southern District of Florida.

## I. INTRODUCTION

4.      This is an action for damages and injunctive relief brought by PLAINTIFFS, current and former pharmacists of WALGREENS who, on the basis of their race are, have been, continue to be, or may in the future be, adversely affected by WALGREENS' continuing policy and pattern or practice of race-based discriminatory treatment of PLAINTIFFS. This systemic discriminatory treatment is manifested by such policies and patterns or practices as denying PLAINTIFFS promotional opportunities such as the opportunity to advance into the Pharmacy Manager, Store Manager, or Pharmacy Supervisor positions; disciplining Black pharmacists more severely than non-Black pharmacists are disciplined for committing the same infractions; continually and repeatedly promoting less qualified, non-Black pharmacists to Pharmacy Manager (WILLIAMS, OKONMAH, SHORTER-MEARES, ECHEBIRI, and TAYLOR), Store Manager (WILLIAMS and J. McMULLEN), or Pharmacy Supervisor (FERGUSON, J. McMULLEN, and C. McMULLEN) positions over Black pharmacists who were and are more

2

qualified despite the Black pharmacists' expressed desires and expectations for promotion; continually and repeatedly informing <u>only</u> non-Black pharmacists about Pharmacy Manager, Store Manager, or Pharmacy Supervisor positions within WALGREENS as well as other benefits and conditions of employment on the same terms applied to non-Black pharmacists.

5.    In addition, WALGREENS has deterred and continues to deter PLAINTIFFS from seeking promotions, management positions and desirable job assignments, and fails to effectively enforce policies prohibiting race discrimination.

6.    The illegal policy and pattern or practice of race discrimination described above has been furthered by subjective decision-making by a predominately non-Black supervisory and managerial workforce. This pervasive, subjective and race-biased decision-making constitutes discriminatory terms and conditions of the employment contract and has had an adverse impact on PLAINTIFFS, and is a continuing violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981, and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*

## II. PARTIES

### Plaintiffs

7.    JOYCE WILLIAMS is a Black pharmacist who has been employed with WALGREENS as a Pharmacist from 1994 until present. JOYCE WILLIAMS graduated with a Bachelor of Science degree in pharmacy from Florida A&M University in 1977. JOYCE WILLIAMS is *sui juris,* over the age of 40, and otherwise competent. JOYCE WILLIAMS is a resident of Hillsborough County, Florida.

8.    MICHAEL FERGUSON is a Black pharmacist who has been employed with WALGREENS as a Pharmacy Intern, Pharmacist and Pharmacy Manager from 1982 until present. MICHAEL FERGUSON graduated with a Bachelor of Science degree in pharmacy from Xavier University in 1984. MICHAEL FERGUSON is *sui juris,* over the age of 18, and otherwise competent. MICHAEL FERGUSON is a resident of Broward County, Florida.

9.    JOSEPH PATRICK McMULLEN is a Black pharmacist who was employed with

3

WALGREENS as a Pharmacy Intern, Pharmacist and Pharmacy Manager from 1993 until August 1998. JOSEPH PATRICK McMULLEN graduated with a Bachelor of Science degree in pharmacy from Florida A&M University in 1993. JOSEPH PATRICK McMULLEN is *sui juris,* over the age of 18, and otherwise competent. JOSEPH PATRICK McMULLEN is a resident of Broward County, Florida.

10.     DELORES OKONMAH is a Black pharmacist who has been employed with WALGREENS as a Pharmacist from 1996 until present. DELORES OKONMAH graduated with a Bachelor of Science degree in pharmacy from Florida A&M University in 1979. DELORES OKONMAH is *sui juris,* over the age of 18, and otherwise competent. DELORES OKONMAH is a resident of Miami-Dade County, Florida.

11.     BERNICE SHORTER-MEARES is a Black pharmacist who has been employed with WALGREENS as a Pharmacist from 1996 until present. BERNICE SHORTER-MEARES graduated with a Bachelor of Science degree in pharmacy from Howard University in 1977. BERNICE SHORTER-MEARES is *sui juris*, over the age of 18, and otherwise competent. BERNICE SHORTER-MEARES is a resident of Miami-Dade County, Florida.

12.     CONSTANCE ECHEBIRI is a Black pharmacist who has been employed with WALGREENS as a Pharmacist from 1994 until present. CONSTANCE ECHEBIRI graduated with a Bachelor of Science degree in pharmacy from Massachusetts College of Pharmacy and Allied Health Sciences in 1992. CONSTANCE ECHEBIRI is *sui juris,* over the age of 18, and otherwise competent. CONSTANCE ECHEBIRI is a resident of Polk County, Florida.

13.     MIA DAWN TAYLOR is a Black pharmacist who has been employed with WALGREENS as a Pharmacy Intern and Pharmacist from 1990 until present. MIA DAWN TAYLOR graduated with a Bachelor of Science degree in pharmacy from Florida A&M University in 1990. MIA DAWN TAYLOR is *sui juris,* over the age of 18, and otherwise competent. MIA DAWN TAYLOR is a resident of Miami-Dade County, Florida.

14.     CARMITA McMULLEN is a Black pharmacist who was employed with WALGREENS as a Pharmacy Cashier, Pharmacy Technician, Pharmacy Intern, Pharmacist and

Pharmacy Manager from 1986 until 1999. CARMITA McMULLEN graduated with a Bachelor of Science degree in pharmacy from Florida A&M University in 1994. CARMITA McMULLEN is *sui juris*, over the age of 18, and otherwise competent. CARMITA McMULLEN is a resident of Broward County, Florida.

Defendant

15.    WALGREENS is an Illinois corporation with its principal place of business in Illinois, and is licensed to do business in Florida. WALGREENS employs more than 107,000 people and owns more than 2,800 stores in 39 states and the Commonwealth of Puerto Rico, each store averaging $5.8 million in annual sales. Approximately twenty percent (20%) of WALGREENS' profits and revenues are made in the State of Florida. WALGREENS, one of the fastest growing retailers in the United States, leads the chain drugstore industry in sales and profits.

16.    In 1998, WALGREENS' net sales exceeded $15 billion, having increased fourteen percent (14%) from 1997. WALGREENS filed nearly 226 million prescriptions in 1998, which was approximately nine percent (9%) of the United States retail market. WALGREENS also operates two mail service facilities that dispensed nearly 6 million prescriptions (more than 19,000 per day) that produced sales of approximately $600 million in 1998. Pharmacy sales are nearly half of WALGREENS' business.

17.    WALGREENS has been and is an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b), 42 U.S.C. § 1981, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, and the Florida Civil Rights Act, Fla. Stat. § 760.02(7).

III. GENERAL PATTERNS OF DISCRIMINATION

18.    The denials and abridgments of employment rights and opportunities suffered by PLAINTIFFS as detailed below are not isolated examples of WALGREENS' employment practices. Rather, they are illustrative of the pervasive policy and pattern or practice of race discrimination in employment that has continually existed at WALGREENS. WALGREENS has

5

created and maintained a systemwide policy and pattern or practice of race-based disparate treatment that has limited the employment opportunities of PLAINTIFFS in all aspects of WALGREENS' operations.

19.    WALGREENS maintains a highly race-segregated workforce, with non-Black pharmacists and employees filling the vast majority of Pharmacy Manager, Store Manager, Pharmacy Supervisor, and District Manager positions. The under-representation of Black pharmacists and Black employees in the Pharmacy Manager, Store Manager, and Pharmacy Supervisor positions is not random or accidental. Rather, it is the result of WALGREENS' longstanding systemic policy and pattern or practice of discriminating against Black pharmacists and Black employees.

20.    As a result of the illegal policies and patterns or practices described above, there are in fact two separate workforces at WALGREENS. One workforce, which is primarily non-Black pharmacists and non-Black employees, enjoys preferential treatment, better job opportunities, better store placement, a swift path to advancement, and dominates all management positions. The other workforce, which is primarily Black and includes PLAINTIFFS, holds a disproportionate share of the lowest level positions, is denied equal terms and conditions of employment, and with few exceptions, has not been allowed to advance to the Pharmacy Manager, Store Manager, or Pharmacy Supervisor positions.

### IV. CLAIMS OF PLAINTIFFS

### JOYCE WILLIAMS

21.    Plaintiff, JOYCE WILLIAMS (hereafter referred to as "WILLIAMS"), over forty (40) years of age and an employee within the meaning of Title VII, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, 42 U.S.C. § 1981 and the Florida Civil Rights Act, has been employed with WALGREENS as a Pharmacist from 1994 until present. As a result of WILLIAMS' previous pharmacy management experience prior to joining WALGREENS, she expressed her desire and interest in WALGREENS management positions. To date, WILLIAMS has <u>never</u> been afforded an opportunity to work as a Pharmacy Manager,

Store Manager or Pharmacy Supervisor. Further, WILLIAMS is never informed about management opportunities as they become available even though non-Black pharmacists are informed. WILLIAMS currently works as a pharmacist in multiple locations with no specific stores assigned (a "Floater Pharmacist") in various stores throughout the Hillsborough County area. WILLIAMS also has not been informed or considered for Pharmacy Manager and Store Manager vacancies as they became available.

22.    WILLIAMS' initial position in 1994 with WALGREENS was as a Floater Pharmacist. Even though WILLIAMS was an experienced pharmacist prior to being employed with WALGREENS and expressed the desire to be assigned to a permanent store location in the Tampa area, the Pharmacy Supervisor forced WILLIAMS to work as a Floater Pharmacist. Conversely, non-Black pharmacists with less years of experience and with equal or less time with WALGREENS were assigned permanent stores. In fact, many non-Black pharmacy graduates newly hired by WALGREENS were often assigned permanent stores almost immediately upon becoming licensed as pharmacists in the state of Florida. WILLIAMS was uncertain as this time as to whether this practice of being passed over was racially-motivated.

23.    After WILLIAMS observed several instances where non-Black pharmacists with less years of experience and equal or less time with WALGREENS were assigned permanent store locations while her requests went ignored, WILLIAMS went to the District Manager, Kirk Wolfram ("Mr. Wolfram"), and expressed the desire to be assigned to a permanent store location in the Tampa area. After speaking to Mr. Wolfram, the Pharmacy Supervisor, Bob Kipp ("Mr. Kipp"), reluctantly assigned WILLIAMS to work in a permanent store location in the Tampa area on the condition that WILLIAMS work the midnight shift (10 p.m. - 7 a.m.). WILLIAMS was assigned to work the midnight shift in this Tampa store even though non-Black pharmacists with equal or less time with WALGREENS were permanently assigned to stores in the Tampa area that did not require working the midnight shift. WILLIAMS expressed her desire to Mr. Wolfram to be assigned to a permanent store location in the Tampa area only after her plea to Mr. Kipp went ignored. Mr. Kipp was thereafter hostile towards WILLIAMS because of her race

7

and the fact that she talked to Mr. Wolfram. WILLIAMS worked in the permanent store location in St. Petersburg for approximately nine month before being transferred to a store in the Tampa area.

24.    Mr. Kipp conveyed his hostility and hatred towards WILLIAMS to Mr. Kipp's personal friend and Store Manager, Glenn Taylor ("Mr. Taylor") and the Pharmacy Manager of the Tampa store. Unbelievably, Mr. Kipp and Mr. Taylor went to the Pharmacy Manager and asked the Pharmacy Manager to begin creating disciplinary records on WILLIAMS regarding minute, inconsequential, and insignificant events. In desperation, WALGREENS even went to the extreme of accusing WILLIAMS of stealing artificial sweeteners (it was alleged that she added one hundred (100) packets of Equal™ to her cup of coffee), but WALGREENS' claim dissolved after WILLIAMS challenged the company's bogus accusation. WILLIAMS has also been subjected to the following after filing a discrimination charge with the EEOC:  hostility; false accusations of misconduct; false accusations of dispensing her own prescriptions without authorization[1]; and unjustified reprimands for failing to follow "store-implemented" policies and practices. Attached as **Exhibit "A"** are some of the letters written by WILLIAMS to management evidencing her complaints about hostile, pestering and racial harassment at WALGREENS.

25.    Even though WILLIAMS continually expressed her desire to obtain a management position (dating back as early as March 29, 1996), WALGREENS hired a non-Black pharmacist with less years of experience (approximately two years of experience) and less

---

[1]WILLIAMS was suspended without pay for two weeks because she initially refused to authorize the release of her medical records to WALGREENS. Her hesitancy, however, was justified in that the Pharmacy Manager and Store Manager were openly discussing WILLIAMS' medication profile with other WALGREENS employees. WILLIAMS eventually authorized the release of her medical records, and WALGREENS' investigation revealed that all of the prescriptions filled for WILLIAMS were authorized. It should be noted that because of WALGREENS' bogus investigation, one of WILLIAMS' treating physicians, Dr. Frank, refused any further treatments of WILLIAMS because WALGREENS implicated that WILLIAMS was a "prescription abuser." See as Exhibit "B" the letter to Cliff Newman of WALGREENS Lost Prevention.

time with WALGREENS to become the Pharmacy Manager. Further, Mr. Kipp coerced the Store Manager and the new Pharmacy Manager into treating WILLIAMS in a hostile manner.

26.    In July 1999, the Tampa store eliminated the need for a midnight pharmacist. WILLIAMS was forced to begin working as a Floater Pharmacist again even though there were positions available where non-Black pharmacists with less experience and equal or less time with WALGREENS were assigned. Having experienced all of the racism, scrutiny and discrimination for several years, WILLIAMS, like many of the Black pharmacists in the Tampa/Orlando area, reluctantly elected to work as a midnight shift Floater Pharmacist to avoid the continuous harassment in the workplace during the day from WALGREENS' management.

27.    Since filing WILLIAMS' first EEOC charge, WALGREENS has also retaliated against WILLIAMS by forcing her to use her accrued paid sick days when leaving a store early while non-Black pharmacists, such as Warren Striek, were not forced to use their sick days when they left the store early.

28.    Several non-Black individuals, including, but not limited to Philip Howthore, were promoted to Store Manager over WILLIAMS even though she had more years as a pharmacist and more management experience. Further, several non-Black pharmacists, such as Debbie Bonanno, Kim Russell, Doug Healy, Holly Provance, Donna O'Neal, Paul Whitt and Michelle Brantly, were promoted to the position of Pharmacy Manager even though WILLIAMS had more experience as a pharmacist and more pharmacy management experience.

29.    Although totally qualified to work as either a Pharmacy Manager and Store Manager, WILLIAMS, over the age of 40, was ignored and passed over for promotions because of her age in addition to her race. Other less qualified non-Black WALGREENS pharmacists and employees, not members of the protected age group, were promoted.

30.    Most recently, in June 1999, WALGREENS accused WILLIAMS of paying a Pharmacy Technician cash, out of her own pocket, to put up a medication order that had arrived in the pharmacy. Martin Northrup, the Pharmacy Supervisor ("Mr. Northrup"), along with a loss prevention representative, questioned WILLIAMS and the Pharmacy Technician about the

incident and launched another fraudulent, contrived investigation of WILLIAMS. After the Pharmacy Technician confirmed that she was "on the clock" for WALGREENS when asked to put up the order, Mr. Northrup apologized to WILLIAMS for the bogus allegation.

     31.    WALGREENS has discriminated against WILLIAMS on account of her race and age by:

     a.    Failing to inform her of advancement opportunities available while informing non-Black pharmacists of the same advancement opportunities;

     b.    Failing to provide her with training to qualify her for promotional opportunities on the same basis as is provided to non-Black pharmacists because of her race;

     c.    Failing to provide her with training to qualify her for promotional opportunities on the same basis as is provided to non-Black pharmacists because of her age;

     d.    Relying on subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny her promotional opportunities for which she was qualified;

     e.    Disciplining her unjustifiably and/or more severely than non-Black pharmacists;

     f.    Besmirching the character and professionalism of WILLIAMS by having Pharmacy Managers and Store Managers create disciplinary records and make false accusations against WILLIAMS, **See Exhibit B**;

     g.    Discouraging and deterring her from seeking promotional opportunities;

     h.    Failing to provide her with job assignments on the same basis as non-Black pharmacists;

     i.    Failing and refusing to implement and follow a uniform posting procedure to ensure that she had and has equal notice of promotional opportunities, which adversely affected and continues to affect her career advancement;

     j.    Failing and refusing to establish a uniform and unbiased process by which she and non-Black pharmacists can apply and compete equally for promotions and management positions;

     k.    Failing and refusing to consider her for desirable work assignments, promotions

and management positions on the same basis as non-Black pharmacists were and are considered;

l.      failing to promote her to positions she was qualified for due to her age while promoting lesser qualified employees under the age of 40;

m.     Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

n.      Denying her other terms and conditions of employment on the same basis applied to non-Black pharmacists.

32.     WILLIAMS filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in January of 1997 alleging, among other things, continuous race discrimination and age discrimination as it pertains to promotions in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* and the Age Discrimination Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"). See **Exhibit "C."** Subsequently, on February 5, 1997, WILLIAMS amended her EEOC charge to further allege that "Black employees as a class have been discriminated against in regards to promotions" and that WALGREENS does not inform Black employees about advancement opportunities. See **Exhibit "D."** Later, WILLIAMS was forced to file a second EEOC charge against WALGREENS for retaliatory actions alleging that she has been forced to use her accrued paid sick days when she left work early whereas her co-workers are not, and that she has been denied additional promotions to management position in retaliation for filing her EEOC charge of discrimination against WALGREENS. See **Exhibit "E."** The EEOC issued WILLIAMS a Notice of Suit Rights on October 2, 1999. See **Exhibit "F."** Finally, on December 28, 1999, Jack Kenesay, Employee Relations Department of WALGREENS, in essence, extended WILLIAMS time to file suit until January 31, 2000 by stating that WALGREENS "will not assert a limitations defense if the suit is filed on or before January 31, 2000.". See **Exhibit "G."** Thus, WILLIAMS has satisfied all conditions precedent to filing this suit under Title VII.

Title VII - Disparate Impact

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

33.    WILLIAMS incorporates Paragraphs 4 through 7, and 15 through 32 as if fully set forth herein.

34.    At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

35.    At all times material hereto, WILLIAMS was an employee within the meaning of 42 U.S.C. § 2000e(f).

36.    WILLIAMS is Black and is therefore a member of a protected class.

37.    WILLIAMS timely filed an EEOC charge.

38.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct had, continues to have, and will have in the future a disparate impact on WILLIAMS.

39.    WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further, WILLIAMS exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. **See Exhibit "G."**

<u>Title VII - Disparate Treatment</u>

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

40.    WILLIAMS incorporates Paragraphs 4 through 7, and 15 through 32 as if fully set forth herein.

41.    At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

42.    At all times material hereto, WILLIAMS was an employee within the meaning of 42 U.S.C. § 2000e(f).

43.    WILLIAMS is Black and is therefore a member of a protected class.

44.    WILLIAMS timely filed an EEOC charge.

45.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct constitutes disparate treatment of

WILLIAMS.

46.　　WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further, WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. **See Exhibit "G."**

42 U.S.C. § 1981 - Disparate Treatment

47.　　WILLIAMS incorporates Paragraphs 4 through 7, and 15 through 32 as if fully set forth herein.

48.　　WILLIAMS is a member of a racial minority, Black.

49.　　The foregoing conduct violates 42 U.S.C. § 1981 because the conduct constitutes disparate treatment of WILLIAMS.

Florida Civil Rights Act

50.　　WILLIAMS incorporates Paragraphs 4 through 7, and 15 through 32 as if fully set forth herein.

51.　　WILLIAMS is a member of a protected class.

52.　　At all times material hereto, WALGREENS was an employer within the meaning of Fla. Stat. § 760.02(7).

53.　　At all times material hereto, WILLIAMS was an employee and an aggrieved person within the meaning of Fla. Stat. §§ 760.02(6) and 760.02(10).

54.　　The foregoing conduct constitutes a prohibited discriminatory practice in violation of the Florida Civil Rights Act of 1992, Fla. Stat. §760.11.

55.　　All conditions precedent have been met for filing this action and proceeding under the Florida Civil Rights Act of 1992.

Age Discrimination in Employment Act

56.　　WILLIAMS incorporates Paragraphs 4 through 7, and 15 through 32 as if fully set forth herein.

57.　　WILLIAMS is an employee within the meaning of the ADEA, 29 U.S.C. § 630(f).

13

58.     At all times material hereto, WALGREENS was an employer within the meaning of 29 U.S.C. § 630(b).

59.     The foregoing conduct constitutes a prohibited discriminatory practice in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623.

MICHAEL FERGUSON

60.     Plaintiff, MICHAEL FERGUSON (hereafter referred to as "FERGUSON"), has been employed with WALGREENS as a Pharmacy Intern from 1982 to 1984, a Pharmacist from 1984 to 1988, and a Pharmacy Manager 1988 until present. As a Pharmacist, FERGUSON initially worked as a Floater Pharmacist for approximately three months prior to being placed in a permanent store. FERGUSON was asked to be a Pharmacy Manager in 1985 in an undesirable store with significant financial problems, but FERGUSON deferred accepting the Pharmacy Manager position at that time because he felt he had not yet received adequate training from WALGREENS to effectively perform the job. As a result of FERGUSON not wanting to accept this problem store at that time, Emerson Oberlin, the Pharmacy Supervisor ("Mr. Oberlin") began to treat FERGUSON differently. Upon information and belief, FERGUSON believes that Bruce Adams, his Pharmacy Manager ("Mr. Adams") was told by Mr. Oberlin to begin creating false disciplinary records on FERGUSON. For example, Mr. Adams attempted to write a disciplinary report on FERGUSON for allegedly showing up to work late. Because FERGUSON was very familiar with company policy, however, he told Mr. Adams that WALGREENS' company policy required that an employee be afforded a verbal warning first. The hostility of Mr. Adams continued after this incident. FERGUSON confronted Mr. Adams about his conduct, but to no avail. After this meeting, Mr. Oberlin transferred FERGUSON to the store where the district office was located.

61.     FERGUSON worked as a staff pharmacist at the store connected to the district office for over two years. In 1988, FERGUSON was asked to assume the Pharmacy Manager position at a problem-ridden store in the Sunny Isles area. In less than a year, FERGUSON not only improved the performance of the store, but also had the store so profitable that it was

generating $1.00 for every 60 cents of inventory, which surpassed the goals set by WALGREENS. FERGUSON also recovered outstanding money from rejected third-party insurance company claims that were left by the previous Pharmacy Manager.

62.    In December 1990, FERGUSON was approached by Gary Vanderbilt, Pharmacy Supervisor ("Mr. Vanderbilt"), to transfer to an undesirable, problem-ridden store in the Northside area as the Pharmacy Manager. Mr. Vanderbilt indicated that FERGUSON's talents as a Pharmacy Manager were being "wasted and underutilized" at the Sunny Isles store. It was at this point that FERGUSON explicitly expressed to Mr. Vanderbilt and Anthony Frizzell, his District Manager ("Mr. Frizzell") that he was interested in being considered for a Pharmacy Supervisor position within WALGREENS. FERGUSON believed that because he had managed to completely turn around  the problem-ridden store in the Sunny Isles area and was asked to clean up another problem-ridden store in an undesirable area, he was "paying his dues" and preparing himself for a Pharmacy Supervisor position. Mr. Vanderbilt told FERGUSON that in order to gain the position of Pharmacy Supervisor with WALGREENS, "You have to be able to smile in someone's face to make them think everything is fine, and put an ax in their back when they look away from you." Statements like this caused FERGUSON to doubt the sincerity of previous promotional career promises he had heard over the years from WALGREENS' management.

63.    FERGUSON began working at the Northside store in Miami in January 1992. The store was in shambles and was accumulating $3,000 to $4,000 per month of third party rejected claims from the insurance companies. As expected, FERGUSON not only turned the store around, but also recovered outstanding money from the third-party rejected claims. In addition, FERGUSON had improved the efficiency and effectiveness of the Northside store so much that it was filling 500+ prescriptions per day even though its hours of operation were from 8:00 a.m. through 9:00 p.m. - well exceeding other stores with similar hours of operation. Throughout his time at the Northside store, FERGUSON continually expressed his interest in a Pharmacy Supervisor position to Mr. Vanderbilt. In fact, on or about 1994, many of the Black pharmacists

in the district voiced their concerns to higher management that Black pharmacists were never considered or interviewed for Pharmacy Supervisor positions even though Black Pharmacy Managers like FERGUSON had proven themselves several times over by rehabilitating and reviving problem-ridden stores. Mr. Vanderbilt and Mr. Frizzell swept the Black pharmacists' inquiry under the rug and never publicly addressed this issue.

64.     In March 1995, FERGUSON asked to be transferred to one of the stores in the Broward County area. FERGUSON made such a request because (1) WALGREENS was opening new stores in several high-crime, undesirable areas in Miami-Dade County; and (2) he knew that traditionally WALGREENS only placed Black pharmacists in these areas. Subsequently, he was transferred to a Broward County store as the Pharmacy Manager. In April 1999, FERGUSON was transferred to another store in the north Miami-Dade County area and immediately thereafter became the Pharmacy Manager. Throughout this time, FERGUSON continually expressed his desire and interest in becoming a Pharmacy Supervisor. FERGUSON's pleas were ignored, and he was transferred to another store in Miami-Dade County as Pharmacy Manager.

65.     Between March 29, 1996 and the date of the initial complaint, Jorge Acosta, Albert Garcia, Phil Chen, and Vivian Ceballos, three non-Black pharmacists with less experience as pharmacists, less experience in management, and less time with WALGREENS were promoted to the position of Pharmacy Supervisor over FERGUSON who had more experience, more experience in management, and more time with WALGREENS. FERGUSON was not informed, interviewed or considered for the Pharmacy Supervisor positions because of his race even though he was more experienced and was more qualified than Mr. Acosta, Mr. Garcia, Mr. Chen, and Ms. Ceballos.

66.     WALGREENS has discriminated against FERGUSON on account of his race by:

a.      Failing to inform him of advancement opportunities available while informing non-Black pharmacists of the same advancement opportunities;

b.      Failing to provide him with training to qualify him for promotional opportunities

on the same basis as is provided to non-Black pharmacists;

      c.      Relying on arbitrary, race-based and subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny him promotional opportunities for which he was qualified;

      d.      Discouraging and deterring him from seeking promotional opportunities;

      e.      Failing to provide him with job assignments on the same basis as non-Black pharmacists;

      f.      Failing and refusing to implement and follow a uniform posting procedure to ensure that he had and has equal notice of promotional opportunities, which adversely affected and continues to affect his career advancement;

      g.      Failing and refusing to establish a uniform and unbiased process by which he and non-Black pharmacists can apply and compete equally for promotions and management positions;

      h.      Failing and refusing to consider him for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists were and are considered;

      i.      Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

      j.      Denying him other terms and conditions of employment on the same basis applied to non-Black pharmacists.

Title VII - Disparate Impact

      (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

      67.      FERGUSON incorporates Paragraphs 4 through 6, 8, 15 through 20, and 60 through 66 as if fully set forth herein.

      68.      At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

      69.      At all times material hereto, FERGUSON was an employee within the meaning of 42 U.S.C. § 2000e(f).

70.     FERGUSON is Black and is therefore a member of a protected class.

71.     WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further, WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. **See Exhibit "G**.

72.     FERGUSON may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and FERGUSON have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

73.     The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct had, continues to have, and will have in the future a disparate impact on FERGUSON.

### Title VII - Disparate Treatment

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

74.     FERGUSON incorporates Paragraphs 4 through 6, 8, 15 through 20, and 60 through 66 as if fully set forth herein.

75.     At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

76.     At all times material hereto, FERGUSON was an employee within the meaning of 42 U.S.C. § 2000e(f).

77.     FERGUSON is Black and is therefore a member of a protected class.

78.     WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further, WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS,

WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. **See Exhibit "G**.

79.     FERGUSON may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and FERGUSON have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

80.     The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct constitutes disparate treatment of FERGUSON.

42 U.S.C. § 1981 - Disparate Treatment

81.     FERGUSON incorporates Paragraphs 4 through 6, 8, 15 through 20, and 60 through 66 as if fully set forth herein.

82.     FERGUSON is a member of a racial minority, Black.

83.     The foregoing conduct violates 42 U.S.C. § 1981 because the conduct constitutes disparate treatment of FERGUSON.

Florida Civil Rights Act

84.     FERGUSON incorporates Paragraphs 4 through 6, 8, 15 through 20, and 60 through 66 as if fully set forth herein.

85.     FERGUSON is a member of a protected class.

86.     At all times material hereto, WALGREENS was an employer within the meaning of Fla. Stat. § 760.02(7).

87.     At all times material hereto, FERGUSON was an employee and an aggrieved person within the meaning of Fla. Stat. §§ 760.02(6) and 760.02(10).

88.     The foregoing conduct constitutes a prohibited discriminatory practice in violation of the Florida Civil Rights Act of 1992, Fla. Stat. §760.11.

89.    All conditions precedent have been met for filing this action and proceeding under the Florida Civil Rights Act of 1992.

### JOSEPH PATRICK McMULLEN

90.    Plaintiff, JOSEPH PATRICK McMULLEN (hereafter referred to as "J. McMULLEN"), was employed with WALGREENS, first as a Pharmacy Intern and subsequently as a Pharmacist from 1993 until 1998. After becoming licensed as a Pharmacist, J. McMULLEN worked as a Floater Pharmacist for a few month before being assigned to work in the Northside store, a problem-ridden store in an undesirable area in Miami. J. McMULLEN immediately expressed his interest in the management opportunities available within WALGREENS including Store Manager and Pharmacy Supervisor positions to Orvil Maloney, his Store Manager ("Mr. Maloney"), Gary Vanderbilt, his Pharmacy Supervisor ("Mr. Vanderbilt"), and Roy Ripak, his District Manager ("Mr. Ripak"). J. McMULLEN was told by Mr. Ripak that WALGREENS would "prefer" J. McMULLEN become a Pharmacy Manager for at least six (6) months before WALGREENS would really consider him for Store Manager. A non-Black pharmacist, however, was allowed to enter the store management training program even though he had never worked as a pharmacist.[2] This disparity in treatment as it pertained to the store management training program was because of J. McMULLEN's race; working as a Pharmacy Manager is not a prerequisite to becoming a Store Manager.

91.    Subsequently, J. McMULLEN became the Pharmacy Manager of the Northside store (January 1994). After six (6) months, J. McMULLEN went to Mr. Ripak about the possibility of a Store Manager position. Instead of permitting J. McMULLEN to enter into the store management training program as the non-Black pharmacist had been allowed, however, WALGREENS permitted J. McMULLEN to allegedly "train" in the Northside store for two days

---

[2]John Cohn, a non-Black employee, worked as a Pharmacy Intern before becoming a licensed pharmacist. Immediately upon becoming licensed as a pharmacist, Mr. Cohn was permitted to begin the store management training program without having worked as a Pharmacist or Pharmacy Manager.

a week while still remaining responsible for the pharmacy department as the Pharmacy Manager. J. McMULLEN was treated differently from others allowed into the store management training program because of his race. Reluctantly, J. McMULLEN began this artificially-created management training regimen. Obviously, WALGREENS never sincerely intended to properly train J. McMULLEN.

92.    J. McMULLEN complained about the disparate treatment to Mr. Ripak, and because of his complaints, Mr. Ripak developed a hostile attitude towards J. McMULLEN. Afterwards, Mr. Ripak began to harass J. McMULLEN about minute, inconsequential, and insignificant events. For example, J. McMULLEN had scheduled and paid for a vacation prior to beginning the bogus management training program to placate him. Without any reasonable notice, Mr. Ripak told J. McMULLEN to cancel his vacation plans immediately before the scheduled vacation. When J. McMULLEN told Mr. Ripak that the vacation could not be canceled because the vacation plans had been made months in advance and certain expenses had already been incurred, Mr. Ripak told J. McMULLEN that "in order for you to grow in this company, part of your life has to be owned by WALGREENS." Upon returning from his vacation, J. McMULLEN was denied the opportunity to continue in the "pseudo" management training program and forced to return to working in the pharmacy full-time. The subject of a store management training program was never again broached with J. McMULLEN. Further, J. McMULLEN was denied the opportunity to continue "training" in the obscure management arrangement that was done to pacify him. J. McMULLEN was denied these store management training opportunities because of his race.

93.    Several months later, J. McMULLEN was transferred to a store in the Hallendale area as the Pharmacy Manager. J. McMULLEN continued to express his interest in a Store Manager position, but his pleas went ignored because of his race. Other non-Black pharmacists and employees who were less qualified than J. McMULLEN were permitted to enter into WALGREENS' store management training program in the state of Florida.

94.    As a result of the discriminatory conduct and treatment, J. McMULLEN resigned

in August of 1998.

95.    WALGREENS has discriminated against J. McMULLEN on account of his race by:

a.    Failing to inform him of advancement opportunities available while informing non-Black pharmacists of the same advancement opportunities;

b.    Failing to provide him with adequate training to qualify him for promotional opportunities on the same basis as is provided to non-Black pharmacists;

c.    Relying on arbitrary, race-based, subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny him promotional opportunities for which he was qualified;

d.    Disciplining him unjustifiably and/or more severely than non-Black pharmacists;

e.    Discouraging and deterring him from seeking promotional opportunities;

f.    Failing to provide him with job assignments on the same basis as non-Black pharmacists;

g.    Failing and refusing to implement and follow a uniform posting procedure to ensure that he had equal notice of promotional opportunities, which adversely affected his career advancement;

h.    Failing and refusing to establish a uniform and unbiased process by which he and non-Black pharmacists could apply and compete equally for promotions and management positions;

i.    Failing and refusing to consider him for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists were and are considered;

j.    Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

k.    Denying him other terms and conditions of employment on the same basis applied to non-Black pharmacists.

<u>Title VII - Disparate Impact</u>

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

96.    J. McMULLEN incorporates Paragraph 4 through 6, 9, 15 through 20, and 90 through 95 as if fully set forth herein.

97.    At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

98.    At all times material hereto, J. McMULLEN was an employee within the meaning of 42 U.S.C. § 2000e(f).

99.    J. McMULLEN is Black and is therefore a member of a protected class.

100.    WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further,    WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. **See Exhibit "G.**

101.    J. McMULLEN may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and J. McMULLEN have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

102.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct had, continues to have, and will have in the future a disparate impact on J. McMULLEN.

### Title VII - Disparate Treatment

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

103.    J. McMULLEN incorporates Paragraph 4 through 6, 9, 15 through 20, and 90 through 95 as if fully set forth herein.

104.    At all times material hereto, WALGREENS was an employer within the meaning

of 42 U.S.C. § 2000e(b).

105.    At all times material hereto, J. McMULLEN was an employee within the meaning of 42 U.S.C. § 2000e(f).

106.    J. McMULLEN is Black and is therefore a member of a protected class.

107.    WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further,    WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. **See Exhibit "G.**

108.    J. McMULLEN may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and J. McMULLEN have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

109.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct constitutes disparate treatment of J. McMULLEN.

<u>42 U.S.C. § 1981 - Disparate Treatment</u>

110.    J. McMULLEN incorporates Paragraph 4 through 6, 9, 15 through 20, and 90 through 95 as if fully set forth herein.

111.    J. McMULLEN is a member of a racial minority, Black.

112.    The foregoing conduct violates 42 U.S.C. § 1981 because the conduct constitutes disparate treatment of J. McMULLEN.

<u>Florida Civil Rights Act</u>

113.    J. McMULLEN incorporates Paragraph 4 through 6, 9, 15 through 20, and 90 through 95 as if fully set forth herein.

114.    J. McMULLEN is a member of a protected class.

115.    At all times material hereto, WALGREENS was an employer within the meaning of Fla. Stat. § 760.02(7).

116.    At all times material hereto, J. McMULLEN was an employee and an aggrieved person within the meaning of Fla. Stat. §§ 760.02(6) and 760.02(10).

117.    The foregoing conduct constitutes a prohibited discriminatory practice in violation of the Florida Civil Rights Act of 1992, Fla. Stat. §760.11.

118.    All conditions precedent have been met for filing this action and proceeding under the Florida Civil Rights Act of 1992.

DELORES OKONMAH

119.    Plaintiff, DELORES OKONMAH (hereafter referred to as "OKONMAH"), has been employed with WALGREENS as a Pharmacist since 1996. Because OKONMAH had extensive pharmacy and pharmacy management experience prior to joining WALGREENS, OKONMAH had the desire and expectation of being afforded a Pharmacy Manager position shortly after being hired, with hopes of ultimately reaching the Pharmacy Supervisor level. WALGREENS, however, has never offered or considered OKONMAH for any of its Pharmacy Manager positions, thereby prohibiting her from ever reaching the Pharmacy Supervisor position.

120.    Initially, OKONMAH was forced to work as a Floater Pharmacist for approximately six (6) months even though many non-Black pharmacists with less experience as a pharmacist and who had joined WALGREENS around the same time OKONMAH was hired were assigned permanent store locations. After being forced to deal with the uncertainty of the scheduling as a Floater Pharmacist, OKONMAH was finally assigned a permanent store.

121.    While at her permanent store location, OKONMAH was often chastised by the customers, particularly when it came to controlled-medications. OKONMAH was called *"nigger"* by a customer in front of the Store Manager and Pharmacy Manager, and the only response from the Store and Pharmacy Managers was to assist the bigoted customer. The Pharmacy Manager was transferred to another store, and WALGREENS appointed a non-Black

pharmacist working at another store as Pharmacy Manager even though OKONMAH had more experience as a pharmacist and had more pharmacy management experience. The non-Black pharmacist that had less experience as a pharmacist as well as less pharmacy management experience was appointed Pharmacy Manager while OKONMAH was neither considered nor interviewed for the Pharmacy Manager position because of OKONMAH's race.

122.    The new non-Black Pharmacy Manager forced OKONMAH and another Black pharmacist to work all of the night and weekend hours while he worked Monday through Friday from 8:00 a.m. to 5:00 p.m. OKONMAH pleaded with the Pharmacy Manager about how unfair it was for she and the other pharmacist to work all of the evening and weekend hours, while the Pharmacy Manager ignored her plea. After approximately six (6) months of this one-sided scheduling, OKONMAH spoke with the Pharmacy Supervisor about the unfair scheduling. After that conversation, the Pharmacy Manager worked one night per week and one Saturday per month while OKONMAH was forced to continue working the remaining evening and weekend hours. After three (3) years of working this unfair schedule under the less qualified non-Black Pharmacy Manager, OKONMAH was transferred to work a split schedule between two stores. OKOHMAH has not been informed or considered for any Pharmacy Manager positions because of her race.

123.    On December 17, 1999, one week before Christmas, OKONMAH realized that WALGREENS had not deposited her paycheck into her checking account. OKONMAH was concerned about not having received her direct deposit because when it had occurred before, she had not received her check a few days later. This would have posed a problem for OKONMAH. After placing several telephone calls and not making any progress with regards to being paid, OKONMAH contacted Vivian Ceballos, her Pharmacy Supervisor ("Ms. Ceballos")[3] about the

---

[3]Ms. Ceballos, OKONMAH's Pharmacy Supervisor is a non-Black pharmacist with less experience as a pharmacist, less pharmacy management experience, and less time with WALGREENS than OKONMAH. Ms. Ceballos was promoted to Pharmacy Supervisor on or about September 1999 even though OKONMAH and others Black pharmacists were more qualified and deserving of the promotion. It should be noted that Ms. Ceballos is very good

problem. OKONMAH was asked to leave a message for Ms. Ceballos. The message left was to have Ms. Ceballos return her call within the next fifteen (15) minutes or she may have to close the store to try to resolve her payroll problem created by WALGREENS' payroll department. Within a few minutes, Ms. Ceballos returned the call and OKONMAH informed the Pharmacy Supervisor about the problem. Ms. Ceballos turned the conversation in a negative direction when she accused OKONMAH of making threats. Ms. Ceballos further stated that she does not want a pharmacist like OKONMAH working for her. After an exchange of words, OKONMAH informed Ms. Ceballos that customers were waiting to speak with her and waiting for their prescriptions.

124.    After a few hours had passed, Ms. Ceballos came to the store, handed OKONMAH her pay *in cash*, and told OKONMAH that she was fired on the grounds of insubordination. Ms. Ceballos fired OKONMAH with Plaintiff, MICHAEL FERGUSON, as a witness. After inquiry, Ms. Ceballos told OKONMAH that she was insubordinate because she threatened to close the store and for allegedly hanging up the phone on her. OKONMAH told Ms. Ceballos that her actions were a bit extreme, especially knowing that many non-Black pharmacists had actually closed the store for personal reasons and were not disciplined. Evidently, Ms. Ceballos was predisposed to fire OKONMAH because of this incident since Ms. Ceballos had already informed a neighboring Store Manager of her impending termination of OKONMAH. OKONMAH was forced to undergo the humiliation of being terminated while other non-Black pharmacist were not terminated or even disciplined because of OKONMAH's race.

125.    Thereafter, OKONMAH met with Mr. Ripak, her District Manager and explained her side of the occurrence. Although she did not feel as though she acted inappropriately, OKONMAH drafted a letter of apology to Ms. Ceballos in an effort to facilitate the discussion.

---

friends with Albert Garcia and Jorge Acosta, both of which are Pharmacy Supervisors with WALGREENS in neighboring districts.

Attached as Exhibit "H" is a copy of the letter to Ms. Ceballos. Within 48 hours, Mr. Ripak rescinded the termination of OKONMAH because he quickly recognized the unprofessional and discriminatory manner in which Ms. Ceballos originally handled the termination.

126.    WALGREENS has discriminated against OKONMAH on account of her race by:

a.    Failing to inform her of advancement opportunities available while informing non-Black pharmacists of the same advancement opportunities;

b.    Failing to provide her with training to qualify her for promotional opportunities on the same basis as is provided to non-Black pharmacists;

c.    Relying on arbitrary, race-based, subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny her promotional opportunities for which she was qualified;

d.    Disciplining her unjustifiably and/or more severely than non-Black pharmacists;

e.    Humiliating her in front of her staff and customers because of a WALGREENS error with her pay;

f.    Discouraging and deterring her from seeking promotional opportunities;

g.    Failing to provide her with job assignments on the same basis as non-Black pharmacists;

h.    Failing and refusing to implement and follow a uniform posting procedure to ensure that she had and has equal notice of promotional opportunities, which adversely affected and continues to affect her career advancement;

i.    Failing and refusing to establish a uniform and unbiased process by which she and non-Black pharmacists can apply and compete equally for promotions and management positions;

j.    Failing and refusing to consider her for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists were and are considered;

k.    Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

l.      Denying her other terms and conditions of employment on the same basis applied to non-Black pharmacists.

## Title VII - Disparate Impact

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

127.    OKONMAH incorporates Paragraphs 4 through 6, 10, 15 through 20, and 119 through 126 as if fully set forth herein.

128.    At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

129.    At all times material hereto, OKONMAH was an employee within the meaning of 42 U.S.C. § 2000e(f).

130.    OKONMAH is Black and is therefore a member of a protected class.

131.    WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further, WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. See Exhibit "G.

132.    OKONMAH may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and OKONMAH have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

133.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct had, continues to have, and will have in the future a disparate impact on OKONMAH.

## Title VII - Disparate Treatment

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

134.    OKONMAH incorporates Paragraphs 4 through 6, 10, 15 through 20, and 119 through 126 as if fully set forth herein.

135.    At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

136.    At all times material hereto, OKONMAH was an employee within the meaning of 42 U.S.C. § 2000e(f).

137.    OKONMAH is Black and is therefore a member of a protected class.

138.    WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further,  WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. See Exhibit "G.

139.    OKONMAH may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and OKONMAH have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

140.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct constitutes disparate treatment of OKONMAH.

### 42 U.S.C. § 1981 - Disparate Treatment

141.    OKONMAH incorporates Paragraphs 4 through 6, 10, 15 through 20, and 119 through 126 as if fully set forth herein.

142.    OKOMMAH is a member of a racial minority, Black.

143.    The foregoing conduct violates 42 U.S.C. § 1981 because the conduct constitutes disparate treatment of OKONMAH.

### Florida Civil Rights Act

144.    OKONMAH incorporates Paragraphs 4 through 6, 10, 15 through 20, and 119

through 126 as if fully set forth herein.

145.    OKONMAH is a member of a protected class.

146.    At all times material hereto, WALGREENS was an employer within the meaning of Fla. Stat. § 760.02(7).

147.    At all times material hereto, OKONMAH was an employee and an aggrieved person within the meaning of Fla. Stat. §§ 760.02(6) and 760.02(10).

148.    The foregoing conduct constitutes a prohibited discriminatory practice in violation of the Florida Civil Rights Act of 1992, Fla. Stat. §760.11.

149.    All conditions precedent have been met for filing this action and proceeding under the Florida Civil Rights Act of 1992.

BERNICE SHORTER-MEARES

150.    Plaintiff, BERNICE SHORTER-MEARES (hereafter referred to as "SHORTER-MEARES"), has been employed with WALGREENS as a Pharmacist since 1996. Initially, SHORTER-MEARES worked as a Floater Pharmacist for approximately one and a half years even though she requested to be assigned a permanent store. In addition to her request to be assigned a permanent store, SHORTER-MEARES expressed her interest in management opportunities, particularly the Pharmacy Manager position, with WALGREENS because she had over fourteen (14) years of management experience prior to joining WALGREENS. SHORTER-MEARES' interests in management were and are still ignored even though non-Black pharmacists with less experience and less time with the company have been allowed to advance into management.

151.    After giving SHORTER-MEARES the impression that she had been assigned to a permanent store, SHORTER-MEARES was forced to continue transferring from store to store every couple of months even though non-Black pharmacists with less time with the company had been assigned to permanent store locations. In fact, SHORTER-MEARES was told by Ms. Ceballos that she was being transferred to a particular store location because WALGREENS needed her "to get this store organized" and that she was the best candidate to do so because of

her "years of experience." The Pharmacy Manager position, however, was given to Xavier Ziegler, a non-Black pharmacist with less years of experience than SHORTER-MEARES. Mr. Ziegler benefitted from SHORTER-MEARES' knowledge and management experience while SHORTER-MEARES' management desires continued to be ignored by WALGREENS.

152.    Throughout her tenure with WALGREENS, SHORTER-MEARES has never been informed nor interviewed for management opportunities because of her race. Incredibly, during her tenure with WALGREENS, SHORTER-MEARES never received an evaluation from the District Manager or Pharmacy Supervisor. Further, many non-Black pharmacists with less experience, less pharmacy management experience, and less time with the company were informed, interviewed, considered, and/or received promotions for the same management opportunities that SHORTER-MEARES was more qualified for, including Mr. Ziegler. Additionally, SHORTER-MEARES was not afforded the opportunities afforded to non-Black pharmacists that involved working with the Pharmacy Supervisors and District Managers.

153.    WALGREENS has discriminated against SHORTER-MEARES on account of her race by:

a.      Failing to inform her of advancement opportunities available while informing non-Black pharmacists of the same advancement opportunities;

b.      Failing to provide her with training to qualify her for promotional opportunities on the same basis as is provided to non-Black pharmacists because of her race;

c.      Relying on arbitrary, race-based, subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny her promotional opportunities for which she was qualified;

d.      Discouraging and deterring her from seeking promotional opportunities;

e.      Failing to provide her with job assignments on the same basis as non-Black pharmacists;

f.      Failing and refusing to implement and follow a uniform posting procedure to ensure that she had and has equal notice of promotional opportunities, which adversely affected

and continues to affect her from advancement;

g.      Failing and refusing to establish a uniform and unbiased process by which she and non-Black pharmacists can apply and compete equally for promotions and management positions;

h.      Failing and refusing to consider her for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists were and are considered;

i.      Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

j.      Denying her other terms and conditions of employment on the same basis applied to non-Black pharmacists.

<u>Title VII - Disparate Impact</u>

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

154.    SHORTER-MEARES incorporates Paragraphs 4 through 6, 11, 15 through 20, and 150 through 153 as if fully set forth herein.

155.    At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

156.    At all times material hereto, SHORTER-MEARES was an employee within the meaning of 42 U.S.C. § 2000e(f).

157.    SHORTER-MEARES is Black and is therefore a member of a protected class.

158.    WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further, WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. See Exhibit "G.

159.    SHORTER-MEARES may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and SHORTER-MEARES have arisen out of similar

discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

160.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct had, continues to have, and will have in the future a disparate impact on SHORTER-MEARES.

Title VII - Disparate Treatment

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

161.    SHORTER-MEARES incorporates Paragraphs 4 through 6, 11, 15 through 20, and 150 through 153 as if fully set forth herein.

162.    At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

163.    At all times material hereto, SHORTER-MEARES was an employee within the meaning of 42 U.S.C. § 2000e(f).

164.    SHORTER-MEARES is Black and is therefore a member of a protected class.

165.    WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further, WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. See Exhibit "G.

166.    SHORTER-MEARES may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and SHORTER-MEARES have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

167.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e, *et seq.* because the conduct constitutes disparate treatment of SHORTER-MEARES.

42 U.S.C. § 1981 - Disparate Treatment

168.    SHORTER-MEARES incorporates Paragraphs 4 through 6, 11, 15 through 20, and 150 through 153 as if fully set forth herein.

169.    SHORTER-MEARES is a member of a racial minority, Black.

170.    The foregoing conduct violates 42 U.S.C. § 1981 because the conduct constitutes disparate treatment of SHORTER-MEARES.

Florida Civil Rights Act

171.    SHORTER-MEARES incorporates Paragraphs 4 through 6, 11, 15 through 20, and 150 through 153 as if fully set forth herein.

172.    SHORTER-MEARES is a member of a protected class.

173.    At all times material hereto, WALGREENS was an employer within the meaning of Fla. Stat. § 760.02(7).

174.    At all times material hereto, SHORTER-MEARES was an employee and an aggrieved person within the meaning of Fla. Stat. §§ 760.02(6) and 760.02(10).

175.    The foregoing conduct constitutes a prohibited discriminatory practice in violation of the Florida Civil Rights Act of 1992, Fla. Stat. §760.11.

176.    All conditions precedent have been met for filing this action and proceeding under the Florida Civil Rights Act of 1992.

CONSTANCE ECHEBIRI

177.    Plaintiff, CONSTANCE ECHEBIRI (hereafter referred to as "ECHEBIRI"), has worked for WALGREENS from 1994 until present. ECHEBIRI began working with WALGREENS as a Floater Pharmacist even though she asked to be assigned a permanent store location. Although ECHEBIRI requested a permanent store, ECHEBIRI was forced to work as a Floater Pharmacist for almost three (3) years while many non-Black pharmacists with less years of experience and less years with WALGREENS were assigned permanent stores. Some of the

stores where ECHEBIRI was scheduled to work were as far as seventy (70) miles from her home.

178.   WALGREENS also misled ECHEBIRI to believe that she was assigned a permanent store location in 1995. Instead, after ECHEBIRI trained Michelle Brantly ("Ms. Brantly")[4], a non-Black Pharmacy Intern who subsequently became licensed as a pharmacist, Ms. Brantly was assigned the actual store where ECHEBIRI trained her, while ECHEBIRI was then forced to continue working as a Floater Pharmacist. Since March 26, 1996, ECHEBIRI has never been informed or considered for Pharmacy Manager positions with WALGREENS.

179.   After ECHEBIRI continued to complain to the Pharmacy Supervisor about not being placed in a permanent store location, ECHEBIRI was finally assigned to a permanent store location, but ECHEBIRI was required to work the undesirable midnight shift. ECHEBIRI was forced to work this undesirable shift while many non-Black pharmacists with less years of experience and less years with WALGREENS were assigned permanent stores with more desirable hours and promoted to the Pharmacy Manager position. ECHEBIRI experienced this disparate treatment concerning permanent store assignment and Pharmacy Manager positions because of her race.

180.   ECHEBIRI also experienced racial insults from management while working with WALGREENS. For example, an Assistant Store Manager, David Weiss[5], in the presence of the Store Manager, Mr. Carpenter, gave ECHEBIRI the password to access the computer system of "*Anthrax*", a phrase that not only means "*charcoal*", but also is the name of a bacterial infectious disease that infects animals and humans. After ECHEBIRI became distraught at having received "*Anthrax*" as her password, she was then given the password of "*Ebola*", which is most commonly known as a deadly *viral* disease that affects *monkeys* and *apes* in *Africa*. What

---

[4]Ms. Brantly is now a Pharmacy Manager within WALGREENS, while ECHEBIRI, who has more experience as a pharmacist, more time with WALGREENS, and who actually trained Ms. Brantly, has not been offered nor considered for a Pharmacy Manager position.

[5]Mr. Weiss has since been promoted to Store Manager within WALGREENS.

possible inference should ECHEBIRI have drawn from WALGREENS management's blatant, racial mockery?

181.    WALGREENS denied ECHEBIRI the time to attend her sister's funeral and her mother's memorial service in 1997. Mike Calnan, the District Manager ("Mr. Calnan") suggested that ECHEBIRI would "lose her job" if she attended her sister's funeral. This thoughtless district manager forced ECHEBIRI to have to weigh the possible loss of her economic livelihood against the emotional upheaval of gathering with family members at her sister's funeral. ECHEBIRI experienced this harassment and disparate treatment because of her race.

182.    WALGREENS also began creating disciplinary records on ECHEBIRI in an effort to besmirch her character professionally, a routine pattern and practice of WALGREENS. WALGREENS has falsely accused ECHEBIRI of dispensing errors that did not occur and of sleeping in the pharmacy on her shift, which also was untrue.

183.    In 1997, ECHEBIRI had gotten approval for vacation from WALGREENS. Two days prior to her vacation, however, ECHEBIRI was injured on the job. ECHEBIRI went to the hospital and later received treatment from a physician and chiropractor. WALGREENS initially refused to cover ECHEBIRI's medical expenses incurred as a result of her on-the-job injury. Instead, ECHEBIRI was forced to use her personal health insurance until her treating health practitioners intervened with WALGREENS' workers compensation carrier.

184.    In 1998, ECHEBIRI was also denied a vacation by Mr. Calnan and Cheryl Nicolay, ECHEBIRI's Pharmacy Manager ("Ms. Nicolay"), even though the vacation had previously been approved by her former District Manager, Mr. Martin Northrop ("Mr. Northrop"). Because of Mr. Northrop's prior approval, ECHEBIRI incurred travel expenses including airline tickets for an international flight. Since Mr. Calnan and Ms. Nicolay halted ECHEBIRI's vacation plans, ECHEBIRI had to bare the full cost of travel expenses that she had to pay in advance.

185.    As a result of ECHEBIRI's frustration associated with WALGREENS' hostile working environment, ECHEBIRI's stress-induced gastrointestinal problems surfaced again and

prompted a physician visit. Her physician, Dr. P. Ijewere, authorized ECHEBIRI to take four days off. ECHEBIRI formally submitted the official documentation from Dr. Ijewere. WALGREENS, in its typical disparate treatment of ECHEBIRI, charged ECHEBIRI with the use of vacation time instead of company-provided sick time. Attached as Exhibit "I" is a correspondence to Michael Whatley of WALGREENS' Department of Employee Relations regarding the 1988 vacation incident.

186.    ECHEBIRI has also complained about unwarranted disciplinary reports prepared by Ms. Nicolay, ECHEBIRI's Pharmacy Manager. For example, Ms. Nicolay prepared a disciplinary report on ECHEBIRI because of ECHEBIRI's failure to arrive at work, in spite of the fact that her flight, U.S. Airways Flight # 1181, had been canceled because of whether conditions. Immediately after finding out about the cancellation of her flight, ECHEBIRI called the pharmacy and informed WALGREENS to make alternate arrangements for a pharmacist in case she was unable to make it to work. She also requested that Ms. Nicolay be notified immediately about ECHEBIRI's predicament. After the bogus disciplinary report, on January 15, 1999, ECHEBIRI sought a forum for which she and Ms. Nicolay could discuss Ms. Nicolay's personal grievances - one year later, Ms. Nicolay has yet to respond. Attached as Exhibit "J" is the correspondence to Ms. Nicolay evidencing ECHEBIRI's intent to address Ms. Nicolay's grievances.

187.    ECHEBIRI complained to the Pharmacy Supervisor as well as WALGREENS' corporate headquarters about all of the racial experiences she encountered at WALGREENS, but the Pharmacy Supervisor and corporate headquarters ignored, continues to ignore, and will likely continue to ignore ECHEBIRI's pleas for help in the racist environment placed around her.

188.    ECHEBIRI desired a management opportunity with WALGREENS, but convinced herself that she would not be considered for such an opportunity because of her race. The following disheartening employment experiences in ECHEBIRI's tenure with WALGREENS are some of the experiences that deterred and discouraged her from pursuing management opportunities: (1) assigned to work as a Floater Pharmacist for nearly four (4) years

while non-Black pharmacists with less years of experience and less time with WALGREENS, such as Michelle Brantly, were assigned permanent stores; (2) experienced racial slurs and constant, baseless scrutiny from management that was not directed to non-Black pharmacists; (3) treated harshly by management during her time of family mourning and personal illness; (4) denied vacations; and (5) scheduled to work the midnight shift in a discriminatory manner.

189.    WALGREENS has discriminated against ECHEBIRI on account of her race by:

a.      Failing to inform her of advancement opportunities available while informing non-Black pharmacists of the same advancement opportunities;

b.      Failing to provide her with training to qualify her for promotional opportunities on the same basis as is provided to non-Black pharmacists;

c.      Relying on arbitrary, race-based, subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny her promotional opportunities for which she was qualified;

d.      Disciplining her unjustifiably and/or more severely than non-Black pharmacists;

e.      Humiliating her with the use of racial slurs from management and staff;

f.      Discouraging and deterring her from seeking promotional opportunities;

g.      Failing to provide her with job assignments on the same basis as non-Black pharmacists;

h.      Failing and refusing to implement and follow a uniform posting procedure to ensure that she had and has equal notice of promotional opportunities, which adversely affected and continues to affect her from advancement;

i.      Failing and refusing to establish a uniform and unbiased process by which she and non-Black pharmacists can apply and compete equally for promotions and management positions;

j.      Failing and refusing to consider her for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists were and are considered;

k.      Failing and refusing to take reasonable and adequate steps to eliminate the effects

of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

l.      Denying her other terms and conditions of employment on the same basis applied to non-Black pharmacists.

### Title VII - Disparate Impact

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

190.    ECHEBIRI incorporates Paragraphs 4 through 6, 12, 15 through 20, and 177 through 189 as if fully set forth herein.

191.    At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

192.    At all times material hereto, ECHEBIRI was an employee within the meaning of 42 U.S.C. § 2000e(f).

193.    ECHEBIRI is Black and is therefore a member of a protected class.

194.    WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further, WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. See Exhibit "G.

195.    ECHEBIRI may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and ECHEBIRI have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

196.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct had, continues to have, and will have in the future a disparate impact on ECHEBIRI.

### Title VII - Disparate Treatment

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

197.    ECHEBIRI incorporates Paragraphs 4 through 6, 12, 15 through 20, and 177 through 189 as if fully set forth herein.

198.    At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

199.    At all times material hereto, ECHEBIRI was an employee within the meaning of 42 U.S.C. § 2000e(f).

200.    ECHEBIRI is Black and is therefore a member of a protected class.

201.    WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further,    WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. See Exhibit "G.

202.    ECHEBIRI may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and ECHEBIRI have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

203.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct constitutes disparate treatment of ECHEBIRI.

### 42 U.S.C. § 1981 - Disparate Treatment

204.    ECHEBIRI incorporates Paragraphs 4 through 6, 12, 15 through 20, and 177 through 189 as if fully set forth herein.

205.    ECHEBIRI is a member of a racial minority, Black.

206.    The foregoing conduct violates 42 U.S.C. § 1981 because the conduct constitutes disparate treatment of ECHEBIRI.

<u>Florida Civil Rights Act</u>

207.    ECHEBIRI incorporates Paragraphs 4 through 6, 12, 15 through 20, and 177 through 189 as if fully set forth herein.

208.    ECHEBIRI is a member of a protected class.

209.    At all times material hereto, WALGREENS was an employer within the meaning of Fla. Stat. § 760.02(7).

210.    At all times material hereto, ECHEBIRI was an employee and an aggrieved person within the meaning of Fla. Stat. §§ 760.02(6) and 760.02(10).

211.    The foregoing conduct constitutes a prohibited discriminatory practice in violation of the Florida Civil Rights Act of 1992, Fla. Stat. §760.11.

212.    All conditions precedent have been met for filing this action and proceeding under the Florida Civil Rights Act of 1992.

<u>MIA DAWN TAYLOR</u>

213.    Plaintiff, MIA DAWN TAYLOR (hereafter referred to as "TAYLOR"), has been employed with WALGREENS, first as a Pharmacy Intern and, subsequently, as a Pharmacist from 1990 until present. After becoming licensed as a Pharmacist, TAYLOR was forced to work as a Floater Pharmacist even though she asked to be placed in a permanent store location. While TAYLOR was forced to work as a Floater Pharmacist, several non-Black Pharmacists who were hired around the same time she was hired were assigned to permanent store locations. After approximately a year, TAYLOR was assigned to the Northside store temporarily before being transferred to another store in the Miami area. After being ill for approximately one week, TAYLOR was again transferred back to the Northside store. Throughout the various transfers, TAYLOR requested that she be placed in a permanent store location and be afforded a management opportunity to the position of Pharmacy Manager, but her request went ignored by WALGREENS. Subsequently, TAYLOR was transferred again to another store in the Miami

area and not afforded a management opportunity. Again, she expressed her interest in management opportunities but her expressed interest went ignored.

214.    While her interest in management went ignored by WALGREENS, TAYLOR received company-wide accolades for customer service based on a letter written by a customer discussing the way she handled his particular problem. TAYLOR received so much company-wide praise for this incident that a story appeared in *Walgreens World*, one of the company's newsletters, about TAYLOR and her encounter with the customer.

215.    Prior to filing the complaint, TAYLOR was never informed or considered for Pharmacy Manager or Store Manager opportunities with WALGREENS because of her race. Further, because of WALGREENS' continuing and on-going pattern and practice for subjectively informing only non-Black pharmacists about management opportunities available, several less-qualified employees, like John Cohn, were informed, considered, and subsequently promoted to Pharmacy Manager or Store Manager. Finally, since March 29, 1996, TAYLOR was not afforded the opportunities afforded to non-Black pharmacists of working as a scheduler, trainer, or recruiter, which would have involved working with the Pharmacy Supervisors and District Managers directly.

216.    WALGREENS has discriminated against TAYLOR on account of her race by:

a.    Failing to inform her of advancement opportunities available while informing non-Black pharmacists of the same advancement opportunities;

b.    Failing to provide her with training to qualify her for promotional opportunities on the same basis as is provided to non-Black pharmacists;

c.    Relying on arbitrary, race-based, subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny her promotional opportunities for which she was qualified;

d.    Discouraging and deterring her from seeking promotional opportunities;

e.    Failing to provide her with job assignments on the same basis as non-Black pharmacists;

f.      Failing and refusing to implement and follow a uniform posting procedure to ensure that she had and has equal notice of promotional opportunities, which adversely affected and continues to affect her from advancement;

g.      Failing and refusing to establish a uniform and unbiased process by which she and non-Black pharmacists can apply and compete equally for promotions and management positions;

h.      Failing and refusing to consider her for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists were and are considered;

i.      Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

j.      Denying her other terms and conditions of employment on the same basis applied to non-Black pharmacists.

### Title VII - Disparate Impact

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

217.    TAYLOR incorporates Paragraphs 4 through 6, 13, 15 through 20, and 213 through 216 as if fully set forth herein.

218.    At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

219.    At all times material hereto, TAYLOR was an employee within the meaning of 42 U.S.C. § 2000e(f).

220.    TAYLOR is Black and is therefore a member of a protected class.

221.    WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further, WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. See Exhibit "G.

222.    TAYLOR may rely on the EEOC charge filed by WILLIAMS, *supra*, because

(1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and TAYLOR have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

223.   The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct had, continues to have, and will have in the future a disparate impact on TAYLOR.

Title VII - Disparate Treatment

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

224.   TAYLOR incorporates Paragraphs 4 through 6, 13, 15 through 20, and 213 through 216 as if fully set forth herein.

225.   At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

226.   At all times material hereto, TAYLOR was an employee within the meaning of 42 U.S.C. § 2000e(f).

227.   TAYLOR is Black and is therefore a member of a protected class.

228.   WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further, WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. See Exhibit "G.

229.   TAYLOR may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and TAYLOR have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v.

Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

230.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. because the conduct constitutes disparate treatment of TAYLOR.

42 U.S.C. § 1981 - Disparate Treatment

231.    TAYLOR incorporates Paragraphs 4 through 6, 13, 15 through 20, and 213 through 216 as if fully set forth herein.

232.    TAYLOR is a member of a racial minority, Black.

233.    The foregoing conduct violates 42 U.S.C. § 1981 because the conduct constitutes disparate treatment of TAYLOR.

Florida Civil Rights Act

234.    TAYLOR incorporates Paragraphs 4 through 6, 13, 15 through 20, and 213 through 216 as if fully set forth herein.

235.    TAYLOR is a member of a protected class.

236.    At all times material hereto, WALGREENS was an employer within the meaning of Fla. Stat. § 760.02(7).

237.    At all times material hereto, TAYLOR was an employee and an aggrieved person within the meaning of Fla. Stat. §§ 760.02(6) and 760.02(10).

238.    The foregoing conduct constitutes a prohibited discriminatory practice in violation of the Florida Civil Rights Act of 1992, Fla. Stat. §760.11.

239.    All conditions precedent have been met for filing this action and proceeding under the Florida Civil Rights Act of 1992.

CARMITA McMULLEN

240.    Plaintiff, CARMITA McMULLEN (hereafter referred to as "C. McMULLEN") began working with WALGREENS in 1986 while she was a high school student. C. McMULLEN worked as a Pharmacy Cashier and subsequently became a Pharmacy Technician. C. McMULLEN then attended pharmacy school at Florida A&M University while continuing to

work with WALGREENS on Christmas and summer vacations. It was C. McMULLEN's desire to one day reach the level of Pharmacy Supervisor and/or District Manager with WALGREENS. Upon completing the didactic work in pharmacy school, C. McMULLEN worked as a Pharmacy Intern for WALGREENS. In 1994, C. McMULLEN graduated with a Bachelor of Science degree in pharmacy from Florida A&M University and began working as a Pharmacist for WALGREENS.

241.    Because C. McMULLEN was very familiar with WALGREENS' pharmacy operations, her transition into assuming the responsibility of running a WALGREENS pharmacy was smooth. C. McMULLEN expressed an interest in management opportunities such as Pharmacy Manager, Pharmacy Supervisor and Store Manager positions immediately. She became a Pharmacy Manager in November 1995 even though she was constantly transferred to various low-performing stores in the Miami area. In fact, C. McMULLEN was transferred to an undesirable, low-performing WALGREENS that closed two months after the transfer. C. McMULLEN was transferred to this store even though there were Pharmacy Manager opportunities in more desirable stores.  During her tenure at this low-performing, undesirable store, C. McMULLEN trained Ms. Ceballos, a Pharmacy Supervisor that was promoted on or about September 1999.

242.    C. McMULLEN was never informed about Pharmacy Manager or Store Manager opportunities in the more desirable stores because of WALGREENS' continuing and on-going pattern and practice for subjectively informing non-Black pharmacists about management opportunities available. As expected, the Pharmacy Manager opportunities in the desirable stores of WALGREENS were filled by non-Black pharmacists.

243.    Further, C. McMULLEN was never informed or considered for Pharmacy Supervisor positions that became available because of her race.

244.    As a result of the discriminatory conduct, C. McMULLEN resigned in January 1999.

245.    WALGREENS has discriminated against C. McMULLEN on account of her race

48

by:

     a.     Failing to inform her of advancement opportunities available while informing non-Black pharmacists of the same advancement opportunities;

     b.     Failing to provide her with training to qualify her for promotional opportunities on the same basis as is provided to non-Black pharmacists because of her race;

     c.     Relying on arbitrary, race-based, subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny her promotional opportunities for which she was qualified;

     d.     Discouraging and deterring her from seeking promotional opportunities;

     e.     Failing to provide her with job assignments on the same basis as non-Black pharmacists;

     f.     Failing and refusing to implement and follow a uniform posting procedure to ensure that she had equal notice of promotional opportunities, which adversely affected her from advancement;

     g.     Failing and refusing to establish a uniform and unbiased process by which she and non-Black pharmacists could apply and compete equally for promotions and management positions;

     h.     Failing and refusing to consider her for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists were and are considered;

     i.     Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

     j.     Denying her other terms and conditions of employment on the same basis applied to non-Black pharmacists.

<u>Title VII - Disparate Impact</u>

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

246.    C. McMULLEN incorporates Paragraphs 4 through 6, 14 through 20, and 240 through 245 as if fully set forth herein.

247.   At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

248.   At all times material hereto, C. McMULLEN was an employee within the meaning of 42 U.S.C. § 2000e(f).

249.   C. McMULLEN is Black and is therefore a member of a protected class.

250.   WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further, WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. See Exhibit "G.

251.   C. McMULLEN may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and C. McMULLEN have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

252.   The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct had, continues to have, and will have in the future a disparate impact on C. McMULLEN.

<u>Title VII - Disparate Treatment</u>

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

253.   C. McMULLEN incorporates Paragraphs 4 through 6, 14 through 20, and 240 through 245 as if fully set forth herein.

254.   At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

255.   At all times material hereto, C. McMULLEN was an employee within the meaning of 42 U.S.C. § 2000e(f).

256.   C. McMULLEN is Black and is therefore a member of a protected class.

257.   WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further, WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. See Exhibit "G.

258.   C. McMULLEN may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and C. McMULLEN have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

259.   The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct constitutes disparate treatment of C. McMULLEN.

<u>42 U.S.C. § 1981 - Disparate Treatment</u>

260.   C. McMULLEN incorporates Paragraphs 4 through 6, 14 through 20, and 240 through 245 as if fully set forth herein.

261.   C. McMULLEN is a member of a racial minority, Black.

262.   The foregoing conduct violates 42 U.S.C. § 1981 because the conduct constitutes disparate treatment of C. McMULLEN.

<u>Florida Civil Rights Act</u>

263.   C. McMULLEN incorporates Paragraphs 4 through 6, 14 through 20, and 240 through 245 as if fully set forth herein.

264.   C. McMULLEN is a member of a protected class.

265.   At all times material hereto, WALGREENS was an employer within the meaning of Fla. Stat. § 760.02(7).

266.    At all times material hereto, C. McMULLEN was an employee and an aggrieved person within the meaning of Fla. Stat. §§ 760.02(6) and 760.02(10).

267.    The foregoing conduct constitutes a prohibited discriminatory practice in violation of the Florida Civil Rights Act of 1992, Fla. Stat. §760.11.

268.    All conditions precedent have been met for filing this action and proceeding under the Florida Civil Rights Act of 1992.

## V. JURY DEMAND

PLAINTIFFS demand trial by jury in this action.

## VI. PUNITIVE DAMAGES

WALGREENS has engaged in the discriminatory conduct as alleged herein maliciously or in reckless disregard and/or indifference of the federally protected rights of the PLAINTIFFS. PLAINTIFFS are therefore entitled to recover punitive damages in the amount according to proof for the claims under the Title VII (disparate treatment) and 42 U.S.C. § 1981.

## VII. PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS request the following relief:

1.    A declaratory judgment that WALGREENS' practices complained of herein are unlawful and violative of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981 and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*

2.    An award of back pay; front pay; damages for lost compensation, promotions, and job benefits that the PLAINTIFFS would have received but for WALGREENS' discriminatory practices; and compensatory damages for emotional distress, humiliation, embarrassment and anguish;

3.    An award of exemplary and punitive damages commensurate with WALGREENS' ability to pay and to deter future discriminatory conduct for the claims under the Title VII (disparate treatment) and 42 U.S.C. § 1981.

4.    An injunction against WALGREENS and its partners, officers, owners, agents, successors, employees, representatives and any and all persons acting in concert with it, from

engaging in each of the unlawful practices, policies, customs and usages set forth herein;

5.      An order requiring WALGREENS to institute and carry out policies, practices and affirmative action programs that provide equal employment opportunities for Black pharmacists that remedy the effect of WALGREENS' past and present unlawful employment practices;

6.      An order restoring PLAINTIFFS to those jobs they would now be occupying but for WALGREENS' discriminatory practices;

7.      A declaratory judgment in favor of Plaintiff, JOYCE WILLIAMS, that WALGREENS' practices complained of herein are unlawful and violative of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*

8.      Reasonable attorney's fees, costs and expenses of suit;

9.      Prejudgment interest; and

10.     Such other and further relief as the Court may deem just and proper.

**LAW OFFICES OF MICHAEL M. TOBIN, P.A.**
Attorneys for Plaintiffs
1099 Ponce De Leon Blvd.
Coral Gables, Florida 33134-3319
Tel:    305-445-5475
Fax:    305-445-5479


_____
KELSAY D. PATTERSON
Fla. Bar No. 119784

CASE NO. 00-6151-CIV-UNGARO/Brown

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served via

U.S. Mail this 7ᵗʰ day of April , 2000, to: MARK R. CHESKINS, ESQ., Attorneys for

Defendant, Steel Hector & Davis LLP, 200 South Biscayne Blvd., 40ᵗʰ Floor, Miami, Florida

33131-2398.

                        LAW OFFICES OF MICHAEL M. TOBIN, P.A.
                        Attorneys for Plaintiffs
                        1099 Ponce De Leon Blvd.
                        Coral Gables, Florida 33134-3319
                        Tel:    305-445-5475
                        Fax:    305-445-5479


                        KELSAY D. PATTERSON
                        Fla. Bar No. 119784

SEPTEMBER 10,1994

MR. ROBERT KIPP
WALGREENS PHARMACY MANAGER
TAMPA DISTRICT
TAMPA, FLORIDA

MEMO: TRANSFER TO TAMPA

DEAR MR. KIPP:

AS YOU ARE AWARE I HAVE BEEN TRYING TO ACQUIRE A TRANSFER TO THE
TAMPA DISTRICT NOW FOR SOMETIME, BUT TO NO AVAIL IT SEEMS AS THOUGH THE
OPPORTUNITY JUST DOESN'T MANIFEST.

I SPOKE TO MR. STEELE REGARDING A TRANSFER AND HE SAID THAT YOU HAD AN
INFLUX OF INTERNS THAT YOU WERE TRYING TO PLACE AND POTENTIAL PHARMACIST
THAT WOULD BE GETTING RESULTS BACK. WITH MY MANY YEARS OF EXPERIENCE
IN PHARMACY AND PHARMACY MANAGEMENT I WOULD LIKE TO THINK THAT I WOULD
BE GIVEN SOME PRIORITY IN PLACEMENT.

PLEASE CONSIDER ME FOR THE NEXT PHARMACY MANAGER OR STAFF POSITION. I AM
INTEREST IN A PERMANENT PLACEMENT, HOWEVER FLOATING IN TAMPA WOULD BE
MORE ADVANTAGEOUS THAN IN PINELLAS, THE FLOATING SUCH A DISTANCE HAS
BECOME OVERWHELMING. THERE APPEALS TO BE A CONTINUAL OF NEW
PHARMACIST TRANSFERRING INTO THIS AREA.

I WILL CALL YOU IN THE NEXT FEW DAYS IN HOPES OF ACQUIRING SOME FURTHER
DIRECTIONS.

SINCERELY,

JOYCE A. WILLIAMS

ATTACHMENT / EXHIBIT __A__

MARCH 30 1996

MR. ROB KIPP
WALGREENS
TAMPA, FLORIDA

DEAR MR. KIPP;

I HAVE DECIDED TO WRITE THIS LETTER BECAUSE I AM IMMENSELY
CONCERN FOR A SITUATION THAT HAS PREVAILED SINCE MY ARRIVAL AT
STORE 00938  AS YOU ARE AWARE I HAVE BEEN EMPLOYED AT THIS STORE
IN THE CAPACITY OF A PHARMACIST FOR LESS THAN A WEEK, I AM
STILL ADJUSTING TO MY NEW ENVIROMENT, LEARNING WHERE THINGS
ARE AND ATTEMPTING TO ACQUAINT MYSELF WITH CO-WORKER , ETC.
NEVER COULD I HAVE CONCEIVED OF THE ALIENATION AS WELL AS THE
DEGREE OF BACKLASH AND PETTINESS, THAT I HAVE ENDURED BY OTHER
STAFF PHARMACISTS AND THE SENIOR TECH.

THEY HAVE MADE NO ATTEMPT TO CAMOUFLAGE THEIR BRASS-FRONTED
ANIMOSITY TOWARD ME. NO SMILES OR FRIENDLY/HELPFUL GESTURES
BUT THE APPEARANCE OF A HOSTILE SOLIDARITY PERMEATES THE
ATMOSPHERE. I HAVE BEEN INFORMED BY ONE OF THE TECHNICIAN THAT
DISAPPROVED OF THE ONSLAUGHT TACTICS, OF A PREDISPOSED BIAS
AGAINST ME. I HAVE BEEN LABORED BY THAT GROUP A HURRICANE
(DISASTER). WHAT-SO-EVER THIS DENOTATION SUPPOSINGLY DEPICT.
NEEDLESS TO SAY THAT I AM OUTRAGED BY SUCH STEREO TYPICAL
INNUENDO. THE PREMISE FOR SUCH A REPULSIVE SUPPOSITION IS
UNFOUNDED AND CAN BE VALIDATED BY PREVIOUS WALGREENS CO-
WORKERS.

I HAVE BEEN CONSTANTLY SUBJECTED TO TRIVIAL AIMLESS  NIT PICKING,
EXAMPLES (HARMACY STOOL IN WRONG PLACE, OVERFILLING CASSETTES,
VIALS NOT FILL TO OVER FLOW CAPACITY) PROJECTS THAT I HAVE
PROFICIENTLY  EXECUTED AS A NIGHT PHARMACIST ARE CONSPICUOUSLY
SCRUTINIZED. I HAVE HAD THE DISTINT OPPORTUNITY TO WORK IN ALL OF
THE 24 HOUR PHARMACY IN THE TAMPA BAY AREA AND I CAN SAY
WITHOUT QUESTION THIS STORE IS THE FARTHERMOST DIFFERENT.   I AM
ASTOUND BY THE FACT THAT THE ADVERSARY EXPECTS NO REFILLS ON
THE CALL IN LOG WHEN THEY ARRIVE WHEN ANY NIGHT R.PH. CAN TELL
YOU YOUR REFILLS CAN BE CAUGHT UP ONE MOMENT AND MINUTES
LATER WITH THREE TELEPHONE LINES RINGING ...THERE COMES FIVE.

SO THE CONTENTION FOR THE FACT THAT WHEN THE MORNING
PHARMACIST ARRIVE THERE ARE REFILLS ON THE BOOK JUST CALLED IN
THAT I HAVEN'T DONE IS NOT EXTRA ORDINARY.  AROUND 6:00 A.M. THE
PHONE STARTS AND IT IS A CONTINUOUS PURSUIT THAT CAN RUN ONE
PERSON.  AND PICKING UP RX'S.  TO HAVE A CLEAN BOOK AT 8:00 A.M.
SOME MORNINGS IS LUDICROUS.  WHEN I GO IN TO WORK RECOGNIZING
THAT WE ARE A 24 HOUR PHARMACY I JUMP IN AND START FILLING
PRESCRIPTIONS.  ON THE LAST TWO MORNINGS AS THE SENIOR TECH
ARRIVED THERE WERE PERSONS DROPPING OFF RX'S  WHICH SHE PUT IN A
LINE FOR ME TO TYPE AND FILL THEREFORE WHEN THE PHARMACIST
ARRIVE MINUTES LATER THEY WERE STILL THERE.  (THE  SENIOR TECH
HAVE  YET TO AFFORD ME THE COURTESY OF A "GOOD MORNING").

HAVING THEM DECIDE EMPHATICALLY THAT I AM UNACCEPTABLE TO
THEM AND TO INOCULATE THE ENVIRONMENT WITH SUCH HOSTILITY IS
WHAT I DEEM  UNPROFESSIONAL BEHAVIOR THEREFORE  IN AN ATTEMPT
TO REMAIN ALOOF AND DETACHED FROM THE PROBLEM WITHOUT
REACTING I SOLICIT YOUR ASSISTANCE IN A RESOLUTION TO THIS
MATTER.

                                        SINCERELY,

                                        JOYCE A. WILLIAMS

①

# RESPOND TO DISCIPLINARY RECORD
## OF 8-9-96

THE ALLEGATION OF A HIGH NUMBE
OF CUSTOMER COMPLAINTS IS SOMETHI
THAT I HEARD ABOUT FOR THE FIRST TI
ON THE OCCASION THAT I GETHER IN TH
PRESENCE OF TAYLOR/MYERS ON THE MORNE
OF 8-9-96. I DISCUSSED WITH THEM
INDIVIDUALLY CLAIMED CUSTOMER COMPLAIN

1. THE COMPLAINT REGARDING FAX RX WAS
GIVEN TO OTHER PHARMACIST SANDRA
NIXON SHE DECIDED SHE WAS NOT GOIN
TO FILL IT DUETO THE FACT THAT SHE WA
ORIGINAL RX AS THE LAW DITATES.
SHE TOLD ME THIS STATING THAT ON
COULDN'T CLEARLY BE READ. RUSSELL MY
APPARENTLY FILLED RX OFF OF FAX PRESR
THEREFORE WHEN PATIENT ARRIVED I WA
TO VERIFY WRITTEN PRESCRIPTIONS.
ONE MEDICINE WE DIDN'T HAVE
HAS BEEN FAX OVER HOWEVER NEIT
RPH ORDER IT FROM FAX COPIES. THE
PATIENT BECAME ANNOYED BECAUSE

(2)

I HAD TO VERIFY ORIGINAL RX'S AGAINST FAX COPIES FOR ACCURACY I WAS WORKING ALONG WITH SIX OTHER CUSTOMERS IN line AHEAD OF THIS CUSTOMER, HOWEVER SHE thought SINCE hers WERE FAX IN SHE SHOULD NOT HAVE TO WAIT HER TURN. I ALSO HAD TO TELL HER THAT WE HAD TO ORDER ONE OF THE RX'S, SHE WENT INTO RAGE.

COMPLAINT #2 DEALT WITH MY FAILURE TO REFUND A PATIENT ON A PRESCRIPTION SHE DIDN'T WANT. IN THE STORE I CAME FROM WE NEVER gave REFUNDS ON RX'S, NO one TOLD ME OF YOUR POLICY HERE BEING DIFFERENT. I TOLD PATIENT SHE WOULD HAVE TO SPEAK WITH PHARMACY MANAGER; the next morning I ASK RPh KIM, ABOUT IT SHE SAID IF A DECISION IS MADE TO ISSUE REFUND THE MESSAGE IS USUALLY PASS ON TO OTHER RPh. AND NO one HAD MENTION IT TO HER, THEREFORE SHE DID NOT PASS IT TO ME.

COMPLAINT #3          REGARDING A PATIENT THAT HAD NO REFILLS ON HER TICID that

SELDOM DISPENSED I SURELY WOULD HA
REMEMBER. HOWEVER, I THINK THAT WO
HAVE FALLEN UNDER PROFESSIONAL JUDGEM
OF DISCRETION AND THE FACTORS INVOL

MYERS MENTION THAT ON AN OCCASSION
PRESCRIPTIONS WERE NOT FILLED I RECA
THE OCCASION BEING ON[it] NIGHT THAT
WAREHOUSE ORDER CAME IN ..I HAD PU
ALL TOTES[up]. HOWEVER BECAUSE MY
JOB AS A NIGHT RPH INVOLVES ALSO FI
PRESCRIPTION AND TAKING CARE OF CUSTO
TIME EXPIRED AND AS I DID IN
MY PREVIOUS STORE AS WELL AS A
ACTION MANY othe NIGHT RPH EMPL
I PUT A RUBBER BAND AROUND STACK
IN ORDER THAT I COULD FILE THEM
THE NEXT NIGHT OR THE DAY SHIFT
COULD PUT IN ORDER IF TIME PERMITTE
I DIDN'T FEEL THAT UNREASONABLE.
THE OCCASSION THAT RUSSELL MYERS
RX MANAGER. TALKED TO ME WAS IN. CON
CONJUCTION

WITH OTHER NIGHT RPH ERVIN GREEN
THE WEEK I CAME TO THIS STORE
IT WAS MAINLY REGARDING things
he WANTED DONE. HE HAS NEVER
MENTION A CUSTOMER COMPLAINT
AS MANY MANY RPH get
OF COMPLAINTS IN THIS STORE
MR. TAYLOR MENTION TO ME THAT
DRAWER WAS SHORT IN the MONT
OF JUNE HOWEVER IF THAT CONSTI
ANY $$ MORE then NOTHING MR. VESTO
THE ASSISTANT INFORMED ME MY DRA
WAS SHORT ONE MORNING AND ASK
FOR THE KEY TO WHERE I IS ST
FOR THE DAY'S SO HE COULD COUNT $
IT, MY DRAWER THAT'S THE EXTEN'
OF HIS TALKING TO ME ABOUT CASH H
ALL OF THIS IS FABRICATED INTO
TO SET THE STAGE FOR TERMINATION, OR

A further example of deceptiveness
is that I reviewed this Disciplinary
Record on the morning of August 9,
however, I didn't sign it due to the
fact that I knew my response was
extensive. Therefore I requested that
it be left in order for me to respond
upon my obtaining it I discovered that
Mr. Taylor had attempted to devise
another fictitious claim by adding
the first sentence that I had
been verbally talked to by him
and Assistant. Mr. Vesto regarding
cash handling. And there also
was a second Disciplinary Record
prepared by Rob Kidd that emerged
upon auditing to this store Mr. Taylor
now assigned me a locker. And I never
saw him do bag checks and many
other employee assures me I was
treated atypical in the searching of
my personal belongings.

6

My failure to delete total Rx's as related by pharmacy manager, I learned from Russell that here they delete after 7 days. At store #718 we deleted after 14 days. Many of the other stores delete differently. No one told me to do it any different or explained how it was to be done.

AUGUST 24, 1996

MR. KIRK WOLFRAM
WALGREENS DISTRICT MANAGER
TAMPA, FLORIDA

DEAR MR. WOLFRAM:

THANK-YOU FOR YOUR ASSISTANCE IN HELPING ME ACQUIRE THE
TRANSFER TO THIS DISTRICT BACK IN MAY. I WISH THAT I COULD
WRITE THAT ALL IS WELL HOWEVER THAT IS NOT THE SITUATION
AND THAT IS WHY I HAVE DECIDED TO WRITE TO YOU FOR AN OBJECTIVE
REVIEW OF AN ARRAY OF CIRCUMSTANCES THAT HAVE RESULTED IN MY
BEING PLACED ON 30 DAY PROBATION. I HAVE ENJOYED WORKING FOR
WALGREENS, AND HAVE ENJOYED A GOOD WORKING ENVIRONMENT
WHILE UNDER THE DIRECTION OF SUPERVISOR JON STEELE IN ST.PETE.
AFTER REPEATEDLY REQUESTING A TRANSFER TO A HILLSBOROUGH
COUNTY STORE FROM ROB KIPP, BUT NOT UNTIL I SOUGHT YOUR
ASSISTANCE DID I RECEIVE THE TRANSFER. UPON BEING TRANSFERRED
TO TAMPA STORE 938, I FELT AS IF THE WORK ENVIRONMENT HAD ALREADY
BEEN POLLUTED AGAINST ME BY MR. KIPP, AS CO-WORKERS
AND MR. KIPP'S PERSONAL FRIEND, STORE MANAGER, GLENN TAYLOR,
HAD PRECONCEIVED, INCORRECT, NOTIONS ABOUT MY PERSONALITY AND
WORK HABITS. IN AN EFFORT TO TRY AND CORRECT THE SITUATION, I
WROTE MR.. KIPP A LETTER ON MAY 30, 1996, EXPLAINING MY CONCERNS
AND REQUESTED HIS ASSISTANCE. MR. KIPP NEVER RESPONDED TO MY
WRITTEN REQUEST FOR ASSISTANCE.

WHILE IN THE TAMPA STORE I HAVE NOT BEEN SHOWN DIFFERENT POLICIES
ON THE WAY TO DO BUSINESS IN STORE 938 NOR HAVE ANY ONE
CONVEYED ANY SPECIFIC METHODS TO EMPLOY. THE PINELLAS STORE
HAD ITS OWN POLICY REGARDING DELETES AND THE FLORIDA LAW SPELLS
OUT RULES REGARDING FAX PRESCRIPTIONS. I WAS NEVER TOLD THAT I
WAS DOING ANYTHING INCORRECTLY, UNTIL SUCH TIME, AS MR. MYERS
PRESENTED ME WITH AN UNDATED WRITTEN ACCOUNT OF THINGS I HAD
ALLEGEDLY BEEN DOING WRONG. COINCIDENTALLY, MR. KIPP REQUESTED
THAT MR. MYERS DOCUMENT IN WRITING SOME BAD PERFORMANCE
ITEMS WHICH I ALLEGEDLY ENGAGED IN. THESE ITEMS I DISAGREE WITH
FOR THE VARIOUS REASONS OUTLINED.

TO RESPONDED TO THE ALLEGATION THAT I FAILED TO TOTALLY DELETE RX'S AS RELATED BY MR. MYERS, I LEARNED AT THE TIME THAT HE PRESENTED ME WITH THIS LIST OF THINGS I WASN'T DOING THAT AT THIS STORE THEY DELETED RX'S EVERY 7 DAYS WHERE AS WE DELETED THEM EVERY 14 DAYS, HOWEVER NO ONE POINTED OUT TO ME THAT I WAS NOT DELETING COMPLETELY. I WAS PUT UNDER SURVEILLANCE AND OBSERVED BY LOSS PREVENTION I EXPLAINED MY DISTRUST FOR STORE MANAGEMENT AND THE FACTTHAT THE CAMERA SHOULD HAVE REVEALED WHERE THEY CAME FROM WITHOUT QUESTION. MY PERSONAL EFFECTS WERE ALSO SEARCHED , NO OTHER RX EMPLOYEES WERE SUBJECTED TO SUCH DEPLORABLE APPROACH. A FACT THAT I FEEL HAD A RACIAL OVERTONE. THERE IS MUCH TO MANY GAMES PLAYED IN THIS ENVIROMENT SOLELY PREDICATED ON ETHNIC DISCORD. THOUGH MY ACTIONS IN CONCEALING THE BLISTER PACKAGING MAY HAVE APPEARED SUSPICIOUS WHEN VIEWED ON CAMERA, ONE WOULD HAVE TO BE INVOLVED IN THE DAILY TURMOIL TO UNDERSTAND THE RATIONALITY. I DOUBT THAT I COULD HAVE DEPLETED#100 TABS OF EQUAL IN ONE CUP OF COFFEE.

I HAVE ENJOYED A SUCCESSFUL CAREER AS A PHARMACIST FOR MANY YEARS; I WOULD LIKE TO CONTINUE A SUCCESSFUL CAREER WITH WALGREEN'S BUT IN ORDER TO DO SO I NEED TO HAVE COOPERATION AND NOT BE SUBJECTED TO: HOSTILITY, ACCUSATIONS AND SEARCHING OF PERSONAL ;PROPERTY WITH THE HOPE OF LABELING ME A THIEF, BEING REPRIMANDED FOR THINGS WHICH I WAS NEVER TOLD WRONG OR NOT IN ACCORDANCE WITH SPECIALIZED WAY STORE #938 DOES BUSINESS I WOULD LIKE A TRANSFER OUT OF THIS STORE AS I RELATED TO MR.KIPP. I THINK THAT MR. KIPP APPEARS DETERMINED TO STIFLE MY CAREER WITH WALGREEN'S AND THEREFORE I SEEK YOUR ASSISTANCE. THANK YOU IN ADVANCE FOR YOUR CONSIDERATION IN THIS MATTER.. I HAVE ENCLOSED A COPY OF THE LETTER I WROTE TO MR. KIPP. THE DATE ON THE LETTER SHOULD HAVE BEEN MAY 25.

SINCERELY,

JOYCE A. WILLIAMS

cc
MR. JAKE KENESEY
EMPLOYEE RELATIONS

JANUARY 30, 1997

MR. KIRK WOLFRAM
WALGREENS DISTRICT MANAGER
TAMPA, FLORIDA

DEAR MR. WOLFRAM:

I WROTE TO YOU BACK IN AUGUST SEEKING YOUR INTERVENTION REGARDING
VARIOUS SUSPICIOUS INCIDENTS THAT WERE DELIBERATELY LAUNCH AGAINST
ME, AFTER I SOUGHT YOUR ASSISTANCE IN GETTING A TRANSFER TO THE TAMPA
DISTRICT FROM ST. PETERSBURG. THAT SITUATION CONTINUE TO BE A SOURCE
OF BITTER CONTENTION.

I AM WRITING THIS LETTER TO EXPRESS MY CONCERNS REGARDING AN INCIDENT
THAT VIOLATED MY RIGHT TO PRIVACY AS AFFORDED ME BY THE FEDERAL STATUE
456.703(H) AND FLORIDA STATUE 456.017(2) AND ALSO WAS A BREACH OF COMPANY
POLICY. ON WEDSNDAY NIGHT (1/22/97), UPON STARTING WORK I ASKED THE
PHARMACIST, DOUG HEALY TO REFILL A PRESCRIPTION FOR STADOL A MEDICATION I
TAKE FOR MIGRAINE HEADACHE. HE FILL IT WITHOUT HESITATION, HOWEVER
ON FRIDAY HE MADE A MOCKERY OF THE ORDEAL AS HE SHARED THE DETAILS WITH
STORE MANAGER (RANDY REDDICK) DIVULGING THE SPECIFIC DRUG THERAPY.

THE FACT THAT I CHANGED STORES OBVIOUSLY DIDN'T CHANGE MY SUPERVISOR'
ROB KIPP'S ATTITUDE TOWARD ME ONLY HARDEN IT AND MADE HIM REDIRECT HIS
ANIMOSITY. I HAVE DISCOVERED EVIDENCE THAT DOUG HAS ALREADY BEEN
SUMMONED TO DOCUMENT ANY INFRACTIONS INVOLVING ME. THERE IS A GROWING
SENSE OF DISPAIR THAT THE CORRUPT, BIAS, BIGOTRY AND THE PROPENSITY TO
RETALIATE AGAINST ME COMPELS MR. KIPP. HE APPEARS TO BE AN ARTFUL
PRACTITIONER OF HIDDEN CAMERA TRICKS AND EXPLOITATION TO THE EXTENT OF
BEING CONSUMED BY EXTRAORDINARY EFFORTS TO SUBDUE ME. I TAKE GREAT
OFFENSE TO THE FACT THAT THE CONFIDENTIALITY AND PERSONAL NATURE OF MY
PRESCRIPTION REQUEST WAS COMPROMISED, IT WAS NOT IN MY BEST INTEREST AND
I RENDERED NO CONSENT FOR SUCH INFORMATION TO BE EXPOSED. THIS WAS
INTENTED AS A MALICIOUS ACT TO DISCREDIT ME, EVERYONE IN THE STORE KNOWS
MY BUSINESS AND THEREFORE I INTEND TO SEEK LEGAL RECOURSE. IT IS A
TRAVESTY THAT ANYONE WOULD PERSUE AN AGENDA WITH SUCH VIGOR TO
JEOPARDIZE A COMPANY AS PROGRESSIVE AS "WALGREENS".

I ASSUME THIS IS WHY SO MANY PHARMACY MANAGERS POSITIONS HAVE BECOME
AVAILABLE AND WITH MY EXPERIENCE I HAVE NOT BEEN CONSIDERED. I REGRET
THAT THE PLAYERS ATTITUDE ARE SWAYED BY ONE INDIVIDUAL WITH A VENDETTA.
I AM REQUESTING THAT APPPROPRIATE DISCIPLINARY ACTIONS BE TAKEN TOWARD
THE PERPETRATORS DOUG HEALY (PHARMACY MANAGER) AND RANDY REDDICK
(STORE MANAGER) FOR INVADING MY PRIVACY. I WOULD ASK THAT I BE ALLOW TO DO
MY JOB WITH THE ASSURRANCE THAT I WILL BE TREATED LIKE OTHER EMPLOYEES.

CC:                                              SINCERELY,
MR. JAKE KENESEY
EMPLOYEE RELATIONS

                                                 JOYCE A. WILLIAMS

FEBRUARY 2, 1997

MR. KENESEY:
EMPLOYEE RELATIONS
WALGREENS COMPANY
DEERFIELD, ILLINOIS

DEAR MR. KENESEY:

I SPOKE WITH YOU BACK IN AUGUST IN RELATIONS TO AN ONRUSH OF
EVENTS THAT ENSUED UPON MY REQUESTING THE ASSISTANCE OF MR.
WOLFRAM IN SEEKING A TRANSFER TO THE TAMPA DISTRICT. I HAD HOPED
THAT YOUR INTERVENTION WOULD HAVE ERADICATED THE PROBLEM
AND THAT I COULD SUCCEED WITH ENTHUSIASM IN PERFORMING MY
DUTIES AS A PHARMACIST WITH WALGREENS WITHOUT FURTHER
PLOTTING AND NUISANCE.

NEEDLESS TO SAY THAT I AM DISTURBED AND DISGUSTED BY THE
REURGE OF EVENTS THAT ARE CLEARLY STILL AN ACT OF RETALIATION,
IT IS NOT A HASSLE BUT MORE OF A NIGHTMARE. HARASSMENT
PREDICATED UPON PREJUDICE AND PERSONAL VENDETTA IS EVIDENT
THAT THERE IS A CHRONIC DISREGARD FOR EMPLOYEE RELATIONS.

FROM AN UPBRINGING OF LOVE AND TRUST TO A PRESENT DAY CULTURE
IN THE WORK PLACE OF DISTRUST AND BACK-BITING IS ENOUGH TO
DAMPENED ONE'S SPIRIT. I AM THEREFORE APPEALING TO YOU FOR
YOUR ASSISTANCE IN ALLEVIATING THESE PROBLEMS. I WOULD LIKE TO
BE TREATED FAIRLY AND WITH RESPECT WITHOUT RESERVATIONS.

SINCERELY,

JOYCE A. WILLIAMS

AUGUST 15, 1997

MR. JOHN W. KENESEY
EMPLOYEE RELATIONS
WALGREENS COMPANY
200 WILMOT RD.
DEERFIELD, IL

DEAR MR. KENESEY:

I WROTE TO YOU SOME TIME BACK SEEKING YOUR INTERVENTION IN AN ORDEAL
THAT MIMIC RETAILIATION.  I WISH I COULD SAY THAT I HAVE SINCE BEEN ALLOWED
TO DO MY JOB WITHOUT INCIDENCE.  HOWEVER THIS WEEK I AM BEEN SUBJECTED TO
AN INVESTIGATION TO DETERMINE IF I HAVE BEEN WRITING PRESCRIPTIONS FOR
MYSELF.  THE SAME DRUG (STADOL) IN QUESTION IS THE DRUG THAT I LODGE AA
COMPLAINT INVOLVING VIOLATION OF MY PRIVACY, WHEN THE STORE MANGER AND
THE PHARMACY MANAGER DISCUSSED MY PROFILE IN THE COMPANY OF OTHERS.

I WAS TOLD THAT BECAUSE OF THE FREQUENCY OF WHICH I USE THIS DRUG FOR
MIGRAINE HEADACHE AND THE COST TO THE INSURANCE COMPANY, THIS
WARRANTED THAT THEY INVESTIGATE.  I CAN'T UNDERSTAND THE RATIONALITY
THAT'S VERY AMBIGUOUS AND WOULD LEAVE AN EMPLOYEE THAT COST
THE COMPANY SUBSTANTIALLY IN HEALTH CARE VULNERABLE TO HARRASSMENT.
WHY AM I BEING SUBJECTED TO THIS SCRUNITY THAT RESEMBLE A WITCH HUNT.

THIS PROBE HAS PHYSICIANS QUESTIONING MY INTEGRITY  AND SUGGEST TO SOME
THAT I AM ABUSING THIS DRUG.  THIS IS RETAILIATION I HAVE NOT DONE ANYTHING
TO WARRANT SUCH INVESTIGATION AND THEREFORE I WOULD APPRECIATE IT IF
I BE ALLOWED TO DO MY JOB WITHOUT CONTINUOUS ADVERSE INCIDENTS.

I AM ENCLOSING A COPY OF A LETTER THAT I WROTE TO MY KIPP BACK IN SEPT.
1994 AS YOU REQUESTED FROM BOB JETT OF E.E.O.C. I AM CONFIDENT THAT MR.
KIPP RECEIVED THIS LETTER BECAUSE I DID FOLLOW UP WITH A PHONE CALL TO
ATTEMPT TO ACCESS THE STATUS OF THE TRANSFER.  I WAS DIRECTED BY HIS
SECRETARY I BELIEVE IT WAS DEBBIE TO TALK WITH MR. STEELE PER MR. KIPP.  I
TOLD HER THAT I HAD SPOKEN TO MR. STEELE AND ASKED IF HE MR. KIPP HAD
RECEIVED MY LETTER, SHE ASSURED ME HE HAD, HOWEVER HE LEFT HER THOSE
INSTRUCTIONS TO GIVE TO ME.

I CAN'T UNDERSTAND WHY HE HAS  NO COPY OF THIS LETTER, OR RECOLLECTION OF
THIS THIS CONVERSATION.

SINCERELY,


JOYCE A. WILLIAMS

SEPTEMBER 16, 1997

MR. KIRK WOLFRAM
WALGREEN COMPANY
TAMPA DISTRICT MANAGER
TAMPA, FLORIDA

DEAR MR. WOLFRAM:

AFTER GIVING MUCH CONSIDERATION TO YOUR CONVERSATION AND YOUR LETTER
INFORMING ME OF DISCIPLINARY ACTIONS YOU IMPOSE UPON ME, I FELT IT WOULD BE
REMISS OF ME NOT TO RESPOND TO THE MULTIPLE ALLEGATIONS. I FIND IT
UNDESIRABLE TO BE MEASURED BY A DIFFERENT YARDSTICK THAN OTHER
COLLEAGUES EMPLOYED BY WALGREENS. SINCE TALKING TO YOU I HAVE
SURRENDERED TO A CURIOSITY THAT LED ME TO INDISCRIMINATELY INQUIRE OF
APPROXIMATELY FIFTEEN PHARMACIST WHETHER THEY WERE AWARE OF THESE FACTS:

1. THAT IT WAS AGAINST COMPANY POLICY FOR A PHARMACIST TO FILL A
   PRESCRIPTION FOR ONE'S SELF. NO ONE THAT I SPOKE TO HAD EVER HEARD
   OF SUCH RULE NOR REMEMBERED READING IT. THEREFORE I WOULD
   APPRECIATE IT IF YOU COULD DIRECT ME TO THE SOURCE OF THIS RULE IN
   ORDER THAT I CAN VIEW IT FOR MY OWN UNDERSTANDING.
2. ALL OF THE PHARMACIST WERE AMAZED TO LEARN THAT IT WAS A CITABLE
   OFFENSE NOT TO SIGN THE LOG UPON PICKING UP A PRESCRIPTION ON THE
   WALGREENS PLAN AND ADMITTED THAT THEY SELDOM SIGNED. THEY
   CONVEYED JUST HOW LUDCRIOUS THAT WAS SINCE WALGREENS IS SELF
   INSURED, UNLIKE OTHER INSURANCE COMPANY THAT DO PERIODIC AUDITS.

MR. WOLFRAM UP UNTIL NOW I HAD REGARDED LOSS PREVENTION AS A FAIRLY
HONORABLE PILLAR OF THE WALGREENS ORGANIZATION THAT I FELT WOULD SEEK AN
UNBIAS ATTEMPT TO DISCOVER THE FACTS. HOWEVER AFTER I SAT DOWN WITH
MR. ODOM AND MR. NEWMAN AND INFORMED THEM OF THE FACT THAT USUALLY AT
NIGHT MOST OF THE EMPLOYEE SALES ARE RUNG UP IN THE PHARMACY DO TO THE
FACT THAT THE NIGHT STAFF IS OFTEN WORKING IN THAT AREA., ANY SALE THAT WAS
RING FOR ME WAS EITHER RUNG MY MR. TOOTHMAN OR THE FRONT CASHIER ON MY
REGISTER. MR. KIPP STATED IN THE MEETING THAT MR. TOOTHMAN HAD NO
RECOLLECTION OF HAVING RUNG UP A PRESCRIPTION, HOWEVER HE FAILED TO
CONSULT THE FRONT CASHIER, INSTEAD FOUND IT CONVENIENT TO SAY THAT I RANG IT
FOR MYSELF. THAT ACCUSATION IS INDICATIVE OF THE FACT THAT THE TRUTH WAS
DISTORTED AND NO FURTHER ENDEAVOR TO DISCERN THE REALITY WAS ATTEMPTED.

THE ACCUSATION THAT I SELF MEDICATED MYSELF IS AN ALDULTERATED DELUSION SO
SERIOUS THAT I TOOK THE LIBERTY TO CONSULT WITH A MEMBER OF THE BOARD OF
PHARMACY AS I INFORMED YOU AND MR KIPP IN THE MEETING. I WAS DIRECTED TO THE
FLORIDA STATUE 465.0275 THAT COVERS EMERGENCY REFILLS (I HAVE ATTACHED A
COPY OF THAT STATUE). THEREFORE SINCE PRESCRIPTION #504110 WAS APPROVED BY
BOTH DR. KAHAN AND DR. FOX, INASMUCH AS I GOT APPROVAL PURSUANT TO THIS
STATUE AND WITHIN THE GUIDE LINES, THE REFILL ON THAT PRESCIPTION WAS WITHIN
THE CONFOUNDS OF THE LAW. BECAUSE I PRACTICE PHARMACY IN THE STATE OF
FLORIDA I AM OBLIGATED LIKE ALL OTHER PHARMACIST TO BE GOVERNED BY THE
FLORIDA LAW. DR. FOX'S NAME WAS ON THAT PRESCRIPTION AND I OBTAINED
SUBSEQUENT AUTHORIZATION, THERE IS NO DISCREPANCY THERE.

YOU ALSO INDICATED THAT THE REGISTER JOURNAL WAS INSPECTED TO DETERMINE IF I HAD PAID FOR A PRESCRIPTION THAT WAS FILLED ON THE 6-6-97, IT WAS ASSUMED THAT BECAUSE IT WAS FILLED ON THAT DAY THAT IT WAS CONFISCATED ON THE SAME DAY WHICH WAS NOT NECESSARILY A FACT. HOWEVER SINCE MR. REDDICK THE STORE MANAGER WAS SO ANXIOUS TO POUR FUEL ON THE FIRE WITHOUT KNOWING WHEN THE PRESCRIPTION WAS PICK UP HE DECLARED IT WAS NOT PAID FOR AN ASSUMPTION THAT HAS NO MERIT. THIS DEFINES THE PICTURE HE AND HIS ASSOCIATES ARE STRIVING TO PAINT IN THEIR OVERZEALOUS ATTEMPT TO BID ME FAREWELL.

MR. WOLFRAM MY POINT IS THAT I WAS REPRIMANDED AND SUSPENSED WITHOUT PAY BASED UPON CIRCUMSTANTIAL CLAIMS THAT FITTED WITHIN THE CONFOUNDS OF SOMEONE'S ULTERIOR MOTIVE. THIS HAS CAUSE A TREMENDOUS BURDEN ON ME AND MY FAMILY BOTH SPIRITUALLY, EMOTIONALLY AND FINANCIALLY, I AM VERY CONCERNED ABOUT THE INTEGRITY OF THIS INVESTIGATION AND FEEL THAT THE RESULTS COULD HAVE BEEN COMPROMISED IN AN EFFORT TO COMPOUND AS MANY MINOR INFRACTIONS AS POSSIBLE AGAINST ME IN ORDER TO JUSTIFY THE WARNING THAT ANY FURTHER VIOLATION OF LAW OR WALGREEN POLICY WILL RESULT IN MY DISMISSSAL FROM WALGREENS EMPLOYMENT.

I WOULD APPRECIATE A RESPONSE TO MY INQUIRIES AT YOUR EARLIEST CONVENIENCE AND APPRECIATE CONSIDERATIONS IN THIS MATTER.

RESPECTFULLY,

JOYCE A. WILLIAMS

CC: MR. JOHN KENESEY
    EMPLOYEE RELATIONS
    BOB JETT, E.E.O.C.
    DAVID LINESCH, ESQ.

OCTOBER 2, 1997

MR. BOB JETT
E.E.O.C.
501 E. POLK ST. SUITE 1020
TAMPA, FLORIDA

DEAR MR. JETT:

AS I MENTION TO YOU A COUPLE OF WEEKS EARLIER MY CURRENT SUPERVISOR HAS
WAGED A WAR AGAINST ME TO PROCURE EVIDENCE TO TERMINATE ME. THERE IS NO
REASON WHY HE SHOULD BE VIEWING MY MEDICAL PROFILE, THIS ACTION FURTHER
VALIDATE THAT THE REASONS THEY STATED TO YOU REGARDING WHY THEY WERE
DISCUSSING MY PROFILE WAS A LIE, THE MOTIVES WERE TO HARRESS ME.

I ALSO INFORMED YOU THAT THEIR REASONS FOR NOT PROMOTING ME RELAVENT TO
CUSTOMER PROBLEMS WERE ALSO INVALID SINCE THE ALLEDGED CUSTOMER
COMPLAINS WAS AFTER I HAD BEEN EMPLOYED WITH WALGREENS IN EXCESS OF TWO
PLUS YEARS. I ASSUMED EMPLOYMENT WITH YEARS OF EXPERIENCE MANY IN
PHARMACY MANAGEMENT AS MY RESUME SUGGEST.

I INFORMED YOU THAT THERE WERE WHITE MALES THAT WERE PROMOTED TO
PHARMACY MANAGER THAT HAD MANY CUSTOMER PROBLEMS, WARREN STREIKE HAD
SUCH A TERRIBLE CUSTOMER SERVICE PROBLEM HE WAS TRANSFERRED TO TAMPA
FROM ST. PETERSBURG AND WAS PROMOTED TO PHARMACY MANAGER. ANOTHER
INDIVIDUAL THAT INCURRED SIMILAR PROBLEMS IS PAUL WHITT IN ST. PETERSBURG
WHO WALKED OUT A STORE AFTER AN ALTERCATION WITH A CUSTOMER AND WAS
LATER PROMOTED TO PHARMACY MANAGER.

WALGREENS CATERGORICALLY HIRE BLACKS IN POSITIONS WITHOUT PROMOTING
THEM TO MANAGEMENT POSITIONS. THE FACT THAT THERE IS ONLY FOUR BLACK
STORE MANAGERS IN THE STATE OF FLORIDA FURTHER ESTABLISH MY CONCERNS.

I SHOULD HOPE THAT SITUATION IS OBSERVED WITH THE SCRUTINY IT DESERVED IN
ORDER THAT BLACK EMPLOYEES ARE AFFORDED THE SAME OPPORTUNITIES WITHOUT
REGARD FOR THEIR SKIN COLOR.

SINCERELY,


JOYCE A. WILLIAMS

JANUARY 28, 1998

MR. KIRK WOLFRAM
WALGREEN COMPANY
TAMPA DISTRICT MANAGER
TAMPA, FLORIDA

DEAR MR. WOLFRAM:

WITH EACH PASSING DAY I RECOGNIZE THAT I CAN'T DEPEND UPON MY STORE MANGER,
MR. REDDICK TO CONVEY WITH FAIRNESS ANY ORDEAL THAT INVOLVES ME, SO
THEREFORE I FEEL COMPEL TO ADDRESS AN INCIDENT THAT OCCURRED ON JANUARY 22,
THAT INVOLVED A CUSTOMER MR. JOHN ANNIS, IN AN EFFORT TO DISPEL THE TWISTING
OF THE FACTS.

SHORTLY AFTER ARRIVING TO WORK THIS CUSTOMER GAVE THE PHARMACIST
(MICHELE) A COUPLE OF RX'S, SHE ASKED ME HOW LONG IT WOULD BE TO FILL THEM I
RESPONDED ABOUT 15 MINUTES. I WAS AT THAT TIME RELIEVING HER AND THERE WERE
OTHER CUSTOMERS IN THE DRIVE THUR. UPON PROCESSING HIS PRESCRIPTIONS I
LEARNED THAT HIS INSURANCE HAD EXPIRED AND THE COST OF THE RX'S WERE
APPROXIMATELY $140.00 /PLUS THEREFORE I PAGED HIM THE TO SEE IF HE HAD A NEW
INSURANCE CARD. HE DIDN'T RETURN TO THE PHARMACY AFTER THE PAGE AND ONE OF
THE GUYS FROM THE STOCK CREW WAS DELIVERING MY WAREHOUSE ORDER. DUE TO
THE FACT THAT I HAVE A CURRENT DISABILITY AND I AM RESTRICTED FROM LIFTING
THE TOTES, I BEGGED THE INDULGENCE OF THE STOCK GUY TO REMAIN PUT IN ORDER
THAT I COULD RETRIEVE A SHOPPING CART THAT HE COULD PUT THE TOTES ONTO TO
FACILITATE MY ABILITY TO PUT THE STOCK UP.

AFTER THE CUSTOMER FINALLY RETURNED TO THE PHARMACY I INFORMED HIM THAT
HIS INSURANCE HAD EXPIRED AND THE CASH PRICE OF THE PRESCRIPTIONS, HE THEN
WENT INTO A FRENZY DECLARING THAT HIS CARD WAS ACTIVE AND ETC. . . I INFORMED
HIM THAT THE INFORMATION WAS BEING OBTAINED FROM HIS INSURANCE COMPANY,
HE ANGUISHLY DECLARED THAT HE WANTED IT FOR THE CASH PRICE, HOWEVER HE
COULDN'T UNDERSTAND THAT IT WOULD TAKE ANOTHER MINUTE OR TWO TO FINISH
PROCESSING THE RX'S. AS I RANG HIM UP HE HAD EATEN AN ICE CREAM THAT HAD
CHOCOLATE AND NUTS REMAINING IN THE WRAPPER AS HE HELD IT UP FOR ME TO SCAN
THE MESS SPILLED ALL OVER THE COUNTER. HE MAKE THE DISGUSTING REMARK "SEE
IF YOU CAN ENJOY CLEANING THAT UP". I DID NOT DIGNIFY THAT COMMENT, I CHOSE TO
IGNORE IT AND COMPLETED HIS SALE, AS HE RANTED AND RAVED DECLARING HIS
INSURANCE WAS VALID, I TOLD HIM THAT IF HE BOUGHT US A NEW CARD THAT WE
WOULD REFUND HIM WITHOUT HESITATIONS.

HE WENT UP FRONT AND FOUND ASSISTANT MANAGER MS. HAWTHORN AND WAS JUST
AS OBNOXIOUS TOWARD HER STATING HE WANTED TO SEE SOMEONE WITH AUTHORITY,
TOTALLY OVER LOOKING HER POSITION. HE TOLD HER THAT I HAD BEEN OUT IN THE
STORE SHOPPING AND THAT WHEN HE RETURNED HIS PRESCIPTIONS WEREN'T READY
AND THAT I HAD AN ATTITUDE. I SAID VERY LITTLE TO THIS GUY BECAUSE I KNEW HE
HAD A PROBLEM, I EVEN PAGED MANAGEMENT TO PHARMACY HOWEVER THEY WERE
UNLOADING THE TRUCK AND MS. HAWTHORN SAID SHE NEVER HEARD ME. SINCE
SLAVERY IS OVER HIS REMARK SUGGESTING I ENJOY CLEANING UP HIS MESS WAS THE
EPITOME OF DISRESPECT.

IT WOULD BE VERY EASY FOR THE FACTS TO BE MISCONSTRUED SINCE MR. REDDICK NEVER APPROACHED ME PERSONALLY HE SENT MR. NAVA HIS ASSISTANT TO ASK ME WHAT HAPPEN, THOUGH HE WAS AVAILABLE AND IN HIS OFFICE. HOW DIFFICULT A TASK IT MUST HAVE BEEN FOR HIM TO APPROACH ME HIMSELF, WHEN I WENT TO THE OFFICE TO TAKE MY BANK MR. NAVA WAS RELATING TO HIM MY VERSION OF THE EPISODE. WHAT KIND OF ATMOSPHERE OR MORALE IS HE (MR. REDDICK) INTENTED UPON FOSTERING, HEARSAY IS THE EYE OF ANY STORM AND PROBLEMS CAN ONLY BE EXACERBATED BY HARBORING SUCH A THRUST FOR RUMORS.

THE PHARMACY MANAGER DOUG HEALY PREYED UPON THIS OPPORTUNITY TO EXTEND THIS ORDEAL BY FORCIBLY INSISTING THAT MR. ANNIS SEND THE WALGREENS COMMENT CARD IN TO COMPLAIN AGAINST ME. STATING TO MR. ANNIS THAT THIS WAS THE AMMUNITION NEEDED TO GET RID OF ME. MR. WOLFRAM MY REQUEST HERE IS THAT IF THIS IS THE GAME THAT IS BEING PLAYED, THAT I BE INFORMED OF THE RULES SO THAT I CAN BECOME ONE OF THE PLAYERS. CUSTOMERS COMPLAINED TO ME EVERY NIGHT ABOUT SOMETHING THE DAY SHIFT HASN'T DONE, FROM PRESCRIPTION ERRORS TO OTHER PHARMACY OMISSIONS. I CAN'T APPRECIATE BEING THE VICTIM OF THIS DISPARATE TREATMENT TO BLACKEN ME, IN AN ATTEMPT TO THREATEN MY POSITION.

IT IS EVIDENT THAT MY OUSTER IS STEADILY BEING ORCHESTRATED BY MANAGEMENT. THEREFORE I REQUEST TO REVIEW ANY COMMENTS OR NOTATIONS RELATIVE TO THIS ORDEAL DEPOSITED IN MY PERSONNEL FILE. I WOULD APPRECIATE IN THE FUTURE THAT A MORE PROFESSIONAL APPROACH BE EMPLOYED IN DEALING WITH SUCH INCIDENTS IN ORDER TO MAINTAIN THE INTEGRITY OF THE SITUATION. CUSTOMERS COMPLAINTS IN THE RETAIL ENVIROMENT ARE CONTINOUS, MANY INVALID LODGED BECAUSE OF CIRCUMSTANCES BEYOND THE CONTROL OF THE PHARMACIST OR CLERK IN THIS STORE AND IN EVERY OTHER WALGREENS STORE. I WOULD ASK THAT THIS CALCULATED CONSPIRACY BE EXPELLED AND THAT I BE ALLOWED TO DO MY JOB WITHOUT BEING SINGLE OUT.

SINCERELY,


JOYCE A. WILLIAMS


CC: MR. JOHN KENESEY
     EMPLOYEE RELATIONS
     FILE

JULY 29, 1997

MR. CLIFF NEWMAN
LOSS PREVENTION
WALGREENS CO.
TAMPA, FLORIDA

DEAR MR. NEWMAN:

I AM WRITING YOU REGARDING THE ONGOING INVESTIGATION THAT IS BEING
WEDGED AGAINST ME TO DETERMINE  IF I HAVE FILLED PRESCRIPTIONS FOR A
MEDICATION (STADOL) THAT I USE FOR MIGRAINE HEADACHES WITHOUT THE
AUTHORIZATION OF A PHYSICIAN.  IT HAS BEEN ALLEDGED THAT THE SCRUTINY
IS THE RESULT OF MY HAVING RECEIVED PRESCRIPTIONS UNDER MY INSURANCE
PLAN WHICH IS ADMINSTERED BY WALGREENS.

AS I SAT THROUGH THE MEETING YESTERDAY MORNING WITH YOU AND MR. ODOM
BOTH REPRESENTING LOST PREVENTION AND ROB KIPP MY SUPERVISOR AND
ANSWERED QUESTIONS RELATIVE TO THE PRESCRIPTIONS AND THE REFILLS, THERE
WERE QUESTIONS ASKED THAT MADE ME WONDER WHAT THE ULTERIOR MOTIVES
WERE.  I WAS ASKED WHY I  REQUESTED FROM DR. KAHAN WHO HAS BEEN
MY FAMILY PHYSICAN FOR MANY YEARS NOT TO PROVIDE ANY INFORMATION
REGARDING MY MEDICAL HISTORY.

ON TODAY I RECEIVED A LETTER FROM DR. FRANKS OFFICE REJECTING ME AS A
PATIENT INFORMING ME THAT THEY WILL SEE ME  ONLY FOR EMERGENCYS AND WILL
NOT GIVE ME ANY CONTROLLED MEDICATION, THEY ALLOWED ME 30 DAYS TO FIND
ANOTHER PHYSICIAN.  UPON RECEIVING SUCH A LETTER I WAS ASTOUND AND
CALLED THE OFFICE TO ATTEMPT TO  UNDERSTAND WHAT HAD TRANSPIRED.  I WAS
TOLD THAT IT WAS DUE TO A CALL FROM WALGREENS IMPLICATING THAT I WAS A
PRESCRIPTION ABUSER THAT REFILLED MY OWN PRESCRIPTIONS WITHOUT
APPROVAL.

MR. NEWMAN I AM GRAVELY DISTRAUGHTED ABOUT THIS SUGGESTION, IT HAS NOT
ONLY TARNISHED MY REPUTATION BUT  MY HEALTH HAS BEEN COMPROMISED.  AS WE
SAT IN THAT MEETING YOU WERE ABLE TO UNRAVEL THE REFILLS AND THE REASON
WHY DR. FRANKS OFFICE COULD NOT IDENTIFY SOME DATES BECAUSE THEY WERE
ALLOCATED REFILLS.  THE EXTENT TO WHICH I SUFFER FROM HEADACHES MAKES
THIS IMMEASURABLE HARMFUL.  TO BE INCAPACITATED BY A MIGRAINE DICTATES
THAT I MAINTAIN A UNQUESTIONABLE PATIENT/CLIENT RELATIONSHIP WITH MY
PHYSICIAN.  I DO NOT ABUSE DRUGS, AND DO NOT APPRECIATE THE INSINUATION,  IT
COULD BE A HAZARD TO MY CAREER AS A PHARMACIST.

ATTACHMENT / EXHIBIT B

PLEASE BE ADVISE THAT I WILL NOT RENDER PERMISSION FOR ANY CONTACT WITH

DR. MAHAN UNDER ANY CIRCUMSTANCES RELATIVE TO MY MEDICAL HISTORY VIA REFILLS OR OTHERWISE. THIS ENTIRE PROCESS IS THE RESULT OF A VENDETTA MR. KIPP HAS AGAINST ME FOR FILLING CHARGES AGAINST HIM. IT IS IN RETALIATION THAT HE CONTINUES TO HARASS ME HOPING THAT HE CAN FIND SOME REASON TO JUSTIFY SEPARATING ME FROM WALGREENS, THEREFORE AS HE PRECLUDE THIS WITCH HUNT IT'S ON TO WHAT SO EVER ELSE HE CAN CONJURE UP.

MR. NEWMAN I APEAL TO YOUR CONSCIENCE TO DO WHAT IS RIGHT. WOULD IT BE FAIR TO HAVE SOMEONE CONSISTENLY SEEKING TO DESTOY YOU EMPLOYING ANY TACTIC AVAILABLE TO THEM TO CONSUME YOU. WELL SIR, THAT IS PRECISELY WHAT THIS IS ALL ABOUT. I REQUEST THAT IT CEASES IMMEDIATELY.

SINCERELY,


JOYCE A. WILLIAMS

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| FEPA | |
| X EEOC | |

_____ and EEOC

| NAME (indicate Mr., Ms., Mrs.) | HOME TELEPHONE (include Area Code) |
|---|---|
| Ms. Joyce A. Williams | (813) 968-2060 |

| STREET ADDRESS | CITY, STATE & ZIP CODE | Date of Birth |
|---|---|---|
| 5016 Melrow Court | Tampa, FL. 33624 | 8/3/53 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NO. OF EMP. | TELEPHONE |
|---|---|---|
| Walgreens Pharmacy | 15+ | (813) 621-6041 |

| STREET ADDRESS | CITY, STATE, ZIP CODE | COUNTY |
|---|---|---|
| 3910 U.S. Highway 301 N. | Tampa, FL. 33619 | Hillsborough |

| NAME | TELEPHONE |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE & ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON (CHECK APPROPRIATE BOXES)

X RACE   COLOR   SEX   RELIGION   NATIONAL ORIGIN

RETALIATION   X AGE   DISABILITY   OTHER (SPECIFY)

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST 3/29/96 | LATEST 1/29/97 |
| X Continuing Action | |

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s))

**I. PERSONAL HARM**

On a continuous basis I have been denied an opportunity to apply for promotion to the positions of Store Manager and Pharmacy Manager in the Tampa Bay Area.

**II. RESPONDENT'S REASON**

No reasons was provided because the positions are never posted.

**III. DISCRIMINATORY STATUTE(S)**

I believe that I was discriminated against because of my race Black, and my age forty-three (43), in violation of Title VII of the Civil Rights Act of 1964, as amended and The Age discrimination in Employment Act of 1967 as amended.

| I want this charge filed with both the EEOC and the state or local agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY (When necessary for state and local requirements) |
|---|---|
| | I swear and affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under the penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| Date 1-29-97   Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) |

ATTACHMENT / EXHIBIT C

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| FEPA | AMENDED |
| X EEOC | 151970664 |

and EEOC

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Ms. Joyce A. Williams | (813) 968-2060 |

| STREET ADDRESS | CITY, STATE & ZIP CODE | Date of Birth |
|---|---|---|
| 5016 Melrow Court | Tampa, FL. 33624 | 8/3/53 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NO. OF EMP. | TELEPHONE |
|---|---|---|
| Walgreens Pharmacy | 15+ | (813) 621-6041 |

| STREET ADDRESS | CITY, STATE, ZIP CODE | COUNTY |
|---|---|---|
| 3910 U.S. Highway 301 N. Tampa, FL. 33619 | | Hillsborough |

| NAME | TELEPHONE |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE & ZIP CODE | COUNTY |
|---|---|---|
| | | |

| CAUSE OF DISCRIMINATION BASED ON (CHECK APPROPRIATE BOXES) | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| X RACE   COLOR   SEX   RELIGION   NATIONAL ORIGIN | EARLIEST  3/29/96    LATEST  1/29/97 |
| RETALIATION   X AGE   DISABILITY   OTHER(SPECIFY) | X  Continuing Action |

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s))

**I.    PERSONAL HARM**

On a continuous basis I have been denied an opportunity to apply for promotion to the positions of Store Manager and Pharmacy Manager in the Tampa Bay Area.

**II.   RESPONDENT'S REASON**

No reasons was provided because the positions are never posted.

**III. DISCRIMINATORY STATUTE(S)**

I believe that I was discriminated against because of my race Black, and my age forty-three (43), in violation of Title VII of the Civil Rights Act of 1964, as amended and The Age discrimination in Employment Act of 1967 as amended.

**IV.  I believe that Black employees as a class have been discriminated against in regards to promotions.**

| I want this charge filed with both the EEOC and the state or local agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY (When necessary for state and local requirements) |
|---|---|
| | I swear and affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under the penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| 2-5-97  [signature] Christine Perry (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) |

ATTACHMENT / EXHIBIT *P*

**EEOC AFFIDAVIT**

(This form is affected by the Privacy Act of 1974. See Privacy Act Statement before completing this form.)

| | |
|---|---|
| Name **Joyce A. Williams** | Telephone Numbers (Give Area Code) **(813) 968-2060** |

Address (number, street, city, state & zip code) **5016 Melrow Court  Tampa, FL. 33624**

The following person can always contact me!

Name **Carolyn Welch**
Telephone **813/254-6882**

Address (number, street, city, state & zip code) **1701 Pine Street  Tampa, FL. 33607-3037**

**STATUS OF EMPLOYMENT**

| CHECK ONE    NOT WORKING | Respondent's name, address, city, state & Zip code |
|---|---|
| X WORKING   SEEKING EMPLOYMENT | **Walgreens Drug Stores** |
| | **4651 W. Kennedy Blvd.** |
| | **Tampa, FL. 33609-2519** |

| Type of Business | Dates of Employment: |
|---|---|
| **Pharmacy** | From April 93  To: present |

| Position Title **Pharmacist** | Department **Pharmacy** |
|---|---|

Indicate disability, if applicable

**I.    PERSONAL HARM**

On a continuous basis I have been denied an opportunity to apply for promotion to the positions of Store Manager and Pharmacy Manager in the Tampa Bay Area.

**II.   RESPONDENT'S REASON**

No reasons was provided because the positions are never posted.

**III. DISCRIMINATORY STATUTE(S)**

I believe that I was discriminated against because of my race Black, and my age forty-three (43), in violation of Title VII of the Civil Rights Act of 1964, as amended and The Age discrimination in Employment Act of 1967 as amended.

**IV.  EMPLOYMENT PROFILE**

The Respondent employs approximately 70 Store Managers in the Tampa Bay Area, which includes Clearwater, Florida and St. Petersburg, Florida; of whom none are Black, I am not knowledgeable of their age, but through company literature I know that the average age is around 32.

The Respondent employs approximately 70 Pharmacy Managers in the Tampa Bay Area which includes Clearwater, Florida and St. Petersburg, Florida; of whom 4 are

Black and I am not knowledgeable of their age.

Respondent employs approximately 200 Pharmacist in the Tampa Bay Area; approximately 30 are Black.

The company's main office is located in Deerfield, Illinois.

## V. POLICY (IES)

I am not knowledgeable of Respondent's Promotional Policy.

## VI. CORROBORATIVE DATA

### Store Manager:

My personnel records will support that I have a B.S. Degree in Pharmacy, 3 years of seniority with respondent, 18 total years of experience as a Pharmacist, 10 *years of experience* as a Pharmacy Manager with various other companies and during my employment Respondent has evaluated me once, which was average.

The records will support that the following White employee, not in the protected age group, who was promoted to the position of Store Manager, has less experience as a Pharmacist and less management experience:

Philip Howthore, was promoted to Store Manager, in Tampa, Florida, in November 1996 and numerous other individuals who I can not identify.

### Pharmacy Manager:

The records will support that the following White employees, not in the protected age group, who were promoted to the position of Pharmacy Manager, have less experience as a Pharmacist and less management experience:

Debbie Bonanno,

Kim Russell,

Doug Healy,

Holly Provance,

Donna O'Neal,

Paul Whitt and numerous others whom I cannot identify.

Several year I have indicated on an annual questionnaire that I was desirous of a management position.

## VII. COMPARATIVE DATA

### Store Manager:

Philip Howthore, White, not in the protected age group, who has more seniority, was promoted to Store Manager in Tampa, Florida, in November 1996 and numerous other individuals whom I cannot identify.

### Pharmacy Manager:

The following White employees, not in the protected age group, were promoted to the position of Pharmacy Manager, I am not knowledgeable of their seniority date

Debbie Bonanno,

Doug Kealy,

Holly Provance,

Donna O'Neal,

Paul Whitt and numerous others whom I cannot identify

VIII. WITNESSES, BASES, RELATIONSHIP AND SUMMARY OF WHAT THEY CAN TESTIFY TO

I have witnesses:

| Name, Address, City, State, Zip Code & Tel. # | Basis(es) | Relationship | What He/She Can Testify |
|---|---|---|---|
| Jon Bessis Tel #()- | White, I do not know his age. | Pharmacy Supv. | That upon being hired I informed him that I was desirous of a position in management. |
| Tel #()- | | | |
| Tel #()- | | | |
| Tel #()- | | | |
| Tel #()- | | | |

IX.  CLASS ACTION

I do wish to pursue this matter as a class in this charge.

X.  GENERAL INFORMATION

Normally individuals are moved to another store upon being promoted.

I declare under the penalty of perjury that the foregoing is true and correct.

| DATE 2-7-97 | SIGNATURE | |
|---|---|---|
| Date | Signature of EEOC Representative | Page   of |

EEOC Form 133

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| FEPA X EEOC | 151990757 |

__FLORIDA COMMISSION ON HUMAN RELATIONS__   and EEOC

| NAME (Indicate Mr., Ms., Mrs.) Mrs. Joyce Williams | HOME TELEPHONE (Include Area Code) (813) 968 - 2060 |
|---|---|

| STREET ADDRESS 5016 Melrow Court | CITY, STATE & ZIP CODE   Tampa, Fl. 33624 | Date of Birth 08/03/53 |
|---|---|---|

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME Walgreens | NO. OF EMP. 20+ | TELEPHONE (813) 286-1366 |
|---|---|---|

| STREET ADDRESS 4651 W. Kennedy Ave. | CITY, STATE, ZIP CODE   Tampa, Fl. 33609 | COUNTY Hillsborough |
|---|---|---|

| NAME | | TELEPHONE |
|---|---|---|
| STREET ADDRESS | CITY, STATE & ZIP CODE | COUNTY |

| CAUSE OF DISCRIMINATION BASED ON (CHECK APPROPRIATE BOXES) RACE  COLOR  SEX  RELIGION  NATIONAL ORIGIN X RETALIATION  AGE  DISABILITY  OTHER(SPECIFY) | DATE DISCRIMINATION TOOK PLACE EARLIEST 02/97   LATEST 04/27/99 X Continuing Action |
|---|---|

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s))

I.   PERSONAL HARM
I have been employed by the above named facility since April 23, 1994. I previous filed a charge of discrimination (151970604) against the above named facility. Since filing this charge of discrimination, I have been forced to use sick time/days when I go home while my co-workers are not charged sick time/days when they go home. Additionally, I have been denied several promotions to management positions.
II.  RESPONDENT'S REASON
Randy Reddick, Store Manager, told me it was up to the Pharmacy Supervisor to decided if I was going to be charged with sick time/days when I went home.
III. DISCRIMINATORY STATUTE(S)
I believe that I was forced to use sick time/days when I go home while my co-workers are not charged sick time/days when they go home and denied several promotions to management positions in retaliation for filing a previous charge of discrimination in violation of The Age Discrimination in Employment Act and Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the state or local agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY (When necessary for state and local requirements) |
|---|---|
| I declare under the penalty of perjury that the foregoing is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| | SIGNATURE OF COMPLAINANT |

---

### EEOC AFFIDAVIT

(This form is affected by the Privacy Act of 1974. See Privacy Act Statement before completing this form.)

| Name Joyce Williams | Telephone Numbers (Give Area Code)  (813) 968-2060 |
|---|---|

Address (number, street, city, state & zip code) 5016 Melrow Court, Tampa, Fl. 33624

The following person can always contact me

Name Carolyn Welch (Sister)
Telephone (813) 254-6882

Address (number, street, city, state & zip code) 17101 Pine Street, Tampa, Fl. 33610

STATUS OF EMPLOYMENT

| CHECK ONE  NOT WORKING X WORKING  SEEKING EMPLOYMENT | Respondent's name, address, city, state & Zip code Walgreens, 4651 W. Kennedy Ave., Tampa, Fl. 33609 |
|---|---|

| Type of Business Store | Dates of Employment From 04/23/94 To 04/27/99 |
|---|---|

| Position Title Pharmacist | Department Phar. |
|---|---|

Indicate disability, if applicable

ATTACHMENT / EXHIBIT E

I have been employed by the above named facility since April 21, 1994. I previously filed a charge of discrimination [151970604] against the above named facility. Since filing this charge of discrimination, I have been forced to use sick time/days when I go home while my co-workers are not charged sick time/days when they go home. Additionally, I have been denied several promotions to management positions.

## II. RESPONDENT'S REASON

Randy Reddick, Store Manager, told me it was up to the Pharmacy Supervisor to decided if I was going to be charged with sick time/days when I went home.

## III. DISCRIMINATORY STATUTE(S)

I believe that I was forced to use sick time/days when I go home while my co-workers are not charged sick time/days when they go home and denied several promotions to management positions in retaliation for filing a previous charge of discrimination in violation of The Age Discrimination in Employment Act and Title VII of the Civil Rights Act of 1964, as amended.

## IV. EMPLOYMENT PROFILE

The Respondent employs approximately 20+ persons.

## V. POLICY (IES)

The Respondent does not have a policy regarding promotions. The Respondent never post the available positions, they put who they want into the position.

## VI. COMPARATIVE DATA

## VII. COMPARATIVE DATA

- Terrance Williams, Pharmacist, Jean Angle, Pharmacist, and Lisa Davis, Pharmacist, told me that they were told by management that if you go home sick you will be paid. The individuals mentioned above told they were paid for sick time/days when they went home sick.

## VIII. WITNESSES, BASES, RELATIONSHIP AND SUMMARY OF WHAT THEY CAN TESTIFY TO

I have a few witnesses.

| Name, Address, City, State, Zip Code & Tel. # | Basis(es) | Relationship | What He/She Can Testify |
|---|---|---|---|
| Terry Williams<br>Tel #()- | | Pharmacist | Told me he was told by management that if you go home sick you will be paid. He also told me he was paid for sick time/days when he went home sick. |
| Jean Angle<br>Tel #()- | | .   . | . |
| Lisa Davis<br>Tel #()- | | .   . | Told me she was told by management that if you go home sick you will be paid. She also told me she was paid for sick time/days when she went home sick. |
| Tel #()- | | | |
| Tel #()- | | | |

## X. GENERAL INFORMATION

The company does not post any position that become available, the only thing is that the next thing you know someone is wearing a management uniform and they are a manager. I was never asked if I wanted to become a manager. Additionally, the Pharmacy Supervisor who determines if I will be paid for sick time/days, is the same individual who I filed my previous charge of discrimination against.

I declare under the penalty of perjury that the foregoing is true and correct.

| DATE 1-22-99 | SIGNATURE | |
|---|---|---|
| Date<br>04/27/99 | Signature of EEOC Representative | Page 2 of 2 |

EEOC Form 133

EEOC Form 161 (10/96)

U.S. ANNUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

OCT 25 1999

| To: | From: |
|---|---|
| Joyce A. Williams<br>5016 Medrow Court<br>Tampa, Florida 33705 | U. S. Equal Employment Opportunity Commission<br>Tampa Area Office<br>501 E. Polk Street, Room 1020<br>Tampa, Florida 33602 |

[ ]    *On behalf of person(s) aggrieved whose identity is*
       *CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No.<br>151970604 | EEOC Representative<br>Sylvia Pouncy | Telephone No.<br>(813) 228-2310 |
|---|---|---|

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]    The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]    Your allegations did not involve a disability that is covered by the Americans with Disabilities Act.

[ ]    The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ]    We cannot investigate your charge because it was not filed within the time limit required by law.

[ ]    Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ]    While reasonable efforts were made to locate you, we were not able to do so.

[ ]    You had 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

[x]    The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]    The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge

[ ]    Other *(briefly state)* _____

### – NOTICE OF SUIT RIGHTS –
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may pursue this matter further by bringing suit in federal or state court against the respondent(s) named in the charge. If you decide to sue, you must sue **WITHIN 90 DAYS** from your receipt of this Notice. Otherwise your right to sue based on the above-numbered charge will be lost.

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible. (If you file suit, please send a copy of your court complaint to this office.)

On behalf of the Commission

_____          10/3/95
Manuel Zurita, Area Director                 *(Date Mailed)*

Enclosure
Copy of Charge

cc:    John Kenescy, Employee Relations
       Walgreen Company
       Mail Stop #2258
       200 Wilmot Road
       Deerfield, IL 60015

ATTACHMENT / EXHIBIT *E*



**The Pharmacy America Trusts**

TO: Ann Snow, Esq.

*Fax: 813/221-8013*
*Phone:*

From:   Jack Kenesey
Address: Employee Relations Department
         200 Wilmot Road MS# 2256
         Deerfield, IL  60015

Phone: (847) 914-3596
Fax: (847) 914-2824
Date: 12/28/99
Pages Including Cover Page: 1

Re: Williams v. Walgreens

Per our conversation today, Walgreens will not assert a limitations defense if the suit is filed on or before January 31, 2000. The reason is that you and I have been attempting much of today and earlier in mediation sessions to reach a settlement of the claim. I am back in the office on 1/5/00. Please call me then.

I am happy that your child was not seriously injured today.

ATTACHMENT / EXHIBIT  F

December 20, 1999

Delores Okonmah, R.Ph.
1260 NW 189 Terrace
Miami, Fl. 33169

Vivian Ceballos, R.Ph. Supervisor
Walgreen's District Office
Miami, Fl

Dear Vivian,
   This letter is a heartfelt letter of apology. I am still very unsure of
how our conversation on Friday, December 17 deteriorated to the point
of non-communication. I have never in the past tried to be disrespectful
to you as a person, nor to you as my Pharmacy Supervisor.

   The past few days have been ones of soul searching for me. In every
situation I believe there is a "blessing and a lesson". It is difficult to find
the blessing and the lesson sometimes. I realize that on Friday when I
called for you, it was a call out of fear. The fear was based on my prior
experience with not getting paid. I realize the fear was based also on
other very, very personal medical and family matters that have
happened to me over the past eight months. Please understand that I
am not trying to make excuses. But, I do want you to know that I respect
you and your position. I respect your willingness to come up to the plate
and accept the position. I wish you only the best in this giant endeavor.

   I realize you are busy, but in my search to understand last Friday I
have been reading and I read the following which spoke out to me:
"In the middle of panic, crisis, or confusion, it can be difficult to listen to
what is said and not to what you hear. Even the slightest emotional
upheaval will not only cloud your vision, it will also clog your ears. When
we are upset we hear with <u>fear muffs</u> on our ears. We hear with our
broken hearts, our shattered egos, and our anger. At times like this,
harmless little words take on great big meanings, and the smallest, most
innocent gestures become life-threatening movements. You may feel like
you are being attacked when you are actually being consoled. You may
think you are being criticized when you are really being supported. If you
know you are upset and feel vulnerable, ask people what they are saying
before you jump to a conclusion about what they said." "Listen to what is
said, not to what you hear." (from Faith In The Valley by Iyanla Vanzant).

ATTACHMENT / EXHIBIT _H_

When I read this passage it spoke out to me. I was calling for your help. I had no idea that our conversation would go in the direction that it did. I was listening with my fear muffs on I suppose. Again, I apologize for any disrespect perceived by my words, actions, or tone. My "lesson and blessing" from this is to follow my mind and one cannot have faith and fear. So I must let go of the fear and hold only onto the faith.

Thank you for time in reading this letter and for an open mind and heart.

Sincerely.


*Delores Okonmah*



Connie Echebiri
P.O.Box 1183
Winter Haven
FL.33882.

MR.M.Wattley
Dept. of Employee Relations
Walgreens corporate office
200 Wilmont
Deerfield,IL 60015.
Dear MR. Wattley,
_RE:Sick time Vs Vacation time.

On or about september 1998, I had a detailed discussion with my then district manager,

Mr.Martin Northrop about my vacation.He had assured me that it was okey for me to take my

vacation according to scheduled on December 1998. Based upon that discussion, I made

detailed arrangement including international flight ticket.

On or about November 1998,I submitted my vacation request to my new district manager

Mr.Mike Calnan via E-mail and Ms Cheryl Nicolay my pharmacy manager. Ms. Nicolay bluntly

rejected my vacation request for reasons which I still do not understand.

Due to pre-existing health condition Dr.P. Ijewere had given me sick off from the 21st to the

24th of December and I had formerly submitted the official document from the doctor including

my other requests to the Pharmacy manager Ms.Cheryl Nicolay.

Upon return to work on the 4th of January 1999, I was suprised to note that my sick time had

been charged to my vacation time even though to the best of my knowledge I had accumulated

ample sick time.

I would, please, like to know why my sick time was applied to my vacation time despite the

fact that my formal application for vacation was denied by Ms. Nicolay and Mr. Calnan.

I find the above situation very embarrassing and inappropriate and would like my vacation

time restored.

Thank you in advance for your kind co-operation in evaluating this situation.

Sincerely,
Connie Echebiri.



ATTACHMENT / EXHIBIT

Connie Echebiri
P.O.Box 1183
Winter Haven,FL.33882
January 15th,1999.
PH:941 297 5317

Ms Cheryl Nicolay
Pharmacy Manager
Walgreens Drug Store
705 First Street South
Winter Haven,FL 33880
        Dear Ms Nicolay,
In response to your disciplinary report of january 4th 1999,I wish to express
my disappointment at your insensitivity and lack of emparty towards a
fellow professional colleague and Walgreens associate who was a victim of near
natural disaster of weather catastrophy.
        On January 4th 1999,because of a disastrous weather which paralized the
whole nation,USAirways flight number 1181 among others was cancelled and as a
result of those cancellations,my schedule for that day which had been
perfectly and carefully planned was grossly disrupted.In response to the
uncertainty caused by the weather and because of my concern for the smooth
running of Walgreens store number 4005,I ignored my personal predicament and
arranged for phone call to the pharmacy informing them to make alternate
arrangement in case I was not able to get to work on time.
        Mrs. I.J.Agbara called at about 9.00 pm and spoke to an associate
telling them about my situation. As soon as I was able,I personally called the
pharmacy and spoke to Mr.Joseph Greenfield,the then pharmacist on duty
about 9:30 pm explaining my situation and suggesting that contingency plan be
made in case I was not able to get home on time for work.I specifically
requested that you Ms Nicolay be personally notified of the situation.
        I respect you as a person; I respect your position as my pharmacy
manager  and I love Walgreens as a company.Over the past five years,I have
worked diligently and have given my best to Walgreens.Your present actions
and THREAT for future heavy penalties is unnecessarilly hostile and seems to
be a perpetuation of your pattern of HARASSMENT of me . It is my desire to
serve Walgreens honestly and to the best of my ability as I have done all along
but your improvised acts of harassment will make it very difficult for me to
function normally.
        On or about June 1998,you had falsely accused me of sleeping while on
duty and alleged of having a camera surveillance of me-your allegation was
found to be false.Similarly,your other prompted up charges have been found
to be false.It is my impression that you do not like me as a person and that
you have personal grievances against me. I am willing and ready to sit with
you at an appropriate forum to resolve whatever grievances that you may have
against me so that I can be relaxed and work in a conducive enviroment where
I can continue to function efficiently and effectively to give my best
professional services to Walgreens and our beloved customers.
                                                Sincerely,
                                                Connie Echebiri.

CC:Mr. Chris ELIOTT Pharmacy District Manager
    Mr.Daniel Dirr-Store Manager.
    Mr.Mark Wattley-Employee Relations.


ATTACHMENT EXHIBIT