UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO: 00-6151-CIV-UNGARO/Brown

JOYCE WILLIAMS, individually;
MICHAEL FERGUSON, individually;
JOSEPH PATRICK McMULLEN,
individually; DELORES OKONMAH,
individually; BERNICE SHORTER-
MEARES, individually;
CONSTANCE ECHEBIRI, individually;
MIA DAWN TAYLOR, individually;
and CARMITA McMULLEN, individually,

        Plaintiffs,

v.

WALGREEN COMPANY,

        Defendant.

_____/

## PLAINTIFF'S FIRST AMENDED COMPLAINT - INJUNCTIVE RELIEF SOUGHT AND DEMAND FOR JURY TRIAL

Plaintiffs, JOYCE WILLIAMS ("WILLIAMS"), MICHAEL FERGUSON ("FERGUSON"), JOSEPH PATRICK McMULLEN ("J. McMULLEN"), DELORES OKONMAH ("OKONMAH"), BERNICE SHORTER-MEARES ("SHORTER-MEARES"), CONSTANCE ECHEBIRI ("ECHEBIRI"), MIA DAWN TAYLOR ("TAYLOR"), and CARMITA McMULLEN ("C. McMULLEN"), individually (hereinafter referred to collectively as the "PLAINTIFFS"), bring this action against WALGREEN COMPANY (hereafter referred to as "WALGREENS") under federal and state laws prohibiting discrimination in employment on the basis of race. PLAINTIFFS allege:

1

### JURISDICTION AND VENUE

1.      This Court has original jurisdiction of PLAINTIFFS' claims pursuant to 28 U.S.C. § 1331, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981. This Court has supplemental jurisdiction over PLAINTIFFS' claims pursuant to 28 U.S.C. § 1367 as PLAINTIFFS' state law claims under the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.* are so related to PLAINTIFFS' claims under federal law in that they form part of the same case or controversy.

2.      This Court also has supplemental jurisdiction over a companion discrimination charge on the basis of age included within WILLIAMS' EEOC charge pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*

3.      Venue is appropriate in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. §§ 1391(b)-(c) and 42 U.S.C. §2000e. Many of the unlawful employment practices hereinafter alleged have been committed in the Southern District of Florida, and a majority of the PLAINTIFFS reside within the Southern District of Florida.

### I. INTRODUCTION

4.      This is an action for damages and injunctive relief brought by PLAINTIFFS, current and former pharmacists of WALGREENS who, on the basis of their race are, have been, continue to be, or may in the future be, adversely affected by WALGREENS' continuing policy and pattern or practice of race-based discriminatory treatment of PLAINTIFFS. This systemic discriminatory treatment is manifested by such policies and patterns or practices as denying PLAINTIFFS promotional opportunities such as the opportunity to advance into the Pharmacy Manager, Store Manager, or Pharmacy Supervisor positions; disciplining Black pharmacists more severely than non-Black pharmacists are disciplined for committing the same infractions; continually and repeatedly promoting less qualified, non-Black pharmacists to Pharmacy Manager (WILLIAMS, OKONMAH, SHORTER-MEARES, ECHEBIRI, and TAYLOR), Store Manager (WILLIAMS and J. McMULLEN), or Pharmacy Supervisor (FERGUSON, J. McMULLEN, and C. McMULLEN) positions over Black pharmacists who were and are more

qualified despite the Black pharmacists' expressed desires and expectations for promotion; continually and repeatedly informing <u>only</u> non-Black pharmacists about Pharmacy Manager, Store Manager, or Pharmacy Supervisor positions within WALGREENS as well as other benefits and conditions of employment on the same terms applied to non-Black pharmacists.

5.      In addition, WALGREENS has deterred and continues to deter PLAINTIFFS from seeking promotions, management positions and desirable job assignments, and fails to effectively enforce policies prohibiting race discrimination.

6.      The illegal policy and pattern or practice of race discrimination described above has been furthered by subjective decision-making by a predominately non-Black supervisory and managerial workforce. This pervasive, subjective and race-biased decision-making constitutes discriminatory terms and conditions of the employment contract and has had an adverse impact on PLAINTIFFS, and is a continuing violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981, and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.*

## II. PARTIES

### Plaintiffs

7.      JOYCE WILLIAMS is a Black pharmacist who has been employed with WALGREENS as a Pharmacist from 1994 until present. JOYCE WILLIAMS graduated with a Bachelor of Science degree in pharmacy from Florida A&M University in 1977. JOYCE WILLIAMS is *sui juris,* over the age of 40, and otherwise competent. JOYCE WILLIAMS is a resident of Hillsborough County, Florida.

8.      MICHAEL FERGUSON is a Black pharmacist who has been employed with WALGREENS as a Pharmacy Intern, Pharmacist and Pharmacy Manager from 1982 until present. MICHAEL FERGUSON graduated with a Bachelor of Science degree in pharmacy from Xavier University in 1984. MICHAEL FERGUSON is *sui juris,* over the age of 18, and otherwise competent. MICHAEL FERGUSON is a resident of Broward County, Florida.

9.      JOSEPH PATRICK McMULLEN is a Black pharmacist who was employed with

3

WALGREENS as a Pharmacy Intern, Pharmacist and Pharmacy Manager from 1993 until August 1998. JOSEPH PATRICK McMULLEN graduated with a Bachelor of Science degree in pharmacy from Florida A&M University in 1993. JOSEPH PATRICK McMULLEN is *sui juris,* over the age of 18, and otherwise competent. JOSEPH PATRICK McMULLEN is a resident of Broward County, Florida.

10.    DELORES OKONMAH is a Black pharmacist who has been employed with WALGREENS as a Pharmacist from 1996 until present. DELORES OKONMAH graduated with a Bachelor of Science degree in pharmacy from Florida A&M University in 1979. DELORES OKONMAH is *sui juris,* over the age of 18, and otherwise competent. DELORES OKONMAH is a resident of Miami-Dade County, Florida.

11.    BERNICE SHORTER-MEARES is a Black pharmacist who has been employed with WALGREENS as a Pharmacist from 1996 until present. BERNICE SHORTER-MEARES graduated with a Bachelor of Science degree in pharmacy from Howard University in 1977. BERNICE SHORTER-MEARES is *sui juris,* over the age of 18, and otherwise competent. BERNICE SHORTER-MEARES is a resident of Miami-Dade County, Florida.

12.    CONSTANCE ECHEBIRI is a Black pharmacist who has been employed with WALGREENS as a Pharmacist from 1994 until present. CONSTANCE ECHEBIRI graduated with a Bachelor of Science degree in pharmacy from Massachusetts College of Pharmacy and Allied Health Sciences in 1992. CONSTANCE ECHEBIRI is *sui juris,* over the age of 18, and otherwise competent. CONSTANCE ECHEBIRI is a resident of Polk County, Florida.

13.    MIA DAWN TAYLOR is a Black pharmacist who has been employed with WALGREENS as a Pharmacy Intern and Pharmacist from 1990 until present. MIA DAWN TAYLOR graduated with a Bachelor of Science degree in pharmacy from Florida A&M University in 1990. MIA DAWN TAYLOR is *sui juris,* over the age of 18, and otherwise competent. MIA DAWN TAYLOR is a resident of Miami-Dade County, Florida.

14.    CARMITA McMULLEN is a Black pharmacist who was employed with WALGREENS as a Pharmacy Cashier, Pharmacy Technician, Pharmacy Intern, Pharmacist and

Pharmacy Manager from 1986 until 1999. CARMITA McMULLEN graduated with a Bachelor of Science degree in pharmacy from Florida A&M University in 1994. CARMITA McMULLEN is *sui juris,* over the age of 18, and otherwise competent. CARMITA McMULLEN is a resident of Broward County, Florida.

Defendant

15.    WALGREENS is an Illinois corporation with its principal place of business in Illinois, and is licensed to do business in Florida. WALGREENS employs more than 107,000 people and owns more than 2,800 stores in 39 states and the Commonwealth of Puerto Rico, each store averaging $5.8 million in annual sales. Approximately twenty percent (20%) of WALGREENS' profits and revenues are made in the State of Florida. WALGREENS, one of the fastest growing retailers in the United States, leads the chain drugstore industry in sales and profits.

16.    In 1998, WALGREENS' net sales exceeded $15 billion, having increased fourteen percent (14%) from 1997. WALGREENS filed nearly 226 million prescriptions in 1998, which was approximately nine percent (9%) of the United States retail market. WALGREENS also operates two mail service facilities that dispensed nearly 6 million prescriptions (more than 19,000 per day) that produced sales of approximately $600 million in 1998. Pharmacy sales are nearly half of WALGREENS' business.

17.    WALGREENS has been and is an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b), 42 U.S.C. § 1981, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, and the Florida Civil Rights Act, Fla. Stat. § 760.02(7).

III. GENERAL PATTERNS OF DISCRIMINATION

18.    The denials and abridgments of employment rights and opportunities suffered by PLAINTIFFS as detailed below are not isolated examples of WALGREENS' employment practices. Rather, they are illustrative of the pervasive policy and pattern or practice of race discrimination in employment that has continually existed at WALGREENS. WALGREENS has

created and maintained a systemwide policy and pattern or practice of race-based disparate treatment that has limited the employment opportunities of PLAINTIFFS in all aspects of WALGREENS' operations.

19.    WALGREENS maintains a highly race-segregated workforce, with non-Black pharmacists and employees filling the vast majority of Pharmacy Manager, Store Manager, Pharmacy Supervisor, and District Manager positions. The under-representation of Black pharmacists and Black employees in the Pharmacy Manager, Store Manager, and Pharmacy Supervisor positions is not random or accidental. Rather, it is the result of WALGREENS' longstanding systemic policy and pattern or practice of discriminating against Black pharmacists and Black employees.

20.    As a result of the illegal policies and patterns or practices described above, there are in fact two separate workforces at WALGREENS. One workforce, which is primarily non-Black pharmacists and non-Black employees, enjoys preferential treatment, better job opportunities, better store placement, a swift path to advancement, and dominates all management positions. The other workforce, which is primarily Black and includes PLAINTIFFS, holds a disproportionate share of the lowest level positions, is denied equal terms and conditions of employment, and with few exceptions, has not been allowed to advance to the Pharmacy Manager, Store Manager, or Pharmacy Supervisor positions.

IV. CLAIMS OF PLAINTIFFS

JOYCE WILLIAMS

21.    Plaintiff, JOYCE WILLIAMS (hereafter referred to as "WILLIAMS"), over forty (40) years of age and an employee within the meaning of Title VII, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, 42 U.S.C. § 1981 and the Florida Civil Rights Act, has been employed with WALGREENS as a Pharmacist from 1994 until present. As a result of WILLIAMS' previous pharmacy management experience prior to joining WALGREENS, she expressed her desire and interest in WALGREENS management positions. To date, WILLIAMS has never been afforded an opportunity to work as a Pharmacy Manager,

Store Manager or Pharmacy Supervisor. Further, WILLIAMS is never informed about management opportunities as they become available even though non-Black pharmacists are informed. WILLIAMS currently works as a pharmacist in multiple locations with no specific stores assigned (a "Floater Pharmacist") in various stores throughout the Hillsborough County area. WILLIAMS also has not been informed or considered for Pharmacy Manager and Store Manager vacancies as they became available.

22.    WILLIAMS' initial position in 1994 with WALGREENS was as a Floater Pharmacist. Even though WILLIAMS was an experienced pharmacist prior to being employed with WALGREENS and expressed the desire to be assigned to a permanent store location in the Tampa area, the Pharmacy Supervisor forced WILLIAMS to work as a Floater Pharmacist. Conversely, non-Black pharmacists with less years of experience and with equal or less time with WALGREENS were assigned permanent stores. In fact, many non-Black pharmacy graduates newly hired by WALGREENS were often assigned permanent stores almost immediately upon becoming licensed as pharmacists in the state of Florida. WILLIAMS was uncertain as this time as to whether this practice of being passed over was racially-motivated.

23.    After WILLIAMS observed several instances where non-Black pharmacists with less years of experience and equal or less time with WALGREENS were assigned permanent store locations while her requests went ignored, WILLIAMS went to the District Manager, Kirk Wolfram ("Mr. Wolfram"), and expressed the desire to be assigned to a permanent store location in the Tampa area. After speaking to Mr. Wolfram, the Pharmacy Supervisor, Bob Kipp ("Mr. Kipp"), reluctantly assigned WILLIAMS to work in a permanent store location in the Tampa area on the condition that WILLIAMS work the midnight shift (10 p.m. - 7 a.m.). WILLIAMS was assigned to work the midnight shift in this Tampa store even though non-Black pharmacists with equal or less time with WALGREENS were permanently assigned to stores in the Tampa area that did not require working the midnight shift. WILLIAMS expressed her desire to Mr. Wolfram to be assigned to a permanent store location in the Tampa area only after her plea to Mr. Kipp went ignored. Mr. Kipp was thereafter hostile towards WILLIAMS because of her race

7

and the fact that she talked to Mr. Wolfram. WILLIAMS worked in the permanent store location in St. Petersburg for approximately nine month before being transferred to a store in the Tampa area.

24.    Mr. Kipp conveyed his hostility and hatred towards WILLIAMS to Mr. Kipp's personal friend and Store Manager, Glenn Taylor ("Mr. Taylor") and the Pharmacy Manager of the Tampa store. Unbelievably, Mr. Kipp and Mr. Taylor went to the Pharmacy Manager and asked the Pharmacy Manager to begin creating disciplinary records on WILLIAMS regarding minute, inconsequential, and insignificant events. In desperation, WALGREENS even went to the extreme of accusing WILLIAMS of stealing artificial sweeteners (it was alleged that she added one hundred (100) packets of Equal™ to her cup of coffee), but WALGREENS' claim dissolved after WILLIAMS challenged the company's bogus accusation. WILLIAMS has also been subjected to the following after filing a discrimination charge with the EEOC: hostility; false accusations of misconduct; false accusations of dispensing her own prescriptions without authorization[1]; and unjustified reprimands for failing to follow "store-implemented" policies and practices. Attached as **Exhibit "A"** are some of the letters written by WILLIAMS to management evidencing her complaints about hostile, pestering and racial harassment at WALGREENS.

25.    Even though WILLIAMS continually expressed her desire to obtain a management position (dating back as early as March 29, 1996), WALGREENS hired a non-Black pharmacist with less years of experience (approximately two years of experience) and less

---

[1]WILLIAMS was suspended without pay for two weeks because she initially refused to authorize the release of her medical records to WALGREENS. Her hesitancy, however, was justified in that the Pharmacy Manager and Store Manager were openly discussing WILLIAMS' medication profile with other WALGREENS employees. WILLIAMS eventually authorized the release of her medical records, and WALGREENS' investigation revealed that all of the prescriptions filled for WILLIAMS were authorized. It should be noted that because of WALGREENS' bogus investigation, one of WILLIAMS' treating physicians, Dr. Frank, refused any further treatments of WILLIAMS because WALGREENS implicated that WILLIAMS was a "prescription abuser." See as Exhibit "B" the letter to Cliff Newman of WALGREENS Lost Prevention.

time with WALGREENS to become the Pharmacy Manager. Further, Mr. Kipp coerced the Store Manager and the new Pharmacy Manager into treating WILLIAMS in a hostile manner.

26.    In July 1999, the Tampa store eliminated the need for a midnight pharmacist. WILLIAMS was forced to begin working as a Floater Pharmacist again even though there were positions available where non-Black pharmacists with less experience and equal or less time with WALGREENS were assigned. Having experienced all of the racism, scrutiny and discrimination for several years, WILLIAMS, like many of the Black pharmacists in the Tampa/Orlando area, reluctantly elected to work as a midnight shift Floater Pharmacist to avoid the continuous harassment in the workplace during the day from WALGREENS' management.

27.    Since filing WILLIAMS' first EEOC charge, WALGREENS has also retaliated against WILLIAMS by forcing her to use her accrued paid sick days when leaving a store early while non-Black pharmacists, such as Warren Striek, were not forced to use their sick days when they left the store early.

28.    Several non-Black individuals, including, but not limited to Philip Howthore, were promoted to Store Manager over WILLIAMS even though she had more years as a pharmacist and more management experience. Further, several non-Black pharmacists, such as Debbie Bonanno, Kim Russell, Doug Healy, Holly Provance, Donna O'Neal, Paul Whitt and Michelle Brantly, were promoted to the position of Pharmacy Manager even though WILLIAMS had more experience as a pharmacist and more pharmacy management experience.

29.    Although totally qualified to work as either a Pharmacy Manager and Store Manager, WILLIAMS, over the age of 40, was ignored and passed over for promotions because of her age in addition to her race. Other less qualified non-Black WALGREENS pharmacists and employees, not members of the protected age group, were promoted.

30.    Most recently, in June 1999, WALGREENS accused WILLIAMS of paying a Pharmacy Technician cash, out of her own pocket, to put up a medication order that had arrived in the pharmacy. Martin Northrup, the Pharmacy Supervisor ("Mr. Northrup"), along with a loss prevention representative, questioned WILLIAMS and the Pharmacy Technician about the

incident and launched another fraudulent, contrived investigation of WILLIAMS. After the Pharmacy Technician confirmed that she was "on the clock" for WALGREENS when asked to put up the order, Mr. Northrup apologized to WILLIAMS for the bogus allegation.

31.    WALGREENS has discriminated against WILLIAMS on account of her race and age by:

a.    Failing to inform her of advancement opportunities available while informing non-Black pharmacists of the same advancement opportunities;

b.    Failing to provide her with training to qualify her for promotional opportunities on the same basis as is provided to non-Black pharmacists because of her race;

c.    Failing to provide her with training to qualify her for promotional opportunities on the same basis as is provided to non-Black pharmacists because of her age;

d.    Relying on subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny her promotional opportunities for which she was qualified;

e.    Disciplining her unjustifiably and/or more severely than non-Black pharmacists;

f.    Besmirching the character and professionalism of WILLIAMS by having Pharmacy Managers and Store Managers create disciplinary records and make false accusations against WILLIAMS, **See Exhibit B**;

g.    Discouraging and deterring her from seeking promotional opportunities;

h.    Failing to provide her with job assignments on the same basis as non-Black pharmacists;

i.    Failing and refusing to implement and follow a uniform posting procedure to ensure that she had and has equal notice of promotional opportunities, which adversely affected and continues to affect her career advancement;

j.    Failing and refusing to establish a uniform and unbiased process by which she and non-Black pharmacists can apply and compete equally for promotions and management positions;

k.    Failing and refusing to consider her for desirable work assignments, promotions

and management positions on the same basis as non-Black pharmacists were and are considered;

l.      failing to promote her to positions she was qualified for due to her age while promoting lesser qualified employees under the age of 40;

m.      Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

n.      Denying her other terms and conditions of employment on the same basis applied to non-Black pharmacists.

32.      WILLIAMS filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in January of 1997 alleging, among other things, continuous race discrimination and age discrimination as it pertains to promotions in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* and the Age Discrimination Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"). See **Exhibit "C."** Subsequently, on February 5, 1997, WILLIAMS amended her EEOC charge to further allege that "Black employees as a class have been discriminated against in regards to promotions" and that WALGREENS does not inform Black employees about advancement opportunities. **See Exhibit "D."** Later, WILLIAMS was forced to file a second EEOC charge against WALGREENS for retaliatory actions alleging that she has been forced to use her accrued paid sick days when she left work early whereas her co-workers are not, and that she has been denied additional promotions to management position in retaliation for filing her EEOC charge of discrimination against WALGREENS. **See Exhibit "E."** The EEOC issued WILLIAMS a Notice of Suit Rights on October 2, 1999. **See Exhibit "F."** Finally, on December 28, 1999, Jack Kenesay, Employee Relations Department of WALGREENS, in essence, extended WILLIAMS time to file suit until January 31, 2000 by stating that WALGREENS "will not assert a limitations defense if the suit is filed on or before January 31, 2000.". **See Exhibit "G."** Thus, WILLIAMS has satisfied all conditions precedent to filing this suit under Title VII.

### Title VII - Disparate Impact

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

33.    WILLIAMS incorporates Paragraphs 4 through 7, and 15 through 32 as if fully set forth herein.

34.    At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

35.    At all times material hereto, WILLIAMS was an employee within the meaning of 42 U.S.C. § 2000e(f).

36.    WILLIAMS is Black and is therefore a member of a protected class.

37.    WILLIAMS timely filed an EEOC charge.

38.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct had, continues to have, and will have in the future a disparate impact on WILLIAMS.

39.    WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further, WILLIAMS exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. **See Exhibit "G."**

Title VII - Disparate Treatment

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

40.    WILLIAMS incorporates Paragraphs 4 through 7, and 15 through 32 as if fully set forth herein.

41.    At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

42.    At all times material hereto, WILLIAMS was an employee within the meaning of 42 U.S.C. § 2000e(f).

43.    WILLIAMS is Black and is therefore a member of a protected class.

44.    WILLIAMS timely filed an EEOC charge.

45.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct constitutes disparate treatment of

WILLIAMS.

46.    WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further, WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. **See Exhibit "G."**

42 U.S.C. § 1981 - Disparate Treatment

47.    WILLIAMS incorporates Paragraphs 4 through 7, and 15 through 32 as if fully set forth herein.

48.    WILLIAMS is a member of a racial minority, Black.

49.    The foregoing conduct violates 42 U.S.C. § 1981 because the conduct constitutes disparate treatment of WILLIAMS.

Florida Civil Rights Act

50.    WILLIAMS incorporates Paragraphs 4 through 7, and 15 through 32 as if fully set forth herein.

51.    WILLIAMS is a member of a protected class.

52.    At all times material hereto, WALGREENS was an employer within the meaning of Fla. Stat. § 760.02(7).

53.    At all times material hereto, WILLIAMS was an employee and an aggrieved person within the meaning of Fla. Stat. §§ 760.02(6) and 760.02(10).

54.    The foregoing conduct constitutes a prohibited discriminatory practice in violation of the Florida Civil Rights Act of 1992, Fla. Stat. §760.11.

55.    All conditions precedent have been met for filing this action and proceeding under the Florida Civil Rights Act of 1992.

Age Discrimination in Employment Act

56.    WILLIAMS incorporates Paragraphs 4 through 7, and 15 through 32 as if fully set forth herein.

57.    WILLIAMS is an employee within the meaning of the ADEA, 29 U.S.C. § 630(f).

13

58.     At all times material hereto, WALGREENS was an employer within the meaning of 29 U.S.C. § 630(b).

59.     The foregoing conduct constitutes a prohibited discriminatory practice in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623.

<u>MICHAEL FERGUSON</u>

60.     Plaintiff, MICHAEL FERGUSON (hereafter referred to as "FERGUSON"), has been employed with WALGREENS as a Pharmacy Intern from 1982 to 1984, a Pharmacist from 1984 to 1988, and a Pharmacy Manager 1988 until present. As a Pharmacist, FERGUSON initially worked as a Floater Pharmacist for approximately three months prior to being placed in a permanent store. FERGUSON was asked to be a Pharmacy Manager in 1985 in an undesirable store with significant financial problems, but FERGUSON deferred accepting the Pharmacy Manager position at that time because he felt he had not yet received adequate training from WALGREENS to effectively perform the job. As a result of FERGUSON not wanting to accept this problem store at that time, Emerson Oberlin, the Pharmacy Supervisor ("Mr. Oberlin") began to treat FERGUSON differently. Upon information and belief, FERGUSON believes that Bruce Adams, his Pharmacy Manager ("Mr. Adams") was told by Mr. Oberlin to begin creating false disciplinary records on FERGUSON. For example, Mr. Adams attempted to write a disciplinary report on FERGUSON for allegedly showing up to work late. Because FERGUSON was very familiar with company policy, however, he told Mr. Adams that WALGREENS' company policy required that an employee be afforded a verbal warning first. The hostility of Mr. Adams continued after this incident. FERGUSON confronted Mr. Adams about his conduct, but to no avail. After this meeting, Mr. Oberlin transferred FERGUSON to the store where the district office was located.

61.     FERGUSON worked as a staff pharmacist at the store connected to the district office for over two years. In 1988, FERGUSON was asked to assume the Pharmacy Manager position at a problem-ridden store in the Sunny Isles area. In less than a year, FERGUSON not only improved the performance of the store, but also had the store so profitable that it was

generating $1.00 for every 60 cents of inventory, which surpassed the goals set by WALGREENS. FERGUSON also recovered outstanding money from rejected third-party insurance company claims that were left by the previous Pharmacy Manager.

62.    In December 1990, FERGUSON was approached by Gary Vanderbilt, Pharmacy Supervisor ("Mr. Vanderbilt"), to transfer to an undesirable, problem-ridden store in the Northside area as the Pharmacy Manager. Mr. Vanderbilt indicated that FERGUSON's talents as a Pharmacy Manager were being "wasted and underutilized" at the Sunny Isles store. It was at this point that FERGUSON explicitly expressed to Mr. Vanderbilt and Anthony Frizzell, his District Manager ("Mr. Frizzell") that he was interested in being considered for a Pharmacy Supervisor position within WALGREENS. FERGUSON believed that because he had managed to completely turn around  the problem-ridden store in the Sunny Isles area and was asked to clean up another problem-ridden store in an undesirable area, he was "paying his dues" and preparing himself for a Pharmacy Supervisor position. Mr. Vanderbilt told FERGUSON that in order to gain the position of Pharmacy Supervisor with WALGREENS, "You have to be able to smile in someone's face to make them think everything is fine, and put an ax in their back when they look away from you." Statements like this caused FERGUSON to doubt the sincerity of previous promotional career promises he had heard over the years from WALGREENS' management.

63.    FERGUSON began working at the Northside store in Miami in January 1992. The store was in shambles and was accumulating $3,000 to $4,000 per month of third party rejected claims from the insurance companies. As expected, FERGUSON not only turned the store around, but also recovered outstanding money from the third-party rejected claims. In addition, FERGUSON had improved the efficiency and effectiveness of the Northside store so much that it was filling 500+ prescriptions per day even though its hours of operation were from 8:00 a.m. through 9:00 p.m. - well exceeding other stores with similar hours of operation. Throughout his time at the Northside store, FERGUSON continually expressed his interest in a Pharmacy Supervisor position to Mr. Vanderbilt. In fact, on or about 1994, many of the Black pharmacists

in the district voiced their concerns to higher management that Black pharmacists were never considered or interviewed for Pharmacy Supervisor positions even though Black Pharmacy Managers like FERGUSON had proven themselves several times over by rehabilitating and reviving problem-ridden stores. Mr. Vanderbilt and Mr. Frizzell swept the Black pharmacists' inquiry under the rug and never publicly addressed this issue.

64.     In March 1995, FERGUSON asked to be transferred to one of the stores in the Broward County area. FERGUSON made such a request because (1) WALGREENS was opening new stores in several high-crime, undesirable areas in Miami-Dade County; and (2) he knew that traditionally WALGREENS only placed Black pharmacists in these areas. Subsequently, he was transferred to a Broward County store as the Pharmacy Manager. In April 1999, FERGUSON was transferred to another store in the north Miami-Dade County area and immediately thereafter became the Pharmacy Manager. Throughout this time, FERGUSON continually expressed his desire and interest in becoming a Pharmacy Supervisor. FERGUSON's pleas were ignored, and he was transferred to another store in Miami-Dade County as Pharmacy Manager.

65.     Between March 29, 1996 and the date of the initial complaint, Jorge Acosta, Albert Garcia, Phil Chen, and Vivian Ceballos, three non-Black pharmacists with less experience as pharmacists, less experience in management, and less time with WALGREENS were promoted to the position of Pharmacy Supervisor over FERGUSON who had more experience, more experience in management, and more time with WALGREENS. FERGUSON was not informed, interviewed or considered for the Pharmacy Supervisor positions because of his race even though he was more experienced and was more qualified than Mr. Acosta, Mr. Garcia, Mr. Chen, and Ms. Ceballos.

66.     WALGREENS has discriminated against FERGUSON on account of his race by:

a.      Failing to inform him of advancement opportunities available while informing non-Black pharmacists of the same advancement opportunities;

b.      Failing to provide him with training to qualify him for promotional opportunities

on the same basis as is provided to non-Black pharmacists;

c.       Relying on arbitrary, race-based and subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny him promotional opportunities for which he was qualified;

d.       Discouraging and deterring him from seeking promotional opportunities;

e.       Failing to provide him with job assignments on the same basis as non-Black pharmacists;

f.       Failing and refusing to implement and follow a uniform posting procedure to ensure that he had and has equal notice of promotional opportunities, which adversely affected and continues to affect his career advancement;

g.       Failing and refusing to establish a uniform and unbiased process by which he and non-Black pharmacists can apply and compete equally for promotions and management positions;

h.       Failing and refusing to consider him for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists were and are considered;

i.       Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

j.       Denying him other terms and conditions of employment on the same basis applied to non-Black pharmacists.

<u>Title VII - Disparate Impact</u>

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

67.     FERGUSON incorporates Paragraphs 4 through 6, 8, 15 through 20, and 60 through 66 as if fully set forth herein.

68.     At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

69.     At all times material hereto, FERGUSON was an employee within the meaning of 42 U.S.C. § 2000e(f).

70.    FERGUSON is Black and is therefore a member of a protected class.

71.    WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further,  WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. **See Exhibit "G**.

72.    FERGUSON may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and FERGUSON have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

73.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct had, continues to have, and will have in the future a disparate impact on FERGUSON.

### Title VII - Disparate Treatment

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

74.    FERGUSON incorporates Paragraphs 4 through 6, 8, 15 through 20, and 60 through 66 as if fully set forth herein.

75.    At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

76.    At all times material hereto, FERGUSON was an employee within the meaning of 42 U.S.C. § 2000e(f).

77.    FERGUSON is Black and is therefore a member of a protected class.

78.    WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further,  WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS,

WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. **See Exhibit "G**.

79.     FERGUSON may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and FERGUSON have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

80.     The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct constitutes disparate treatment of FERGUSON.

## 42 U.S.C. § 1981 - Disparate Treatment

81.     FERGUSON incorporates Paragraphs 4 through 6, 8, 15 through 20, and 60 through 66 as if fully set forth herein.

82.     FERGUSON is a member of a racial minority, Black.

83.     The foregoing conduct violates 42 U.S.C. § 1981 because the conduct constitutes disparate treatment of FERGUSON.

## Florida Civil Rights Act

84.     FERGUSON incorporates Paragraphs 4 through 6, 8, 15 through 20, and 60 through 66 as if fully set forth herein.

85.     FERGUSON is a member of a protected class.

86.     At all times material hereto, WALGREENS was an employer within the meaning of Fla. Stat. § 760.02(7).

87.     At all times material hereto, FERGUSON was an employee and an aggrieved person within the meaning of Fla. Stat. §§ 760.02(6) and 760.02(10).

88.     The foregoing conduct constitutes a prohibited discriminatory practice in violation of the Florida Civil Rights Act of 1992, Fla. Stat. §760.11.

89.     All conditions precedent have been met for filing this action and proceeding under the Florida Civil Rights Act of 1992.

### JOSEPH PATRICK McMULLEN

90.     Plaintiff, JOSEPH PATRICK McMULLEN (hereafter referred to as "J. McMULLEN"), was employed with WALGREENS, first as a Pharmacy Intern and subsequently as a Pharmacist from 1993 until 1998. After becoming licensed as a Pharmacist, J. McMULLEN worked as a Floater Pharmacist for a few month before being assigned to work in the Northside store, a problem-ridden store in an undesirable area in Miami. J. McMULLEN immediately expressed his interest in the management opportunities available within WALGREENS including Store Manager and Pharmacy Supervisor positions to Orvil Maloney, his Store Manager ("Mr. Maloney"), Gary Vanderbilt, his Pharmacy Supervisor ("Mr. Vanderbilt"), and Roy Ripak, his District Manager ("Mr. Ripak"). J. McMULLEN was told by Mr. Ripak that WALGREENS would "prefer" J. McMULLEN become a Pharmacy Manager for at least six (6) months before WALGREENS would really consider him for Store Manager. A non-Black pharmacist, however, was allowed to enter the store management training program even though he had never worked as a pharmacist.[2] This disparity in treatment as it pertained to the store management training program was because of J. McMULLEN's race; working as a Pharmacy Manager is not a prerequisite to becoming a Store Manager.

91.     Subsequently, J. McMULLEN became the Pharmacy Manager of the Northside store (January 1994). After six (6) months, J. McMULLEN went to Mr. Ripak about the possibility of a Store Manager position. Instead of permitting J. McMULLEN to enter into the store management training program as the non-Black pharmacist had been allowed, however, WALGREENS permitted J. McMULLEN to allegedly "train" in the Northside store for two days

---

[2]John Cohn, a non-Black employee, worked as a Pharmacy Intern before becoming a licensed pharmacist. Immediately upon becoming licensed as a pharmacist, Mr. Cohn was permitted to begin the store management training program without having worked as a Pharmacist or Pharmacy Manager.

a week while still remaining responsible for the pharmacy department as the Pharmacy Manager. J. McMULLEN was treated differently from others allowed into the store management training program because of his race. Reluctantly, J. McMULLEN began this artificially-created management training regimen. Obviously, WALGREENS never sincerely intended to properly train J. McMULLEN.

92.     J. McMULLEN complained about the disparate treatment to Mr. Ripak, and because of his complaints, Mr. Ripak developed a hostile attitude towards J. McMULLEN. Afterwards, Mr. Ripak began to harass J. McMULLEN about minute, inconsequential, and insignificant events. For example, J. McMULLEN had scheduled and paid for a vacation prior to beginning the bogus management training program to placate him. Without any reasonable notice, Mr. Ripak told J. McMULLEN to cancel his vacation plans immediately before the scheduled vacation. When J. McMULLEN told Mr. Ripak that the vacation could not be canceled because the vacation plans had been made months in advance and certain expenses had already been incurred, Mr. Ripak told J. McMULLEN that "in order for you to grow in this company, part of your life has to be owned by WALGREENS." Upon returning from his vacation, J. McMULLEN was denied the opportunity to continue in the "pseudo" management training program and forced to return to working in the pharmacy full-time. The subject of a store management training program was never again broached with J. McMULLEN. Further, J. McMULLEN was denied the opportunity to continue "training" in the obscure management arrangement that was done to pacify him. J. McMULLEN was denied these store management training opportunities because of his race.

93.     Several months later, J. McMULLEN was transferred to a store in the Hallendale area as the Pharmacy Manager. J. McMULLEN continued to express his interest in a Store Manager position, but his pleas went ignored because of his race. Other non-Black pharmacists and employees who were less qualified than J. McMULLEN were permitted to enter into WALGREENS' store management training program in the state of Florida.

94.     As a result of the discriminatory conduct and treatment, J. McMULLEN resigned

in August of 1998.

95.    WALGREENS has discriminated against J. McMULLEN on account of his race by:

a.    Failing to inform him of advancement opportunities available while informing non-Black pharmacists of the same advancement opportunities;

b.    Failing to provide him with adequate training to qualify him for promotional opportunities on the same basis as is provided to non-Black pharmacists;

c.    Relying on arbitrary, race-based, subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny him promotional opportunities for which he was qualified;

d.    Disciplining him unjustifiably and/or more severely than non-Black pharmacists;

e.    Discouraging and deterring him from seeking promotional opportunities;

f.    Failing to provide him with job assignments on the same basis as non-Black pharmacists;

g.    Failing and refusing to implement and follow a uniform posting procedure to ensure that he had equal notice of promotional opportunities, which adversely affected his career advancement;

h.    Failing and refusing to establish a uniform and unbiased process by which he and non-Black pharmacists could apply and compete equally for promotions and management positions;

i.    Failing and refusing to consider him for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists were and are considered;

j.    Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

k.    Denying him other terms and conditions of employment on the same basis applied to non-Black pharmacists.

Title VII - Disparate Impact

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

96.     J. McMULLEN incorporates Paragraph 4 through 6, 9, 15 through 20, and 90 through 95 as if fully set forth herein.

97.     At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

98.     At all times material hereto, J. McMULLEN was an employee within the meaning of 42 U.S.C. § 2000e(f).

99.     J. McMULLEN is Black and is therefore a member of a protected class.

100.    WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further, WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. **See Exhibit "G.**

101.    J. McMULLEN may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and J. McMULLEN have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

102.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct had, continues to have, and will have in the future a disparate impact on J. McMULLEN.

<u>Title VII - Disparate Treatment</u>

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

103.    J. McMULLEN incorporates Paragraph 4 through 6, 9, 15 through 20, and 90 through 95 as if fully set forth herein.

104.    At all times material hereto, WALGREENS was an employer within the meaning

of 42 U.S.C. § 2000e(b).

105.    At all times material hereto, J. McMULLEN was an employee within the meaning of 42 U.S.C. § 2000e(f).

106.    J. McMULLEN is Black and is therefore a member of a protected class.

107.    WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further, WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. **See Exhibit "G.**

108.    J. McMULLEN may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and J. McMULLEN have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

109.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct constitutes disparate treatment of J. McMULLEN.

<u>42 U.S.C. § 1981 - Disparate Treatment</u>

110.    J. McMULLEN incorporates Paragraph 4 through 6, 9, 15 through 20, and 90 through 95 as if fully set forth herein.

111.    J. McMULLEN is a member of a racial minority, Black.

112.    The foregoing conduct violates 42 U.S.C. § 1981 because the conduct constitutes disparate treatment of J. McMULLEN.

<u>Florida Civil Rights Act</u>

113.    J. McMULLEN incorporates Paragraph 4 through 6, 9, 15 through 20, and 90 through 95 as if fully set forth herein.

114.    J. McMULLEN is a member of a protected class.

115.    At all times material hereto, WALGREENS was an employer within the meaning of Fla. Stat. § 760.02(7).

116.    At all times material hereto, J. McMULLEN was an employee and an aggrieved person within the meaning of Fla. Stat. §§ 760.02(6) and 760.02(10).

117.    The foregoing conduct constitutes a prohibited discriminatory practice in violation of the Florida Civil Rights Act of 1992, Fla. Stat. §760.11.

118.    All conditions precedent have been met for filing this action and proceeding under the Florida Civil Rights Act of 1992.

DELORES OKONMAH

119.    Plaintiff, DELORES OKONMAH (hereafter referred to as "OKONMAH"), has been employed with WALGREENS as a Pharmacist since 1996. Because OKONMAH had extensive pharmacy and pharmacy management experience prior to joining WALGREENS, OKONMAH had the desire and expectation of being afforded a Pharmacy Manager position shortly after being hired, with hopes of ultimately reaching the Pharmacy Supervisor level. WALGREENS, however, has never offered or considered OKONMAH for any of its Pharmacy Manager positions, thereby prohibiting her from ever reaching the Pharmacy Supervisor position.

120.    Initially, OKONMAH was forced to work as a Floater Pharmacist for approximately six (6) months even though many non-Black pharmacists with less experience as a pharmacist and who had joined WALGREENS around the same time OKONMAH was hired were assigned permanent store locations. After being forced to deal with the uncertainty of the scheduling as a Floater Pharmacist, OKONMAH was finally assigned a permanent store.

121.    While at her permanent store location, OKONMAH was often chastised by the customers, particularly when it came to controlled-medications. OKONMAH was called *"nigger"* by a customer in front of the Store Manager and Pharmacy Manager, and the only response from the Store and Pharmacy Managers was to assist the bigoted customer. The Pharmacy Manager was transferred to another store, and WALGREENS appointed a non-Black

pharmacist working at another store as Pharmacy Manager even though OKONMAH had more experience as a pharmacist and had more pharmacy management experience. The non-Black pharmacist that had less experience as a pharmacist as well as less pharmacy management experience was appointed Pharmacy Manager while OKONMAH was neither considered nor interviewed for the Pharmacy Manager position because of OKONMAH's race.

122.    The new non-Black Pharmacy Manager forced OKONMAH and another Black pharmacist to work all of the night and weekend hours while he worked Monday through Friday from 8:00 a.m. to 5:00 p.m. OKONMAH pleaded with the Pharmacy Manager about how unfair it was for she and the other pharmacist to work all of the evening and weekend hours, while the Pharmacy Manager ignored her plea. After approximately six (6) months of this one-sided scheduling, OKONMAH spoke with the Pharmacy Supervisor about the unfair scheduling. After that conversation, the Pharmacy Manager worked one night per week and one Saturday per month while OKONMAH was forced to continue working the remaining evening and weekend hours. After three (3) years of working this unfair schedule under the less qualified non-Black Pharmacy Manager, OKONMAH was transferred to work a split schedule between two stores. OKOHMAH has not been informed or considered for any Pharmacy Manager positions because of her race.

123.    On December 17, 1999, one week before Christmas, OKONMAH realized that WALGREENS had not deposited her paycheck into her checking account. OKONMAH was concerned about not having received her direct deposit because when it had occurred before, she had not received her check a few days later. This would have posed a problem for OKONMAH. After placing several telephone calls and not making any progress with regards to being paid, OKONMAH contacted Vivian Ceballos, her Pharmacy Supervisor ("Ms. Ceballos")[3] about the

---

[3]Ms. Ceballos, OKONMAH's Pharmacy Supervisor is a non-Black pharmacist with less experience as a pharmacist, less pharmacy management experience, and less time with WALGREENS than OKONMAH. Ms. Ceballos was promoted to Pharmacy Supervisor on or about September 1999 even though OKONMAH and others Black pharmacists were more qualified and deserving of the promotion. It should be noted that Ms. Ceballos is very good

problem. OKONMAH was asked to leave a message for Ms. Ceballos. The message left was to have Ms. Ceballos return her call within the next fifteen (15) minutes or she may have to close the store to try to resolve her payroll problem created by WALGREENS' payroll department. Within a few minutes, Ms. Ceballos returned the call and OKONMAH informed the Pharmacy Supervisor about the problem. Ms. Ceballos turned the conversation in a negative direction when she accused OKONMAH of making threats. Ms. Ceballos further stated that she does not want a pharmacist like OKONMAH working for her. After an exchange of words, OKONMAH informed Ms. Ceballos that customers were waiting to speak with her and waiting for their prescriptions.

124.    After a few hours had passed, Ms. Ceballos came to the store, handed OKONMAH her pay *in cash*, and told OKONMAH that she was fired on the grounds of insubordination. Ms. Ceballos fired OKONMAH with Plaintiff, MICHAEL FERGUSON, as a witness. After inquiry, Ms. Ceballos told OKONMAH that she was insubordinate because she threatened to close the store and for allegedly hanging up the phone on her. OKONMAH told Ms. Ceballos that her actions were a bit extreme, especially knowing that many non-Black pharmacists had actually closed the store for personal reasons and were not disciplined. Evidently, Ms. Ceballos was predisposed to fire OKONMAH because of this incident since Ms. Ceballos had already informed a neighboring Store Manager of her impending termination of OKONMAH. OKONMAH was forced to undergo the humiliation of being terminated while other non-Black pharmacist were not terminated or even disciplined because of OKONMAH's race.

125.    Thereafter, OKONMAH met with Mr. Ripak, her District Manager and explained her side of the occurrence. Although she did not feel as though she acted inappropriately, OKONMAH drafted a letter of apology to Ms. Ceballos in an effort to facilitate the discussion.

---

friends with Albert Garcia and Jorge Acosta, both of which are Pharmacy Supervisors with WALGREENS in neighboring districts.

Attached as Exhibit "H" is a copy of the letter to Ms. Ceballos. Within 48 hours, Mr. Ripak rescinded the termination of OKONMAH because he quickly recognized the unprofessional and discriminatory manner in which Ms. Ceballos originally handled the termination.

126.    WALGREENS has discriminated against OKONMAH on account of her race by:

a.    Failing to inform her of advancement opportunities available while informing non-Black pharmacists of the same advancement opportunities;

b.    Failing to provide her with training to qualify her for promotional opportunities on the same basis as is provided to non-Black pharmacists;

c.    Relying on arbitrary, race-based, subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny her promotional opportunities for which she was qualified;

d.    Disciplining her unjustifiably and/or more severely than non-Black pharmacists;

e.    Humiliating her in front of her staff and customers because of a WALGREENS error with her pay;

f.    Discouraging and deterring her from seeking promotional opportunities;

g.    Failing to provide her with job assignments on the same basis as non-Black pharmacists;

h.    Failing and refusing to implement and follow a uniform posting procedure to ensure that she had and has equal notice of promotional opportunities, which adversely affected and continues to affect her career advancement;

i.    Failing and refusing to establish a uniform and unbiased process by which she and non-Black pharmacists can apply and compete equally for promotions and management positions;

j.    Failing and refusing to consider her for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists were and are considered;

k.    Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

l.      Denying her other terms and conditions of employment on the same basis applied to non-Black pharmacists.

### Title VII - Disparate Impact

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

127.    OKONMAH incorporates Paragraphs 4 through 6, 10, 15 through 20, and 119 through 126 as if fully set forth herein.

128.    At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

129.    At all times material hereto, OKONMAH was an employee within the meaning of 42 U.S.C. § 2000e(f).

130.    OKONMAH is Black and is therefore a member of a protected class.

131.    WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further,  WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. See Exhibit "G.

132.    OKONMAH may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and OKONMAH have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

133.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct had, continues to have, and will have in the future a disparate impact on OKONMAH.

### Title VII - Disparate Treatment

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

134.    OKONMAH incorporates Paragraphs 4 through 6, 10, 15 through 20, and 119 through 126 as if fully set forth herein.

135.    At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

136.    At all times material hereto, OKONMAH was an employee within the meaning of 42 U.S.C. § 2000e(f).

137.    OKONMAH is Black and is therefore a member of a protected class.

138.    WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further, WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. See Exhibit "G.

139.    OKONMAH may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and OKONMAH have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

140.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct constitutes disparate treatment of OKONMAH.

### 42 U.S.C. § 1981 - Disparate Treatment

141.    OKONMAH incorporates Paragraphs 4 through 6, 10, 15 through 20, and 119 through 126 as if fully set forth herein.

142.    OKOMMAH is a member of a racial minority, Black.

143.    The foregoing conduct violates 42 U.S.C. § 1981 because the conduct constitutes disparate treatment of OKONMAH.

### Florida Civil Rights Act

144.    OKONMAH incorporates Paragraphs 4 through 6, 10, 15 through 20, and 119

through 126 as if fully set forth herein.

145.    OKONMAH is a member of a protected class.

146.    At all times material hereto, WALGREENS was an employer within the meaning of Fla. Stat. § 760.02(7).

147.    At all times material hereto, OKONMAH was an employee and an aggrieved person within the meaning of Fla. Stat. §§ 760.02(6) and 760.02(10).

148.    The foregoing conduct constitutes a prohibited discriminatory practice in violation of the Florida Civil Rights Act of 1992, Fla. Stat. §760.11.

149.    All conditions precedent have been met for filing this action and proceeding under the Florida Civil Rights Act of 1992.

<u>BERNICE SHORTER-MEARES</u>

150.    Plaintiff, BERNICE SHORTER-MEARES (hereafter referred to as "SHORTER-MEARES"), has been employed with WALGREENS as a Pharmacist since 1996. Initially, SHORTER-MEARES worked as a Floater Pharmacist for approximately one and a half years even though she requested to be assigned a permanent store. In addition to her request to be assigned a permanent store, SHORTER-MEARES expressed her interest in management opportunities, particularly the Pharmacy Manager position, with WALGREENS because she had over fourteen (14) years of management experience prior to joining WALGREENS. SHORTER-MEARES' interests in management were and are still ignored even though non-Black pharmacists with less experience and less time with the company have been allowed to advance into management.

151.    After giving SHORTER-MEARES the impression that she had been assigned to a permanent store, SHORTER-MEARES was forced to continue transferring from store to store every couple of months even though non-Black pharmacists with less time with the company had been assigned to permanent store locations. In fact, SHORTER-MEARES was told by Ms. Ceballos that she was being transferred to a particular store location because WALGREENS needed her "to get this store organized" and that she was the best candidate to do so because of

her "years of experience." The Pharmacy Manager position, however, was given to Xavier Ziegler, a non-Black pharmacist with less years of experience than SHORTER-MEARES. Mr. Ziegler benefitted from SHORTER-MEARES' knowledge and management experience while SHORTER-MEARES' management desires continued to be ignored by WALGREENS.

152.    Throughout her tenure with WALGREENS, SHORTER-MEARES has never been informed nor interviewed for management opportunities because of her race. Incredibly, during her tenure with WALGREENS, SHORTER-MEARES never received an evaluation from the District Manager or Pharmacy Supervisor. Further, many non-Black pharmacists with less experience, less pharmacy management experience, and less time with the company were informed, interviewed, considered, and/or received promotions for the same management opportunities that SHORTER-MEARES was more qualified for, including Mr. Ziegler. Additionally, SHORTER-MEARES was not afforded the opportunities afforded to non-Black pharmacists that involved working with the Pharmacy Supervisors and District Managers.

153.    WALGREENS has discriminated against SHORTER-MEARES on account of her race by:

a.      Failing to inform her of advancement opportunities available while informing non-Black pharmacists of the same advancement opportunities;

b.      Failing to provide her with training to qualify her for promotional opportunities on the same basis as is provided to non-Black pharmacists because of her race;

c.      Relying on arbitrary, race-based, subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny her promotional opportunities for which she was qualified;

d.      Discouraging and deterring her from seeking promotional opportunities;

e.      Failing to provide her with job assignments on the same basis as non-Black pharmacists;

f.      Failing and refusing to implement and follow a uniform posting procedure to ensure that she had and has equal notice of promotional opportunities, which adversely affected

and continues to affect her from advancement;

g.      Failing and refusing to establish a uniform and unbiased process by which she and non-Black pharmacists can apply and compete equally for promotions and management positions;

h.      Failing and refusing to consider her for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists were and are considered;

i.      Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

j.      Denying her other terms and conditions of employment on the same basis applied to non-Black pharmacists.

<u>Title VII - Disparate Impact</u>

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

154.    SHORTER-MEARES incorporates Paragraphs 4 through 6, 11, 15 through 20, and 150 through 153 as if fully set forth herein.

155.    At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

156.    At all times material hereto, SHORTER-MEARES was an employee within the meaning of 42 U.S.C. § 2000e(f).

157.    SHORTER-MEARES is Black and is therefore a member of a protected class.

158.    WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further, WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. See Exhibit "G.

159.    SHORTER-MEARES may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and SHORTER-MEARES have arisen out of similar

discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

160.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct had, continues to have, and will have in the future a disparate impact on SHORTER-MEARES.

Title VII - Disparate Treatment

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

161.    SHORTER-MEARES incorporates Paragraphs 4 through 6, 11, 15 through 20, and 150 through 153 as if fully set forth herein.

162.    At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

163.    At all times material hereto, SHORTER-MEARES was an employee within the meaning of 42 U.S.C. § 2000e(f).

164.    SHORTER-MEARES is Black and is therefore a member of a protected class.

165.    WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further,  WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. See Exhibit "G.

166.    SHORTER-MEARES may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and SHORTER-MEARES have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

167.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e, *et seq.* because the conduct constitutes disparate treatment of SHORTER-MEARES.

42 U.S.C. § 1981 - Disparate Treatment

168.    SHORTER-MEARES incorporates Paragraphs 4 through 6, 11, 15 through 20, and 150 through 153 as if fully set forth herein.

169.    SHORTER-MEARES is a member of a racial minority, Black.

170.    The foregoing conduct violates 42 U.S.C. § 1981 because the conduct constitutes disparate treatment of SHORTER-MEARES.

Florida Civil Rights Act

171.    SHORTER-MEARES incorporates Paragraphs 4 through 6, 11, 15 through 20, and 150 through 153 as if fully set forth herein.

172.    SHORTER-MEARES is a member of a protected class.

173.    At all times material hereto, WALGREENS was an employer within the meaning of Fla. Stat. § 760.02(7).

174.    At all times material hereto, SHORTER-MEARES was an employee and an aggrieved person within the meaning of Fla. Stat. §§ 760.02(6) and 760.02(10).

175.    The foregoing conduct constitutes a prohibited discriminatory practice in violation of the Florida Civil Rights Act of 1992, Fla. Stat. §760.11.

176.    All conditions precedent have been met for filing this action and proceeding under the Florida Civil Rights Act of 1992.

CONSTANCE ECHEBIRI

177.    Plaintiff, CONSTANCE ECHEBIRI (hereafter referred to as "ECHEBIRI"), has worked for WALGREENS from 1994 until present. ECHEBIRI began working with WALGREENS as a Floater Pharmacist even though she asked to be assigned a permanent store location. Although ECHEBIRI requested a permanent store, ECHEBIRI was forced to work as a Floater Pharmacist for almost three (3) years while many non-Black pharmacists with less years of experience and less years with WALGREENS were assigned permanent stores. Some of the

stores where ECHEBIRI was scheduled to work were as far as seventy (70) miles from her home.

178.    WALGREENS also misled ECHEBIRI to believe that she was assigned a permanent store location in 1995. Instead, after ECHEBIRI trained Michelle Brantly ("Ms. Brantly")[4], a non-Black Pharmacy Intern who subsequently became licensed as a pharmacist, Ms. Brantly was assigned the actual store where ECHEBIRI trained her, while ECHEBIRI was then forced to continue working as a Floater Pharmacist. Since March 26, 1996, ECHEBIRI has never been informed or considered for Pharmacy Manager positions with WALGREENS.

179.    After ECHEBIRI continued to complain to the Pharmacy Supervisor about not being placed in a permanent store location, ECHEBIRI was finally assigned to a permanent store location, but ECHEBIRI was required to work the undesirable midnight shift. ECHEBIRI was forced to work this undesirable shift while many non-Black pharmacists with less years of experience and less years with WALGREENS were assigned permanent stores with more desirable hours and promoted to the Pharmacy Manager position. ECHEBIRI experienced this disparate treatment concerning permanent store assignment and Pharmacy Manager positions because of her race.

180.    ECHEBIRI also experienced racial insults from management while working with WALGREENS. For example, an Assistant Store Manager, David Weiss[5], in the presence of the Store Manager, Mr. Carpenter, gave ECHEBIRI the password to access the computer system of "*Anthrax*", a phrase that not only means "*charcoal*", but also is the name of a bacterial infectious disease that infects animals and humans. After ECHEBIRI became distraught at having received "*Anthrax*" as her password, she was then given the password of "*Ebola*", which is most commonly known as a deadly *viral* disease that affects *monkeys* and *apes* in *Africa*. What

---

[4]Ms. Brantly is now a Pharmacy Manager within WALGREENS, while ECHEBIRI, who has more experience as a pharmacist, more time with WALGREENS, and who actually trained Ms. Brantly, has not been offered nor considered for a Pharmacy Manager position.

[5]Mr. Weiss has since been promoted to Store Manager within WALGREENS.

possible inference should ECHEBIRI have drawn from WALGREENS management's blatant, racial mockery?

181.    WALGREENS denied ECHEBIRI the time to attend her sister's funeral and her mother's memorial service in 1997. Mike Calnan, the District Manager ("Mr. Calnan") suggested that ECHEBIRI would "lose her job" if she attended her sister's funeral. This thoughtless district manager forced ECHEBIRI to have to weigh the possible loss of her economic livelihood against the emotional upheaval of gathering with family members at her sister's funeral. ECHEBIRI experienced this harassment and disparate treatment because of her race.

182.    WALGREENS also began creating disciplinary records on ECHEBIRI in an effort to besmirch her character professionally, a routine pattern and practice of WALGREENS. WALGREENS has falsely accused ECHEBIRI of dispensing errors that did not occur and of sleeping in the pharmacy on her shift, which also was untrue.

183.    In 1997, ECHEBIRI had gotten approval for vacation from WALGREENS. Two days prior to her vacation, however, ECHEBIRI was injured on the job. ECHEBIRI went to the hospital and later received treatment from a physician and chiropractor. WALGREENS initially refused to cover ECHEBIRI's medical expenses incurred as a result of her on-the-job injury. Instead, ECHEBIRI was forced to use her personal health insurance until her treating health practitioners intervened with WALGREENS' workers compensation carrier.

184.    In 1998, ECHEBIRI was also denied a vacation by Mr. Calnan and Cheryl Nicolay, ECHEBIRI's Pharmacy Manager ("Ms. Nicolay"), even though the vacation had previously been approved by her former District Manager, Mr. Martin Northrop ("Mr. Northrop"). Because of Mr. Northrop's prior approval, ECHEBIRI incurred travel expenses including airline tickets for an international flight. Since Mr. Calnan and Ms. Nicolay halted ECHEBIRI's vacation plans, ECHEBIRI had to bare the full cost of travel expenses that she had to pay in advance.

185.    As a result of ECHEBIRI's frustration associated with WALGREENS' hostile working environment, ECHEBIRI's stress-induced gastrointestinal problems surfaced again and

prompted a physician visit. Her physician, Dr. P. Ijewere, authorized ECHEBIRI to take four days off. ECHEBIRI formally submitted the official documentation from Dr. Ijewere. WALGREENS, in its typical disparate treatment of ECHEBIRI, charged ECHEBIRI with the use of vacation time instead of company-provided sick time. Attached as Exhibit "I" is a correspondence to Michael Whatley of WALGREENS' Department of Employee Relations regarding the 1988 vacation incident.

186.    ECHEBIRI has also complained about unwarranted disciplinary reports prepared by Ms. Nicolay, ECHEBIRI's Pharmacy Manager. For example, Ms. Nicolay prepared a disciplinary report on ECHEBIRI because of ECHEBIRI's failure to arrive at work, in spite of the fact that her flight, U.S. Airways Flight # 1181, had been canceled because of whether conditions. Immediately after finding out about the cancellation of her flight, ECHEBIRI called the pharmacy and informed WALGREENS to make alternate arrangements for a pharmacist in case she was unable to make it to work. She also requested that Ms. Nicolay be notified immediately about ECHEBIRI's predicament. After the bogus disciplinary report, on January 15, 1999, ECHEBIRI sought a forum for which she and Ms. Nicolay could discuss Ms. Nicolay's personal grievances - one year later, Ms. Nicolay has yet to respond. Attached as Exhibit "J" is the correspondence to Ms. Nicolay evidencing ECHEBIRI's intent to address Ms. Nicolay's grievances.

187.    ECHEBIRI complained to the Pharmacy Supervisor as well as WALGREENS' corporate headquarters about all of the racial experiences she encountered at WALGREENS, but the Pharmacy Supervisor and corporate headquarters ignored, continues to ignore, and will likely continue to ignore ECHEBIRI's pleas for help in the racist environment placed around her.

188.    ECHEBIRI desired a management opportunity with WALGREENS, but convinced herself that she would not be considered for such an opportunity because of her race. The following disheartening employment experiences in ECHEBIRI's tenure with WALGREENS are some of the experiences that deterred and discouraged her from pursuing management opportunities: (1) assigned to work as a Floater Pharmacist for nearly four (4) years

while non-Black pharmacists with less years of experience and less time with WALGREENS, such as Michelle Brantly, were assigned permanent stores; (2) experienced racial slurs and constant, baseless scrutiny from management that was not directed to non-Black pharmacists; (3) treated harshly by management during her time of family mourning and personal illness; (4) denied vacations; and (5) scheduled to work the midnight shift in a discriminatory manner.

189.    WALGREENS has discriminated against ECHEBIRI on account of her race by:

a.    Failing to inform her of advancement opportunities available while informing non-Black pharmacists of the same advancement opportunities;

b.    Failing to provide her with training to qualify her for promotional opportunities on the same basis as is provided to non-Black pharmacists;

c.    Relying on arbitrary, race-based, subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny her promotional opportunities for which she was qualified;

d.    Disciplining her unjustifiably and/or more severely than non-Black pharmacists;

e.    Humiliating her with the use of racial slurs from management and staff;

f.    Discouraging and deterring her from seeking promotional opportunities;

g.    Failing to provide her with job assignments on the same basis as non-Black pharmacists;

h.    Failing and refusing to implement and follow a uniform posting procedure to ensure that she had and has equal notice of promotional opportunities, which adversely affected and continues to affect her from advancement;

i.    Failing and refusing to establish a uniform and unbiased process by which she and non-Black pharmacists can apply and compete equally for promotions and management positions;

j.    Failing and refusing to consider her for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists were and are considered;

k.    Failing and refusing to take reasonable and adequate steps to eliminate the effects

of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

I.    Denying her other terms and conditions of employment on the same basis applied to non-Black pharmacists.

Title VII - Disparate Impact

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

190.    ECHEBIRI incorporates Paragraphs 4 through 6, 12, 15 through 20, and 177 through 189 as if fully set forth herein.

191.    At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

192.    At all times material hereto, ECHEBIRI was an employee within the meaning of 42 U.S.C. § 2000e(f).

193.    ECHEBIRI is Black and is therefore a member of a protected class.

194.    WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further, WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. See Exhibit "G.

195.    ECHEBIRI may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and ECHEBIRI have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

196.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct had, continues to have, and will have in the future a disparate impact on ECHEBIRI.

## Title VII - Disparate Treatment

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

197.　ECHEBIRI incorporates Paragraphs 4 through 6, 12, 15 through 20, and 177 through 189 as if fully set forth herein.

198.　At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

199.　At all times material hereto, ECHEBIRI was an employee within the meaning of 42 U.S.C. § 2000e(f).

200.　ECHEBIRI is Black and is therefore a member of a protected class.

201.　WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further, WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. See Exhibit "G.

202.　ECHEBIRI may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and ECHEBIRI have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

203.　The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct constitutes disparate treatment of ECHEBIRI.

## 42 U.S.C. § 1981 - Disparate Treatment

204.　ECHEBIRI incorporates Paragraphs 4 through 6, 12, 15 through 20, and 177 through 189 as if fully set forth herein.

205.　ECHEBIRI is a member of a racial minority, Black.

206.    The foregoing conduct violates 42 U.S.C. § 1981 because the conduct constitutes disparate treatment of ECHEBIRI.

<u>Florida Civil Rights Act</u>

207.    ECHEBIRI incorporates Paragraphs 4 through 6, 12, 15 through 20, and 177 through 189 as if fully set forth herein.

208.    ECHEBIRI is a member of a protected class.

209.    At all times material hereto, WALGREENS was an employer within the meaning of Fla. Stat. § 760.02(7).

210.    At all times material hereto, ECHEBIRI was an employee and an aggrieved person within the meaning of Fla. Stat. §§ 760.02(6) and 760.02(10).

211.    The foregoing conduct constitutes a prohibited discriminatory practice in violation of the Florida Civil Rights Act of 1992, Fla. Stat. §760.11.

212.    All conditions precedent have been met for filing this action and proceeding under the Florida Civil Rights Act of 1992.

<u>MIA DAWN TAYLOR</u>

213.    Plaintiff, MIA DAWN TAYLOR (hereafter referred to as "TAYLOR"), has been employed with WALGREENS, first as a Pharmacy Intern and, subsequently, as a Pharmacist from 1990 until present. After becoming licensed as a Pharmacist, TAYLOR was forced to work as a Floater Pharmacist even though she asked to be placed in a permanent store location. While TAYLOR was forced to work as a Floater Pharmacist, several non-Black Pharmacists who were hired around the same time she was hired were assigned to permanent store locations. After approximately a year, TAYLOR was assigned to the Northside store temporarily before being transferred to another store in the Miami area. After being ill for approximately one week, TAYLOR was again transferred back to the Northside store. Throughout the various transfers, TAYLOR requested that she be placed in a permanent store location and be afforded a management opportunity to the position of Pharmacy Manager, but her request went ignored by WALGREENS. Subsequently, TAYLOR was transferred again to another store in the Miami

area and not afforded a management opportunity. Again, she expressed her interest in management opportunities but her expressed interest went ignored.

214. While her interest in management went ignored by WALGREENS, TAYLOR received company-wide accolades for customer service based on a letter written by a customer discussing the way she handled his particular problem. TAYLOR received so much company-wide praise for this incident that a story appeared in *Walgreens World*, one of the company's newsletters, about TAYLOR and her encounter with the customer.

215. Prior to filing the complaint, TAYLOR was never informed or considered for Pharmacy Manager or Store Manager opportunities with WALGREENS because of her race. Further, because of WALGREENS' continuing and on-going pattern and practice for subjectively informing only non-Black pharmacists about management opportunities available, several less-qualified employees, like John Cohn, were informed, considered, and subsequently promoted to Pharmacy Manager or Store Manager. Finally, since March 29, 1996, TAYLOR was not afforded the opportunities afforded to non-Black pharmacists of working as a scheduler, trainer, or recruiter, which would have involved working with the Pharmacy Supervisors and District Managers directly.

216. WALGREENS has discriminated against TAYLOR on account of her race by:

a. Failing to inform her of advancement opportunities available while informing non-Black pharmacists of the same advancement opportunities;

b. Failing to provide her with training to qualify her for promotional opportunities on the same basis as is provided to non-Black pharmacists;

c. Relying on arbitrary, race-based, subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny her promotional opportunities for which she was qualified;

d. Discouraging and deterring her from seeking promotional opportunities;

e. Failing to provide her with job assignments on the same basis as non-Black pharmacists;

f.      Failing and refusing to implement and follow a uniform posting procedure to ensure that she had and has equal notice of promotional opportunities, which adversely affected and continues to affect her from advancement;

g.      Failing and refusing to establish a uniform and unbiased process by which she and non-Black pharmacists can apply and compete equally for promotions and management positions;

h.      Failing and refusing to consider her for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists were and are considered;

i.      Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

j.      Denying her other terms and conditions of employment on the same basis applied to non-Black pharmacists.

<u>Title VII - Disparate Impact</u>

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

217.    TAYLOR incorporates Paragraphs 4 through 6, 13, 15 through 20, and 213 through 216 as if fully set forth herein.

218.    At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

219.    At all times material hereto, TAYLOR was an employee within the meaning of 42 U.S.C. § 2000e(f).

220.    TAYLOR is Black and is therefore a member of a protected class.

221.    WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further, WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. <u>See</u> Exhibit "G.

222.    TAYLOR may rely on the EEOC charge filed by WILLIAMS, *supra*, because

(1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and TAYLOR have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

223.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct had, continues to have, and will have in the future a disparate impact on TAYLOR.

### Title VII - Disparate Treatment

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

224.    TAYLOR incorporates Paragraphs 4 through 6, 13, 15 through 20, and 213 through 216 as if fully set forth herein.

225.    At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

226.    At all times material hereto, TAYLOR was an employee within the meaning of 42 U.S.C. § 2000e(f).

227.    TAYLOR is Black and is therefore a member of a protected class.

228.    WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further,  WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. See Exhibit "G.

229.    TAYLOR may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and TAYLOR have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v.

Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

230.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct constitutes disparate treatment of TAYLOR.

### 42 U.S.C. § 1981 - Disparate Treatment

231.    TAYLOR incorporates Paragraphs 4 through 6, 13, 15 through 20, and 213 through 216 as if fully set forth herein.

232.    TAYLOR is a member of a racial minority, Black.

233.    The foregoing conduct violates 42 U.S.C. § 1981 because the conduct constitutes disparate treatment of TAYLOR.

### Florida Civil Rights Act

234.    TAYLOR incorporates Paragraphs 4 through 6, 13, 15 through 20, and 213 through 216 as if fully set forth herein.

235.    TAYLOR is a member of a protected class.

236.    At all times material hereto, WALGREENS was an employer within the meaning of Fla. Stat. § 760.02(7).

237.    At all times material hereto, TAYLOR was an employee and an aggrieved person within the meaning of Fla. Stat. §§ 760.02(6) and 760.02(10).

238.    The foregoing conduct constitutes a prohibited discriminatory practice in violation of the Florida Civil Rights Act of 1992, Fla. Stat. §760.11.

239.    All conditions precedent have been met for filing this action and proceeding under the Florida Civil Rights Act of 1992.

### CARMITA McMULLEN

240.    Plaintiff, CARMITA McMULLEN (hereafter referred to as "C. McMULLEN") began working with WALGREENS in 1986 while she was a high school student. C. McMULLEN worked as a Pharmacy Cashier and subsequently became a Pharmacy Technician. C. McMULLEN then attended pharmacy school at Florida A&M University while continuing to

work with WALGREENS on Christmas and summer vacations. It was C. McMULLEN's desire to one day reach the level of Pharmacy Supervisor and/or District Manager with WALGREENS. Upon completing the didactic work in pharmacy school, C. McMULLEN worked as a Pharmacy Intern for WALGREENS. In 1994, C. McMULLEN graduated with a Bachelor of Science degree in pharmacy from Florida A&M University and began working as a Pharmacist for WALGREENS.

241.    Because C. McMULLEN was very familiar with WALGREENS' pharmacy operations, her transition into assuming the responsibility of running a WALGREENS pharmacy was smooth. C. McMULLEN expressed an interest in management opportunities such as Pharmacy Manager, Pharmacy Supervisor and Store Manager positions immediately. She became a Pharmacy Manager in November 1995 even though she was constantly transferred to various low-performing stores in the Miami area. In fact, C. McMULLEN was transferred to an undesirable, low-performing WALGREENS that closed two months after the transfer. C. McMULLEN was transferred to this store even though there were Pharmacy Manager opportunities in more desirable stores.  During her tenure at this low-performing, undesirable store, C. McMULLEN trained Ms. Ceballos, a Pharmacy Supervisor that was promoted on or about September 1999.

242.    C. McMULLEN was never informed about Pharmacy Manager or Store Manager opportunities in the more desirable stores because of WALGREENS' continuing and on-going pattern and practice for subjectively informing non-Black pharmacists about management opportunities available. As expected, the Pharmacy Manager opportunities in the desirable stores of WALGREENS were filled by non-Black pharmacists.

243.    Further, C. McMULLEN was never informed or considered for Pharmacy Supervisor positions that became available because of her race.

244.    As a result of the discriminatory conduct, C. McMULLEN resigned in January 1999.

245.    WALGREENS has discriminated against C. McMULLEN on account of her race

by:

    a.    Failing to inform her of advancement opportunities available while informing non-Black pharmacists of the same advancement opportunities;

    b.    Failing to provide her with training to qualify her for promotional opportunities on the same basis as is provided to non-Black pharmacists because of her race;

    c.    Relying on arbitrary, race-based, subjective selection criteria and decision-making by non-Black pharmacists and supervisors to deny her promotional opportunities for which she was qualified;

    d.    Discouraging and deterring her from seeking promotional opportunities;

    e.    Failing to provide her with job assignments on the same basis as non-Black pharmacists;

    f.    Failing and refusing to implement and follow a uniform posting procedure to ensure that she had equal notice of promotional opportunities, which adversely affected her from advancement;

    g.    Failing and refusing to establish a uniform and unbiased process by which she and non-Black pharmacists could apply and compete equally for promotions and management positions;

    h.    Failing and refusing to consider her for desirable work assignments, promotions and management positions on the same basis as non-Black pharmacists were and are considered;

    i.    Failing and refusing to take reasonable and adequate steps to eliminate the effects of WALGREENS' past and continuing discriminatory policy and pattern or practice; and

    j.    Denying her other terms and conditions of employment on the same basis applied to non-Black pharmacists.

<u>Title VII - Disparate Impact</u>

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

    246.    C. McMULLEN incorporates Paragraphs 4 through 6, 14 through 20, and 240 through 245 as if fully set forth herein.

247.    At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

248.    At all times material hereto, C. McMULLEN was an employee within the meaning of 42 U.S.C. § 2000e(f).

249.    C. McMULLEN is Black and is therefore a member of a protected class.

250.    WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further, WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. See Exhibit "G.

251.    C. McMULLEN may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and C. McMULLEN have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

252.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct had, continues to have, and will have in the future a disparate impact on C. McMULLEN.

Title VII - Disparate Treatment

(Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*)

253.    C. McMULLEN incorporates Paragraphs 4 through 6, 14 through 20, and 240 through 245 as if fully set forth herein.

254.    At all times material hereto, WALGREENS was an employer within the meaning of 42 U.S.C. § 2000e(b).

255.    At all times material hereto, C. McMULLEN was an employee within the meaning of 42 U.S.C. § 2000e(f).

256.    C. McMULLEN is Black and is therefore a member of a protected class.

257.    WILLIAMS timely filed an EEOC charge. Further, WILLIAMS has received a Notice of Right to Sue notice from the EEOC. Further,  WILLIAMS has exhausted all administrative remedies prior to the institution of this action. By agreement with WALGREENS, WILLIAMS is not filing the Complaint outside of the expiration of her Notice of Right to Sue. See Exhibit "G.

258.    C. McMULLEN may rely on the EEOC charge filed by WILLIAMS, *supra*, because (1) the charge being relied upon was timely filed and not otherwise defective; (2) the individual claims of WILLIAMS and C. McMULLEN have arisen out of similar discriminatory treatment; and (3) the discriminatory treatment is a continuation of past discriminatory treatment into the present. Calloway v. Partners National Health Plans, 986 F.2d 446 (11th Cir. 1993); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).

259.    The foregoing conduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* because the conduct constitutes disparate treatment of C. McMULLEN.

42 U.S.C. § 1981 - Disparate Treatment

260.    C. McMULLEN incorporates Paragraphs 4 through 6, 14 through 20, and 240 through 245 as if fully set forth herein.

261.    C. McMULLEN is a member of a racial minority, Black.

262.    The foregoing conduct violates 42 U.S.C. § 1981 because the conduct constitutes disparate treatment of C. McMULLEN.

Florida Civil Rights Act

263.    C. McMULLEN incorporates Paragraphs 4 through 6, 14 through 20, and 240 through 245 as if fully set forth herein.

264.    C. McMULLEN is a member of a protected class.

265.    At all times material hereto, WALGREENS was an employer within the meaning of Fla. Stat. § 760.02(7).

266.    At all times material hereto, C. McMULLEN was an employee and an aggrieved person within the meaning of Fla. Stat. §§ 760.02(6) and 760.02(10).

267.    The foregoing conduct constitutes a prohibited discriminatory practice in violation of the Florida Civil Rights Act of 1992, Fla. Stat. §760.11.

268.    All conditions precedent have been met for filing this action and proceeding under the Florida Civil Rights Act of 1992.

## V.  JURY DEMAND

PLAINTIFFS demand trial by jury in this action.

## VI.  PUNITIVE DAMAGES

WALGREENS has engaged in the discriminatory conduct as alleged herein maliciously or in reckless disregard and/or indifference of the federally protected rights of the PLAINTIFFS. PLAINTIFFS are therefore entitled to recover punitive damages in the amount according to proof for the claims under the Title VII (disparate treatment) and 42 U.S.C. § 1981.

## VII.  PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS request the following relief:

1.    A declaratory judgment that WALGREENS' practices complained of herein are unlawful and violative of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., 42 U.S.C. § 1981 and the Florida Civil Rights Act, Fla. Stat. § 760.01, et seq.

2.    An award of back pay; front pay; damages for lost compensation, promotions, and job benefits that the PLAINTIFFS would have received but for WALGREENS' discriminatory practices; and compensatory damages for emotional distress, humiliation, embarrassment and anguish;

3.    An award of exemplary and punitive damages commensurate with WALGREENS' ability to pay and to deter future discriminatory conduct for the claims under the Title VII (disparate treatment) and 42 U.S.C. § 1981.

4.    An injunction against WALGREENS and its partners, officers, owners, agents, successors, employees, representatives and any and all persons acting in concert with it, from

engaging in each of the unlawful practices, policies, customs and usages set forth herein;

5.      An order requiring WALGREENS to institute and carry out policies, practices and affirmative action programs that provide equal employment opportunities for Black pharmacists that remedy the effect of WALGREENS' past and present unlawful employment practices;

6.      An order restoring PLAINTIFFS to those jobs they would now be occupying but for WALGREENS' discriminatory practices;

7.      A declaratory judgment in favor of Plaintiff, JOYCE WILLIAMS, that WALGREENS' practices complained of herein are unlawful and violative of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*

8.      Reasonable attorney's fees, costs and expenses of suit;

9.      Prejudgment interest; and

10.     Such other and further relief as the Court may deem just and proper.

**LAW OFFICES OF MICHAEL M. TOBIN, P.A.**
Attorneys for Plaintiffs
1099 Ponce De Leon Blvd.
Coral Gables, Florida 33134-3319
Tel:    305-445-5475
Fax:    305-445-5479

KELSAY D. PATTERSON
Fla. Bar No. 119784

CASE NO. 00-6151-CIV-UNGARO/Brown

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served via

U.S. Mail this 28th day of April, 2000, to: MARK R. CHESKINS, ESQ., Steel Hector & Davis

LLP, Attorneys for Defendant, 200 South Biscayne Blvd., 40th Floor, Miami, Florida 33131-

2398.

**LAW OFFICES OF MICHAEL M. TOBIN, P.A.**
Attorneys for Plaintiffs
1099 Ponce De Leon Blvd.
Coral Gables, Florida 33134-3319
Tel:    305-445-5475
Fax:    305-445-5479


_____
KELSAY D. PATTERSON
Fla. Bar No. 119784