UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO: 00-6151-CIV- HUCK/Brown

NIGHT BOX
FILED

JAN 1 2 2001

CLARENCE MA~~...~~
CLERK, USDC / SDFL / MIA

JOYCE WILLIAMS, et al,

                      Plaintiffs,

v.

WALGREEN COMPANY,

                      Defendant.

_____/

## PLAINTIFFS' BRIEF RE: COURT'S ORDER OF JANUARY 2, 2001

Plaintiffs, by and through undersigned counsel, file the following Initial Brief pursuant to the Court's Order of January 2, 2001 and state as follows:

I.   Issue:               Whether to Sever the Eight Individual Plaintiffs claims

### FACTUAL SUMMARY OF CLAIMS

In this matter, the Plaintiffs are eight (8) black pharmacists who have sued Walgreens over the company's subjective and discriminatory promotion practices. These practices have resulted in a systemic disparate impact on them and other black pharmacists being excluded entirely from the position of pharmacy supervisor. The position of pharmacy supervisor is tantamount to the district manager position, as the pharmacy supervisor is in charge of the operations at multiple stores. Additionally, there are remarkably few blacks in the position of store pharmacy department manager. When Walgreens has a vacancy for the position of store pharmacy department manager and/or the

1

position of pharmacy supervisor, those vacancies are not noticed, published or made known. As a business practice, the pharmacy supervisor in seeking to fill the position of pharmacy manager at a store will approach the pharmacy candidate and offer said candidate the position. The regional pharmacy manager handles the promotion to the position of pharmacy supervisor in the same manner. From time to time, but on an inconsistent basis, Walgreens sends a questionnaire to its pharmacists seeking information on various aspects of its operations by its individual pharmacists. If and when the questionnaire is sent out, there is a single inquiry seeking to determine whether the responding pharmacist is interested in management opportunities. Other than this, there are no other ways to objectively register interest in any managerial vacancy. Attached as Plaintiffs **Exhibit 1** is an Affidavit from Karl Meehan the Regional Director of Eastern Pharmacy Operations for Walgreens wherein he confirms the above representations. Black pharmacists are not given the opportunity to apply for vacant positions. See Plaintiffs' Composite **Exhibit 2**-Plaintiffs' responses to Defendant's Second Interrogatories.

The few black store pharmacy managers that do exist are systemically put in communities heavily populated by black Americans, high crime communities, or stores that have long been known to be problematic. (See Plaintiff's Composite **Exhibit 2**). Through a Request for Production being attached as Plaintiffs' **Exhibit 3**, Walgreens admits to employing 488 black pharmacists in Florida between the time period of January 1, 1995 through January 1, 2000. In this same

time frame, Walgreens employed a total of 2,844 pharmacists in the state of Florida. The 488 black pharmacists employed constituted almost 20% of the pharmacy work force. Despite these numbers, Plaintiffs' **Exhibit 4** demonstrates through the Defendant's own response that no black pharmacist has ever been offered the opportunity of pharmacy supervisor. The outstanding discovery owed to the Plaintiffs by the Defendant at this time is designed to further collaborate the disparities in the Defendant's pharmacy work force. For instance, a pharmacists in the employ of Walgreens for over twenty (20) years a black pharmacist named William Powell has never been offered the opportunity as a pharmacy supervisor. Another African American pharmacist named Angela Cure scored an 81 as pharmacy manager on August 1, 1999, which is the identical score of Vivian Ceballos on this same date, but Ms. Ceballos was offered the pharmacy supervisor position over Ms. Cure. See Plaintiff's **Exhibit 5**. Ms. Cure was in the employ of Walgreens several years before Vivian Ceballos became employed by the Defendant.

In order to comply with the Court's Order, these matters must be abridged, but suffice it to say they are fully explained in the Amended Complaint. These complaints as alleged by all eight (8) Plaintiffs also deal with subjective job assignments like "floating". This practice of floating involves sending different staff pharmacists to various stores to work instead of assigning them to a permanent/home store. Some of the eight (8) Plaintiffs are pharmacists with over fifteen (15) years of experience yet have been floating

against their wishes since being hired while non-black pharmacists with less experience and/or time with the company have been assigned permanent/home stores. Floating can require a pharmacists to travel several miles to locate the new assignment, work varying shifts, work with different pharmacists and technicians, and deprives them of consistent supervisory observation.

II. Issue:                          Nexus and Joinder

Rule 20 of the Federal Rules of Civil Procedure is as close to Rule 23 as a party can get without it being a class. Rule 23a prescribes the various items that must be similar and/or in common with several Plaintiffs in order for the Court to certify it as a class. <u>Culpepper v. Inland Mortgage Corp.</u>, 1999 U.S. Dist. Lexis 11846 (Northern District of Alabama, Southern Division 1999). Rule 20 reads as follows:

> Permissive joinder. All persons may join in one action as Plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrences and if any questions of law or fact common to all of these persons will arise in the action.

The interrogatory responses given by the Plaintiffs, the Amended Complaint, and the EEOC charge of Michael Ferguson demonstrate the common nexus of facts they all have in common. Plaintiffs' **Exhibit 6** is an Order wherein the Plaintiffs' Motion for a Voluntary Dismissal of the Case as a Class Action was granted **without** Prejudice. Counsel for the Plaintiffs has been involved in intense negotiations with a few high profile class action labor law firms in the country. However, until such a motion is made for Class certification, Rule 20 as prescribed is applicable and further supported by cases which support keeping

this action together in one suit. <u>Sun Point Securities, Inc. v. Porta,</u> 192 F.R. D. 716 (U.S. Dist Ct. for the Middle District of Florida, Tampa Division March 31, 2000), holds that the permissive joinder rule permits Plaintiffs to structure litigation and join multiple parties on either side as they choose. The two (2) requirements for permissive joinder is that the claims involve common questions of law or fact and that the claims arise from the same transaction or occurrence. The case of <u>Jean v. Meissner,</u> 90 F.R.D. 658 (U.S. Dist. Ct. for the Southern Dist. of Florida Miami Division 1981), dealt with the issue of permissive joinder and found that if common questions of fact or law do exist then the Court may wish to bifurcate on any issue that varies greatly from the rest of the common claims. The aforementioned is relevant in the sense that this Honorable Court questions whether the damages aspect of the trial could be handled in an efficient, sufficient, sensible, clear manner. The trial in this matter could be held on the common issues, then bifurcated for damages.

**CONCLUSION**

Plaintiffs would respectfully ask this Honorable Court to abate the present Scheduling Order for a period of ninety (90) days in order to allow prospective Class counsel time to get involved in the action  In the alternative, the Plaintiffs would respectfully ask for the sake of discovery, efficiency, and resources that their individual cases be kept joined and allow the damages portion of their trial be bifurcated in the event liability is determined in their favor.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was mailed

this ⟨12⟩ day of January, 2001, to: Heather L. Gatley, Esq., Steel Hector & Davis LLP,

Attorneys for Defendant, 200 South Biscayne Blvd., 40th Floor, Miami, Florida 33131-

2398.

> **MICHAEL M. TOBIN, P.A.**
> Attorneys for Plaintiffs
> 1099 Ponce De Leon Blvd.
> Coral Gables, Florida 33134-3319
> Tel:    305-445-5475
> Fax:    305-445-5479
> BY: _Kelsay D. Patterson_
>      Kelsay D. Patterson
>      Fla. Bar No. 119784

6

PLAINTIFF'S
EXHIBIT

_____

## AFFIDAVIT OF KARL MEEHAN

STATE OF ILLINOIS )
                         ) ss:
COUNTY OF LAKE )

BEFORE ME, the undersigned authority, personally appeared Karl Meehan, who being first duly sworn, deposes and says:

1.      My name is Karl Meehan and I am the Regional Director of Eastern Pharmacy Operations for Walgreen Co. ("Walgreens"). I have held this position since April 1, 1997. I am authorized to submit this affidavit on behalf of Walgreens.

2.      This affidavit is based on my personal knowledge or belief. If called as a witness, I could truthfully testify as to the matters contained in this affidavit.

3.      Since I assumed my current position, Walgreens has not used postings or job announcements to inform Pharmacy Managers about the availability of a Pharmacy Supervisor position.

4.      The District Pharmacy Supervisor position is not one that Pharmacy Managers apply for and there are no outside applicants because Walgreens hires District Pharmacy Supervisors from the existing Pharmacy Manager pool.

5.      On an annual basis, the Pharmacy Manager's District Pharmacy Supervisor conducts an evaluation of the Pharmacy Manager's performance and the Pharmacy Manager performs a self-evaluation.

6.      It is during this evaluation process that it is determined whether or not a Pharmacy Manager is an "emerging leader" at Walgreens.

7.      The Pharmacy Supervisor meets with the Vice-President of Store

Operations, District Manager, and the Performance Development Department, which is a neutral group that monitors the evaluation process, and discusses the evaluation. If satisfactory, the District Manager signs off on the evaluation.

8.    The District Manager and District Pharmacy Supervisor give each Pharmacy Manager a score based on their annual evaluation. The score is entered into the Human Resources database and the Pharmacy Managers are ranked according to score.

9.    When a District Pharmacy Supervisor position becomes available, a two-step process occurs.

10.   The first step is done locally and involves a review of the database for the top-ranked Pharmacy Managers. After the top-ranked Pharmacy Managers are identified, the District Manager contacts me and obtains permission to interview the potential candidates. Once permission is obtained, the District Manager contacts the top-ranked Pharmacy Managers and asks them to interview for the District Pharmacy Supervisor position. If interested in the position, they interview with the District Manager.

11.   Once that pool of candidates is narrowed down to those who meet the local/district goals and objectives, the corporate level of Walgreens becomes actively involved. If I have not interviewed the candidates on a previous occasion, I interview them in order to determine who satisfies the written job description for a District Pharmacy Supervisor position and meets the corporate goals and objectives.

12.   After the interviewing is completed, the District Manager over the district that is hiring a new District Pharmacy Supervisor and I jointly decide which Pharmacy Manager should receive the promotion.

2

JW/WG 030260

13.    Pharmacy Manager Michael Ferguson has never contacted me expressing an interest in a District Pharmacy Supervisor position and I am not aware of him making any such inquiries to any member of management at Walgreens.

14.    There have only been three District Pharmacy Supervisor positions filled in Mr. Ferguson's geographic region since 1997.

15.    In order to become a District Pharmacy Supervisor, a Pharmacy Manager must show exemplary work experience as a Pharmacy Manager, receive positive feedback during the annual review process, and must be ranked among the top-scoring Pharmacy Managers in the Human Resources database.

16.    The most recent promotion to a District Pharmacy Supervisor position in Mr. Ferguson's district was obtained by Vivian Ceballos, a Hispanic female.

FURTHER AFFIANT SAYETH NOT.

Karl Meehan

3

JW/WG 030261

I HEREBY CERTIFY that on this day, before me, an officer duly authorized by law in

the state and county aforesaid to administer oaths, personally appeared Karl Meehan, who is

personally known to me or who provided his drivers license from the State of _Illinois_

No. _M500-5056-0184_ or _____ as identification and who swore under oath and

acknowledged before me that the foregoing affidavit is true and correct.

SWORN TO AND SUBSCRIBED before me this _31ST_ day of May, 2000.

_____
Notary Public

_Royal F. Raidle_
Printed Name of Notary
My commission expires: _3/17/2002_

ROYAL F. RAIDLE
MY COMMISSION # CC 725331
EXPIRES: March 17, 2002
Bonded Thru Notary Public Underwriters

MIA_1998/593859-1

4

JW/WG 030262

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO: 00-6151-CIV-UNGARO/Brown

JOYCE WILLIAMS, individually;
MICHAEL FERGUSON, individually;
JOSEPH PATRICK McMULLEN,
individually; DELORES OKONMAH,
individually; BERNICE SHORTER-
MEARES, individually;
CONSTANCE ECHEBIRI, individually;
MIA DAWN TAYLOR, individually;
and CARMITA McMULLEN, individually,

       Plaintiffs,

v.

WALGREEN COMPANY,

       Defendant.

_____/

### PLAINTIFF, CARMITA MCMULLEN'S NOTICE OF SERVICE OF ANSWERS TO DEFENDANT'S SECOND SET OF INTERROGATORIES

Plaintiff, Carmita McMullen, by and through undersigned counsel, and in accordance with Fed. R. Civ. P. 33 and S.D. Fla. L.R. 26.1 G., hereby gives Notice of Service of Answers to Defendant's Second Set of Interrogatories.

### CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this _____ day of November, 2000, to: Heather L. Gatley, Esq., Steel



Hector & Davis LLP, Attorneys for Defendant, 200 South Biscayne Blvd., 40th

Floor, Miami, Florida 33131-2398.

**MICHAEL M. TOBIN, P.A.**
Attorneys for Plaintiffs
1099 Ponce De Leon Blvd.
Coral Gables, Florida 33134-3319
Tel:    305-445-5475
Fax:    305-445-5479


_____
KELSAY D. PATTERSON
Fla. Bar No. 119784

2

## CARMITA MCMULLEN'S ANSWERS TO SECOND SET OF INTERROGATORIES

1. Walgreens has a subjective promotion policy and practice. There are no objective tests to measure the aptitude of a staff pharmacist for management, no test to measure the clinical competence of a staff pharmacist, nor are the vacant positions for pharmacy manager or pharmacy supervisor posted. As a practice, Walgreens has a policy of placing its black pharmacist in all black neighborhoods, or poor neighborhoods in areas of high crime. The special projects such as scheduling for the district for substitute and replacement pharmacist to fill-in for pharmacists on vacation or who have called in sick is an assignment that is subjectively and always given to non-black pharmacists. Black staff pharmacist and pharmacy mangers are virtually always sent to problem stores. A problem store is a store where various items are deficient such as the pharmacy department is operating at a loss with too much inventory on the shelves and failing to generate profit; the personnel have been improperly trained and pharmaceutical competence from the technicians becomes an issue. There is no management training through any formalized course to "bridge the gap". Any management mentoring by the pharmacy managers or the regional supervisors to the staff pharmacists is done on a purely subjective basis. Any management training, input, or feedback from a pharmacy manager or regional supervisor is done on a personal one on one level subjectively to whom management chooses rather than for all as a policy. Black pharmacists are given little feedback about their work performance, and the performance evaluations that are given are arbitrary and do not take place on any given periodic or cycle. While there is no written policy specifying the objective requirements and credentials for placing a black pharmacy manager in a new Walgreens store that is scheduled to be open, black pharmacy managers have not been extended opportunities to open brand new pharmacy departments at new stores. Black staff pharmacists float and fill in as replacements for a much longer amount of time then their non-black counterparts unless the non-black counterparts have specifically requested it. Black pharmacists are not offered jobs near areas of town that are close to their homes, but instead assigned to stores that are either in low income high crime areas or all black neighborhoods.

2. A failure to be promoted. A failure to be informed and know of vacant positions to be eligible for applying for these positions. The incompetent staff at the problematic stores effect the department's overall performance including the key performance indicator. A more qualified staff will

3

usually have a better chance of meeting their KPI's. Qualified technicians are not being paid enough at the stores in all black neighborhoods and in low income high crime areas versus the technicians working in high income and middle class areas. The results in a problem hiring and retaining capable technicians in these bad stores because better store will pay them more. Walgreens will allow and pay these technicians more at the "better"" stores making it impossible to compete for the pool of talented technicians. Lower wages in all black or bad neighborhoods fails to attract competent professionals. The failure to assign the special project of scheduling to black pharmacist results in less visibility to the black pharmacists to do a task that is clearly management in nature, and less qualified people are always transferred and assigned to the stores where black managers reside by the non-black district schedulers who are able to pick and chose the people they assign to stores as substitutes/replacements. Black pharmacists who must float indefinitely for great periods of time are put at a disadvantage because their performance cannot be critiqued on a daily basis by the same pharmacy manager, and without any consistency or continuity as a key contributor at a specific store it is also highly unlikely the black pharmacist in this perpetual state of floating would ever be considered for management.

3. Observation and personal experience in the work environment as described in interrogatories 1 and 2.

4. The lack of black pharmacists who occupy the positions of pharmacy manager and regional supervisor. The failure of Walgreens to allow black pharmacist to handle or be assigned the special project tacks of scheduling for the district. The subjectivity of promotions and the failure to post the various pharmaceutical vacancies for position like pharmacy manager and regional supervisor, being assigned problematic stores increases the amount of work, stress, and anxiety for the black pharmacy managers who are responsible for the aggregate results of the store's pharmacy department despite productivity levels and under trained staff members. Black pharmacists are always in large proportions at the 24 hour stores which is a difficult work shift because of the non-stop volume, and the constant schedule rotation. Black pharmacist including black pharmacy managers have their vacations, absences, and sick time scrutinized more closely than their non-black counterparts.

5. A full response has already be given in both interrogatory number 1, 2, and number 4. Please see those responses

6. Verbally, because no criteria known; specific date unknown, to supervisor Albert Garcia. Verbal expressions were made often, on several occasions, on a daily/weekly basis.

7. Qualifications for other pharmacists, unknown, no criteria were given for promoting.

4

8. Few blacks are in upper management, and few black pharmacy managers are given the opportunity to supervise non-black staff pharmacists. High crime areas in low income neighborhoods and/or stores located in all black neighborhoods are thought to be the domain and province of the black pharmacy managers and that can do nothing but contribute to a highly race segregated work force. The paragraphs in the Amended Complaint from 18 through 20 should be adopted and affirmed as part of this response.

9. I adopt the paragraphs in the Amended Complaint 18, 19, and 20 for this answer.

10. Please refer to interrogatory responses 1, 2, and I adopt paragraphs 18, 19,and 20 of the Amended Complaint.

11. No posting of the managerial vacancies at the stores including the position of regional supervisor make it impossible to know of the vacant positions. Because the positions are not posted, it is impossible to apply for a position not known to you that is vacant. The specific instances requested are a matter of a daily and ongoing policy and practice. For further clarification on this matter see the affidavit of Karl Meehan who affirms that positions are not posted.

12. Walgreens does not provide any formalized management training, mentoring is on a subjective basis determined by whom the pharmacy manager or supervisor personally selects to tutor, and give management instructional advice. See also responses to interrogatory 1, 2, and 4.

13. See interrogatory responses to numbers 11, 7, 4, and 1. The Defendant continues to request the same information about the same policies and discriminatory practices and the impact it has had upon myself and the other Plaintiffs by rephrasing each of the questions. While the questions ask for the same information, the same information will not be given over and over again but these response will be referenced by previous fully answered responses.

14. Blacks are rarely allowed to train in non-black stores. Floating; the special project of scheduling; the failure to place black pharmacy managers in new stores; see also interrogatory response to number 1. The matters as described in interrogatory number 1 and in this response as well as the response throughout theses interrogatories cannot be identified on any specific date. These policies and practices as described are presently happening, they happened on a daily basis in the past, they are continuing and ongoing and virtually any date in the past can be identified as a date upon which discrimination took place with respect to these policies and practices Walgreens uses because these things as complained of happened every single day.

15. See number 1, there are no objective procedures in place, they are all subjective which forms part of the complaints as found in the Amended Complaint. Objective requirements and specifications are needed.

16. Managerial placements in new stores; stores without problems that include personnel and profit; assignment to stores in low crime areas; assignment to profitable stores; assignment to stores closer to home; permanent store for an assignment; the ability to schedule for the district and the ability to have the non-black pharmacists who are presently scheduling for the district to do it on a more fair basis; lunch breaks, and because 50% of the staff is supposed to come from the surrounding community, to allow the black pharmacy managers to pay more for competent technicians from outside the surrounding community knowing the level of income and education in the areas where the black pharmacy managers have been assigned.

17. Embarrassment and humiliation to have to take orders from less qualified personnel without college degrees Getting orders from a less qualified person, who I have trained to be a technician is very humiliating and embarrassing. Humiliation along with anger of never seeing a black pharmacist promoted to supervisor. Seeing black pharmacists who have been with the company for over 20 years and not being promoted. Every day going to work and not seeing a black pharmacist being promoted was very upsetting. Constantly working in high volume stores without adequate help was stressful. Not being recognized for doing a good job by not being assigned a special project made me very frustrated. To know that you work hard and were never given the opportunity to move up makes me question my ability.   To be discriminated against when you are qualified or even ore qualified (than a non-black) has made me rethink my career goals, but it has caused me approximately $30.000.00 to obtain an advance degree in order to change jobs when I really did not want to, but I had no opportunity for advancement. Having changed jobs because of non-advancement has caused me to receive a decrease in pay. All of this happening has made me very angry, since I went to school and obtained the same degree as non-blacks. I was with Walgreens since 1987 and my entrance letter to pharmacy school included my goal to be a pharmacy supervisor with Walgreens. Being held back from your goals because of your color is unexplainable. Humiliation, anger, and embarrassment are feelings that are felt but cannot explain the deep impact that this has caused. Feelings cannot be expressed when you walk into a job and to know that in 10 years you will be at that same status because of your color.

18. No I have never felt like this before.

19. See Complaint.

6

20. I was transferred to West Dixie 139th , to a low productivity store, that was closing. Worked with Bob Becker who was a problem pharmacist. All Walgreens supervisors were aware of the difficulty of work with this pharmacist. Upon closing, I asked my current supervisor to be transferred to a newly opened pharmacy (NE 125th) and was denied. Store was given to a Hispanic and I was transferred to a problematic store i.e. high volume, inventory problems, as well as loss profit and a high crime area. The new store that I was requesting was in a better neighborhood, low crime, profitability was not established yet. Would also been a better opportunity to build an appropriate staff.

21. During January of 1999 I was in school to get my doctor of pharmacy degree. I was obtaining an additional degree in order to prepare for a career change. This change was considered due to the fact that there was no opportunities for advancement with Walgreens Company. There were no black upper management (pharmacy supervisor positions) in my district. No blacks with special assignment duties. I had been a pharmacy manager since 1995 and no other opportunities were offered. Not wanting to be at the same position for the next 10 years, I decided to make a career change and resigned. I resigned on good terms, good productivity, and good overall performance.

22. 5 years prior to Walgreens, I was a student working on my pharmacy degree. During that time, I worked for Walgreens as a technician during the holiday seasons when I returned home. After Walgreens, I worked at the following: Miami Children's Hospital, Miami, Florida, (305)666-6511 (ext. 2440). Pharmacist, see resume. I worked there from 11/98 to 7/00, salary: $26.34 per hour for 28 hours per week (part-time), my reason for leaving was to obtain a pharmacy residency; Jackson Memorial Hospital, Miami, Florida, (305)585-8960, pharmacy resident. I have been there from 7/00 to present. Salary: $36,000.00 per year.

23. Not to my knowledge. See previous response for names and addresses of employers and see resume that has been produced.

24. I contacted Connie Chan of Miami Children's Hospital. Miami Children's Hospital, salary: $26.34 per hour (28 part time hours). Contact: Connie Chan. Contacted November of 1999 and hired as pharmacist (staff).

25. Nova Southeastern University: August of 1997: (accepted)/started program, applied: May of 1997. Studied: pharmacy (Doctors of Pharmacy) graduated: May of 2000; Jackson Memorial Hospital: applied: January of 2000, accepted/started: July of 2000, studied: Pharmacy resident, general practice, status: currently training.

26. Upon being hired at Miami Children's, I was working at Walgreens 32 hours a week. I started training at Miami Children's on November of 1998. I trained approximately 8-10 hours per week until I resigned from Walgreens. In January of 1999, I began to work approximately 24-28 hours

per week. I was hired as a part timer at Miami Children's. My salary at Walgreens was approximately $72,000.00 per year and my salary at Miami Children's was approximately $40,000.00. I did not start my part time position until I had resigned.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO: 00-6151-CIV-UNGARO/Brown

JOYCE WILLIAMS, individually;
MICHAEL FERGUSON, individually;
JOSEPH PATRICK McMULLEN,
individually; DELORES OKONMAH,
individually; BERNICE SHORTER-
MEARES, individually;
CONSTANCE ECHEBIRI, individually;
MIA DAWN TAYLOR, individually;
and CARMITA McMULLEN, individually,

        Plaintiffs,

v.

WALGREEN COMPANY,

        Defendant.

_____/

## PLAINTIFF, MICHAEL FERGUSON'S NOTICE OF SERVICE OF ANSWERS TO DEFENDANT'S SECOND SET OF INTERROGATORIES

Plaintiff, Michael Ferguson, by and through undersigned counsel, and in accordance with Fed. R. Civ. P. 33 and S.D. Fla. L.R. 26.1 G., hereby gives Notice of Service of Answers to Defendant's Second Set of Interrogatories.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this _____ day of November, 2000, to: Heather L. Gatley, Esq., Steel

Hector & Davis LLP, Attorneys for Defendant, 200 South Biscayne Blvd., 40th

Floor, Miami, Florida 33131-2398.

**MICHAEL M. TOBIN, P.A.**
Attorneys for Plaintiffs
1099 Ponce De Leon Blvd.
Coral Gables, Florida 33134-3319
Tel:    305-445-5475
Fax:    305-445-5479


_____
KELSAY D. PATTERSON
Fla. Bar No. 119784

## MICHAEL FERGUSON'S ANSWERS TO SECOND SET OF INTERROGATORIES

1. Walgreens has a subjective promotion policy and practice. There are no objective tests to measure the aptitude of a staff pharmacist for management, no test to measure the clinical competence of a staff pharmacist, nor are the vacant positions for pharmacy manager or pharmacy supervisor posted. As a practice, Walgreens has a policy of placing its black pharmacist in all black neighborhoods, or poor neighborhoods in areas of high crime. The special projects such as scheduling for the district for substitute and replacement pharmacist to fill-in for pharmacists on vacation or who have called in sick is an assignment that is subjectively and always given to non-black pharmacists. Black staff pharmacist and pharmacy mangers are virtually always sent to problem stores. A problem store is a store where various items are deficient such as the pharmacy department is operating at a loss with too much inventory on the shelves and failing to generate profit; the personnel have been improperly trained and pharmaceutical competence from the technicians becomes an issue. There is no management training through any formalized course to "bridge the gap". Any management mentoring by the pharmacy managers or the regional supervisors to the staff pharmacists is done on a purely subjective basis. Any management training, input, or feedback from a pharmacy manager or regional supervisor is done on a personal one on one level subjectively to whom management chooses rather than for all as a policy. Black pharmacists are given little feedback about their work performance, and the performance evaluations that are given are arbitrary and do not take place on any given periodic or cycle. While there is no written policy specifying the objective requirements and credentials for placing a black pharmacy manager in a new Walgreens store that is scheduled to be open, black pharmacy managers have not been extended opportunities to open brand new pharmacy departments at new stores. Black staff pharmacists float and fill in as replacements for a much longer amount of time then their non-black counterparts unless the non-black counterparts have specifically requested it. Black pharmacists are not offered jobs near areas of town that are close to their homes, but instead assigned to stores that are either in low income high crime areas or all black neighborhoods.

2. A failure to be promoted. A failure to be informed and know of vacant positions to be eligible for applying for these positions. The incompetent staff at the problematic stores effect the department's overall performance including the key performance indicator. A more qualified staff will

3

usually have a better chance of meeting their KPI's. Qualified technicians are not being paid enough at the stores in all black neighborhoods and in low income high crime areas versus the technicians working in high income and middle class areas. The results in a problem hiring and retaining capable technicians in these bad stores because better store will pay them more. Walgreens will allow and pay these technicians more at the "better"" stores making it impossible to compete for the pool of talented technicians. Lower wages in all black or bad neighborhoods fails to attract competent professionals. The failure to assign the special project of scheduling to black pharmacist results in less visibility to the black pharmacists to do a task that is clearly management in nature, and less qualified people are always transferred and assigned to the stores where black managers reside by the non-black district schedulers who are able to pick and chose the people they assign to stores as substitutes/replacements. Black pharmacists who must float indefinitely for great periods of time are put at a disadvantage because their performance cannot be critiqued on a daily basis by the same pharmacy manager, and without any consistency or continuity as a key contributor at a specific store it is also highly unlikely the black pharmacist in this perpetual state of floating would ever be considered for management.

3. Observation and personal experience in the work environment as described in interrogatories 1 and 2.

4. The lack of black pharmacists who occupy the positions of pharmacy manager and regional supervisor. The failure of Walgreens to allow black pharmacist to handle or be assigned the special project tacks of scheduling for the district. The subjectivity of promotions and the failure to post the various pharmaceutical vacancies for position like pharmacy manager and regional supervisor, being assigned problematic stores increases the amount of work, stress, and anxiety for the black pharmacy managers who are responsible for the aggregate results of the store's pharmacy department despite productivity levels and under trained staff members. Black pharmacists are always in large proportions at the 24 hour stores which is a difficult work shift because of the non-stop volume, and the constant schedule rotation. Black pharmacist including black pharmacy managers have their vacations, absences, and sick time scrutinized more closely than their non-black counterparts.

5. A full response has already be given in both interrogatory number 1, 2, and number 4. Please see those responses.

6. I have expressed my desire and interest in a Walgreen's position in the following ways: while speaking to Gary Vanderbilt over the phone in 1990. Myself and pharmacy manager Dion Herrara asking Gary Vanderbilt before a pharmacy manager's meeting what duties, salary, and bonuses of pharmacy supervisor consisted of with Gary Vanderbilt asking

is if we were interested and we both gave a "yes" for a reply, but did not get a definite answer from Gary about our questions. From 1990 to 1994, I occasionally discussed opportunities and possibilities for advancement with Dion Herrara. From 1994 to 1999, I occasionally spoke with Joseph Conway concerning opportunities and discussed our interest and concerns. Since 1994, I had discussions with Joseph and Carmita about opportunities and possibilities of promotion within the Walgreens Company and tried to encourage them to continue to strive for their goals. On March 27, 2000, I sent an e-mail to the Miami North District Manager expressing that I was still interested in a District Pharmacy Supervisor position and would like to know what criteria is used in the selection process, however, I never received a response. By completing personnel information questionnaire specifying my interest.

7.  I was an intern with the Walgreen Company from 1981 to 1984, and a pharmacist since 1984 to present. During my employment with the company, I have successfully managed and increased the standings and profitability of store 1392 from 1989 to 1991, which was in an area with decreasing business and poorly located; increased the profitability of store 620 from 1992 to 1995 which was the busiest non-24 hour store in the district third only to 2 other 24 hour high volume stores, from 1995 to March 1999, I managed store 1530, a store competitively stressed by other nearby Walgreen stores. None of the units I managed were left in a worse condition than the condition in which I obtained it in. Nonetheless, I think that I showed my qualifications by making problematic stores financially better, more visually appealing, and helped pharmacists, cashiers, and technicians to be more knowledgeable and to perform at a level much higher than they did before my arrival at a unit.

8.  Few blacks are in upper management, and few black pharmacy managers are given the opportunity to supervise non-black staff pharmacists. High crime areas in low income neighborhoods and/or stores located in all black neighborhoods are thought to be the domain and province of the black pharmacy managers and that can do nothing but contribute to a highly race segregated work force. The paragraphs in the Amended Complaint from 18 through 20 should be adopted and affirmed as part of this response.

9.  District managers and district supervisors giving non-black pharmacy managers desirable, less problematic stores or a better staff assignment so that the non-black pharmacy manager receives positive feed back and higher rankings during annual reviews to show why they are better suited for the promotion to district pharmacy supervisor. (District pharmacy supervisor: Vivian Ceballos. Phil Chen, Mary Schwartz, Jorge Acosta, Hal Lunsik, and Albert Garcia. Non-black pharmacist and pharmacy managers are allowed to transfer to areas of stores of their choice when a

position becomes available. Many non-black employees have enjoyed this treatment. Example: Michelle Guerrier, Ann Marie Voss, Martin Abreu, Vivian Ceballos, etc. This happens on a daily basis; all the time.

10. See number 9.

11. No posting of the managerial vacancies at the stores including the position of regional supervisor make it impossible to know of the vacant positions. Because the positions are not posted, it is impossible to apply for a position not known to you that is vacant. The specific instances requested are a matter of a daily and ongoing policy and practice. For further clarification on this matter see the affidavit of Karl Meehan who affirms that positions are not posted.

12. To my knowledge and experience there was no training courses offered nor provided for promotional opportunities.

13. I was denied the opportunity to compete for a district pharmacy supervisor position from 1990 to present mainly by Gary Vanderbilt whom knew of my interest and suppressed my performance ratings. Each district manager during this period of time district pharmacy supervisor after Gary Vanderbilt must have had communications about my endeavors, because Hal Lunsik made a reference to my desire in June of 1999, which I never discussed with him prior to that date.

14. Everyday and on an ongoing basis there are instances including but not limited to: no placement into new stores (which is an ongoing or existing problem), placement into stores in black or poorly performing areas, could not get feed back nor insight on requirements to become a district pharmacy supervisor, nor was I informed (see affidavit of Karl Meehan, regional director of Eastern Pharmacy Operations for Walgreens Co.).

15. See number 1, there are no objective procedures in place, they are all subjective which forms part of the complaints as found in the Amended Complaint. Objective requirements and specifications are needed.

16. Managerial placements in new stores; stores without problems that include personnel and profit; assignment to stores in low crime areas; assignment to profitable stores; assignment to stores closer to home; permanent store for an assignment; the ability to schedule for the district and the ability to have the non-black pharmacists who are presently scheduling for the district to do it on a more fair basis; lunch breaks, and because 50% of the staff is supposed to come from the surrounding community, to allow the black pharmacy managers to pay more for competent technicians from outside the surrounding community knowing the level of income and education in the areas to where the black pharmacy managers have been assigned.

17. I have been stressed, angered had decreased motivation and self-esteem knowing that no matter how hard I tried or how well I did, I would never be acknowledged nor rewarded for my efforts by Walgreens.

18. None.
19. I believe that Emerson Oberlin encouraged Mark Stamand to build improper documents of disciplinary actions against me, see paragraph 60 of Amended Complaint (Mark Stamand instead of Bruce Adams). I was told in a loud tone of voice in front of a technician and customers that he had a stack of applications on his desk and if I did not want to work anymore, let him know if I wanted a transfer, say so and he would arrange it. I refused the position because I was not willing to assume the pharmacy managers position at a problematic store at that time.
20. I believe the basis of Mr. Oberlin initiating Mark Stamand to create disciplinary records on me resulted from me declining the pharmacy manager's position at that store. I contend the records were false because Mark Stamand did not follow company procedure (see paragraph 60 of Amended Complaint). When I transferred to the store downstairs from the district office where Ray Ripak was store manager and Bruce Adams was pharmacy manager, I would be occasionally questioned concerning my knowledge and abilities and give tasks by Bruce Adams which appeared to satisfy him because Bruce shortly stopped scrutinizing my knowledge and abilities.
21. Mark Stamand complained and threatened me with disciplinary actions because tiny pieces of paper were on the floor a couple of nights when I closed the pharmacy and trash cans were not emptied. He never inquired about how tough a night workload, or work situation I encountered on those nights. I responded to this hostility by having a meeting and addressed the issues with mark Stamand and the store manager, Mr. Reaves and asked that it stop.
22. In March of 1999 while at work, I called my supervisor Hal Lunsik, and expressed to him that I no longer wanted to be a pharmacy manager. Hal asked of it was due to something that he said or did and I replied that I was no longer motivated and my decision was not directly caused by him. I offered to talk to him privately at another time if he wanted to but he asked did I need time to rethink my decision and I said no, I have already done that. The reason for my decision in March of 1999 was that I felt disenchanted with the company for not affording dedicated and hard working employees  a chance to fairly compete for promotions and to fairly receive transfers. Also I felt emotionally drained, discouraged, motivation decrease. And decreased drive to pursue future promotions, felt personally stagnated without any more hope to progress within the company and improve my economic status be being a manager with Walgreens.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO: 00-6151-CIV-HUCK/Brown

JOYCE WILLIAMS, individually;
MICHAEL FERGUSON, individually;
JOSEPH PATRICK McMULLEN,
individually; DELORES OKONMAH,
individually; BERNICE SHORTER-
MEARES, individually;
CONSTANCE ECHEBIRI, individually;
MIA DAWN TAYLOR, individually;
and CARMITA McMULLEN, individually,

       Plaintiffs,

v.

WALGREEN COMPANY,

       Defendant.
_____/

## PLAINTIFF, JOSEPH PATRICK MCMULLEN'S  NOTICE OF SERVICE OF ANSWERS TO DEFENDANT'S SECOND SET OF INTERROGATORIES

Plaintiff, Joseph Patrick McMullen, by and through undersigned counsel, and in accordance with Fed. R. Civ. P. 33 and S.D. Fla. L.R. 26.1 G., hereby gives Notice of Service of Answers to Second Set of Interrogatories.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this _____ day of January, 2001, to: Heather L. Gatley, Esq., Steel Hector & Davis LLP,

1

Attorneys for Defendant, 200 South Biscayne Blvd., 40th Floor, Miami, Florida 33131-

2398.

**MICHAEL M. TOBIN, P.A.**
Attorneys for Plaintiffs
1099 Ponce De Leon Blvd.
Coral Gables, Florida 33134-3319
Tel:    305-445-5475
Fax:    305-445-5479


_____
KELSAY D. PATTERSON
Fla. Bar No. 119784

## JOSEPH PATRICK MCMULLEN'S ANSWERS TO SECOND SET OF INTERROGATORIES

1.   Walgreens has a subjective promotion policy and practice. There are no objective tests to measure the aptitude of a staff pharmacist for management, no test to measure the clinical competence of a staff pharmacist, nor are the vacant positions for pharmacy manager or pharmacy supervisor posted. As a practice, Walgreens has a policy of placing its black pharmacist in all black neighborhoods, or poor neighborhoods in areas of high crime. The special projects such as scheduling for the district for substitute and replacement pharmacist to fill-in for pharmacists on vacation or who have called in sick is an assignment that is subjectively and always given to non-black pharmacists. Black staff pharmacist and pharmacy mangers are virtually always sent to problem stores. A problem store is a store where various items are deficient  such as the pharmacy department is operating at a loss with too much  inventory on the shelves and failing to generate profit; the personnel have been improperly trained and pharmaceutical competence from the technicians becomes an issue. There is no management training through any formalized course to "bridge the gap". Any management mentoring by the pharmacy managers or the regional supervisors to the staff pharmacists is done on a purely subjective basis. Any management training, input, or feedback from a pharmacy manager or regional supervisor is done on a personal one on one level subjectively to whom management chooses rather than for all as a policy. Black pharmacists are given little feedback about their work performance, and the performance evaluations that are given are arbitrary and do not

take place on any given cycle. While there is no written policy specifying the objective requirements and credentials for placing a black pharmacy manager in a new Walgreens store that is scheduled to be open. black pharmacy managers have not been extended opportunities to open brand new pharmacy departments at new stores. Black staff pharmacists float and fill in as replacements for a much longer amount of time then their non-black counterparts unless the non-black counterparts have specifically requested it. Black pharmacists are not offered jobs near areas of town that are close to their homes, but instead assigned to stores that are either in low income high crime areas or all black neighborhoods.

2.   A failure to be promoted. A failure to be informed and know of vacant positions to be eligible for applying for these positions. The incompetent staff at the problematic stores effect the department's overall performance including the key performance indicator. A more qualified staff will usually have a better chance of meeting their KPI's. Qualified technicians are not being paid enough at the stores in all black neighborhoods and in low income high crime areas versus the technicians working in high income and middle class areas. This results in a problem hiring and retaining capable technicians in these bad stores because better stores will pay them more. Walgreens will allow and pay these technicians more at the "better"" stores making it impossible to compete for the pool of talented technicians. Lower wages in all black or bad neighborhoods fails to attract competent professionals. The failure to assign the special project of scheduling to black pharmacist results in less visibility to the black pharmacists to do a task that is clearly management in nature, and less qualified

4

people are always transferred and assigned to the stores where black managers reside

by the non-black district schedulers who are able to pick and choose the people they

assign to stores as substitutes/replacements. Black pharmacists who must float

indefinitely for great periods of time are put at a disadvantage because their

performance cannot be critiqued on a daily basis by the same pharmacy manager, and

without any consistency or continuity as a key contributor at a specific store it is also

highly unlikely the black pharmacist in this perpetual state of floating would ever be

considered for management.

   3.   Observation and personal experience in the work environment as described in

interrogatories 1 and 2.

   4.   The lack of black pharmacists who occupy the positions of pharmacy manager

and regional supervisor. The failure of Walgreens to allow black pharmacist to handle

or be assigned the special project tacks of scheduling for the district. The subjectivity of

promotions and the failure to post the various pharmaceutical vacancies for position

like pharmacy manager and regional supervisor, being assigned problematic stores

increases the amount of work, stress, and anxiety for the black pharmacy managers

who are responsible for the aggregate results of the store's pharmacy department

despite productivity levels and under trained staff members. Black pharmacists are

always in large proportions at the 24 hour stores which is a difficult work shift because

of the non-stop volume, and the constant schedule rotation. Black pharmacist

including black pharmacy managers have their vacations, absences, and sick time

scrutinized more closely than their non-black counterparts.

5.  A full response has already be given in both interrogatory number 1, 2, and number 4. Please see those responses.

6.  First I expressed my interest in Store management, not Pharmacy management verbally to store manger Orville Maloney, Pharmacy manager Michael Ferguson, and Pharmacy Supervisor Gary Vanderbilt (November/December 1994). I was asked to express my interest in writing. So I wrote a letter of interest to Store Manager Orville Maloney, District Manager Roy Ripak and Pharmacy Supervisor Gary Vanderbilt (December 94/January 95). The letter stated I was interested in management, but I wanted to become a store manger not a pharmacy manager.

7.  Nisa Fried, Ray Sawaged, Jean Bailey, Marty Martinez, Xaiver Zigler. My pharmacy experience exceeds the pharmacy experience of the above listed persons, and time with Walgreens should not be a factor as Vivian Ceballos a present pharmacy supervisor has been with Walgreens for approximately 4 years and in this short period of time has been promoted from staff pharmacist, to pharmacy manager, and now occupies the position of pharmacy supervisor.

8.  Few blacks are in upper management, and few black pharmacy managers are given the opportunity to supervise non-black staff pharmacists. High crime areas in low income neighborhoods and/or stores located in all black neighborhoods are thought to be the domain and province of the black pharmacy managers and that can do nothing but contribute to a highly race segregated work force. The paragraphs in the Amended Complaint from 18 through 20 should be adopted and affirmed as part of this response.

9. I adopt the paragraphs in the Amended Complaint 18, 19, and 20 for this answer.

10. Please refer to interrogatory responses 1, 2, and I adopt paragraphs 18, 19,and 20 of the Amended Complaint.

11. No posting of the managerial vacancies at the stores including the position of regional supervisor make it impossible to know of the vacant positions. Because the positions are not posted, it is impossible to apply for a position not known to you that is vacant. The specific instances requested are a matter of a daily and ongoing policy and practice. For further clarification on this matter see the affidavit of Karl Meehan who affirms that positions are not posted.

12. Walgreens does not provide any formalized management training, mentoring is on a subjective basis determined by whom the pharmacy manager or supervisor personally selects to tutor, and give management instructional advice. See also responses to interrogatory 1, 2, and 4.

13. See interrogatory responses to numbers 11, 7, 4, and 1. The Defendant continues to request the same information about the same policies and discriminatory practices and the impact it has had upon myself and the other Plaintiffs by rephrasing each of the questions. While the questions ask for the same information, the same information will not be given over and over again but these response will be referenced by previous fully answered responses.

14. Additionally, the Plaintiff has never had a management offer extended to him with regard to store managers or pharmacy supervisors because these managerial vacancies were not posted, advertised, or made known to him or the other black

pharmacists, it is impossible to identify all of the job management vacancies that came into existence, but this Plaintiff believes the Defendant has records of these promotions in Florida from 1996-1999..

15. Honestly I do not know how a promotion is determined in the Walgreens Company. I thought hard work and store performance should be the criteria, but as I worked with Walgreens and saw opportunities come available that fact was not realized. As I assessed my situation and realized that no matter how hard I worked I was not going to be able to move up in the company, it was devastating. I was always told if you worked hard you can have opportunities to move up, but as I looked around in the Walgreens Company and did not see anyone that looked like me (African American) in senior management positions. I decided that it was time that I make a decision with my career. Time is short and if I am going to become successful in my working career I must be in a situation that is fair. Working at Walgreens has left a scar on me emotionally and mentally, because while at Walgreens, I had low self-esteem and I thought I was not smart enough to move up in the company.

16. Managerial placements in new stores; stores without problems that include personnel and profit; assignment to stores in low crime areas; assignment to profitable stores; assignment to stores closer to home; permanent store for an assignment; the ability to schedule for the district and the ability to have the non-black pharmacists who are presently scheduling for the district to do it on a more fair basis; lunch breaks, and because 50% of the staff is supposed to come from the surrounding community, to allow the black pharmacy managers to pay more for competent technicians from

8

outside the surrounding community knowing the level of income and education in the areas where the black pharmacy managers have been assigned.

17. As mentioned in Question 15, I experienced low self-esteem because I felt that I was not smart enough to move up in this company beyond Pharmacy manager. Growing up as an African American you hear stories about discrimination, but to actually experience it, words cannot express how I feel right now. As I think back now and look at that situation it brings tears to my eyes and a hurt that I would not want anyone to experience. I am humiliated now to have anyone know I feel this way. This is the reason I did not seek professional help because I felt like less of a man to have someone or a situation to affect me as a MAN in this manner.

18. Whenever I experience a very stressful situation I have a condition called GERD. Gastro-Esophageal Reflux Disease. This is a condition that stomach acid seeps back into the esophagus during sleep and cause a vomiting situation, because of excess acid production from stressful situation. GERD can occur from other situations, but in my case this only happens when I am in stressful situation. I started to experience this situation during my last 8 months with Walgreens, **(Jan 98-Aug 98). I** self medicated myself with over-the-counter products such as Gaviscon, Pepcid AC, Tagamet HB. The only other time I have experienced this was when I was preparing for my pharmacy boards.

19. Does not apply.

20. Prior to Walgreens I was in college. I mainly had part-time jobs.

Air Force Reserves 1-89/1-95
Munitions system specialists

Maintained and inspected ammunitions
Homestead AFB, Homestead, Florida

ABC Liquors 6-89/8-91
Stock clerk and cashier $4.00hr
Tallahassee, Fl

Florida A&M University 8-91/12-91
Pharmacy Department
Lab Clerk / Work Study $4.00 hr
Tallahassee, Fl

Humana Hospital
Intern
Aug 92- Dec 92
Pharmacy intern
Aventura, Fl

21. As I considered where I wanted to be in the next five years I decided that

Walgreens is where I will not realize my career goals. So I decided to write a letter of

resignation. The letter was address to Hal Lunsik Pharmacy Supervisor and Alex

Palermo District Manager. Hal Lunsik was out on medical leave due to a knee surgery.

When he received the letter he called me at the store and asked why was I leaving. My

response was as follows:

> I was leaving because I did not see a chance for advancement I have been a
> pharmacy manager since (2-95), and I do not see a chance of moving up. I told
> him I see William Powell (African American) a pharmacy manager who has been
> with the company since 1969 and he has not moved up past pharmacy manager.
> Mr. Powell has been an excellent employee and manager and has not been
> promoted. Seeing Mr. Powell's situation I did not want to find myself 20 years
> later in the same predicament. Lunsik's response was Powell came along when
> the company was not growing and now the company is in a perfect time and I
> may be considered one day for a promotion.

10

Lunsik also stated that he hated to loose me because I am one of his best pharmacists and if I want to come back he will re-hire me. The conversation ended there. That was the last and only time I heard from Lunsik.

22. August 98-September 98
    APP Pharmacy
    Staff Pharmacist
    Michael Corbin-Manager, $72k/yr

    Sept 98-Nov 98
    Cardinal Staffing
    Temp Service
    Various employers $30hr

    Nov 98
    MiniMed, Inc.
    Staff pharmacist $62k/yr

23. When I wrote my letter to express my interest to be a store manager, I was told that I had to go into Pharmacy Management first. I was stunned to hear this because a year earlier Mr. John Cohn went directly into the store manager program without working as staff pharmacist or a pharmacy manager. I was also told that after I worked six months as a pharmacy manager, I would be considered to enter into the next class of EXA, the store manager program. When six months passed I again expressed my interest in store management. I was told that I had to work three days in the pharmacy and two days with the store manager, but I was not officially in the program. I again was stunned of the criteria because I did not see anyone else go through this type of program. As I worked in this program I was still responsible for the pharmacy and it's performance. I thought this was a lot to do and I was set up for failure because I was not able to learn the store manager procedures properly and I was

still responsible for the pharmacy department that I only worked in 60% of the time. I felt I was just pacified in hopes I would alter my career goals.

24. During the time I was going through the mock store management training, the store was in the process of moving to a new location. During that time the move date was changed several times because of permit approvals and other situations. At the same time I was scheduled to go on vacation. As the time came to move I changed my vacation dates on several occasions due to the changed move dates. Then came a time when I locked in my vacation dates and purchased tickets because the move was not set and I wanted to take my vacation. As my dates were set I was assured that it would not affect the move of the pharmacy. So as time continued, the move was set at a last minute instance and it was the same time as my vacation, and it was only days before I was to take my vacation. I expressed that my vacation had been put on hold several times and my vacation was set and tickets were purchased, and I could not change these dates. The pharmacy moved when I was on vacation. Mind you I was still in the Mock store manager training program.

After returning from vacation Roy Ripak, asked to have a talk with me in the store. At the time the new store location was still being renovated and a new camera area was being constructed. The area where the camera department was going was empty and this is where Ripak and myself had our talk.

Ripak expressed his dissatisfaction with me for not changing my vacation date again for the move. He told me I was not a team player, and if I wanted to move up within the Walgreens company "**A PART OF MY LIFE MUST BELONG TO**

WALGREENS". These words have never left my mind. He also stated at that time I was to stay in the pharmacy department full time and not consider to go into store management until Walgreens becomes a major part of my life. Unfortunately there was no one else present but Ripak and Myself. This conversation took place March 1996.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO: 00-6151-CIV-UNGARO/Brown

JOYCE WILLIAMS, individually;
MICHAEL FERGUSON, individually;
JOSEPH PATRICK McMULLEN,
individually; DELORES OKONMAH,
individually; BERNICE SHORTER-
MEARES, individually;
CONSTANCE ECHEBIRI, individually;
MIA DAWN TAYLOR, individually;
and CARMITA McMULLEN, individually,

        Plaintiffs,

v.

WALGREEN COMPANY,

        Defendant.

_____/

## PLAINTIFF, BERNICE SHORTER-MEARES' NOTICE OF SERVICE OF ANSWERS TO DEFENDANT'S SECOND SET OF INTERROGATORIES

Plaintiff, Bernice Shorter-Meares, by and through undersigned counsel,

and in accordance with Fed. R. Civ. P. 33 and S.D. Fla. L.R. 26.1 G., hereby gives

Notice of Service of Answers to Defendant's Second Set of Interrogatories.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was

mailed this _____ day of November, 2000, to: Heather L. Gatley, Esq., Steel

1

Hector & Davis LLP, Attorneys for Defendant, 200 South Biscayne Blvd., 40th

Floor, Miami, Florida 33131-2398.

**MICHAEL M. TOBIN, P.A.**
Attorneys for Plaintiffs
1099 Ponce De Leon Blvd.
Coral Gables, Florida 33134-3319
Tel:    305-445-5475
Fax:    305-445-5479


_____
KELSAY D. PATTERSON
Fla. Bar No. 119784

## BERNICE SHORTER-MEARES' ANSWERS TO SECOND SET OF INTERROGATORIES

1. Walgreens has a subjective promotion policy and practice. There are no objective tests to measure the aptitude of a staff pharmacist for management, no test to measure the clinical competence of a staff pharmacist, nor are the vacant positions for pharmacy manager or pharmacy supervisor posted. As a practice, Walgreens has a policy of placing its black pharmacist in all black neighborhoods, or poor neighborhoods in areas of high crime. The special projects such as scheduling for the district for substitute and replacement pharmacist to fill-in for pharmacists on vacation or who have called in sick is an assignment that is subjectively and always given to non-black pharmacists. Black staff pharmacist and pharmacy mangers are virtually always sent to problem stores. A problem store is a store where various items are deficient such as the pharmacy department is operating at a loss with too much inventory on the shelves and failing to generate profit; the personnel have been improperly trained and pharmaceutical competence from the technicians becomes an issue. There is no management training through any formalized course to "bridge the gap". Any management mentoring by the pharmacy managers or the regional supervisors to the staff pharmacists is done on a purely subjective basis. Any management training, input, or feedback from a pharmacy manager or regional supervisor is done on a personal one on one level subjectively to whom management chooses rather than for all as a policy. Black pharmacists are given little feedback about their work performance, and the performance evaluations that are given are arbitrary and do not take place on any given periodic or cycle. While there is no written policy specifying the objective requirements and credentials for placing a black pharmacy manager in a new Walgreens store that is scheduled to be open, black pharmacy managers have not been extended opportunities to open brand new pharmacy departments at new stores. Black staff pharmacists float and fill in as replacements for a much longer amount of time then their non-black counterparts unless the non-black counterparts have specifically requested it. Black pharmacists are not offered jobs near areas of town that are close to their homes, but instead assigned to stores that are either in low income high crime areas or all black neighborhoods.
2. A failure to be promoted. A failure to be informed and know of vacant positions to be eligible for applying for these positions. The incompetent staff at the problematic stores effect the department's overall performance including the key performance indicator. A more qualified staff will

3

usually have a better chance of meeting their KPI's. Qualified technicians are not being paid enough at the stores in all black neighborhoods and in low income high crime areas versus the technicians working in high income and middle class areas. The results in a problem hiring and retaining capable technicians in these bad stores because better store will pay them more. Walgreens will allow and pay these technicians more at the "better"" stores making it impossible to compete for the pool of talented technicians. Lower wages in all black or bad neighborhoods fails to attract competent professionals. The failure to assign the special project of scheduling to black pharmacist results in less visibility to the black pharmacists to do a task that is clearly management in nature, and less qualified people are always transferred and assigned to the stores where black managers reside by the non-black district schedulers who are able to pick and chose the people they assign to stores as substitutes/replacements. Black pharmacists who must float indefinitely for great periods of time are put at a disadvantage because their performance cannot be critiqued on a daily basis by the same pharmacy manager, and without any consistency or continuity as a key contributor at a specific store it is also highly unlikely the black pharmacist in this perpetual state of floating would ever be considered for management.

3. Observation and personal experience in the work environment as described in interrogatories 1 and 2.

4. The lack of black pharmacists who occupy the positions of pharmacy manager and regional supervisor. The failure of Walgreens to allow black pharmacist to handle or be assigned the special project tacks of scheduling for the district. The subjectivity of promotions and the failure to post the various pharmaceutical vacancies for position like pharmacy manager and regional supervisor, being assigned problematic stores increases the amount of work, stress, and anxiety for the black pharmacy managers who are responsible for the aggregate results of the store's pharmacy department despite productivity levels and under trained staff members. Black pharmacists are always in large proportions at the 24 hour stores which is a difficult work shift because of the non-stop volume, and the constant schedule rotation. Black pharmacist including black pharmacy managers have their vacations, absences, and sick time scrutinized more closely than their non-black counterparts.

5. A full response has already be given in both interrogatory number 1, 2, and number 4. Please see those responses.

6. I have made non-stop verbal expressions of my desire to be put in a permanent home store instead of floating to Albert Garcia and Malisandra Matos. Additionally, I have made several statements to Albert Garcia about my desire to be put into management as I have over 24 years of pharmacy experience and there is no conceivable reason why I should be

4

floating, not assigned to a permanent store, nor in management. On a daily basis I express all of these things to which ever pharmacy manager at the store I am scheduled to float at to further underscore my desire to be considered for management but first to be to be placed in a store on a permanent basis. There are no approximate dates for when these verbal expressions where made other than to refer the Defendant to my scheduling to verify when I worked at these particular stores and to then follow up with each of the pharmacy managers at the stores where I worked. One such manger who is also a Plaintiff in this case was Carmita McMullen. While I can provide no specific dates I can affirm that these expressions have been made by me on a non-stop continual basis since beginning my employment with Walgreens. I would estimate that I have had over 40 such conversations at least.

7. Nisa Fried, Ray Sawaged, Jean Bailey, Marty Martinez, Xaiver Zigler. My pharmacy experience exceeds the pharmacy experience of the above listed persons, and time with Walgreens should not be a factor as Vivian Ceballos a present pharmacy supervisor has been with Walgreens for approximately 4 years and in this short period of time has been promoted from staff pharmacist, to pharmacy manager, and now occupies the position of pharmacy supervisor.

8. Few blacks are in upper management, and few black pharmacy managers are given the opportunity to supervise non-black staff pharmacists. High crime areas in low income neighborhoods and/or stores located in all black neighborhoods are thought to be the domain and province of the black pharmacy managers and that can do nothing but contribute to a highly race segregated work force. The paragraphs in the Amended Complaint from 18 through 20 should be adopted and affirmed as part of this response.

9. I adopt the paragraphs in the Amended Complaint 18, 19, and 20 for this answer.

10. Please refer to interrogatory responses 1, 2, and I adopt paragraphs 18, 19,and 20 of the Amended Complaint.

11. No posting of the managerial vacancies at the stores including the position of regional supervisor make it impossible to know of the vacant positions. Because the positions are not posted, it is impossible to apply for a position not known to you that is vacant. The specific instances requested are a matter of a daily and ongoing policy and practice. For further clarification on this matter see the affidavit of Karl Meehan who affirms that positions are not posted.

12. Walgreens does not provide any formalized management training, mentoring is on a subjective basis determined by whom the pharmacy manager or supervisor personally selects to tutor, and give management instructional advice. See also responses to interrogatory 1, 2, and 4.

13. See interrogatory responses to numbers 11, 7, 4, and 1. The Defendant continues to request the same information about the same policies and discriminatory practices and the impact it has had upon myself and the other Plaintiffs by rephrasing each of the questions. While the questions ask for the same information, the same information will not be given over and over again but these response will be referenced by previous fully answered responses.

14. Blacks are rarely allowed to train in non-black stores. Floating; the special project of scheduling; the failure to place black pharmacy managers in new stores; see also interrogatory response to number 1. The matters as described in interrogatory number 1 and in this response as well as the response throughout theses interrogatories cannot be identified on any specific date. These policies and practices as described are presently happening, they happened on a daily basis in the past, they are continuing and ongoing and virtually any date in the past can be identified as a date upon which discrimination took place with respect to these policies and practices Walgreens uses because these things as complained of happened every single day.

15. See number 1, there are no objective procedures in place, they are all subjective which forms part of the complaints as found in the Amended Complaint. Objective requirements and specifications are needed.

16. Managerial placements in new stores; stores without problems that include personnel and profit; assignment to stores in low crime areas; assignment to profitable stores; assignment to stores closer to home; permanent store for an assignment; the ability to schedule for the district and the ability to have the non-black pharmacists who are presently scheduling for the district to do it on a more fair basis; lunch breaks, and because 50% of the staff is supposed to come from the surrounding community, to allow the black pharmacy managers to pay more for competent technicians from outside the surrounding community knowing the level of income and education in the areas where the black pharmacy managers have been assigned.

17. The job environment at Walgreens has caused me to feel anger and resentment at being disregarded for promotions. It has gotten progressively harder to motivate myself in a company that does not reward hard work and dedication or experience. This discrimination forced me to cut my hours to 4 days per week, realizing that advancement in this company for me anyway was not forthcoming. With over 14 years of management experience prior to Walgreens, I had expectations of opportunities for advancement with this company. Seeing the managerial experience that I offer, with the non-stop floating that I am required to do, yet not being promoted or being considered for promotion has been a real slap in my face.

18. No I have never felt like this before.

19. Yes I requested it, I told Walgreens that I had problems with my knees in April of 1998 and my work schedule was reduced to 4 days a week for 32 hours.

20. I do not recall working at both the retreat psychiatric hospital and Walgreens at the same time. In 1990 I worked for the retreat as a contracted independent service. In 1994 or approximately there I was employed by the retreat as its pharmacy director/manager. I left the retreat hospital in April of 1996 as the hospital was sold and its pharmacy services was restructured. I worked 40 hours per week at the retreat and earned $60,000.00 per year.

21. Every day/every week to the district scheduler. It was always verbal and to every pharmacy manager including Carmita McMullen who once intervened on my behalf to try to stop another floating transfer.

22. Albert Garcia said I would be assigned permanently to a store split between the store known as 3493 (95th & 7th Avenue) and 163rd Street and NE 15th Avenue. Carmita was supposed to be my pharmacy manager at 3493. Albert Garcia then backed away from his word and representation including the representation also affirmed by Malisandra Matos I was supposed to be permanently then assigned to 90th and Biscayne. Albert Garcia then backed away from that position and said that I would be permanently assigned to split between store 3493 and 3105 . In 1998 Albert Garcia assigned me to 3105 when my work schedule was reduced to 32 hours per week on 4 day basis. He also told me at that time I will be permanently assigned to this particular store. In 1999 I was made to float 1 day per week on Mondays to various stores and only allowed to work 3 days per week at 3105. Later in about October of 1999 I was transferred to store 3782 by Vivian Ceballos.

23. Will provide after my attorney receives the discovery from Walgreens with respect to this issue.

24. See interrogatory response to number 7.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO: 00-6151-CIV-UNGARO/Brown

JOYCE WILLIAMS, individually;
MICHAEL FERGUSON, individually;
JOSEPH PATRICK McMULLEN,
individually; DELORES OKONMAH,
individually; BERNICE SHORTER-
MEARES, individually;
CONSTANCE ECHEBIRI, individually;
MIA DAWN TAYLOR, individually;
and CARMITA McMULLEN, individually,

        Plaintiffs,

v.

WALGREEN COMPANY,

        Defendant.

_____/

## PLAINTIFF, DELORES OKONMAH'S NOTICE OF SERVICE OF ANSWERS TO DEFENDANT'S SECOND SET OF INTERROGATORIES

Plaintiff, Delores Okonmah, by and through undersigned counsel, and in accordance with Fed. R. Civ. P. 33 and S.D. Fla. L.R. 26.1 G., hereby gives Notice of Service of Answers to Defendant's Second Set of Interrogatories.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this _____ day of November, 2000, to: Heather L. Gatley, Esq., Steel

Hector & Davis LLP, Attorneys for Defendant, 200 South Biscayne Blvd., 40th

Floor, Miami, Florida 33131-2398.

**MICHAEL M. TOBIN, P.A.**
Attorneys for Plaintiffs
1099 Ponce De Leon Blvd.
Coral Gables, Florida 33134-3319
Tel:    305-445-5475
Fax:    305-445-5479


_____

KELSAY D. PATTERSON
Fla. Bar No. 119784

2

## DELORES OKONMAH'S ANSWERS TO SECOND SET OF INTERROGATORIES

1. Walgreens has a subjective promotion policy and practice. There are no objective tests to measure the aptitude of a staff pharmacist for management, no test to measure the clinical competence of a staff pharmacist, nor are the vacant positions for pharmacy manager or pharmacy supervisor posted. As a practice, Walgreens has a policy of placing its black pharmacist in all black neighborhoods, or poor neighborhoods in areas of high crime. The special projects such as scheduling for the district for substitute and replacement pharmacist to fill-in for pharmacists on vacation or who have called in sick is an assignment that is subjectively and always given to non-black pharmacists. Black staff pharmacist and pharmacy mangers are virtually always sent to problem stores. A problem store is a store where various items are deficient such as the pharmacy department is operating at a loss with too much inventory on the shelves and failing to generate profit; the personnel have been improperly trained and pharmaceutical competence from the technicians becomes an issue. There is no management training through any formalized course to "bridge the gap". Any management mentoring by the pharmacy managers or the regional supervisors to the staff pharmacists is done on a purely subjective basis. Any management training, input, or feedback from a pharmacy manager or regional supervisor is done on a personal one on one level subjectively to whom management chooses rather than for all as a policy. Black pharmacists are given little feedback about their work performance, and the performance evaluations that are given are arbitrary and do not take place on any given or cycle. While there is no written policy specifying the objective requirements and credentials for placing a black pharmacy manager in a new Walgreens store that is scheduled to be open, black pharmacy managers have not been extended opportunities to open brand new pharmacy departments at new stores. Black staff pharmacists float and fill in as replacements for a much longer amount of time then their non-black counterparts unless the non-black counterparts have specifically requested it. Black pharmacists are not offered jobs near areas of town that are close to their homes, but instead assigned to stores that are either in low income high crime areas or all black neighborhoods.

2. A failure to be promoted. A failure to be informed and know of vacant positions to be eligible for applying for these positions. The incompetent staff at the problematic stores effect the department's overall performance including the key performance indicator. A more qualified staff will

usually have a better chance of meeting their KPI's. Qualified technicians are not being paid enough at the stores in all black neighborhoods and in low income high crime areas versus the technicians working in high income and middle class areas. This results in a problem hiring and retaining capable technicians in these bad stores because better stores will pay them more. Walgreens will allow and pay these technicians more at the "better"" stores making it impossible to compete for the pool of talented technicians. Lower wages in all black or bad neighborhoods fails to attract competent professionals. The failure to assign the special project of scheduling to black pharmacist results in less visibility to the black pharmacists to do a task that is clearly management in nature, and less qualified people are always transferred and assigned to the stores where black managers reside by the non-black district schedulers who are able to pick and choose the people they assign to stores as substitutes/replacements. Black pharmacists who must float indefinitely for great periods of time are put at a disadvantage because their performance cannot be critiqued on a daily basis by the same pharmacy manager, and without any consistency or continuity as a key contributor at a specific store it is also highly unlikely the black pharmacist in this perpetual state of floating would ever be considered for management.

3. Observation and personal experience in the work environment as described in interrogatories 1 and 2.

4. The lack of black pharmacists who occupy the positions of pharmacy manager and regional supervisor. The failure of Walgreens to allow black pharmacist to handle or be assigned the special project tacks of scheduling for the district. The subjectivity of promotions and the failure to post the various pharmaceutical vacancies for position like pharmacy manager and regional supervisor, being assigned problematic stores increases the amount of work, stress, and anxiety for the black pharmacy managers who are responsible for the aggregate results of the store's pharmacy department despite productivity levels and under trained staff members. Black pharmacists are always in large proportions at the 24 hour stores which is a difficult work shift because of the non-stop volume, and the constant schedule rotation. Black pharmacist including black pharmacy managers have their vacations, absences, and sick time scrutinized more closely than their non-black counterparts.

5. A full response has already be given in both interrogatory number 1, 2, and number 4. Please see those responses.

6. At a meeting for staff pharmacist at the district office in 1997, the Plaintiff heard district manager Ripak discuss a new area that Wagreens would soon venture into called Home Health Care. When the formal part of the meeting concluded, the Plaintiff approached Ripak and made several verbal inquiries about Home health Care as this new venture interested

her greatly especially considering her extensive history in home health care due to previous employment. Ripak brushed her aside and would not talk to her in general or in detail about the Home Health Care program, any time period for its implementation, nor did he direct her to anyone with more information on the matter then himself. Presently, Walgreens has recently put into implementation a home health care program known as Health Care Initiatives. In May of 1999, the Plaintiff requested a reduction of hours and asked for a split shift. District manager Ripak allowed the schedule change and told her that she would make a good pharmacy manager.

7. Nisa Fried, Ray Sawaged, Jean Bailey, Marty Martinez, Xaiver Zigler. My pharmacy experience exceeds the pharmacy experience of the above listed persons, and time with Walgreens should not be a factor as Vivian Ceballos a present pharmacy supervisor has been with Walgreens for approximately 4 years and in this short period of time has been promoted from staff pharmacist, to pharmacy manager, and now occupies the position of pharmacy supervisor.

8. Few blacks are in upper management, and few black pharmacy managers are given the opportunity to supervise non-black staff pharmacists. High crime areas in low income neighborhoods and/or stores located in all black neighborhoods are thought to be the domain and province of the black pharmacy managers and that can do nothing but contribute to a highly race segregated work force. The paragraphs in the Amended Complaint from 18 through 20 should be adopted and affirmed as part of this response.

9. I adopt the paragraphs in the Amended Complaint 18, 19, and 20 for this answer.

10. Please refer to interrogatory responses 1, 2, and I adopt paragraphs 18, 19,and 20 of the Amended Complaint.

11. No posting of the managerial vacancies at the stores including the position of regional supervisor make it impossible to know of the vacant positions. Because the positions are not posted, it is impossible to apply for a position not known to you that is vacant. The specific instances requested are a matter of a daily and ongoing policy and practice. For further clarification on this matter see the affidavit of Karl Meehan who affirms that positions are not posted.

12. Walgreens does not provide any formalized management training, mentoring is on a subjective basis determined by whom the pharmacy manager or supervisor personally selects to tutor, and give management instructional advice. See also responses to interrogatory 1, 2, and 4.

13. See interrogatory responses to numbers 11, 7, 4, and 1. The Defendant continues to request the same information about the same policies and discriminatory practices and the impact it has had upon myself and the

other Plaintiffs by rephrasing each of the questions. While the questions ask for the same information, the same information will not be given over and over again but these response will be referenced by previous fully answered responses.

14. See response to number 6 as it pertains to Health Initiatives. Additionally, the Plaintiff has never had a management offer extended to her and because managerial vacancies and promotions are not posted, advertised, or made known to her or the other black pharmacists, it is impossible to identify all of the job management vacancies that came into existence.

15. See number 1, there are no objective procedures in place, they are all subjective which forms part of the complaints as found in the Amended Complaint. Objective requirements and specifications are needed.

16. Managerial placements in new stores; stores without problems that include personnel and profit; assignment to stores in low crime areas; assignment to profitable stores; assignment to stores closer to home; permanent store for an assignment; the ability to schedule for the district and the ability to have the non-black pharmacists who are presently scheduling for the district to do it on a more fair basis; lunch breaks, and because 50% of the staff is supposed to come from the surrounding community, to allow the black pharmacy managers to pay more for competent technicians from outside the surrounding community knowing the level of income and education in the areas where the black pharmacy managers have been assigned.

17. There have been many days over the past four (4) years that I have left Walgreens I tears, with my blood pressure elevated, feeling sad, angry, frustrated, and sometime shocked. I have been treated poorly by store managers, pharmacy mangers, and others who act as if they hate you and by employees in non-management positions. During these four (4) years I have been subjective to poorly trained, unprofessional assistance, and inadequate help. I have been called names by people on both sides of the counter when I have attempted to maintain a professional environment in the work place. I have been a registered pharmacists, a respective health care professional for twenty (20) years, and I have never been treated in such a dehumanizing manner as has occurred over these four (4) years at Walgreens. What does this type of treatment need to lead to and why does one stay? I have stayed because I am the single support of my four (4) beautiful children as a divorced woman. I stayed because I need to money to support my family and the "job security" that Walgreens offers as a company to some of its employees. However, the cost over these four (4) years have been more doctor visits for asthma, stress, lower back pain, and elevated blood pressure. I believe in the power of God and miracles, so each day I go to Walgreens I go with a prayer. It is simply by my faith that I can do my job at Walgreens. I am there to help people who truly

need help. So, I sit in my car at the end of a shift sometimes and clam down, or I will share with my family the events that occurred that particular day, and i will be encouraged and loved enough to do it another day.

18. No I have never felt like this before.

19. This response incorporates paragraphs 123, 124, and 125 of the Amended Complaint. Additionally, Maria a staff pharmacist at store number 748 closed the store to distinct occasions due to her own personal reasons, and it would be impossible to close the pharmacy department without the store manager and pharmacy supervisor both having knowledge of the closure. Maria whose last name is unknown at this time was never disciplined, certainly not terminated, and after closing the store on one occasion was allowed to go ahead and do it a second time and still see no disciplinary action.

20. 1992 through 1994, Caremark, Miramar, Florida, Title: Clinical Pharmacists, 40 hours per week; 1994 through 1996, CAPS (Central Admixture Pharmacy Services), Miami Lakes, Florida, (305)821-1115 contact, Dionne. Title: IV Pharmacists, 40 hours per week; and 1996 to present, Walgreens, 11920 NW 27 Avenue, Miami, Florida 33167 (305)681-0970, title: Staff Pharmacist, 32 hours per week.

21. Every day/every week to the district scheduler.

22. This response should incorporate paragraph number 121 of the Amended Complaint, and as referenced in that paragraph, the customer's name is unknown by it occurred at store number 748.

23. This response should incorporate paragraph number 122 from the Amended Complaint. Noel Auerbach was the pharmacy department manager at store 748 and Albert Garcia was the pharmacy supervisor. The Plaintiff, Cherly Bell, and a staff pharmacists named "Clevand" last name unknown had to work the weekend and the long hours as described in paragraph number 122. Maria, also at store number 748 was also subjective to long hours as well.

24. This response should incorporate paragraphs 123, 124., and 125 of the Amended Complaint. On or about December 17th, the Plaintiff discovered that her paycheck had not been deposited into her direct account. This was not the first instance where a deposit had not been made and as company procedure, her paycheck should have then come from the cash from within the store to correct the temporary inconvenience. This matter was particularly problematic to the Plaintiff because it was so near the holiday season and she had previously written several checks for various gifts and expenses that would soon be returned for insufficient funds because the check was not deposited into her account. The Plaintiff had several phone calls throughout the day to Vivian Ceballos, the pharmacy supervisor, about the necessity of her pay being deposited into her

checking account due to the aforementioned reasons by the end of business day. Without question, the phone calls were indeed strained and tensions were running high because the pharmacy supervisor felt as though the Plaintiff's banking and checking problems were such that they could probably wait until the next business week irrespective of the representation being made to her by Plaintiff. The Plaintiff advised the pharmacy supervisor that if such would be of the extent of her assistance in her banking manager dilemma, she would have to take care of the matter for herself and that would require her to close the pharmacy department. Hours later, the pharmacy supervisor showed up at the store where Plaintiff was working, presented her pay in cash, asked her if she had any excuse for her conduct other than as previously explained, and when the Plaintiff responded "no", the pharmacy supervisor then terminated her. The Plaintiff came to learn that a store manager at store number 3782 named Ms. "Hill" had told Bernice Shorter-Meares that Vivian Ceballos intended and desperately wanted to terminate the Plaintiff weeks before this transaction or occurrence took place with respect to the failure to deposit her paycheck into her account on December 17th. With respect to the people who witnessed the conversation at the store between the Plaintiff and the pharmacy supervisor, Michael Ferguson witnessed the transaction as well as Valencia Wilson.

25. Maria, staff pharmacist at store number 748. Unsure of her personal reasons, but it occurred on two (2) instances. The pharmacy manger Noel Auerbach new about it as well as Norman Pierson the store manager and Hal Lunsik the pharmacy supervisor knew about it. Jean Bailey also closed a store for personal reasons at store number 3678.

26. The Plaintiff requested less than 40 hours by choice in May of 1999. The reasons presented at that time were the following: she will be closer to home, and she needed to reduce her personal anxiety and stress level.

8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO: 00-6151-CIV-HUCK/Brown

JOYCE WILLIAMS, individually;
MICHAEL FERGUSON, individually;
JOSEPH PATRICK McMULLEN,
individually; DELORES OKONMAH,
individually; BERNICE SHORTER·
MEARES, individually;
CONSTANCE ECHEBIRI, individually;
MIA DAWN TAYLOR, individually;
and CARMITA McMULLEN, individually,

        Plaintiffs,

v.

WALGREEN COMPANY,

        Defendant.
_____/

## PLAINTIFF, MIA DAWN TAYLOR'S  NOTICE OF SERVICE
## OF ANSWERS TO DEFENDANT'S SECOND SET OF INTERROGATORIES

Plaintiff, Mia Dawn Taylor, by and through undersigned counsel, and in

accordance with Fed. R. Civ. P. 33 and S.D. Fla L.R. 26.1 G., hereby gives Notice of

Service of Answers to Second Set of Interrogatories.

1

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was mailed

this _____ day of January, 2001, to: Heather L. Gatley, Esq., Steel Hector & Davis LLP,

Attorneys for Defendant, 200 South Biscayne Blvd., 40th Floor, Miami, Florida 33131-

2398.

> **MICHAEL M. TOBIN, P.A.**
> Attorneys for Plaintiffs
> 1099 Ponce De Leon Blvd.
> Coral Gables, Florida 33134-3319
> Tel:    305-445-5475
> Fax:   305-445-5479
>
>
> _____
>
> KELSAY D. PATTERSON
> Fla. Bar No. 119784

2

## TAYLOR'S ANSWERS TO SECOND SET OF INTERROGATORIES

1.  Walgreens has a subjective promotion policy and practice. There are no objective tests to measure the aptitude of a staff pharmacist for management, no test to measure the clinical competence of a staff pharmacist, nor are the vacant positions for pharmacy manager or pharmacy supervisor posted. As a practice, Walgreens has a policy of placing its black pharmacist in all black neighborhoods, or poor neighborhoods in areas of high crime. The special projects sucn as scheduling for the district for substitute and replacement pharmacist to fill-in for pharmacists on vacation or who have called in sick is an assignment that is subjectively and always given to non-black pharmacists. Black staff pharmacist and pharmacy mangers are virtually always sent to problem stores. A problem store is a store where various items are deficient  such as the pharmacy department is operating at a loss with too much  inventory on the shelves and failing to generate profit; the personnel have been improperly trained and pharmaceutical competence from the technicians becomes an issue. There is no management training through any formalized course to "bridge the gap". Any management mentoring by the pharmacy managers or the regional supervisors to the staff pharmacists is done on a purely subjective basis. Any management training, input, or feedback from a pharmacy manager or regional supervisor is done on a personal one on one level subjectively to whom management chooses rather than for all as a policy. Black pharmacists are given little feedback about their work

3

performance, and the performance evaluations that are given are arbitrary and do not take place on any given cycle. While there is no written policy specifying the objective requirements and credentials for placing a black pharmacy manager in a new Walgreens store that is scheduled to be open, black pharmacy managers have not been extended opportunities to open brand new pharmacy departments at new stores. Black staff pharmacists float and fill in as replacements for a much longer amount of time then their non-black counterparts unless the non-black counterparts have specifically requested it. Black pharmacists are not offered jobs near areas of town that are close to their homes, but instead assigned to stores that are either in low income high crime areas or all black neighborhoods.

2.   A failure to be promoted. A failure to be informed and know of vacant positions to be eligible for applying for these positions. The incompetent staff at the problematic stores effect the department's overall performance including the key performance indicator. A more qualified staff will usually have a better chance of meeting their KPI's. Qualified technicians are not being paid enough at the stores in all black neighborhoods and in low income high crime areas versus the technicians working in high income and middle class areas. This results in a problem hiring and retaining capable technicians in these bad stores because better stores will pay them more. Walgreens will allow and pay these technicians more at the "better"" stores making it impossible to compete for the pool of talented technicians. Lower wages in all black or

4

bad neighborhoods fails to attract competent professionals. The failure to assign the special project of scheduling to black pharmacist results in less visibility to the black pharmacists to do a task that is clearly management in nature, and less qualified people are always transferred and assigned to the stores where black managers reside by the non-black district schedulers who are able to pick and choose the people they assign to stores as substitutes/replacements. Black pharmacists who must float indefinitely for great periods of time are put at a disadvantage because their performance cannot be critiqued on a daily basis by the same pharmacy manager, and without any consistency or continuity as a key contributor at a specific store it is also highly unlikely the black pharmacist in this perpetual state of floating would ever be considered for management.

3. Observation and personal experience in the work environment as described in interrogatories 1 and 2.

4. The lack of black pharmacists who occupy the positions of pharmacy manager and regional supervisor. The failure of Walgreens to allow black pharmacist to handle or be assigned the special project tacks of scheduling for the district. The subjectivity of promotions and the failure to post the various pharmaceutical vacancies for position like pharmacy manager and regional supervisor, being assigned problematic stores increases the amount of work, stress, and anxiety for the black pharmacy managers who are responsible for the aggregate results of the store's pharmacy department

5

despite productivity levels and under trained staff members. Black pharmacists are always in large proportions at the 24 hour stores which is a difficult work shift because of the non-stop volume, and the constant schedule rotation. Black pharmacists including black pharmacy managers have their vacations, absences, and sick time scrutinized more closely than their non-black counterparts.

5.  A full response has already be given in both interrogatory number 1, 2, and number 4. Please see those responses.

6.  Approximately Jan.1999

7.  Nisa Fried, Ray Sawaged, Jean Bailey, Marty Martinez, Xaiver Zigler. My pharmacy experience exceeds the pharmacy experience of the above listed persons, and time with Walgreens should not be a factor as Vivian Ceballos a present pharmacy supervisor has been with Walgreens for approximately 4 years and in this short period of time has been promoted from staff pharmacist, to pharmacy manager, and now occupies the position of pharmacy supervisor.

8.  Few blacks are in upper management, and few black pharmacy managers are given the opportunity to supervise non-black staff pharmacists. High crime areas in low income neighborhoods and/or stores located in all black neighborhoods are thought to be the domain and province of the black pharmacy managers and that can do nothing but contribute to a highly race segregated work force. The paragraphs in

6

the Amended Complaint from 18 through 20 should be adopted and affirmed as part of this response.

9.   I adopt the paragraphs in the Amended Complaint 18, 19, and 20 for this answer.

10. Please refer to interrogatory responses 1, 2, and I adopt paragraphs 18, 19,and 20 of the Amended Complaint.

11. No posting of the managerial vacancies at the stores including the position of regional supervisor make it impossible to know of the vacant positions. Because the positions are not posted, it is impossible to apply for a position not known to you that is vacant. The specific instances requested are a matter of a daily and ongoing policy and practice. For further clarification on this matter see the affidavit of Karl Meehan who affirms that positions are not posted.

12. Walgreens does not provide any formalized management training, mentoring is on a subjective basis determined by whom the pharmacy manager or supervisor personally selects to tutor, and give management instructional advice. See also responses to interrogatory 1, 2, and 4.

13. See interrogatory responses to numbers 11, 7, 4, and 1. The Defendant continues to request the same information about the same policies and discriminatory practices and the impact it has had upon myself and the other Plaintiffs by rephrasing each of the questions. While the questions ask for the same information, the same information

will not be given over and over again but these response will be referenced by previous fully answered responses.

14. Additionally, the Plaintiff has never had a management offer extended to her and because managerial vacancies and promotions are not posted, advertised, or made known to her or the other black pharmacists, it is impossible to identify all of the job management vacancies that came into existence, but the Defendant would know of all the pharmacy management vacancies in 1995, 1996, 1997, 1998, and 1999 in Florida.

15. See number 1, there are no objective procedures in place, they are all subjective which forms part of the complaints as found in the Amended Complaint. Objective requirements and specifications are needed.

16. Managerial placements in new stores; stores without problems that include personnel and profit; assignment to stores in low crime areas; assignment to profitable stores; assignment to stores closer to home; permanent store for an assignment; the ability to schedule for the district and the ability to have the non-black pharmacists who are presently scheduling for the district to do it on a more fair basis; lunch breaks, and because 50% of the staff is supposed to come from the surrounding community, to allow the black pharmacy managers to pay more for competent technicians from outside the surrounding community knowing the level of income and education in the areas where the black pharmacy managers have been assigned.

8

17. Over the course of the past two years, I along with others have witnessed and can attest to continuous changes in which I have endured professionally, physically, emotionally, domestically, and spiritually, all of which I strongly believe are attributed to Walgreens. Professionally, despite my performance evaluations, merits, and concentrated efforts, I was not rewarded with any type of job advancement. I felt as though I was not perceived as an equal in comparison to fellow pharmacists.   I witnessed noticeable subtleties and distinctions in what appeared to be double standards regarding treatment practices. Specifically, certain things did not seem to matter with some of my colleagues. Yet, that did not seem to be the case with me in respect to those very same things. My judgment appeared to be more scrutinized and more questioned in general, mainly in relation to two separate medical leaves. One pertained to my daughter's surgery, the other pertained to mine. At said times, my then supervisor, Albert Garcia still felt the need to challenge the legitimacy of the leave, despite my having submitted the appropriate documentation required from my doctor in advance. My judgment has also been questioned in reference to my daughter's scheduled surgery in November of 1999, by my current supervisor, Vivian Ceballos.  In addition, I became apprehensive about initiating or performing any additional duties outside of my outlined job description, which perhaps further added to narrowing my chances for advancement. Physically, I have experienced headaches on a regular  basis. Initially, they were mild, yet aggravating. later, they progressed to migraines, which required me to

take prescription medication as well as over the counter medicine. I also experienced extensive weight gain, most of which I still have today. Hair Loss, adult on-set acne, and insomnia were additional experiences I encountered.  On the average, I acquired about five hours of sleep nightly. Needless to say, resulted in my being overly fatigued, stressed, irritable, and moody.  On many occasions when I was able to sleep, I would have dreams that somehow connected to Walgreens. Emotionally and mentally I was exhausted and my self worth was an ongoing challenge and primarily my overall morale was low. This lead me to seek solace spiritually, by confiding in and praying with a close friend and family member. As a result of my emotional , physical and mental exertion, my domestic life was affected. My daughter has suffered the hardest brunt of all, in my opinion. In that, there was a deficiency in the essential time needed  necessary for her pivotal developing years. Unfortunately this lack of sufficiency of time can be viewed as precious time missed from mother/daughter bonding moments. However, this is time lost that can never be replaced.

18. No - Never.

19. The non- Black pharmacists I can respectfully identify to the best of my recollection as being hired around the same time as I are: Steven Valley and Ann-Marie Voss. If they were not hired around the same time they became licensed Pharmacist around the same time as I. I don't know their specific qualification, their respective assigned stores were:

Steven Valley- Store No.1530
3552 S. University Drive
Miramar, Florida 33025; and

Ann-Marie Voss- Store No. 3525
6817 Taff Street
Hollywood, Florida 33024

Initially, I was told by my then pharmacy supervisor that I would be floating until a store became available. However, I did not make an effort to inquire about being permanently assigned until gaining knowledge of my pregnancy in December of 1990.

20.  These are the names of the non-black pharmacists that were afforded the opportunity of working as scheduler (person responsible for scheduling replacement pharmacists for stores in need due to insufficient staffing due to various reasons). These people also work closely with the pharmacy supervisor and is more likely to become acquainted with fellow colleges. Therefore, being more visible to all.  As for the qualifications I was not aware and am still not aware of what is required to be considered for such positions. As for a trainer or recruiter I was aware of such available qualifications needed to be considered for such positions, but I have never expressed any desired interest. Specifically, just a desire to be advanced and/or promoted. I have never known of when Walgreens has sought to fill positions for trainer/recruiter. These vacancies are not posted.

Steven Valley
Ann-Marie Voss
Ray Sawaged

11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO: 00-6151-CIV-HUCK/Brown

JOYCE WILLIAMS, individually;
MICHAEL FERGUSON, individually:
JOSEPH PATRICK McMULLEN,
individually; DELORES OKONMAH,
individually; BERNICE SHORTER-
MEARES, individually;
CONSTANCE ECHEBIRI, individually;
MIA DAWN TAYLOR, individually;
and CARMITA McMULLEN, individually,

        Plaintiffs,

v.

WALGREEN COMPANY,

        Defendant.
_____/

### PLAINTIFF, JOYCE WILLIAMS' NOTICE OF SERVICE OF ANSWERS TO DEFENDANT'S SECOND SET OF INTERROGATORIES

Plaintiff, Joyce Williams, by and through undersigned counsel, and in accordance

with Fed. R. Civ. P. 33 and S.D. Fla. L.R. 26.1 G., hereby gives Notice of Service of

Answers to Second Set of Interrogatories.

1

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was mailed

this _____ day of January, 2001, to: Heather L. Gatley, Esq., Steel Hector & Davis LLP,

Attorneys for Defendant, 200 South Biscayne Blvd., 40th Floor, Miami, Florida 33131-

2398.

**MICHAEL M. TOBIN, P.A.**
Attorneys for Plaintiffs
1099 Ponce De Leon Blvd.
Coral Gables, Florida 33134-3319
Tel:    305-445-5475
Fax:    305-445-5479


_____
KELSAY D. PATTERSON
Fla. Bar No. 119784

2

## WILLIAMS' ANSWERS TO SECOND SET OF INTERROGATORIES

1.   Walgreens has a subjective promotion policy and practice. There are no objective tests to measure the aptitude of a staff pharmacist for management, no test to measure the clinical competence of a staff pharmacist, nor are the vacant positions for pharmacy manager or pharmacy supervisor posted. As a practice, Walgreens has a policy of placing its black pharmacist in all black neighborhoods, or poor neighborhoods in areas of high crime. The special projects such as scheduling for the district for substitute and replacement pharmacist to fill-in for pharmacists on vacation or who have called in sick is an assignment that is subjectively and always given to non-black pharmacists. Black staff pharmacist and pharmacy mangers are virtually always sent to problem stores. A problem store is a store where various items are deficient  such as the pharmacy department is operating at a loss with too much  inventory on the shelves and failing to generate profit; the personnel have been improperly trained and pharmaceutical competence from the technicians becomes an issue. There is no management training through any formalized course to "bridge the gap". Any management mentoring by the pharmacy managers or the regional supervisors to the staff pharmacists is done on a purely subjective basis. Any management training, input, or feedback from a pharmacy manager or regional supervisor is done on a personal one on one level subjectively to whom management chooses rather than for all as a policy. Black pharmacists are given little feedback about their work

3

performance, and the performance evaluations that are given are arbitrary and do not take place on any given cycle. While there is no written policy specifying the objective requirements and credentials for placing a black pharmacy manager in a new Walgreens store that is scheduled to be open, black pharmacy managers have not been extended opportunities to open brand new pharmacy departments at new stores. Black staff pharmacists float and fill in as replacements for a much longer amount of time then their non-black counterparts unless the non-black counterparts have specifically requested it. Black pharmacists are not offered jobs near areas of town that are close to their homes, but instead assigned to stores that are either in low income high crime areas or all black neighborhoods.

2.  A failure to be promoted. A failure to be informed and know of vacant positions to be eligible for applying for these positions. The incompetent staff at the problematic stores effect the department's overall performance including the key performance indicator. A more qualified staff will usually have a better chance of meeting their KPI's. Qualified technicians are not being paid enough at the stores in all black neighborhoods and in low income high crime areas versus the technicians working in high income and middle class areas. This results in a problem hiring and retaining capable technicians in these bad stores because better stores will pay them more. Walgreens will allow and pay these technicians more at the "better"" stores making it impossible to compete for the pool of talented technicians. Lower wages in all black or

4

bad neighborhoods fails to attract competent professionals. The failure to assign the special project of scheduling to black pharmacist results in less visibility to the black pharmacists to do a task that is clearly management in nature, and less qualified people are always transferred and assigned to the stores where black managers reside by the non-black district schedulers who are able to pick and choose the people they assign to stores as substitutes/replacements. Black pharmacists who must float indefinitely for great periods of time are put at a disadvantage because their performance cannot be critiqued on a daily basis by the same pharmacy manager, and without any consistency or continuity as a key contributor at a specific store it is also highly unlikely the black pharmacist in this perpetual state of floating would ever be considered for management.

3.   Observation and personal experience in the work environment as described in interrogatories 1 and 2.

4.   The lack of black pharmacists who occupy the positions of pharmacy manager and regional supervisor. The failure of Walgreens to allow black pharmacist to handle or be assigned the special project tacks of scheduling for the district. The subjectivity of promotions and the failure to post the various pharmaceutical vacancies for position like pharmacy manager and regional supervisor, being assigned problematic stores increases the amount of work, stress, and anxiety for the black pharmacy managers who are responsible for the aggregate results of the store's pharmacy department

5

despite productivity levels and under trained staff members. Black pharmacists are always in large proportions at the 24 hour stores which is a difficult work shift because of the non-stop volume, and the constant schedule rotation. Black pharmacists including black pharmacy managers have their vacations, absences, and sick time scrutinized more closely than their non-black counterparts.

5. A full response has already be given in both interrogatory number 1, 2, and number 4. Please see those responses.

6. When I was hired in 1993, I talked to supervisor Jon Steele about my experience and the opportunities to advance in pharmacy and store management. Thereafter I indicated it each year on a questionnaire asking you to state or identify your professional interest and your desire for achievement. I later wrote a letter to Mr. Kipp on September of 1994 and asked him again for management consideration.

7. Tracy Yoder; Heather Siminski; John Sivon; Sandra Anderson; Kimberly Chapman; Matthew Christ; Karen Hale; Doug Healy; Paul Whitt; and Evelio Prieto.

8. Few blacks are in upper management, and few black pharmacy managers are given the opportunity to supervise non-black staff pharmacists. High crime areas in low income neighborhoods and/or stores located in all black neighborhoods are thought to be the domain and province of the black pharmacy managers and that can do nothing but contribute to a highly race segregated work force. The paragraphs in

6

the Amended Complaint from 18 through 20 should be adopted and affirmed as part
of this response.

9.  If non-black RPH decided to him/herself that they were not going back to a
store, they would not be assigned, for example, I was traveling to a store in Spring Hill
in 1996. I was usually the only woman to be consistently sent to Spring Hill when there
were many floating RPH's.  Nancy McGowar, Sandy Anderson and other white RPH's
refused to go there and were not sent. Ms. Anderson refused to go to the store in a
black area on Hillsborough Avenue, #3458. Another example, of preferential treatment
occurred with pharmacy manager Kenny Coats when he was caught for writing a
prescription without physician approval. He was given a ten (10) day suspension and
still remains a RPH manager. If it has been a black manager, they would have been
fired. During the ordeal, they tried to say that I had refilled Stadol without
authorization. I think I received fourteen (14) days suspension and there was no proof
that I did not have MD's approval. It was proved that coats lacked the physician's
approval, yet I was suspended longer without proof.

10. The black pharmacists were more apt to be in a store that was deemed as a
problem store, high volume-high Medicaid. The stores that were less attractive to
white RPH's were usually in black or Hispanic areas. White pharmacists received the
less volume more affluent stores and refused stores like #938.

7

11. No posting of the managerial vacancies at the stores including the position of regional supervisor makes it impossible to know of the vacant positions. Because the positions are not posted, it is impossible to apply for a position not known to you that is vacant. The specific instances requested are a matter of a daily and ongoing policy and practice. For further clarification on this matter see the affidavit of Karl Meehan who affirms that positions are not posted.

12. Walgreens does not provide any formalized management training, mentoring is on a subjective basis determined by whom the pharmacy manager or supervisor personally selects to tutor, and give management instructional advice. See also responses to interrogatory 1, 2, and 4.

13. See interrogatory responses to numbers 11, 7, 4, and 1. The Defendant continues to request the same information about the same policies and discriminatory practices and the impact it has had upon myself and the other Plaintiffs by rephrasing each of the questions. While the questions ask for the same information, the same information will not be given over and over again but these response will be referenced by previous fully answered responses.

14. As a floater pharmacist, I was usually assigned to stores that were either far away from my home and less attractive hours. I learned of this by looking over the floaters schedules which each store received monthly. I was constantly given more difficult stores further away from my home, more nights, and weekends.

8

15. See number 1, there are no objective procedures in place, they are all subjective which forms part of the complaints as found in the Amended Complaint. Objective requirements and specifications are needed.

16. Managerial placements in new stores; stores without problems that include personnel and profit; assignment to stores in low crime areas; assignment to profitable stores; assignment to stores closer to home; permanent store for an assignment; the ability to schedule for the district and the ability to have the non-black pharmacists who are presently scheduling for the district to do it on a more fair basis; lunch breaks, and because 50% of the staff is supposed to come from the surrounding community, to allow the black pharmacy managers to pay more for competent technicians from outside the surrounding community knowing the level of income and education in the areas where the black pharmacy managers have been assigned.

17. In 1994 when I attempted to get a transfer to Tampa from St. Pete and had to deal with supervisor Bob Kipp. My problems began with him asking the pharmacy manager to harass me and by manufacturing a disciplinary paper trail. I began to have migraine headaches. I went to see Dr. Bruce Kahan and was given Stadol and Vorahpil Imitrex. At one point I was having a very difficult time sleeping as well and sought professional help from Psychiatrist Dr. Sheep. I was subjected to much humiliation when Walgreens searched my personal belongings and was put in a state of depression as I have had to play this game of retaliation for making this and other claims. When Mr. Kipp said that I

9

wrote my own prescriptions, I was emotionally bankrupt. They wrote me up for ridiculous claims such as me having a technician come in off the clock to make my orders.

18. My migraines were the result of the tension I was subjected to at work. I was going through tremendous stress that was deliberately designed to stagnate me. I would get hives and to see an allergist. I was given Zytec in an attempt to treat hives. I also had insomnia, fatigue, nightmares, and depression.

19. Tracy Peiska. I have approximately twenty (20) years more of experience. I called supervisor Bhardi regarding her placement at #265 and sent him an e-mail which he did not respond. I later came in contact with him, and he told me that he was "grooming" her for a management position. He was aware that I was interested in management and a permanent store. However, I continued to float while there were many permanent assignments.

20. Mr. Kipp told the pharmacy manager to document any and all points of contentions. He polluted the environment at the store that I worked in so much that on the first week, I wrote him about the hostile environment. Mr. Kipp was known for his dislike of blacks. When I first came to his district, he would assign me to a store that was in Spring Hill three (3) to four (4) time a week and it took me over an hour to get there.

21. I was working the night shift at the store on W. Hillsborough Avenue. This was after I had gone over Kipp's head to get to Tampa. I went to my car around 3:00 a.m. to

get some equal tablets that were there. When I got back to the pharmacy, I had the tablet container and a piece of the wrapper from my car. I was filling/emptying prescription bottles. I took the piece of paper and put it in the bottle and disposed of it. They had a camera in the area I was working in. Around 6:00 a.m., the store manager and Mr. Kipp came in and retrieved the bottle with the paper in it. They asked me to go to the back room and asked what I had put in the bottle and why. I explained to them the situation. I suggested that if they had a tape of me, they should use their evidence. The fact was that I knew that this was again a ploy to harass me. The reason why I put the paper in the bottle was because I recognized that they were looking for anything on me like a witch hunt.

22. When I moved to #938 I was disciplined (written up) for nor completing tasks or RX that came in prior to 8:00 a.m., Mr. Kipp asked Russell Myers to write me up for any and all events. I was written up for not filling some RX's that were faxed in when they were not even faxed to me. I was written up for filling my own prescription when there had been no policy prohibiting this. Randy and supervisor Martin Northrop also accused me of paying a technician to come in off the clock and put up warehouse orders. They brought in lost prevention and went through the entire process in an attempt to harass me.

23. Randy Redick, store manager, was soliciting Mr. Kipp to harass me and when I went to work in his store, not only did he participate in this but he also went through my

11

file and discussed my medical history with others. He maligned me in my absence

therefore making it difficult to work with respect and dignity around the other

pharmacists. White pharmacists were not having their personal files and medical

problems open to uninvited discussions with or other employees. There were many

white pharmacists that were customer service antagonist: Paul Whitt, Warren Stretke,

Steve Stock, and Harrell Arnoff. They received complaints all of the time. Paul Whitt is a

pharmacy manager and has been reassigned numerous times.

24. Holly Provance; Laura Jenen; Evelio Prieto; Matt Christ; Tracy Yoder; Heather

Lichner; Kim Chapman; Fon Chun; Tracy Peisak; Tracy Harris; Karen Hile; Steve

Hitchcock; Frank Vega; and John Sivon.

25. This includes pharmacy manager positions all over Tampa since stores are

continuously being opened, and the position of store manager.  Unfortunately since

positions were never posted. I was made aware once the positions were already filled.

The positions are filled and selected by supervisors.

26. Dr. Bruce Kahan, primary physician: saw him for headaches and insomnia; Dr.

Hardelp, psychiatry-saw him for depression, headaches, and insomnia; Dr. Bray-

gynecology; Dr. H. Castelli-ortho; Dr. E. Feldman-ortho; Dr. R. Fox-allergist; Dr. Frank-

headaches; and Dr. Crespo.

27. Yes. There is a history of failure to promote black pharmacists  in most of the

pharmacy business. Kash and Karry had a similar problem and I did file a case against

them. However, it was dismissed for failure to prosecute. I personally filed it. I feel I

have an obligation to fight racial inequities.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6151-Civ-Ungaro-Benages/Brown

JOYCE WILLIAMS, individually;
MICHAEL FERGUSON, individually;
JOSEPH PATRICK MCMULLEN,
individually; DELORES OKONMAH,
individually; BERNICE SHORTER-
MEARES, individually; CONSTANCE
ECHEBIRI, individually; MIA DAWN
TAYLOR, individually; CARMITA
MCMULLEN, individually;

        Plaintiffs,

vs.

WALGREEN COMPANY,

        Defendant.

_____/



## WALGREENS' SUPPLEMENTAL RESPONSE
## TO PLAINTIFFS' REQUEST FOR PRODUCTION

    Defendant Walgreen Co. ("Walgreens") supplements its responses to Plaintiffs' Request for Production.

### Supplemental Response to Plaintiffs' Request for Production

    6.    Produce any and all letters from January 1, 1995 through January 1, 2000 wherein a black pharmacist employed by the Defendant in the State of Florida was offered the opportunity to interview for the position of pharmacy supervisor in the Florida market area.

    **RESPONSE:** Walgreens does not have any documents responsive to this request.

9.    Provide a complete list of all black pharmacists employed in the Florida market area by the Defendant between the time period of January 1, 1995 through January 1, 2000.

**RESPONSE:** Subject to, but without waiving, Walgreens' prior objections to this production request, and in accordance with this Court's Order dated September 27, 2000, Walgreens states that the number of black pharmacists in the districts where Plaintiffs worked from January 1, 1995, through January 1, 2000, is as follows:

| District | Total Number of Black Pharmacists |
|---|---|
| Ft. Lauderdale South | 43 |
| Miami North | 153 |
| Miami South | 38 |
| Orlando South | 80 |
| Tampa East | 50 |
| Tampa North | 90 |
| Tampa West | 34 |
| **Totals** | **488** |

10.    Provide a complete list of all pharmacists including black pharmacists employed by the Defendant in the Florida market area between the time period of January 1, 1995 through January 1, 2000.

**RESPONSE:** Subject to, but without waiving, Walgreens' prior objections to this production request, and in accordance with this Court's Order dated September 27, 2000, Walgreens states that the number of pharmacists, including black pharmacists, in the districts where Plaintiffs worked from January 1, 1995, through January 1, 2000, is as follows:

| District | Total Number of Pharmacists |
|---|---|
| Ft. Lauderdale South | 176 |

2

| District | Total Number of Pharmacists |
|----------|----------------------------|
| Miami North | 416 |
| Miami South | 396 |
| Orlando South | 436 |
| Tampa East | 416 |
| Tampa North | 532 |
| Tampa West | 472 |
| **Totals** | **2844** |

Respectfully submitted,
STEEL HECTOR & DAVIS LLP
Attorneys for Defendant Walgreen Co.
200 South Biscayne Boulevard
Miami, Florida 33131-2398
(305) 577-7000 Telephone
(305) 577-7001 Telecopier

By: _____
    Edwin G. Torres
    Florida Bar No. 911569
    Heather L. Gatley
    Florida Bar No. 0050482
    Brian L. Lerner
    Florida Bar No. 0177202

3

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this 29th day of September, 2000, to:

Kelsay D. Patterson, Esq.
Law Offices of Michael M. Tobin, P.A.
1099 Ponce De Leon Blvd.
Coral Gables, Florida 33134-3319

By: _____

Brian L. Lerner

4

5.      Provide all of the W-2 forms for each of the respective named Plaintiffs for each year from 1993 through 1999.

**RESPONSE:** Subject to the confidentiality agreement and order entered into by the parties, Walgreens will produce for inspection and copying documents responsive to this request. Because it would impose an undue burden on Walgreens to locate the actual W-2 forms, Walgreens will produce earning summaries for each of the plaintiffs for each year from 1993 through 1999.

6.      Produce any and all letters from January 1, 1995 through January 1, 2000 wherein a black pharmacist employed by the Defendant in the State of Florida was offered the opportunity to interview for the position of pharmacy supervisor in the Florida market area.

**RESPONSE:** At least since April 1, 1997, Walgreens has not sent letters to any pharmacists in Florida offering them the opportunity to interview for a Pharmacy Supervisor position in Florida. Therefore, Walgreens does not have any documents responsive to this request.

7.      Produce any and all letters directed to black pharmacist employed by the Defendant between January 1, 1995 through January 1, 2000 wherein the pharmacist was offered the opportunity to interview for a district manager position in the Florida market area.

**RESPONSE:** Walgreens does not have any documents responsive to this request. The only individuals considered for District Manager positions were persons with store management experience.

8.      Produce all letters from black pharmacist employed by the Defendant between January 1, 1995 through January 1, 2000 in the Florida market area wherein the opportunity to interview for a pharmacy supervisor and/or district manager position was declined or rejected.

**RESPONSE:** Walgreens does not have any documents responsive to this request.

5



PLAINTIFF'S
EXHIBIT
4

## RATINGS CHART

| NAME | RATING DATE | SCORE |
|------|-------------|-------|
| Noel Auerbach | 08/01/1999 | 81 |
| Vivian Ceballos | 08/01/1999 | 81 |
| Philip Chen | 08/01/1999 | 80 |
| Angela Cure | 08/01/1999 | 81 |
| Michael Ferguson | 08/01/1998 | 74 |
| Georgia Lentzos | 08/01/1998 | 85 |



PLAINTIFF'S
EXHIBIT
5

JW/WG 030327

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Case No. 00-6151-CIV-UNGARO-BENAGES

JOYCE WILLIAMS, et al.,
    Plaintiffs,

vs.

WALGREEN COMPANY,
    Defendant.
_____/



FILED by _____ D.C.

APR 1 8 2000

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## ORDER

    THIS CAUSE is before the Court upon Plaintiffs' Motion for Voluntary Dismissal of the Case as a Class Action without Prejudice and Voluntary Dismissal of Certain Named Plaintiffs, Individually, without Prejudice, filed April 10, 2000.

    THE COURT has considered the Motion, the pertinent portions of the record and being otherwise fully advised in the premises, it is hereby

    ORDERED AND ADJUDGED that the Motion is GRANTED and this case is DISMISSED without prejudice as a class action.  In making this ruling, the Court finds that the precertification dismissal of the class claims is not the product of collusion and the putative class members will not be prejudiced. *See Gunn v. World Omni Financial Corp.*, 184 F.R.D. 417, 419 (M.D. Ala. 1999); *Anderberg v. Masonite Corp.*, 176 F.R.D. 682, 689-90 (N.D. Ga. 1997). Additionally, the individual claims of Plaintiffs Kim Colston, Lester Henderson and Joseph Smith are DISMISSED without prejudice.

    DONE AND ORDERED in Chambers at Miami, Florida, this _//_ day of April, 2000.

URSULA UNGARO-BENAGES
UNITED STATES DISTRICT JUDGE

copies provided:
counsel of record



PLAINTIFF'S
EXHIBIT
_6_